No. 25-6038

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

LINNEY'S PIZZA, LLC,

Plaintiff-Appellant,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

Defendant-Appellee,

and

BANK POLICY INSTITUTE, and CLEARING HOUSE ASSOCIATION, LLC,

Proposed Intervenors.

On Appeal from the United States District Court for the
Eastern District of Kentucky, No. 3:22-cv-00071 (Van Tatenhove, J.)

## BRIEF OF APPELLANT LINNEY'S PIZZA, LLC

Jennifer Kincaid Adams
BLACKBURN DOMENE BURCHETT
PLLC
614 W. Main Street, Suite 3000
Louisville, KY 40202
(502) 584-1600
jadams@bdblawky.com

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main St., 5th Fl.
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Bryan Weir
Frank H. Chang
Cody Ray Milner
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Appellant Linney's Pizza, LLC is not a subsidiary or affiliate of a publicly owned corporation, and no corporation has a substantial financial interest in the outcome of this litigation.

## TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................... i

Table of Contents ......................................................................................... ii

Table of Authorities .................................................................................... iv

Statement in Support of Oral Argument ..................................................... xi

Statement of Jurisdiction ..............................................................................1

Statement of the Issues ..................................................................................1

Statement of the Case ....................................................................................2

A.    Congress directs the Board to regulate debit-card interchange fees ........2

    1.    Debit-card interchange fees. ..............................................................2

    2.    Congress passes the Durbin Amendment, which directs the Board to set an interchange-fee standard. ...................................................5

B.    The Board proposes a 12-cent cap, but issuer banks successfully lobby the Board to nearly double the fee in the Final Rule. ............................7

    1.    The Proposed Rule. ...........................................................................7

    2.    Regulation II ......................................................................................8

C.    A federal district court vacates Regulation II, but the D.C. Circuit saves it on appeal only through Chevron deference ..........................................9

D.    The Board issues an Updated Rule. .....................................................11

E.    Linney's Pizza sues ..............................................................................11

Summary of the Argument ...........................................................................13

Standard of Review ......................................................................................14

Argument ......................................................................................................16

I.    Regulation II is contrary to law and exceeds the Board's statutory authority ...................................................................................................16

    A.    The Board lacks discretion to depart from Congress's commands in the Durbin Amendment ........................................................................16

    B.    Regulation II contradicts the Durbin Amendment by creating a third category of costs out of statutory silence. .............................17

C.  Regulation II contradicts the Durbin Amendment by including prohibited costs in the fee standard. ................................................47

D.  Regulation II contradicts the Durbin Amendment by setting a one-size-fits-all cap. .................................................................................59

II.  Regulation II's fee standard is arbitrary and capricious. ........................63

A.  The Board ignored the functional similarity between debit-card and checking transactions.................................................................63

B.  Regulation II considered unauthorized costs and failed to rationalize those inclusions ............................................................67

C.  The Board bypassed issuer- and transaction-specific costs in favor of hypothetical averages for a universal cap....................................70

III.  Regulation II's fee standard should be vacated ......................................71

Conclusion....................................................................................................72

Certificate of Compliance...............................................................................74

Certificate of Service ......................................................................................74

Addendum ......................................................................................................a

# TABLE OF AUTHORITIES

**Cases**

*Air All. Hous. v. EPA,*
   906 F.3d 1049 (D.C. Cir. 2018) ...................................................................42

*Alabama v. North Carolina,*
   560 U.S. 330 (2010) .....................................................................................25

*Alaska Airlines, Inc. v. Brock,*
   480 U.S. 678 (1987) .....................................................................................40

*All. for Fair Bd. Recruitment v. SEC,*
   125 F.4th 159 (5th Cir. 2024) ......................................................................34

*Allen v. Milligan,*
   599 U.S. 1 (2023) .........................................................................................19

*Am. Bus. Ass'n v. Slater,*
   231 F.3d 1 (D.C. Cir. 2000) ...................................................................59, 60

*ANR Storage Co. v. FERC,*
   904 F.3d 1020 (D.C. Cir. 2018) ...................................................................70

*AT&T Mobility LLC v. Concepcion,*
   563 U.S. 333 (2011) .....................................................................................34

*Biden v. Nebraska,*
   143 S.Ct. 2355 (2023) ......................................................................29, 32, 33

*Bittner v. United States,*
   598 U.S. 85 (2023) .......................................................................................26

*Blanton v. Domino's Pizza Franchising LLC,*
   962 F.3d 842 (6th Cir. 2020) .......................................................................21

*Bridgeport Hosp. v. Becerra,*
   108 F.4th 882 (D.C. Cir. 2024) ...............................................................33, 60

*Brown-Forman Corp. v. NLRB,*
   169 F.4th 646 (6th Cir. 2026) ......................................................................16

*Bufkin v. Collins,*
    145 S.Ct. 728 (2025) ...................................................................18, 19

*Canaday v. Anthem Co., Inc.,*
    9 F.4th 392 (6th Cir. 2021) .................................................................27

*Chevron, U.S.A. v. NRDC, Inc.,*
    467 U.S. 837 (1984) ............................................................................10

*Clayman v. Goodman Props, Inc.,*
    518 F.2d 1026 (D.C. Cir. 1973) ...........................................................44

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) .................................................................50

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    144 S.Ct. 2440 (2024) ...........................................................12, 60, 71, 72

*Donovan v. FirstCredit, Inc.,*
    983 F.3d 246 (6th Cir. 2020) ...............................................................24

*Dubin v. United States,*
    143 S.Ct. 1557 (2023) .........................................................................35

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
    575 U.S. 768 (2015) ............................................................................32

*FCC v. Prometheus Radio Project,*
    141 S.Ct. 1150 (2021) ...............................................................15, 63, 64

*Flora v. United States,*
    362 U.S. 145 (1960) ............................................................................46

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n,*
    594 U.S. 382 (2021) ............................................................................25

*Humane Society of U.S. v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017) .............................................................50

*In re Cardizem CD Antitrust Litig.,*
    481 F.3d 355 (6th Cir. 2007) ...............................................................52

v

*In re Fed. Bureau of Prisons' Execution Protocol Cases,*
955 F.3d 106 (D.C. Cir. 2020) ..............................................................34

*In re MCP No. 185,*
124 F.4th 993 (6th Cir. 2025) ..............................................................60

*Johnson v. Guzman Chavez,*
594 U.S. 523 (2021) ..............................................................................23

*Kentucky v. Biden,*
123 F.4th 455 (6th Cir. 2024) ..............................................................71

*Kentucky v. EPA,*
123 F.4th 447 (6th Cir. 2024) ..............................................................17

*King v. Burwell,*
576 U.S. 473 (2015) ..............................................................................32

*Kirtsaeng v. John Wiley & Sons, Inc.,*
568 U.S. 519 (2013) ..............................................................................39

*Linney's Pizza, LLC, v. Bd. of Governors of Fed. Rsrv. Sys.,*
2023 WL 6050569 (E.D. Ky. Sept. 15, 2023)........................................12

*Linney's Pizza, LLC, v. Bd. of Governors of Fed. Rsrv. Sys.,*
2024 WL 4129195 (6th Cir. Sept. 5, 2024)............................................13

*Linney's Pizza, LLC, v. Bd. of Governors of Fed. Rsrv. Sys.,*
804 F.Supp.3d 717 (E.D. Ky. 2025)......................13, 16, 18, 26, 28, 30, 31, 37, 38, 41, 43, 44, 46, 48, 49, 50, 53, 56, 58, 59, 61, 64, 69

*Loper Bright Enters. v. Raimondo,*
144 S.Ct. 2244 (2024) ................................................15, 17, 18, 40, 47

*Loper Bright Enters., Inc. v. Raimondo,*
45 F.4th 359 (D.C. Cir. 2022) ..............................................................40

*Louisiana v. EPA,*
90 F.4th 461 (5th Cir. 2024) ........................................63, 64, 65, 66

*Luna Torres v. Lynch,*
578 U.S. 452 (2016) ........................................................................40

*Matter of Sinclair,*
870 F.2d 1340 (7th Cir. 1989) ......................................................37

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.,*
851 F.3d 1076 (11th Cir. 2017) ....................................................44

*MCI Telecomm. Corp. v. AT&T,*
512 U.S. 218 (1994) ..................................................................32, 42

*Meister v. U.S. Dep't of Ag.,*
623 F.3d 363 (6th Cir. 2010) ........................................................67

*Michigan v. EPA,*
268 F.3d 1075 (D.C. Cir. 2001) ...............................................15, 16

*Michigan v. EPA,*
576 U.S. 743 (2015) ......................................................................63

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ..............................................................15, 63, 71

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.,*
746 F.3d 474 (D.C. Cir. 2014) ("*NACS II*") ...............................3, 10, 11, 49, 51

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.,*
958 F.Supp.2d 85 (D.D.C. 2013) ("*NACS I*") .........................9, 10, 19, 20, 21,
22, 36, 46, 72

*NFIB v. OSHA,*
142 S.Ct. 661 (2022) .....................................................................29

*Pereira v. Sessions,*
585 U.S. 198 (2018) ..................................................................50, 61

*Polselli v. IRS,*
598 U.S. 432 (2023) ......................................................................27

*Pulsifer v. United States,*
144 S.Ct. 718 (2024) ................................................................39, 40

vii

*Qwest Corp. v. FCC*,
258 F.3d 1191 (10th Cir. 2001) ...................................................................67, 68

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ...............................................................................41

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) ...............................................................................22

*Russello v. United States*,
464 U.S. 16 (1983) ...............................................................................26

*San Antonio v. United States*,
631 F.2d 831 (D.C. Cir. 1980) ...............................................................49

*SAS Inst., Inc., v. Iancu*,
584 U.S. 357 (2018) ...............................................................................28

*Save Jobs USA v. DHS*,
111 F.4th 76 (D.C. Cir. 2024) ...................................................................28, 29

*Sierra Club v. Slater*,
120 F.3d 623 (6th Cir. 1997) ...............................................................14

*Stanley v. City of Sanford*,
145 S.Ct. 2058 (2025) ...............................................................................46

*Tiger Lily, LLC v. Dep't of Hous. & Urb. Dev.*,
5 F.4th 666 (6th Cir. 2021) ...............................................................42

*U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993) ...............................................................................44

*United States v. Davis*,
45 F.4th 73 (D.C. Cir. 2022) ...................................................................39

*United States v. Lockhart*,
749 F.3d 148 (2d Cir. 2014) ...............................................................44

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ...............................................................71

viii

*Univ. of Tex. Sw. Med. Cntr. v. Nassar,*
  570 U.S. 338 (2013) ..............................................................................24

*Veneklase v. Bridgewater Condos, L.C.,*
  670 F.3d 705 (6th Cir. 2012) ...............................................................25

*Weatherford U.S., L.P. v. Dep't of Lab.,*
  68 F.4th 1030 (6th Cir. 2023) .............................................................25

*West Virginia v. EPA,*
  142 S.Ct. 2587 (2022) ...........................................................29, 30, 31, 32

## Statutes, Rules, and Regulations

12 C.F.R. §235.4(b)(1)............................................................................52

15 U.S.C. §1693*o*-2 ......................................... xi, 1, 6, 7, 8, 19, 20, 21, 22, 23, 24,
  26, 27, 33, 34, 35, 36, 38, 43, 47, 48,
  49, 50, 51, 52, 54, 55, 56, 57, 58, 59,
  60, 61, 62, 64, 67, 68, 70

5 U.S.C. §553...........................................................................................1

5 U.S.C. §706..................................................13, 14, 15, 16, 51, 63, 71

FRAP 4(a)(1)(B) .....................................................................................1

## Other Authorities

156 Cong. Rec. S5925 (daily ed. July 15, 2010) (Sen. Durbin) ...................36, 53

Antonin Scalia & Bryan Garner, *Reading Law* (2012) ....................21, 34, 35, 37,
  41, 45, 62

Bd. of Governors of the Fed. Rsrv. Sys., *2009 Interchange Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions* 6 (June 2011) ........................................................31

Bd. of Governors of the Fed. Rsrv. Sys., *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* 1 (Dec. 2025)...................................................2, 3, 31

*Black's Law Dictionary* (9th ed. 2009) ...................................................19, 49, 54

x

*Concise Oxford English Dictionary* (12th ed. 2011) ..............................................21

Levinger & Zabek, *Credit or Debit*, Fed. Rsrv. Bank of Boston (2011) .............5

*New Oxford Am. Dictionary* (3d ed. 2010)...............................................19, 21, 61

*Shorter Oxford English Dictionary* (6th ed. 2007)................................................61

*Webster's New Coll. Dictionary* (2008)..............................................................19, 21

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

In accordance with Sixth Circuit Rule 34(a), Appellant Linney's Pizza, LCC respectfully requests oral argument. This appeal presents several complex statutory-interpretation issues relating to 15 U.S.C. §1693$o$-2, which implicate whether the Board of Governors of the Federal Reserve System exceeded its statutory authority or acted arbitrarily when promulgating a significant financial sector rule: The debit card interchange fee component of Regulation II, 76 Fed. Reg. 43,394 (July 20, 2011). Oral argument could materially assist this Court in understanding the legal issues presented here.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331, because Linney's Pizza's complaint raises claims under the APA, 5 U.S.C. §553. This Court has jurisdiction under 28 U.S.C. §1291 to review the district court's final judgment, which was entered on September 15, 2025. *See* Judgment, R.62, PageID#1105. Linney's Pizza timely filed a notice of appeal on November 11, 2025. *See* Notice, R.63, PageID#1106; FRAP 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1. Whether the Board acted in conflict with, or in excess of, the statutory authority granted by 15 U.S.C. §1693*o*-2 when promulgating the debit card interchange fee standard in Regulation II.

2. Whether the Board acted in an arbitrary and capricious manner, or otherwise abused its discretion, when promulgating the debit card interchange fee standard in Regulation II.

1

## STATEMENT OF THE CASE

### A.    Congress directs the Board to regulate debit-card interchange fees.

#### 1.    Debit-card interchange fees.

American consumers use debit cards to pay for goods and services hundreds of millions of times every day. In 2009, when Congress enacted the Durbin Amendment, debit-card payments accounted for 37.6 billion transactions involving $1.4 trillion in value. *See* Regulation II, R.39-2, PageID#368. That figure has only increased since then—in 2023, debit-card payments grew to 100.7 billion transactions involving $4.7 trillion in value. *See* Bd. of Governors of the Fed. Rsrv. Sys., *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* 1 (Dec. 2025), perma.cc/XEK4-VBQ6. On average, that's 275 million debit transactions each day. This ever-growing consumer demand gives merchants no practical choice: They must accept debit-card payments.

Each debit-card swipe triggers a process to move money from the customer's checking account to the merchant's account. That process involves three other players: the issuer (the customer's bank), the acquirer (the merchant's bank), and the card network (such as Visa or Mastercard), which

2

provides infrastructure and software to facilitate each transaction. *See id.* This process consists of three steps known as authorization, clearance, and settlement. Authorization "begins when the cardholder swipes her debit card, which sends an electronic 'authorization request' to the acquirer conveying the cardholder's account information and the transaction's value." *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 478 (D.C. Cir. 2014) ("*NACS II*"). The issuer then determines "whether the cardholder has sufficient funds in her account to complete the transaction and whether the transaction appears fraudulent," and either approves or rejects the transaction. *Id.* If the issuer approves, the transaction still must be cleared and settled before money changes hands. Clearance is "a formal request for payment sent from the merchant on the network to the issuer." *Id.* Settlement "involves the actual transfer of funds from the issuer to the acquirer," after which "the transaction has concluded." *Id.*

Fees arise at each stage. The largest one is called an interchange fee; it compensates issuers (the customer's bank) for their role. *See* Regulation II, R.39-2, PageID#367. The merchant's bank initially pays the interchange fee,

but it is ultimately assessed to and borne by the merchant. *See id.* Before 2010, interchange fees were *not* regulated or set via negotiation between the issuers (who charged them) and merchants (who paid them). *Id.* Instead, the card networks themselves set the interchange fees. *Id.* Networks then competed for issuers' business by offering the highest interchange fees possible (at merchants' expense). Merchants like Linney's were forced to accept whatever interchange fees the networks set. This typified a broken market: Networks had no incentive to lower interchange fees—and issuers had every incentive to drive up transaction volume—because neither party paid that fee. Merchants did.

Unsurprisingly, debit-card interchange fees exploded, growing 234 percent from 1998 to 2006. *See* Merchants Payments Coalition Comment Letter, R.39-4, PageID#480. In 2009, the average interchange fee for all debit-card transactions reached as high as 44 cents per transaction, totaling $16.2 billion. *See* Regulation II, R.39-2, PageID#368. Compare that to the issuer's cost (at that time) of facilitating the transaction—8 cents per transaction for PIN debit transactions and 13 cents for signature debit transactions. *Id.* at

PageID#368, n.27. In other words, issuers profited between 238% and 450% in over one hundred million transactions per day, making interchange fees a multi-billion-dollar annual profit center for banks. *Id.*

For merchants and consumers, however, those fees were devastating. For small businesses like Linney's, debit-card fees constituted one of their largest operating expenses. In 2010, other small businesses paid $8.9 billion in fees. *See* NACS Comment Letter, R.39-5, PageID#506 (convenience stores). And since debit cards are used disproportionately by lower-income consumers, interchange fees are most burdensome for those who can least afford them. *See* Levinger & Zabek, *Credit or Debit*, Fed. Rsrv. Bank of Boston at 9 (2011), perma.cc/244C-UPC4.

### 2. Congress passes the Durbin Amendment, which directs the Board to set an interchange-fee standard.

Congress deemed such runaway growth in interchange fees unacceptable. Congress recognized that higher interchange fees led to higher prices, lower wages, loss of ready access to goods and services, and lost jobs. Compl., R.1, PageID#4-5. Congress therefore enacted the "Durbin Amendment" as part of the Dodd-Frank Wall Street Reform and Consumer

5

Protection Act of 2010. The Durbin Amendment instructs the Federal Reserve Board to regulate the interchange fees charged by issuers with respect to debit-card transactions. *See* Regulation II, R.39-2, PageID#365. This fee regulation applies only to the largest issuers—those with at least $10 billion in assets. *Id.*

The Durbin Amendment instructs the Board to impose fee limits that are "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693*o*-2(a)(2). Relatedly, Congress instructed the Board to adopt rules that set standards for assessing whether an interchange fee is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693*o*-2(a)(3)(A).

Congress also specifically told the Board *how* to set that standard. Congress told the Board to "consider the functional similarity between—(i) electronic debit transactions; and (ii) checking transactions that are required to … clear at par." *Id.* §1693*o*-2(a)(4)(A). Congress then required the Board to "distinguish between" two types of costs when determining what fees are "reasonable and proportional." *Id.* §1693*o*-2(a)(2), (4)(B). *First*, the Board

6

"shall" consider "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* §1693*o*-2(a)(4)(B)(i). *Conversely*, as to "other costs incurred by the issuer which are not specific to a particular electronic debit transaction," such costs "shall not be considered." *Id.* §1693*o*-2(a)(4)(B)(ii).

**B.    The Board proposes a 12-cent cap, but issuer banks successfully lobby the Board to nearly double the fee in the Final Rule.**

**1.    The Proposed Rule.**

The Board initiated a rulemaking in 2010. *See* Proposed Rule, R.39-6, PageID#517. The proposed rule hewed to the Durbin Amendment's statutory text; it included "only those costs that are specifically mentioned … in the statute." *Id.* at PageID#529-30. The Board specifically excluded fees that were not attributable to particular transactions, such as networking-processing fees, overhead fixed costs, and fraud losses. *Id.* at PageID#530-34, 550, 555; Compl., R.1, PageID#18.  The proposed rule outlined two alternative standards for implementing the "reasonable and proportional" standard. Both would have capped the interchange fee at 12 cents per transaction. *See* Proposed Rule, R.39-6, PageID#532-33.

## 2.    Regulation II.

Sensing the imminent demise of a multi-billion-dollar profit center, the large issuers subject to the proposed rule attacked the proposed rule's alternative fee standards. *See* Regulation II, R.39-2, PageID#388. Their pressure campaign worked and caused the Board to venture beyond the boundaries Congress laid down. Rather than hewing to the two cost categories in §1693*o*-2(a)(4)(B)(i)-(ii), the final rule inferred a third category of unwritten costs—those "that are not encompassed in either the set of costs the Board must consider under Section 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii)." *Id.* at PageID#397. The Board suggested that the Durbin Amendment was "ambiguous" and "silent" on costs "that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." *Id.* Thus, the Board concluded that "all costs related to a particular transaction may be considered." *Id.* at PageID#398.

Under that reasoning, Regulation II permits issuing banks to recoup not only the statutorily mandated incremental ACS costs, but also four other

distinct costs: (1) fixed ACS costs, (2) transaction-monitoring costs, (3) an allowance for an issuer's fraud losses, and (4) network-processing fees. *Id.* at PageID#404-05. Regulation II thus sets an interchange fee of 21 cents per transaction—roughly twice the maximum interchange fee of 12 cents per transaction from the Proposed Rule—plus a 0.05% ad valorem charge. *Id.*

**C.    A federal district court vacates Regulation II, but the D.C. Circuit saves it on appeal only through *Chevron* deference.**

After Regulation II became final, some merchants and trade associations challenged its interchange-fee standard in the U.S. District Court for the District of Columbia. *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 958 F.Supp.2d 85 (D.D.C. 2013) ("*NACS I*"). The district court agreed with the NACS plaintiffs, holding that the Board's fee standard was unlawful. *Id.* at 99-109. The district court recognized that Congress had plainly "bifurcate[d] the entire universe of costs associated with interchange fees" into two categories: "incremental ACS costs relating to a particular transaction," which costs may be considered; and "other costs," which the Board "shall not consider." *Id.* at 100-01. The district court held that the Board's announcement of a third category of costs in the fee standard was "utterly indefensible and

9

"irreconcilable with" the Durbin Amendment. *Id.* at 105-06. "[I]t is quite clear that the statute did not allow the Board to consider the additional fixed costs factored into the interchange fee standard—i.e., (1) fixed ACS costs, (2) transaction monitoring costs, (3) an allowance for an issuer's fraud losses, and (4) network-processing fees." *Id.* at 107.

On appeal, the D.C. Circuit applied the now-defunct doctrine of *Chevron* deference, holding that Regulation II "generally rest[ed] on reasonable constructions of the statute." *NACS II*, 746 F.3d at 477. Accordingly, the D.C. Circuit upheld most of Regulation II, including its novel "third category of costs," on the theory that it reflected an "implicit" legislative delegation as to a purported "ambiguity." *Id.* at 488-89 (quoting *Chevron, U.S.A. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984)). Even under its application of the agency-friendly *Chevron* standard, however, the D.C. Circuit recognized that the Board had failed to "articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment." *Id.* at 493. Rather than vacate the fee standard, the court remanded

10

the rule to the Board to further explain its reasons for including transaction-monitoring costs. *Id.* at 493.

### D.    The Board issues an Updated Rule.

Responding to *NACS II*, the Board issued an Updated Rule in 2015. Its reasoning doubled down on the "[t]he same rationale" for the cost determination that the Board employed in Regulation II. Updated Rule, R.39-7, PageID#561. Invoking that same interpretative framework, the Board added explanations for why it included transaction-monitoring costs in the fee standard. *Id.* It said that "[t]ransactions-monitoring systems … assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction," and therefore fell within the universe of allowable costs, including "any cost that is incurred in effecting any electronic debit transaction." *Id.*

### E.    Linney's Pizza sues.

In December 2022, Linney's Pizza filed this APA suit challenging Regulation II and seeking declaratory and injunctive relief. *See generally* Compl., R.1, PageID#1-40. Linney's Pizza is a family-owned and -operated pizza shop in Frankfort, Kentucky, that opened in July 2021. *See* Decl., R.39-8,

PageID#564. Linney's Pizza accepts debit cards from its customers and pays interchange fees for debit-card transactions subject to Regulation II's fee standard. *Id.* Linney's Pizza alleged that Regulation II's fee standard, as confirmed by the Updated Rule, is unlawful, arbitrary, and capricious. Compl., R.1, PageID#35-39.[1]

The district court granted the Board's motion to dismiss the original Complaint as untimely. *See Linney's Pizza, LLC, v. Bd. of Governors of Fed. Rsrv. Sys.*, 2023 WL 6050569, at *1 (E.D. Ky. Sept. 15, 2023). Linney's Pizza appealed to this Court, and while that appeal was pending the Supreme Court ruled that an APA claim does not accrue until the plaintiff is injured by the final agency action. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S.Ct. 2440, 2460 (2024). In light of *Corner Post*, the parties jointly moved to vacate and remand, so the case returned to the district court. *See Linney's*

---

[1] Linney's Pizza is not the only small business challenging the lawfulness of Regulation II. A small truck stop in North Dakota filed a materially similar APA challenge against Regulation II. The District of North Dakota vacated Regulation II's fee standard, *see Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F.Supp.3d 610 (D.N.D. 2025), but that vacatur has been stayed pending an ongoing appeal, *see Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.*, No. 25-3000 (8th Cir.) (oral argument set for May 13, 2026).

*Pizza, LLC, v. Bd. of Governors of Fed. Rsrv. Sys.*, 2024 WL 4129195, at *1 (6th Cir. Sept. 5, 2024).

On remand, the district court denied Linney's Pizza's motion for summary judgment and granted the Board's cross-motion for summary judgment. *Linney's Pizza, LLC, v. Bd. of Governors of Fed. Rsrv. Sys.*, 804 F.Supp.3d 717, 721 (E.D. Ky. 2025). Linney's Pizza timely appealed.

## SUMMARY OF THE ARGUMENT

The district court erred in upholding Regulation II's transaction fee standard, which contradicts the Durbin Amendment and exceeds the Board's statutory authority.

**1.** The fee standard is contrary to law and "in excess of statutory … authority" because it departs from the statute's clear bifurcation of costs into two categories—permissible and prohibited—and because it factors in costs that the Durbin Amendment expressly prohibits the Board from considering. 5 U.S.C. §706(2)(A), (C). It also imposes a one-size-fits-all fee cap even though the Durbin Amendment requires issuer-specific and transaction-specific fee calculations. *Id.* §706(2)(A), (C).

13

**2.** The fee standard is also "arbitrary and capricious" because the Board ignored required statutory considerations, including the functional similarity between checking and debit-card transactions; considered prohibited costs that Congress didn't intend it to consider, failed to define key terms, and drew arbitrary lines around allowable and prohibited costs; and failed to consider issuer-specific and transaction-specific costs in its fee calculations. *Id.* §706(2)(A).

**3.** Because Regulation II exceeds the Board's authority and is arbitrary and capricious, this Court should reverse the district court's summary judgment and instruct that the fee standard portion of Regulation II be vacated, with a stay of vacatur for six months so that the Board can craft a new, compliant rule. *See id.* §706.

## STANDARD OF REVIEW

This Court reviews the denial of summary judgment *de novo*. *Sierra Club v. Slater*, 120 F.3d 623, 632 (6th Cir. 1997). Under the APA, this Court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C). This

standard requires the Court to "exercise [its] independent judgment" and determine "whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024). If the agency exceeds its statutory authority, "then its action is plainly contrary to law and cannot stand." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

And under the APA, this Court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021). Among other impermissible bases for a decision, agency action must be set aside "if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

15

## ARGUMENT

### I. Regulation II is contrary to law and exceeds the Board's statutory authority.

The APA instructs this Court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C). APA claims require this Court to "exercise independent judgment" and examine "whether [the Board] has acted within its statutory authority." *Brown-Forman Corp. v. NLRB*, 169 F.4th 646, 653 (6th Cir. 2026) (citing *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024)). If an agency exceeds statutory authority, "its action is plainly contrary to law and cannot stand." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

### A. The Board lacks discretion to depart from Congress's commands in the Durbin Amendment.

At the outset, the district court correctly held that no deference is owed to the Board's statutory interpretation of the Durbin Amendment. *See Linney's Pizza*, 804 F.Supp.3d at 725-26. Just a few years ago, when this litigation began, the Board's interpretation of statutory phrases in the Durbin Amendment could have been entitled to deference review. But judicial deference to

16

administrative agencies in statutory interpretation is now gone. *Loper Bright*, 144 S.Ct. at 2272-73.

Earlier in this litigation, the Board still sought deference for its statutory interpretation of the Durbin Amendment. But this Court has already rejected this exact line of argument, for courts "should no longer defer to an agency's answers to legal questions." *Kentucky v. EPA*, 123 F.4th 447, 467 (6th Cir. 2024). The Court "resolves a pure question of law when it interprets key terms" in §1693*o*-2 (such as "incremental cost," "other costs," "specific to," and "particular electronic debit transaction"). *Id.* So when it comes to interpreting these statutory terms, there can be no "deferential standard"—the Court "must review (and correct) the agency's mistaken interpretation of those terms *without giving it deference*." *Id.* (emphasis added).

### B.   Regulation II contradicts the Durbin Amendment by creating a third category of costs out of statutory silence.

The central interpretative question here is whether the Durbin Amendment creates only two categories of costs—mandatory and prohibited, as Linney's Pizza argues—or whether (as the Board argues) statutory silence authorizes the Board to create a third, discretionary category of costs. The

district court concluded that the Durbin Amendment's text includes "a third, silent category of non-incremental-ACS costs which are still related to a particular debit card transaction, which *may or may not* be considered." *Linney's Pizza*, 804 F.Supp.3d at 728. That conclusion was mistaken. The "traditional tools of statutory construction" confirm that Linney's Pizza has the "best reading of the statute." *Loper Bright*, 144 S.Ct. at 2264, 2266 (cleaned up).

### 1. Congress bifurcated the universe of possible costs into only two categories.

The district court erred by concluding that the Durbin Amendment lays out "three broad categories of costs." *Linney's Pizza*, 804 F.Supp.3d at 728. The Durbin Amendment establishes only two categories of costs— (1) costs that the Board must consider, and (2) costs that the Board must not consider.

The inquiry "start[s], as always, with the text." *Bufkin v. Collins*, 145 S.Ct. 728, 737 (2025). The Durbin Amendment unambiguously bifurcates the entire universe of interchange-fee costs by requiring that the Board "shall … distinguish between" two categories of costs: (1) "incremental cost[s] incurred by the issuer" for its role "in the authorization, clearance, and

18

settlement of a particular electronic debit transaction, which cost[s] shall be considered"; and (2) "other costs which are not specific to a particular electronic debit transaction, which costs shall not be considered." 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii). Several textual clues confirm this plain text conclusion.

**a.** To begin, the word "'[s]hall' means 'must,'" and "imposes a mandatory command." *Bufkin*, 145 S.Ct. at 737. So, the Board *must* "distinguish between" the two categories of costs listed in §1693*o*-2(a)(4)(B). To "distinguish," in turn, means to "'separate into different categories' or to 'make a distinction.'" *NACS I*, 958 F.Supp.2d at 100 & n.27 (first quoting Distinguish, *Webster's New Coll. Dictionary* (2008), then quoting Distinguish, *Black's Law Dictionary* (9th ed. 2009)). And the word "between" generally refers to choosing from two options or categories, unlike the word "among," which generally refers to multiple options. *See* Between, *New Oxford Am. Dictionary* (3d ed. 2010); *see also Allen v. Milligan*, 599 U.S. 1, 13 (2023).

The Durbin Amendment's structure buttresses the conclusion that Congress intended "between" to bear its ordinary meaning of denoting only

19

two categories of costs; after all, the Durbin Amendment lists two—and only two—options. The statute's plain text requires the Board to "separate" the universe of costs "into different categories," *NACS I*, 958 F.Supp.2d at 100 & n.27, and Congress's "strategic[] plac[ement]" of "shall consider" and "shall not consider"—immediately following the requirement to "distinguish between" the costs—confirms that Congress bifurcated all costs into only *two* categories, *id.* at 101.

Further evidence comes from the words Congress used to describe the categories of costs themselves—"incremental cost" and "other costs." Congress authorized the Board to "consider" only the "incremental" costs incurred "for the role of the issuer in the authorization, clearance, or settlement of a *particular* electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(i) (emphasis added). That's it. The Durbin Amendment doesn't identify any other allowable costs. "[T]he expression of one thing"—here, incremental ACS costs—"implies the exclusion of other things." *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 849 (6th Cir. 2020); *see also* Antonin Scalia & Bryan Garner, *Reading Law* 107 (2012). The Durbin Amendment thus

contemplates no other allowable costs in the fee standard beyond the incremental ACS costs.

The next subsection eliminates any doubt. There, Congress specified that "other costs"—everything "other" than incremental ACS costs—"shall not be considered" in setting the fee standard. 15 U.S.C. §1693*o*-2(a)(4)(B)(ii). The word "other" "subsume[s] *all* costs not explicitly addressed in the first, permissible category of costs." *NACS I*, 958 F.Supp.2d at 101. "Other" means "being the remaining one or ones of two or more; different or distinct from that or those referred to or implied." Other, *Webster's New Coll. Dictionary* (2007); *see also* Other, *New Oxford Am. Dictionary* (3d ed. 2010); Other, *Concise Oxford English Dictionary* (12th ed. 2011). To know what the term "other costs" means, there must be a reference point—other *than what*? Here, that reference is "the incremental [ACS] cost." 15 U.S.C. §1693*o*-2(a)(4)(B)(i). So the term "other costs" naturally means all "remaining" costs that are *not* the incremental cost and are "different from" the incremental ACS costs. *NACS I*, 958 F.Supp.2d at 101, n.28.

21

"[T]he specific context in which" §1693*o*-2(a)(4)(B)'s "language is used" makes the upshot of the statute's plain text clear. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Congress required the Board to "distinguish between" two (not three) categories of costs, told the Board to consider one category of costs (incremental ACS costs), and prohibited the Board from considering "other costs." Given the statute's command to "distinguish between" those two categories, 15 U.S.C. §1693*o*-2(a)(4)(B), the Board should have (1) defined what costs are "incremental" ACS costs as a baseline, (2) "considered" those costs in the fee standard, *id*. §1693*o*-2(a)(4)(B)(i), and (3) excluded all "other costs" from the fee standard, *id*. §1693*o*-2(a)(4)(B)(ii). Instead, the Board refused even to define what costs are incremental ACS costs, claimed discretion to consider any and all costs, and included prohibited costs—fixed ACS costs, transaction-monitoring costs, fraud losses, and network-processing fees—in the fee standard. The district court's endorsement of the Board's refusal to "distinguish between" allowable incremental ACS costs and "other" forbidden costs was error.

**b.** Beyond the plain text itself, "[t]he statutory structure confirms" the reading proposed by Linney's Pizza. *Johnson v. Guzman Chavez*, 594 U.S. 523, 542 (2021). Congress ordered the Board to "distinguish between" certain categories of costs and told the Board how to treat those categories: It *must* include the first category in the fee cap, and *must not* include the second.

The district court's contrary interpretation allows the Board to imply a third, permissive category—neither mandatory nor prohibited—from statutory silence. But if the district court's conclusion were correct, this imagined third category would fundamentally rewrite the Durbin Amendment to read something like the added italicized language below:

> [T]he Board shall ... distinguish between—
>
>> (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under [§1693o-2(a)(2)]; and
>>
>> (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under [§1693o-2(a)(2)]; *and*
>>
>> *(iii) any other costs incurred by an issuer which are "not incremental costs related to the issuer's role in authorization, clearance, and settlement" but which are still "specific to a particular electronic debit transaction," which costs may or may not be considered as the Board finds appropriate.*

23

*See* Regulation II, R.39-2, PageID#397-98. This proposed third category that the district court believed could be found in "silence" both lacks a basis in the statutory text and contradicts Congress's choice to build §1693*o*-2(a)(4)(B)'s command around two discrete subparagraphs embodying strictly mandatory and prohibitory terms. "Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Univ. of Tex. Sw. Med. Cntr. v. Nassar*, 570 U.S. 338, 353 (2013); *see also Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 258 (6th Cir. 2020) (applying the "presumption that Congress's 'choice in statutory structure was intentional'"). The district court "invert[s] this structural choice by turning the bright-line" bifurcation of costs into two categories "into a more circumstantial and flexible inquiry" that lets the Board circumvent the clear bifurcation and effectively consider whatever costs it likes. *Donovan*, 983 F.3d at 258.

The district court could not construe the statute to include a third category of costs without "effectively … read[ing] words into the statute." *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 393 n.1 (2021). But courts "cannot" "add provisions to a federal statute," *Alabama v.*

24

*North Carolina*, 560 U.S. 330, 352 (2010), and must refrain from "interpreting statutes in a manner that effectively tacks on new language that Congress did not see fit to include," *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 712 (6th Cir. 2012) (cleaned up); *see also Weatherford U.S., L.P. v. Dep't of Lab.*, 68 F.4th 1030, 1038 (6th Cir. 2023) ("[R]espect for Congress's prerogatives as policymaker means carefully attending to the words it chose rather than replacing them with others of our own.").  The deliberate two-subparagraph structure of §1693*o*-2(a)(4)(B) confirms the text's plain meaning: Congress bifurcated the universe of costs into mandatory and prohibited categories, and assigned specific costs to each category.

**c.** The *expressio unius* canon forecloses the district court's attempt to justify a third category of costs from statutory silence. Congress knows how to grant free-ranging discretion and did so explicitly elsewhere in the same statute. "When Congress includes particular language in one section of a statute but omits it from a neighbor," *Bittner v. United States*, 598 U.S. 85, 94 (2023), courts "presume[] that Congress act[ed] intentionally and purposely" in that "exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983).

25

Here, the core of the district court's conclusion is that even though §1693*o*-2(a)(4)(b) specifies just two clear categories of costs, the statute's text "leaves a gray area" for "the Board to consider other costs it is not mandated to consider, as long as they are not costs it is prohibited from considering." *Linney's Pizza*, 804 F.Supp.3d at 731. In other words, the district court's interpretation of §1693*o*-2(a)(4)(B) treats congressional silence as implying a third category that functions as a "catchall" or "residual clause," under which the Board can consider whatever other costs it thinks appropriate.

But *elsewhere* in the Durbin Amendment, Congress explicitly inserted the exact kind of catchall residual provision that the Board now claims can be inferred from the silence of §1693*o*-2(a)(4)(B). In §1693*o*-2(a)(5)(A), a neighboring subsection, Congress authorized the Board to make "adjustments" to the default fee standard "to make allowance for costs incurred by the issuer in preventing fraud." For this fraud-prevention adjustment, Congress ordered the Board to consider six specific factors. *See* 15 U.S.C. §1693*o*-2(a)(5)(B)(ii)(I)-(VI). Congress then added one more provision—granting the

26

Board the power to *also* consider "such other factors as the Board considers appropriate." *Id.* §1693*o*-2(a)(5)(B)(ii)(VII).

In both form and substance, this residual clause in §1693*o*-2(a)(5)(B)(ii)(V)—permitting "such other factors as the Board considers appropriate"—grants the same type of discretionary authority that the Board now insists can be derived from silence in §1693*o*-2(a)(4)(B). But this neighboring explicit delegation of authority to consider other things not listed makes clear that "[h]ad Congress wanted to include" a residual clause in §1693*o*-2(a)(4)(B) permitting the Board to consider any other costs it deemed appropriate, "it certainly knew how to do so." *Polselli v. IRS*, 598 U.S. 432, 439 (2023); *see also Canaday v. Anthem Co., Inc.*, 9 F.4th 392, 399 (6th Cir. 2021).

This dichotomy between §1693*o*-2(a)(4)(B) and §1693*o*-2(a)(5)(B) confirms that when Congress wanted the Board to have the power to consider "such other factors" as it deemed "appropriate," Congress delegated that power explicitly. "But Congress didn't choose to pursue that known and readily available approach here," and its decision to not include a residual cost-consideration provision "must be given effect rather than disregarded."

27

*SAS Inst., Inc., v. Iancu*, 584 U.S. 357, 365 (2018). The district court erred by treating the statutory silence in §1693*o*-2(a)(4)(B) as an unwritten catchall provision, when just one subsection later Congress showed that it would expressly provide catchall provisions when it wanted them.

**d.** The major questions doctrine also confirms Linney's Pizza's interpretation of §1693*o*-2(a)(4)(B). The district court mistook Linney's Pizza's major questions doctrine arguments as seeking to impose a higher standard of review. *See Linney's Pizza*, 804 F.Supp.3d at 726-27. But just "[l]ike a dictionary, or expressio unius, or the extraterritoriality canon, the major questions doctrine is a tool of statutory interpretation." *Save Jobs USA v. DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024). Regardless of whether the doctrine is viewed as "a linguistic canon, or a substantive canon with a constitutional basis safeguarding the separation of powers, or both," the major questions doctrine "function[s]" as one more way "to help courts figure out what a statute means." *Id.*

The major questions doctrine requires agencies claiming important powers to point to clear authority from Congress authorizing their use.

28

Under this doctrine, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 142 S.Ct. 2587, 2605 (2022) (cleaned up). Some jurists view the doctrine as a substantive canon rooted in separation-of-powers principles. *See NFIB v. OSHA*, 142 S.Ct. 661, 667-70 (2022) (Gorsuch, J., concurring). Others view it as a linguistic canon that draws on "context" to help "discern[]" the "text's most natural interpretation." *Biden v. Nebraska*, 143 S.Ct. 2355, 2376-84 (2023) (Barrett, J., concurring). Either way, all agree that the major questions doctrine operates as a clear-statement doctrine, requiring "clear congressional authorization" and something "more than a merely plausible textual basis" for any "transformative ... regulatory authority." *West Virginia*, 142 S.Ct. at 2609-10 (cleaned up).

The district court erred in concluding that "the major questions doctrine" is "inapplicable in this case." *Linney's Pizza*, 804 F.Supp.3d at 727. The district court seemingly based this conclusion on the idea that Linney's Pizza "seeks to compel the Board to take action with a *greater* economic impact." *Id.* (cleaned up). Thus, in the district court's eyes, Regulation II is a *less* major

29

economic regulation than what Linney's Pizza believes is required by the Durbin Amendment.

But this view turns the major questions doctrine on its head. The major questions doctrine asks "whether Congress in fact meant to confer *the power the agency has asserted*." *West Virginia*, 142 S.Ct. at 2608. (emphasis added). The question for determining "major-ness" is not whether Regulation II is a major deviation from the pre-Durbin Amendment market reality. The correct question is whether Regulation II is a major deviation from the powers that Congress clearly authorized the agency to wield.

Under the major questions doctrine, agencies cannot rely on silence either to "make a radical or fundamental change to a statutory scheme" or make "decisions of vast economic and political significance." *West Virginia*, 142 S.Ct. at 2605 (cleaned up). Regulation II is a major deviation from the Durbin Amendment in both respects. As to the statutory scheme, the Durbin Amendment's text identifies two categories of costs. Regulation II invokes statutory silence to create a third category—a "transformative expansion" that causes a "fundamental change to [the] statutory scheme." *Id.* at 2605.

30

And as to an unauthorized "vast economic" decision, debit-card transactions affect far more than "a significant portion of the American economy." *West Virginia*, 142 S.Ct. at 2608 (cleaned up). In 2009 alone, there were "37.6 billion debit and prepaid card transactions … with an aggregate value of more than $1.4 trillion." Bd. of Governors of the Fed. Rsrv. Sys., *2009 Interchange Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions* 6 (June 2011), perma.cc/UF4W-MQJE. In 2023, the most recent year with data on file, interchange fees totaled $34.1 billion. *See 2023 Interchange Fee Revenue*, *supra*, at 2. The Board's decision to depart from the two categories Congress clearly authorized inflated the interchange-fee cap by 9 cents per transaction, thus enabling the transfer of billions of dollars per year from millions of consumers and merchants to a few large issuer banks. That undisputedly "vast" "economic … significance" squarely places this case within the major-questions doctrine. *See King v. Burwell*, 576 U.S. 473, 485-86 (2015) (tax credits "involving billions of dollars in spending each year and affecting the price of health insurance for millions

31

of people" presented "a question of deep 'economic and political significance' that is central to [the] statutory scheme").

Because the fee standard implicates a major question, the Board must show that Congress "clearly" wanted to include the third category of costs upon which the Board based Regulation II's fee standard. *West Virginia*, 142 S.Ct. at 2605. The Board cannot do so. Indeed, the Board has acknowledged that the Durbin Amendment is "silent" on how to treat those costs. Regulation II, R.39-2, PageID#397. By definition, silence is not a clear statement; it's silence. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). Vague terms, subtle devices, and implications from statutory silence cannot clearly "authorize 'basic and fundamental changes in the scheme' designed by Congress." *Nebraska*, 143 S.Ct. at 2368 (quoting *MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 225 (1994)).

Here, in the Durbin Amendment, Congress carefully crafted a detailed scheme for creating a debit-card fee standard. That scheme intentionally bifurcates costs between required "incremental cost[s]" and prohibited "other costs." 15 U.S.C. §1693*o*-2(a)(4)(B). But after deciding that it wasn't

"necessary to determine whether costs are 'incremental,'" Regulation II, R.39-2, PageID#398, the Board refused to define those terms and invented a third category in order "to override" the "statutory command" about considering incremental costs and not considering other costs. *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 889 (D.C. Cir. 2024). By adopting that interpretation of §1693*o*-2(a)(A)(B), the district court's ruling "eviscerate[s] … significant aspects of the statutory text" and accomplishes a "severe restructuring of" Congress's scheme. *Id.* at 888-89 (cleaned up). The major questions doctrine prevents agencies from using statutory silence to "abolish[]" congressional requirements and "supplant[] them with a new regime entirely." *Nebraska*, 143 S.Ct. at 2369.

**e.** Besides classic textual clues, the Durbin Amendment's purpose further confirms Linney's Pizza's reading that the Durbin Amendment bifurcates the universe of costs and permits the Board to consider only incremental ACS costs. This "overarching purpose" is "evident" from both "the text," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011), and the historical context, *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 169 (5th Cir. 2024)

(en banc) (examining the law's "history" to evaluate an agency's interpretation). To be clear: purpose cannot be used to contradict the text itself. But "statutory purpose, as reflected in 'the language and design of the statute as a whole,' can help determine textual meaning." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 121 n.8 (D.C. Cir. 2020) (Katsas, J., concurring); *see also* Scalia & Garner, *supra*, at 56-57.

Here, the Durbin Amendment's stated purpose was reducing the amount of an issuer's interchange fee to a "reasonable and proportional" amount. 15 U.S.C. §1693*o*-2(a)(2). In doing so, Congress sought to make covered debit-card transactions look as much as possible like "checking transactions," which "clear at par" (that is, without any fee imposed by the payor bank)—thus the Durbin Amendment's requirement that the Board "consider the functional similarity" between the two. *Id.* §1693*o*-2(a)(4)(A). To that end, just like checking transactions, debit-card transactions should move *toward* clearing at par, not away from it.

Historical context confirms as much. Congress was responding to a market failure that had allowed the average interchange fee to soar to 44

34

cents per transaction, resulting in a severe economic burden for merchants and consumers. Regulation II, R.39-2, PageID#368. The district court's decision to allow the Board to disregard the clear bifurcation of allowed and prohibited costs, and blessing its claim to discretion to consider *any and all* costs that aren't the incremental ACS costs, vitiates the Durbin Amendment's purpose of reducing the interchange fee and making debit transactions more like checking transactions. *See* 15 U.S.C. §1693*o*-2(a)(2); *id.* §1693*o*-2(a)(4)(A).

**f.** And "[t]hose who find legislative history helpful will find yet further support" for Linney's Pizza's interpretation. *Dubin v. United States*, 143 S.Ct. 1557, 1569 n.7 (2023); *accord* Scalia & Garner, *supra*, at 388.

During a floor speech, Senator Durbin—the statute's principal author and namesake—explained that "the cost to be considered by the Board in conducting its reasonable and proportional analysis is the incremental [ACS] cost," "as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction." 156 Cong. Rec. S5925 (daily ed. July 15, 2010) (Statement of Sen. Durbin). When first litigating this question in 2013, the Board "admit[ted]"

35

that this "statement ... divide[s] the universe of costs into two categories." *NACS I*, 958 F.Supp.2d at 102. Yet despite that concession, the Board admittedly refused even to define the "incremental" cost Senator Durbin referred to. *See* Regulation II, R.39-2, PageID#398. That means the Board necessarily failed to "distinguish" between the different categories of costs identified in the Durbin Amendment's text despite the statute's clear command that the Board "shall" distinguish between incremental ACS costs and other costs. 15 U.S.C. §1693*o*-2(a)(4)(B).

To be clear, Linney's Pizza does not suggest that legislative history overrides the Durbin Amendment's clear text. Both parties here agree that "legislative history cannot trump clear statutory language." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 132 n.9 (2018) (cleaned up). But legislative history can still show that "a particular word or phrase is capable of bearing a particular meaning." Scalia & Garner, *supra*, at 388. Legislative history can reveal "the setting of the enactment and the assumptions its authors entertained about how their words would be understood." *Matter of Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989) (Easterbrook, J.). And here, the legislative

36

history provides one more clear indicator of meaning that points in the same direction as all the textual tools—the Durbin Amendment divides the universe of costs into two categories, not three.

### 2.   The district court erred by reading the statute to contain an implied third category of costs.

The district court rejected the clear bifurcation in the statute's text and endorsed the Board's invention of a third category of costs from statutory silence. It grounded this decision in three key conclusions. None of those three withstands scrutiny.

**a.** The district court first rejected the conclusion that the statutory phrase "distinguish between" limits the Board's authority to the two categories Congress itself identified. *Linney's Pizza*, 804 F.Supp.3d at 729. Its reasoning contains several errors.

*First*, the district court concluded that the slight differences in language between §1693*o*-2(a)(4)(B)'s permitted costs and prohibited costs provisions left "a gray area" to be filled by "a third" category of "other possible costs." *Linney's Pizza*, 804 F.Supp.3d at 729. Again, Congress defined permitted costs as "the incremental cost incurred by the issuer for the role of the

37

issuer in the authorization, clearance, or settlement in a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(i). Congress identified prohibited costs as "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* §1693*o*-2(a)(4)(B)(ii). Based on those slight differences, the district court decided that Congress "merely staked out what [it] considered essential to include and essential to exclude," but "did not speak to the array of other possible costs relevant to determining a reasonable and proportional fee" or "imply the exclusion of the third" category. *Linney's Pizza*, 804 F.Supp.3d at 729.

The district court's conclusion thus rests on an assumption that (1) the "incremental cost" related to "the authorization, clearance, or settlement of a particular transaction" and (2) the costs that are "not specific to a particular transaction" are not simply two different ways of describing the inverse sides of the same dichotomy. But this sort of "assumption" is "unwarranted because words sometimes express overlapping meaning, as indicated by context." *United States v. Davis*, 45 F.4th 73, 79 (D.C. Cir. 2022). There is no "canon of interpretation that forbids interpreting different words used in

38

different parts of the same statute to mean roughly the same thing." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013). Given the statute's full context, the better reading is that Congress sought to clearly articulate the distinction between mandatory costs and prohibited costs by providing two overlapping definitions.

In any event, courts should "not demand (or in truth expect) that Congress draft in the most translucent way possible." *Pulsifer v. United States*, 144 S.Ct. 718, 729 (2024). Litigants can always posit all manner of ways Congress *could have* crafted a statute differently or better. But that offers little insight into the best meaning of the statute that Congress *did* craft. *See id.* at 728-29 (rejecting this mode of argument). Courts therefore "'routinely construed statutes to have a particular meaning even as [they] acknowledged that Congress could have expressed itself more clearly.'" *Id.* at 729 (quoting *Luna Torres v. Lynch*, 578 U.S. 452, 472 (2016)). The question for this Court is not "[c]ould Congress have" written "in more crystalline fashion," but rather, "[i]s that the right and fair reading of the statute before us?" *Luna Torres*, 578

39

U.S. at 472-73. Here, the statute's best reading is that Congress bifurcated the universe of costs into two categories—not three.

And even if the district court were correct that the language of §1693*o*-2(a)(4)(B) somehow left "a gray area" or gap, the district court still tries to justify Regulation II from perceived statutory silence. Yet "Congress's silence on a given issue does not automatically … give an agency carte blanche to speak in Congress's place." *Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359, 374 (D.C. Cir. 2022) (Walker, J., dissenting), *maj. rev'd by* 144 S.Ct. at 2270. Congress's "silence is just that—silence." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). So when "all else [is] equal, silence indicates a lack of authority." *Loper Bright*, 45 F.4th at 374 (Walker, J., dissenting). Thus, even if the district court were correct that the perceived "gray area" implies (through statutory silence) a gap the Board can fill, the Board still lacked authority to use that silence to upend the rest of the statute.

*Second*, the district court invokes the Durbin Amendment's overarching purpose—setting a "reasonable and proportional" fee—as a sufficient reason to set aside the clear bifurcation of costs in §1693*o*-2(a)(4)(B). *See*

40

*Linney's Pizza*, 804 F.Supp.3d at 729. This would effectively mean that a general command must be given superseding force over any later, more specific statutory provisions.

That reasoning contradicts the classic interpretive principle that when there is a "conflict between a general provision and a specific provision, the specific provision prevails." *See* Scalia & Garner, *supra*, at 183. Where a "general authorization and a more limited, specific authorization exist side-by-side," the "terms of the specific authorization must be complied with" to avoid "the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). After all, agencies are bound "not only" by "the ultimate purposes Congress has selected," but also by "the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Tiger Lily, LLC v. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 669-70 (6th Cir. 2021) (quoting *MCI Telecomm.*, 512 U.S. at 231).

In the Durbin Amendment, Congress gave the Board a broad command to craft a reasonable and proportional fee standard—and *then* gave the

41

Board specific commands on what it could and could not consider when crafting that standard. The "scope of the grant of rulemaking authority" conveyed in the general statement of purpose must be measured "by reference to the means" that Congress explicitly discussed later in the statute. *Tiger Lily*, 5 F.4th at 670. The district court inverted that principle. The specific command to distinguish between two (and only two) categories of costs "narrows the scope of" the general command to set a reasonable and proportional fee. *Id.* The general command *cannot* be used to expand past the boundaries of the specific commands. *See Air All. Hous. v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority.").

*Third*, the district court reasoned that the textual bifurcation interpretation "reduces the Board to a mere calculator, sifting costs into one bucket or the other." *Linney's Pizza*, 804 F.Supp.3d at 729. That is mistaken. The Board still has the power to determine what fee is "reasonable and proportional" after considering all *correct* factors, which includes dividing the relevant costs into two categories, not three. 15 U.S.C. §1693*o*-2(a)(2), (4). But that

42

does not mean that the Board has the power to depart from the factors outlined by statute or conjure new considerations out of statutory silence. Furthermore, even if Congress did create a statutory scheme that requires the Board to function as a "mere calculator," the district court has no authority to deviate from that clear text reading, no matter how "mechanical" the district court finds that role to be. *Linney's Pizza*, 804 F.Supp.3d at 729.

**b.** Next, the district court rejected Linney's Pizza's reading of the phrase "other costs" by fixating on the lack of a comma before the first "which" in §1693*o*-2(a)(4)(B)(ii). The district court held that this supposedly missing comma transforms that provision from a *descriptive* clause into a *restrictive* clause and so authorizes the Board to create its implied third category of costs. *Linney's Pizza*, 804 F.Supp.3d at 730.

The district court erred by giving such dispositive weight to a missing comma. To be sure, punctuation can offer some insight into a statute's meaning. But courts have also said "[o]ver and over" that "punctuation alone" is not a "reliable guide for discovery of a statute's meaning." *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993). Statutory interpretation

43

"is a holistic endeavor," and a "purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *Id.* at 454-55 (cleaned up). So "the lack of a separating comma" in a statute "is not dispositive" as to its meaning, *United States v. Lockhart*, 749 F.3d 148, 154 (2d Cir. 2014), in part because "punctation is a most fallible guide by which to interpret a writing," *Clayman v. Goodman Props, Inc.*, 518 F.2d 1026, 1031 n.24 (D.C. Cir. 1973) (cleaned up).

So even though Congress did not set off §1693*o*-2(a)(4)(B)(ii)'s first "which" clause with a comma, such "commas are not necessary." *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1088 (11th Cir. 2017) (en banc) (rejecting argument that a clause was restrictive because it was "not set off by commas"). It is also well-settled that "which" clauses *can* bear a nonrestrictive meaning without a comma. For example, the phrase "Republicans oppose new taxes which are unnecessary" could have the nonrestrictive meaning that "all new taxes are anathema." Scalia & Garner, *supra*, 142.

44

And in any event, placing decisive weight on a comma—as the district court does here—is ultimately "a weak basis for deciding statutory meaning," given that grammarians have been "unsuccessful" in establishing the convention for preferring "comma-*which* for nonrestrictive [clauses]" "as a firm rule." *Id.* More important, when interpreting statutes, punctuation—and a strict "grammarian's" approach—can be "override[n]" to "give[] effect to every word" of the statute. *Id.* at 143; *see also id.* at 165 (explaining that punctuation can be "too weak to trump" "the overwhelming evidence from the structure, language, and subject matter" of the law).

The district court's conclusions about the missing comma and the non-restrictive "which" effectively contend that courts should always expect perfect grammar from Congress. But courts do not "review congressional enactments as a panel of grammarians." *Flora v. United States*, 362 U.S. 145, 150 (1960). As explained, Linney's Pizza's interpretation is the only one that produces a coherent understanding. The district court's comma-driven interpretation vitiates the Durbin Amendment's text, context, structure, and purpose

by "improperly narrowing the scope of *excluded* costs." *NACS I*, 958 F.Supp.2d at 106.

**3.** Building from the supposedly missing comma, the district court concludes that Linney's Pizza's reading would make the phrase "which are not specific to a particular electronic debit transaction" surplusage. *Linney's Pizza's*, 804 F.Supp.3d at 730. But the "canon against surplusage is not an absolute rule," and "certainly does not require" "favor[ing] an unusual meaning ... over a more natural one." *Stanley v. City of Sanford*, 145 S.Ct. 2058, 2066 (2025) (cleaned up). That is particularly true when enforcing the surplusage canon would, itself, create even more surplusage. Here, by invoking surplusage to avoid the textual bifurcation reading of the statute, the district court authorizes a silent, third category that swallows up *all* costs and thereby renders many other key statutory terms—"distinguish between," "incremental cost," "other costs," "shall," and "shall not"—entirely superfluous. *See* 15 U.S.C. §1693*o*-2(a)(4)(B).

46

*    *    *

In the end, the district court relied on little more than purported statutory silence and a missing comma to justify inventing a third category of costs and upending the framework Congress crafted. No court should create a new statutory provision out of silence based on such a fragile reed. This Court's role is to determine the "best reading" of existing statutory text—not to imply new text from silence. *Loper Bright*, 144 S.Ct. at 2266, 2269. Here, the plain text leads to but one conclusion: Congress divided costs into just two categories and limited the Board to considering only incremental ACS costs when setting interchange fees.

## C.    Regulation II contradicts the Durbin Amendment by including prohibited costs in the fee standard.

Regulation II is contrary to the Durbin Amendment for a second, independent reason. The Board included in the fee standard four specific types of costs that are disallowed under the Durbin Amendment: (1) fixed ACS costs, (2) network-processing fees, (3) transaction-monitoring costs, and (4) fraud losses. *See* Regulation II, R.39-2, PageID#397-402. The district court rejected that conclusion, holding that nothing in the statute prevented the

47

Board from including these categories in the fee standard. *See Linney's Pizza*, 804 F.Supp.3d at 731-36. That was error—each of these four categories of costs directly conflicts with Congress's instructions.

**1. Fixed ACS costs.** The Board improperly added "fixed" ACS costs—network connectivity, software, hardware, equipment, and associated labor—into the fee standard. Regulation II, R.39-2, PageID#375; *see also* Updated Rule, R.39-7, PageID#561. Again, the Durbin Amendment limits the Board to considering the "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," while forbidding the Board to consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii) (emphasis added).

Fixed ACS costs are not and cannot be the same as incremental ACS costs. Under settled legal definitions, a fixed cost is a cost that "does not fluctuate with changes in output or business activity," like "overhead expenses such as rent, salaries, and depreciation." Fixed Cost, *Black's Law Dictionary* (9th ed. 2009); *see also San Antonio v. United States*, 631 F.2d 831, 851 n.1 (D.C.

48

Cir. 1980) ("By definition, fixed costs are not associated with any particular traffic."). It would be "a stretch if a shoe store claimed that the rent it pays its landlord is somehow 'specific' to a 'particular' shoe sale." *NACS II*, 746 F.3d at 489. But the Board attempted that precise "stretch" in Regulation II. Banks' fixed ACS costs are not "specific" to any "particular" debit transaction and thus cannot anchor the fee standard. 15 U.S.C. §1693*o*-2(a)(4)(B)(ii).

In the rule, the Board insisted that the Durbin Amendment did not require it to define "fixed or variable costs," Regulation II, R.39-2, PageID#398, thus supposedly leaving the Board free to include all types of fixed ACS costs in the fee standard. The district court agreed that the statute did not require such definitions or line-drawing. *Linney's Pizza*, 804 F.Supp.3d at 732. But definitions matter, especially when Congress used mandatory language that costs either "shall" or "shall not" be considered. 15 U.S.C. §1693*o*-2(a)(4)(B). Fixed ACS costs like "software, hardware, equipment, and labor," Regulation II, R.39-2, PageID#375, are not "*incremental* costs associated with a *particular* electronic debit transaction," 15 U.S.C. §1693*o*-2(a)(4)(B) (emphasis added). And by including fixed ACS costs in the fee standard, Regulation

49

II renders Congress's bifurcation of mandatory and prohibited costs meaningless. This sort of "dodge" to "end run around important statutory limitations" contravenes "Congress' will" and upsets "the careful balance of the statute." *Humane Society of U.S. v. Zinke*, 865 F.3d 585, 603 (D.C. Cir. 2017) (cleaned up).

The district court excused the Board's manipulation of the statute by reasoning that "any such distinctions"—between "fixed" and "variable"—would "be artificial and unworkable." *Linney's Pizza*, 804 F.Supp.3d at 732 (cleaned up). But courts should not allow agencies to ignore Congress simply because Congress identified a difficult task. "[P]ractical considerations … do not justify departing from the statute's clear text." *Pereira v. Sessions*, 585 U.S. 198, 217 (2018); *see Comcast Corp. v. FCC*, 579 F.3d 1, 7 (D.C. Cir. 2009) ("[t]hat a problem is difficult may indicate a need to make some simplifying assumptions," "but it does not justify ignoring altogether a variable so clearly relevant and likely to affect the calculation" a rule requires). Congress forbade the Board to consider costs "which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(ii). Fixed

50

costs fall outside that category. By including them, the Board exceeded its "statutory jurisdiction, authority, [and] limitations." 5 U.S.C. §706(2)(C).

**2. Transaction-monitoring costs.** The Board also included transaction-monitoring costs in the base fee standard. *See* Regulation II, R.39-2, PageID#401-02. Those involve "[t]ransactions-monitoring systems, such as neural networks and fraud-risk scoring systems," that help issuers decide whether to approve a transaction. Updated Rule, R.39-7, PageID#561. But what the Board calls "transaction-monitoring costs" is simply another name for fraud-prevention costs. Indeed, the Board has long called transaction-monitoring costs "the paradigmatic example of fraud-prevention costs." *NACS II*, 746 F.3d at 492; *see also* Regulation II, R.39-2, PageID#368 ("The most commonly reported fraud-prevention activity was transaction monitoring.").

This means that Regulation II improperly double-counted fraud-prevention-type costs in the fee standard. The Durbin Amendment already addresses fraud prevention through a separate, conditional adjustment—after the base fee is set, and only for issuers who comply with Board-established

51

fraud standards. 15 U.S.C. §1693*o*-2(a)(5)(A)(i)-(ii). That latter provision allows an adjustment to the interchange fee "if" the adjustment is "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud" and in compliance with standards. *Id.* §1693*o*-2(a)(5)(A).

Baking transaction-monitoring costs (the most common fraud-prevention costs) into the base fee renders the separate adjustment superfluous. *See In re Cardizem CD Antitrust Litig.*, 481 F.3d 355, 364 (6th Cir. 2007) (rejecting an interpretation that "would make superfluous other provisions" that elsewhere provide for the same cost recovery). Worse, it undercuts the statute's incentive structure: under the district court's misconstruction, issuers automatically get reimbursed for fraud prevention without needing to meet any standards. That contradicts the conditional adjustment scheme Congress instituted to spur better fraud controls. *See* 12 C.F.R. §235.4(b)(1).

Legislative history confirms this point. Senator Durbin made clear that "any fraud prevention adjustment to the fee amount would occur after the base calculation of the reasonable and proportional interchange fee amount takes place." 156 Cong. Rec. S5925 (emphasis added). It "would not be

52

considered as part of the incremental issuer costs upon which the reasonable and proportional fee amount is based." *Id.*

Yet the district court held that double-counting these transaction-monitoring costs did not offend the Durbin Amendment, reasoning that "transaction-monitoring costs, though they also aid in fraud prevention, are integral to an issuer's decision to authorize a specific transaction." *Linney's Pizza*, 804 F.Supp.3d at 733 (cleaned up). The district court therefore found nothing wrong with the same transaction-monitoring costs doing "double-duty" or "overlapping" to serve multiple purposes of the statute. *Id.* But according to the Board's own definitions, these transaction-monitoring costs *are* fraud-prevention costs. *See* Regulation II, R.39-2, PageID#368. And the district court never explained why a single set of costs—even if serving "double-duty"—should be counted in the transaction fee standard *twice*. Regulation II includes transaction-monitoring costs (which are just fraud-prevention costs) *before* the Durbin Amendment's fraud-prevention adjustment, which renders this adjustment provision superfluous.

**3. Fraud losses.** Regulation II tacked on a 5-basis-point ad valorem component for "fraud losses"—losses unrelated to nonsufficient funds and not recovered via chargebacks. Regulation II, R.39-2, PageID#402. But incorporating a fraud losses reimbursement into the fee standard is unlawful for three reasons.

*First*, fraud *losses* are not "*costs*" under the statute. The Durbin Amendment covers only "the incremental *cost* incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i) (emphasis added). "Cost" means "[t]he amount paid or charged for something; price or expenditure." Cost, *Black's Law Dictionary* (9th ed. 2009). Fraud *losses* are not amounts paid or charged for the issuer's ACS role; they are the "disappearance or diminution of value" from a risk that materializes later. Loss, *Black's Law Dictionary* (9th ed. 2009). The Board acknowledged as much in the Proposed Rule: "[f]raud losses … are not includable as allowable costs." R.39-6, PageID#555. Even in the final rule, the Board conceded that fraud losses "are generally the result of the authorization, clearance, and settlement of an

54

apparently valid transaction that the cardholder *later identifies* as fraudulent." Regulation II, R.39-2, PageID#402.

*Second*, fraud losses are not "incremental cost[s] incurred" in a *particular* transaction. 15 U.S.C. §1693*o*-2(a)(4)(B)(i) (emphasis added). The Board conceded this point when it acknowledged that "the exact source of fraud often is unknown" and "network rules allocate responsibility for fraudulent transactions." Regulation II, R.39-2, PageID#402. But merchants pay the 0.05% fraud-loss reimbursement fee for every transaction, regardless of whether any loss occurs on that particular transaction. These constitute anticipatory transfers for "potential loss," not actual incurred "costs." *See id.* Yet the district court ignored the Board's concessions that fraud losses were included to compensate for pure "risk" and "potential loss." *See id.* ("[A]n issuer takes on a greater risk when approving a $100 transaction than a $5 transaction because the amount of the potential loss is greater.").

*Third*, this fraud-loss reimbursement wrecks the statutory scheme. Congress addressed fraud through a conditional ex-post adjustment that rewards issuers who adopt strong prevention measures. *See* 15 U.S.C. §1693*o*-

55

2(a)(5)(A). In essence, Congress sought to incentivize issuers to develop better systems of avoiding fraud by providing the front-end adjustment for better fraud-prevention systems, not a back-end reimbursement for actual fraud suffered. Regulation II short-circuits that incentive by letting issuers recover fraud losses automatically—making fraud a profit center for issuers. That inverts Congress's goal of encouraging fraud reduction and keeping fees "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693*o*-2(a)(2), (5).

The district court sought to justify the fraud-loss reimbursement by analogizing to "lottery tickets" and claiming that the existence of some "uncertainty" does not transform an up-front cost into an after-the-fact loss. *Linney's Pizza*, 804 F.Supp.3d at 734-35. Such an analogy is particularly inapt here. Congress authorized the Board to set a transaction fee based on the *costs* related to the authorization, clearance, and settlement of particular transactions, and the Board itself admits that fraud losses are suffered well after the final stage of that process (settlement) has been completed. *See*

56

Regulation II, R.39-2, PageID#402. The Durbin Amendment does not authorize the Board to create an insurance policy for after-the-fact losses.

**4. Network-processing fees.** The Board unlawfully included network-processing fees (charged by networks like Visa and Mastercard to issuers and acquirers for processing). *See* Regulation II, R.39-2, PageID#401. The inclusion of these fees also contradicts the Durbin Amendment, for three reasons.

*First*, the statute defines "network fee" as "any fee charged and received by a payment card network with respect to an electronic debit transaction, *other than an interchange transaction fee*." 15 U.S.C. §1693*o*-2(c)(10) (emphasis added). For purposes of calculating a lawful transaction fee standard under this statute, a network fee cannot simultaneously be *not* an interchange fee but also a *component* of the interchange fee.

*Second*, the statute explicitly orders the Board to ensure that "a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction." *Id.* §1693*o*-2(a)(8)(B)(i). Regulation II does

57

exactly that by folding network-processing fees into the interchange standard.

*Third*, network-processing fees are not "*incremental* cost[s] incurred by an issuer" for its role in ACS of a particular transaction. *Id.* §1693*o*-2(a)(4)(B)(i). They are costs the networks charge for their role. The Board's contention that issuers incur them to effect transactions cannot override the statute's express bar on treating network fees as interchange components or issuer compensation. *See id.* §§1693*o*-2(c)(10), (a)(8)(B)(i).

But the district court tried to justify including this prohibited cost by claiming that "no transaction can be completed without" network fees, and that "[i]ssuers must participate in networks and must pay fees to do so." *Linney's Pizza*, 804 F.Supp.3d at 736. But in this sense, the district court has acknowledged that network fees are simply another "fixed" cost, unrelated to the "incremental" cost of any "particular" transaction. The district court also waved aside the Durbin Amendment's explicit ban on using network fees to "compensate an issuer," 15 U.S.C. §1693*o*-2(a)(8)(B)(i), by claiming that this exact language only prohibits issuers from "circumventing" other

rules and does not actually prohibit issuers from receiving "reasonable" compensation for network fees, *Linney's Pizza*, 804 F.Supp.3d at 736. But this reasoning reads out of the statute Congress's explicit direction that network fees should not "directly or indirectly compensate an issuer with respect to an electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(8)(B)(i).

### D. Regulation II contradicts the Durbin Amendment by setting a one-size-fits-all cap.

Regulation II's fee standard also contradicts the statute and exceeds statutory authority by imposing a one-size-fits-all standard despite the statute's requirement of issuer- and transaction-specific fee standards.

The Durbin Amendment demands that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." 15 U.S.C. §1693*o*-2(a)(2) (emphasis added). The definite article "the" signals limitation, not generalization. *Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000). The "statute's use of the definite article 'the' takes precedence over an indefinite

59

reading to the contrary." *In re MCP No. 185*, 124 F.4th 993, 1010 (6th Cir. 2025) (quoting *Corner Post*, 144 S.Ct. at 2455).

Here, "[b]y using the definite article 'the' … Congress specified that each of these metrics has a single, definite, discernable value." *Bridgeport Hosp.*, 108 F.4th at 887. Congress thus "particularize[d] the subject which it precedes," *Slater*, 231 F.3d at 5 (cleaned up), tying "cost" and "transaction" to each "issuer," 15 U.S.C. §1693o-2(a)(2). Put simply, the statute instructs that each issuer's recoverable fee must reflect its own *specific* costs for its own *specific* transactions. The interchange fee thus must be issuer-specific and transaction-specific.

Other provisions reinforce this conclusion. The statute tells the Board to consider "the incremental cost by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(i) (emphasis added). Again using "the," it links recoverable costs to "particular" transactions—meaning "[p]ertaining to a single definite thing or person, or set of things or persons, as distinguished from others," or "[b]elonging only to a specified person or thing; restricted

60

to." Particular, *Shorter Oxford English Dictionary* (6th ed. 2007); *see also* Particular, *New Oxford Am. Dictionary* (3d ed. 2010). The fee must also be "proportional" to those costs. As the Board admitted, "the term 'proportional' requires a relationship between the interchange fee and the costs incurred." Regulation II, R.39-2, PageID#394. Regulation II defies both mandates by letting every issuer charge the same—21 cents plus 0.05% per transaction—irrespective of actual per-issuer, per-transaction costs.

Rather than grappling with these textual requirements, the district court adopts the Board's claim that requiring issuer- and transaction-specific fees "would result in a statutory requirement that is virtually impossible to implement." *Linney's Pizza*, 804 F.Supp.3d at 737. But once again, "practical considerations … do not justify departing from the statute's clear text." *Pereira*, 585 U.S. at 217. Agencies cannot rewrite statutory commands because they are difficult. Nor can the district court greenlight the erasure of "specific" and "particular" from the text. 15 U.S.C. §1693*o*-2(a)(4)(B) (allowing "the incremental cost … in … a *particular* electronic debit transaction" and

61

prohibiting costs "which are not *specific* to a *particular* electronic debit transaction" (emphasis added)).

In any event, the district court fails to acknowledge that Congress gave the Board the exact tools it would need to calculate these flexible standards. Elsewhere in the Durbin Amendment, Congress empowered the Board to retrieve "such information as may be necessary" to craft fee standards from issuers and networks. 15 U.S.C. §1693*o*-2(a)(3)(B). Indeed, the Board even initially proposed "an issuer-specific measurement of costs and fees," requiring each issuer to "calculat[e] its allowable costs and receiv[e] an interchange fee that does not exceed its per-transaction allowable costs." Regulation II, R.39-2, PageID#391-93; *cf.* Scalia & Garner, *supra*, at 388 ("legislative history can be consulted to refute attempted application of the absurdity doctrine" and to "establish that it is indeed thinkable that a particular word or phrase should mean precisely what it says").

In sum, the Durbin Amendment mandates a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693*o*-2(a)(2). Regulation II must tie costs to actual issuers

62

and particular transactions—not averages for hypotheticals. Its blanket, average-driven cap flouts the statute.

## II. Regulation II's fee standard is arbitrary and capricious.

Regulation II's fee standard is independently unlawful because it is arbitrary and capricious. The APA requires agencies to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up). Courts must therefore set aside agency action that is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. §706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *Prometheus Radio*, 141 S.Ct. at 1158. The Board's fee standard under Regulation II is arbitrary and capricious for three independent reasons.

### A. The Board ignored the functional similarity between debit-card and checking transactions.

Agency action is arbitrary and capricious when it "fail[s] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Mere "bare acknowledgement" will not suffice; the agency must offer "reasoned consideration." *Louisiana v. EPA*, 90 F.4th 461, 473 (5th Cir. 2024); *see also Prometheus*

*Radio*, 141 S.Ct. at 1158. That demands "adequate" engagement with "an important aspect of [the] problem." *Louisiana*, 90 F.4th at 470, 473.

Here, Congress crafted the Durbin Amendment to ensure that interchange fees cover issuers' incremental ACS costs while approximating as closely as possible the "functional[ly] similar[]" model of "checking transactions," which "are required within the Federal Reserve bank system to clear at par." 15 U.S.C. §1693*o*-2(a)(4)(A)(ii). Whatever "functional similarity" entails, *id.* §1693*o*-2(a)(4)(A), it cannot reconcile a zero-fee par system for checks with a debit regime yielding tens of billions of dollars in annual fees.

The district court erred when it concluded that the Board adequately "compared debit-card transactions to checking transactions" by discussing the "similarities and differences" between the two. *Linney's Pizza*, 804 F.Supp.3d at 739. True enough, the background section of Regulation II sketches parallels and contrasts between debit and checking. *See* Regulation II, R.39-2, PageID#369-70. But in the analytical portion of Regulation II, references to checking vanish. *See id.* PageID#399. The rule's cost analysis briefly nods to the required functional similarity between debit and

64

checking, but that's all—the Board then just "move[s] on," *Louisiana*, 90 F.4th at 473. The role of fixed ACS costs received no comparison in the final rule. For example, processing checks, just like debit payments, requires the processor to have "equipment, hardware, software, and associated labor." Regulation II, R.39-2, PageID#401. Yet Regulation II allows debit card issuers to recover costs for those expenses, even though "a payor's bank in a check transaction (analogous to the issuer in a debit card transaction) would not recoup such costs from the payee's bank (analogous to the merchant acquirer in a debit card transaction)." *Id.* at PageID#369; *see also id.* at PageID#371 ("The presenting bank typically does not pay a fee to the payor's bank in order to receive settlement for the check."). Regulation II offers no adequate rationale for glossing over this incongruity.

Regulation II likewise lacks any comparison of the similarities in transaction-monitoring costs between checking and debit transactions. *See id.* at PageID#401-02. Neither does it compare the similarities in fraud-loss adjustments. *See id.* at PageID#402. Network-processing fees alone draw a checking analogy, *see id.* at PageID#401, but inadequately—the Board includes

65

them by likening them to paper-check processing, where "the payee's bank (the corollary to the acquirer for the merchant) typically pays all of the processing costs, while the payor's bank (the corollary of the issuer in an electronic debit transaction) typically pays no processing fees." *Id.* Even so, it acknowledges that "in electronic check collection systems, both the payee's bank and the payor's bank generally pay processing fees." *Id.* So even though Regulation II *acknowledged* that checks and debit transactions have many of the same costs, it ignored Congress's directive and allowed debit issuers to recover costs that banks cannot recover with respect to check transactions. Contrary to the district court's conclusion, mere acknowledgment is not the same as "reasoned consideration" or an explanation for differential treatment. *Louisiana*, 90 F.4th at 473.

Regulation II thus fell short of Congress's directive to weigh functional similarity. Its fee standard, reaffirmed in the Updated Rule, must be vacated as arbitrary and capricious.

## B.    Regulation II considered unauthorized costs and failed to rationalize those inclusions.

Arbitrariness further infects the fee standard because Regulation II "relied on factors which Congress has not intended it to consider." *Meister v. U.S. Dep't of Ag.*, 623 F.3d 363, 371 (6th Cir. 2010) (cleaned up). Congress confined the Board to considering only incremental ACS costs, barring all others. *See supra* 17-37; 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii). Defying this, the Board asserted power over "*all* costs related to a particular transaction." Regulation II, R.39-2, PageID#398 (emphasis added).

Compounding that error, the Board proceeded to act arbitrarily by refusing to "define adequately key terms" and substituting "a statutory command with some other standard." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1201-02 (10th Cir. 2001). The Durbin Amendment requires the Board to "distinguish between" the issuer-specific "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" and "other costs." 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii). Despite this explicit command, the Board decided it was "not ... necessary to determine whether costs are 'incremental,' fixed or variable," or even

67

if costs were linked to "authorization, clearance, and settlement." Regulation II, R.39-2, PageID#398. But without definitions or determinations of what incremental or ACS costs are, it becomes impossible for the Board to carry out its congressionally-mandated task of "distinguish[ing] between" those costs and "other" costs. 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii).  The Board instead imposed its own regime, embracing "all costs related to a particular transaction," *id.*, contrary to the statute's exclusive focus on incremental ACS costs, 15 U.S.C. §1693o-2(a)(4)(B)(i); *see supra* 17-37. That abdication was arbitrary. *Qwest Corp.*, 258 F.3d at 1201-02.

This refusal to define different types of "costs" led to inconsistent treatment of cost categories. After all, the Board chose to still include many fixed ACS costs in Regulation II, but at the same time, it excluded corporate overhead and compliance costs. *Compare* Regulation II, R.39-2, PageID#375 (including "network connectivity; software, hardware, equipment, and associated labor"), *with id.* at PageID#398 (excluding "corporate overhead" and "general debit card program costs, such as card production and delivery costs"). The Board leaves the reader guessing why Regulation II bars these

68

latter fixed costs that are "related to debit card programs and transactions," if Regulation II's own purported rule is to include "all costs related to a particular transaction" rubric. *Id.* at PageID#398. Likewise, fraud losses were included in Regulation II as "generally the result of the authorization, clearance, and settlement" of illicit transactions, *id.* at PageID#402, but "non-sufficient funds" losses from overdrawn authorizations were not, despite parallel issuer risks, *id.* at PageID#400.

The district court concluded that "[t]he Board's failure to define these terms" was "not arbitrary and capricious," stating—without explanation—that "the lines the Board drew appear eminently reasonable." *Linney's Pizza*, 804 F.Supp.3d at 733, n.9. Yet this misses the primary point—in a statute where Congress explicitly directed the Board to distinguish between two categories of costs, the Board chose not to draw any lines at all and instead "consider[ed]" "all costs related to a particular transaction." Regulation II, R.39-2, PageID#398. And even within that self-created paradigm, the Board never explains the inconsistency between counting a one-time investment in processing equipment towards the fee, but not counting a one-time

69

investment in managerial salaries or physical locations for the processing equipment towards the fee. Such "internally inconsistent" treatment of similar types of costs is a classic hallmark of arbitrary agency action. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024-28 (D.C. Cir. 2018).

## C.    The Board bypassed issuer- and transaction-specific costs in favor of hypothetical averages for a universal cap.

Regulation II is also arbitrary—again for relying on factors that Congress did not intend it to consider—insofar as it rejects Congress's issuer- and transaction-specific directions in favor of a hypothetical average. The Durbin Amendment specifies that fees "that an issuer may receive with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693*o*-2(a)(2). This language requires tailored, issuer- and transaction-specific assessments, not a blanket cap divorced from them. *See supra* 59-62. At minimum, Congress did *not* instruct the Board to base its calculations on hypothetical averages for a generic issuer and transaction. *See id.* Yet the Board built Regulation II around precisely such abstractions. *See id.*; Regulation II,

70

R.39-2, PageID#393-95. So the Board once again relied on factors Congress did not intend for it to consider. *See State Farm*, 463 U.S. at 43.

### III.   Regulation II's fee standard should be vacated.

The APA authorizes courts "to hold unlawful and set aside agency action." 5 U.S.C. §706(2). This language incorporates the traditional meaning of "set aside," or what courts now call vacatur. *Corner Post*, 144 S.Ct. at 2462 (Kavanaugh, J., concurring). Vacatur is the default remedy for APA violations, *see Kentucky v. Biden*, 123 F.4th 455, 473 (6th Cir. 2024), and is the proper remedy here, where the Board's rule is ultra vires and suffers from a fundamental defect, *see United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

Vacatur of Regulation II's fee standard is also necessary to afford Linney's Pizza meaningful relief. Absent vacatur, regulated parties like Linney's Pizza would still be left without redress even after successfully challenging an unlawful regulation. *Corner Post*, 144 S.Ct. at 2464 (Kavanaugh, J., concurring). The Board has already once conceded before the Supreme Court that

71

vacatur is "the only way" to provide relief to a merchant like Linney's Pizza. Tr. of Oral Arg. at 76, *Corner Post*, 144 S.Ct. 2440.

This Court should therefore vacate the fee-standard portions of Regulation II and the Updated Rule—or remand to the district court with instructions for the same. To avoid regulatory disruption, the Court should stay its vacatur order for six months to prevent a return to the unregulated pre-Durbin Amendment market. *See, e.g., NACS I*, 958 F.Supp.2d at 114-15.

## CONCLUSION

The fee standard in Regulation II is contrary to law, exceeds statutory authority, and is arbitrary and capricious. This Court should reverse the district court's judgment and vacate Regulation II's fee standard.

Dated: April 29, 2026                    Respectfully submitted,

Jennifer Kincaid Adams                   /s/ Tyler R. Green
BLACKBURN DOMENE BURCHETT                 Tyler R. Green
PLLC                                     CONSOVOY MCCARTHY PLLC
614 W. Main Street, Suite 3000           222 S. Main St., 5th Fl.
Louisville, KY 40202                     Salt Lake City, UT 84101
(502) 584-1600                           (703) 243-9423
jadams@bdblawky.com                      tyler@consovoymccarthy.com

                                         Bryan Weir
                                         Frank H. Chang
                                         Cody Ray Milner
                                         CONSOVOY MCCARTHY PLLC
                                         1600 Wilson Blvd., Ste. 700
                                         Arlington, VA 22209
                                         (703) 243-9423
                                         bryan@consovoymccarthy.com
                                         frank@consovoymccarthy.com
                                         cody@consovoymccarthy.com


                    *Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) because it contains 12,974 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it was prepared using Microsoft Word in 14-point Palatino Linotype font.

Dated: April 29, 2026                              /s/ *Tyler R. Green*
                                                   Counsel for Appellant


## CERTIFICATE OF SERVICE

I filed this brief via ECF, which will email everyone requiring notice.

Dated: April 29, 2026                              /s/ *Tyler R. Green*
                                                   Counsel for Appellant

74

## ADDENDUM
## Designation of Relevant Documents

| Record Entry | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1-40 |
| 39 | Linney's Pizza's Motion for Summary Judgment | 316-17 |
| 39-1 | Linney's Pizza's Memorandum in Support of Summary Judgment | 318-63 |
| 39-2 | Ex. A – Regulation II | 364-446 |
| 39-4 | Ex. C – Merchants Payments Coalition Comment Letter | 464-504 |
| 39-5 | Ex. D – NACS Comment Letter | 505-15 |
| 39-6 | Ex. E – Proposed Rule | 516-58 |
| 39-7 | Ex. F – Updated Rule | 559-62 |
| 44 | Board's Cross-Motion for Summary Judgment | 733-34 |
| 44-2 | Board's Memorandum in Support of Summary Judgment | 736-79 |
| 53 | Linney's Pizza's Combined Response and Reply | 859-94 |
| 55 | Board's Combined Response and Reply | 922-47 |
| 56 | District Court's Opinion and Order | 948-66 |
| 62 | Judgment | 1105 |
| 63 | Linney's Pizza's Notice of Appeal | 1106-07 |