No. 25-6038

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

LINNEY'S PIZZA, LLC,
*Plaintiff-Appellant*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Eastern District of Kentucky (No. 3:22-cv-00071-GFVT)

---

**BRIEF OF *AMICI CURIAE* RETAIL LITIGATION CENTER, INC.; FOOD MARKETPLACE, INC. D/B/A FMI, THE FOOD INDUSTRY ASSOCIATION; MERCHANT ADVISORY GROUP; NATIONAL ASSOCIATION OF CONVENIENCE STORES; NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER, INC.; RESTAURANT LAW CENTER; ARKANSAS RETAILERS ASSOCIATION; IOWA RETAIL FEDERATION; KENTUCKY RETAIL FEDERATION; MICHIGAN RETAILERS ASSOCIATION; MINNESOTA RETAILERS ASSOCIATION; AND MISSOURI RETAILERS ASSOCIATION IN SUPPORT OF APPELLANT**

---

Monica Welt
Josh Moore
RETAIL LITIGATION CENTER, INC.
99 M Street, S.E., Suite 700
Washington, DC 20003
(202) 869-0200

Adam G. Unikowsky
Krister Rasmussen
JENNER & BLOCK LLP
1099 New York Ave. N.W. Suite 900
Washington, DC  20001-4412
(202) 639-6000
aunikowsky@jenner.com

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ........................................................................4

I.  The inclusion of the prohibited costs in Regulation II's fee cap cannot be squared with the text or purpose of the Durbin Amendment. ....................4

    A.  The inclusion of the prohibited costs in Regulation II's fee cap exceeds the Board's authority under the Durbin Amendment..............4

    B.  The broader statutory and regulatory context confirms that the Board has exceeded its statutory authority........................................10

II.  The inclusion of the prohibited costs in Regulation II's fee cap imposes  unreasonable costs on merchants. ....................................13

    A.  Regulation II has permitted banks to extract unreasonable profits from retailers, and these profits are increasing........................14

    B.  Regulation II's inclusion of the prohibited costs has also effectively forced merchants to indemnify issuers for fraud losses........................................................................19

III.  The Banks' policy justifications for including the prohibited costs in Regulation II's fee cap lack merit..................................................23

CONCLUSION ........................................................................27

APPENDIX A: INTEREST OF AMICI................................................28

i

# TABLE OF AUTHORITIES

**CASES**

*Batterton v. Francis*,
    432 U.S. 416 (1977)...........................................................................................8, 9

*Chewy, Inc. v. U.S. Dep't of Lab.*,
    69 F.4th 773 (11th Cir. 2023) ...............................................................................28

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    794 F. Supp. 3d 610 (D.N.D. 2025)........................................................6, 8, 9, 10

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    568 U.S. 519 (2013)...............................................................................................28

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)..................................................................................................8

*NACS v. Board of Governors of Federal Reserve System*,
    746 F.3d 474 (D.C. Cir. 2014)....................................................................8, 11, 13

*Pulse Network, LLC v. Visa, Inc.*,
    30 F.4th 480 (5th Cir. 2022) ..................................................................................24

*South Dakota v. Wayfair, Inc.*,
    585 U.S. 162 (2018)................................................................................................28

*State v. Welch*,
    595 S.W.3d 615 (Tenn. 2020) ...............................................................................28

*United States v. Visa, Inc.*,
    788 F. Supp. 3d 585 (S.D.N.Y. 2025) ...................................................................24

*United States v. Visa, Inc.*,
    No. 24-cv-7214 (S.D.N.Y. Sept. 24, 2024), ECF No. 1 ......................................24

**STATUTES**

15 U.S.C. § 1693*o*-2(a)(1) .............................................................................................25

15 U.S.C. § 1693*o*-2(a)(2) .............................................................................................11

15 U.S.C. § 1693*o*-2(a)(3)(A).......................................................................................2, 5

15 U.S.C. § 1693*o*-2(a)(4)(A)............................................................................15

15 U.S.C. § 1693*o*-2(a)(4)(B)(i) ..........................................................6, 10, 19

15 U.S.C. § 1693*o*-2(a)(4)(B)(i)-(ii) ...............................................................5

15 U.S.C. § 1693*o*-2(a)(4)(B)(ii) ..............................................................5, 25

15 U.S.C. § 1693*o*-2(a)(5)(A)(i) .....................................................................7

15 U.S.C. § 1693o-2(a)(5)(A)(ii)(I) ..................................................................7

15 U.S.C. § 1693*o*-2(a)(5)(B)(ii)(IV)-(V) .....................................................21

15 U.S.C. § 1693*o*-2(a)(8)(B)(i) .....................................................................6

15 U.S.C. § 1693*o*-2(c)(10) ............................................................................5

42 U.S.C. § 607(a) (1976)..................................................................................9

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.
    L. No. 111-203, § 1075, 124 Stat. 1376, 2068-74 (2010), codified
    at 15 U.S.C. § 1693*o*-2 ...............................................................2, 11

**LEGISLATIVE MATERIALS**

156 Cong. Rec. 10,441 (2010) (statement of Sen. Durbin) ...................................7

*Understanding the Federal Reserve's Proposed Rule on Interchange
    Fees: Implications and Consequences of the Durbin Amendment:
    Hearing Before the Subcomm. on Fin. Institutions & Consumer
    Credit of the H. Comm. on Fin. Servs.*, 112th Cong. (2011)
    (testimony of Sarah Bloom Raskin, Governor, Federal Reserve
    Board), https://www.federalreserve.gov/newsevents/testimony/
    raskin20110217a.htm..............................................................................12

**OTHER AUTHORITIES**

76 Fed. Reg. 43,394, 43,429-31, 43,404 (July 20, 2011) ........................................3

76 Fed. Reg. at 43,429-31, 43,404.........................................................................4

80 Fed. Reg. 48,684, 48,685 (Aug. 14, 2015) ........................................................6

88 Fed. Reg. at 78,105 ...................................................................................17

88 Fed. Reg. at 78,108 ...................................................................................20

*ABA Statement on Federal Reserve's Proposed Regulation II Changes*
    (Oct. 25, 2023),
    https://web.archive.org/web/20251017214017/https:/www.aba.com
    /about-us/press-room/press-releases/federal-reserve-proposed-
    regulation-ii-changes ................................................................................24

Aswath Damodaran, *Margins by Sector (US)* (data as of Jan. 2026),
    https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/
    margin.html ("New York University, *Margins by Sector (US)*")  ...............15, 17

*Credit Cards: Rising Interchange Fees Have Increased Costs for*
    *Merchants, but Options for Reducing Fees Pose Challenges*
    (2009), https://www.gao.gov/assets/gao-10-45.pdf.............................................11

*Debit Card Interchange Fees and Routing*, Notice of Proposed
    Rulemaking, 75 Fed. Reg. 81,722, 81,736-39 (Dec. 28, 2010).........................12

*Debit Card Interchange Fees and Routing*, Notice of Proposed
    Rulemaking, 88 Fed. Reg. 78,100, 78,105 (Nov. 14, 2023)..............................15

Fed. R. App. P. 29(a)(4)(E)..............................................................................1

Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) ......................................................33

Fed. R. App. P. 32(a)(5)...................................................................................33

Fed. R. App. P. 32(a)(6)...................................................................................33

Fed. R. App. P. 32(f)........................................................................................33

Federal Reserve Board, *Data Tables: Interchange Fee Revenue,*
    *Covered Issuer Cost, and Covered Issuer and Merchant Fraud*
    *Loss Related to Debit Card Transactions*, Table 14 (2021),
    http://www.federalreserve.gov/payment
    systems/files/regiireportsdata.xls (data through 2021).....................................20

iv

Federal Reserve System, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* at 22-23 (Dec. 2025), https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2023.pdf ........................................................................................14

Letter from James W. Frost, Office of Policy & Coordination, Bureau of Competition, FTC, to Julie B. Rottenberg, Deputy General Counsel, Chief Counsel, North America, Risk and Merchant Solutions Visa Inc. (Nov. 22, 2016), https://www.ftc.gov/system/files/documents/closing_letters/nid/closing_letter_from_james_frost_to_visa_-_11-22-16.pdf...................................23

Michael Ozanian, *CNBC's Official MLB Team Valuations 2025: Here's How the 30 Franchises Stack Up*, CNBC (Apr. 11, 2025), https://www.cnbc.com/2025/04/11/cnbcs-official-mlb-team-valuations-2025.html ....................................................................18, 19

Press Release, FTC, *FTC Approves Final Order Requiring Mastercard to Stop Blocking the Use of Competing Debit Payment Networks* (May 30, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-approves-final-order-requiring-mastercard-stop-blocking-use-competing-debit-payment-networks...............................................................................23

Reuters, *Visa, Mastercard Draw FTC Inquiry Over Debit Card Transactions - Bloomberg Law*, Reuters (Nov. 13, 2019), https://www.reuters.com/article/us-ftc-visa-mastercard-probe/visa-mastercard-draw-ftc-inquiryover-debit-card-transactions-bloomberg-law-idUSKBN1XN291 ....................................................23

Terri Bradford, *Developments in Interchange Fees in the United States and Abroad*, Payments Sys. Research Briefing (Federal Reserve Bank of Kansas City Apr. 2008), https://www.kansascityfed.org/documents/695/briefings-psr-briefingapr08.pdf ...................................................................10

U.S. Gov't Accountability Off., GAO-10-45, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* (2009), https://www.gao.gov/assets/gao-10-45.pdf ...................................................................

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are Retail Litigation Center, Inc.; Food Marketplace, Inc. d/b/a FMI, the Food Industry Association (FMI); Merchant Advisory Group; National Association of Convenience Stores; National Federation of Independent Business Small Business Legal Center, Inc.; Restaurant Law Center; Arkansas Retailers Association; Iowa Retail Federation; Kentucky Retail Federation; Michigan Retailers Association; Minnesota Retailers Association; and Missouri Retailers Association.[2]

Collectively, *amici* represent a broad range of merchants of all sizes—from single-store operators to major U.S. retailers—who have a strong interest in this case. Regulation II, the challenged regulation at issue, governs billions of debit transactions that occur each year at *amici*'s member businesses. Because the debit interchange fee cap established in Regulation II improperly encompasses costs that Congress did not authorize the Federal Reserve Board (the "Board") to include, *amici*'s members have been forced to pay issuers inflated fees on each of those billions of transactions a year for a decade and a half. Indeed, in the aggregate, it is

---

[1] *Amici* have obtained the consent of all parties to file this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* confirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

[2] Appendix A provides further information on each individual *amicus curiae*.

1

estimated that merchants paid issuers over *$100 billion* in excess profits since 2011, when the Board promulgated Regulation II.[3]  *Amici* file this brief to explain why Regulation II's inclusion of certain costs in calculating the fee standard exceeds the Board's statutory authority; how the inclusion of these prohibited fees in Regulation II's cap has adversely impacted retailers; and why issuers' policy defenses of this component of Regulation II cannot provide an adequate justification for the rule.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court erred in holding that Regulation II's cap could include categories of costs that Congress expressly excluded, and this Court should reverse that decision.  Congress made its intention plain in the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Durbin Amendment"), 15 U.S.C. § 1693*o*-2, that large issuer-banks should not gain unreasonable profits from debit interchange fees, and should instead only charge what is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction," *id.* § 1693*o*-2(a)(3)(A).  The Durbin Amendment delegated limited authority to the Board to "prescribe regulations" ensuring that objective was met within parameters explicitly set out in the statute, including which costs may be included in any interchange transaction fee and which costs may not be included.

---

[3] *See infra* at 18-19 (explaining calculations).

The Board exceeded that limited authority by including four categories of costs that are prohibited by statute: (1) fixed costs of authorizing, clearing and settling (ACS) transactions, (2) transaction-monitoring costs, (3) network processing fees, and (4) a fraud-loss adjustment (collectively, the "Prohibited Costs"). *See generally Debit Card Interchange Fees and Routing*, Final Rule, 76 Fed. Reg. 43,394, 43,429-31, 43,404 (July 20, 2011). Because of this overreach, Regulation II has enabled issuers to extract disproportionate profits from merchants. The scale of these profits in the fifteen years since the Board promulgated Regulation II is staggering. Issuers have taken an estimated $100 billion or more in excess profits from merchants during this period, including over $16 billion in 2023 alone.[4] High-volume issuers are estimated to achieve profit margins approaching 500% under Regulation II. And these profits are likely to skyrocket as issuers' costs decrease and consumers' debit card usage surges.

*Amici* file this brief to explain the impact the inclusion of the Prohibited Costs in Regulation II's fee cap has on retailers of all sizes. As *amici* explain and Congress made clear in law, it is not appropriate to force retailers, who typically operate with razor-thin profit margins of 1-3%, to pay such high debit interchange fees while banks continue to enjoy profit margins of roughly 30%. Regulation II's inflated fee cap operates as nothing more than a vehicle to redistribute money from businesses

---

[4] *See infra* at 18-19 (explaining calculations).

3

and consumers to banks, which is the exact opposite of Congress' express rationale for enacting the Durbin Amendment. Because such a result is foreclosed by Congress' mandate in the Durbin Amendment, the Court should reverse.

**ARGUMENT**

**I.     The inclusion of the prohibited costs in Regulation II's fee cap cannot be squared with the text or purpose of the Durbin Amendment.**

      A.     <u>The inclusion of the prohibited costs in Regulation II's fee cap exceeds the Board's authority under the Durbin Amendment.</u>

A debit interchange fee is the amount paid by a merchant to the bank that issued a consumer's debit card for each transaction in which the consumer uses that card to make a purchase. For card issuers with more than $10 billion in assets, Regulation II set the debit interchange fee cap at 21 cents per transaction, plus an *ad valorem* component of 0.05% of the transaction's value for fraud losses and a 1 cent "fraud-prevention adjustment" for debit-card issuers that meet certain fraud-prevention standards. In adopting this cap, the Federal Reserve Board included four types of costs in addition to the variable costs incurred by an issuer in the authorization, clearance, or settlement ("ACS") of an electronic debit transaction: (1) fixed ACS costs; (2) transaction-monitoring costs; (3) network processing fees; and (4) fraud losses. *See generally* 76 Fed. Reg. at 43,429-31, 43,404. The Board's inclusion of these four costs exceeds the Board's statutory authority under the Durbin Amendment.

4

Congress directed the Board to "distinguish between … the incremental cost[s] incurred by an issuer" for its role in the "authorization, clearance, or settlement of a particular electronic debit transaction," which "shall be considered," and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," which "shall not be considered."   15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii).  This statutory language divides the full universe of issuer costs into two, mutually exclusive categories. Fixed ACS costs, transaction-monitoring costs, network processing fees, and fraud losses are not "specific to a particular electronic debit transaction," *id.* § 1693o-2(a)(4)(B)(ii), and fall squarely into the category of costs Congress prohibited the Board from considering.  Their inclusion in the debit interchange fee cap is therefore contrary to law.

The statutory language, moreover, requires an assessment of whether the interchange fee is "reasonable and proportional to the cost incurred by the issuer with respect to *the* transaction."  *Id.* § 1693o-2(a)(3)(A) (emphasis added).  "*The* transaction," *singular:* this definite article rules out consideration of costs (like fixed costs) that are not incurred with respect to any transaction in particular.

Congress confirmed that the Prohibited Costs were not to be considered for calculating the interchange fee standard by addressing them elsewhere in the Durbin Amendment.  For example, Congress defined interchange fees to exclude network-processing fees.  *See* 15 U.S.C. § 1693o-2(c)(10) ("network fee" defined as "any fee

5

charged and received by a payment card network with respect to an electronic debit transaction, *other than an interchange transaction fee*" (emphasis added)). Congress further mandated that the Board "ensure that … a network fee is not used to directly or indirectly compensate an issuer." *Id.* § 1693*o*-2(a)(8)(B)(i). Network-processing fees "are not incurred for the role of the issuer—they are incurred by an issuer to ensure the network will fulfill its role." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610, 637 (D.N.D. 2025) (vacating Regulation II in case relevantly identical to this one). But the statute unmistakably limits the fee cap to costs "incurred by an issuer *for the role of the issuer*" in the ACS process. *Id.* § 1693*o*-2(a)(4)(B)(i) (emphasis added).

As for transaction-monitoring costs[5] and fraud losses, Congress set forth a separate adjustment elsewhere in the statute to account for such fraud-related expenses—thereby making clear that the Board was to set the interchange fee standard *without* including these expenses. Thus, Congress specified that the "Board may allow for an adjustment to the fee amount received or charged by an issuer," but only if "such adjustment is reasonably necessary to make allowance for costs

---

[5] These, by the Board's own definition, are fraud-prevention costs: "[t]ransactions-monitoring costs are *costs incurred* by the issuer during the authorization process *to detect indications of fraud* or other anomalies in order to assist in the issuer's decision to authorize or decline the transaction." *Debit Card Interchange Fees and Routing*, Clarification, 80 Fed. Reg. 48,684, 48,685 (Aug. 14, 2015) (emphasis added).

incurred by the issuer in preventing fraud." *Id.* § 1693*o*-2(a)(5)(A)(i).  And it is under those standards, Congress specified, that the Board must "take[] into account any fraud-related reimbursements" and "the costs of fraudulent transactions absorbed by each party involved in such transactions," with the Board explicitly directed to "ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i)," *i.e,.* limited to the issuer's fraud-prevention costs. *Id.* § 1693*o*-2(a)(5)(A)(ii)(I), (a)(5)(B)(ii)(V).

Congress' specification that the Board could *adjust* the interchange fee to account for fraud-prevention costs only in certain circumstances makes clear that Congress did not intend for merchants to cover issuers' fraud-prevention costs as a *routine* component of the debit interchange fee distinct from the adjustment.  Along similar lines, Congress' specification of this fraud-prevention adjustment as the means to address debit-card fraud makes clear that the Board lacks authority to incorporate an across-the-board 5-basis-point allowance for fraud losses as a component of the interchange fee standard.  The Board's reading of the statute renders superfluous this adjustment provision and removes any incentive for issuers to minimize debit-card fraud.[6]  The district court in the parallel *Corner Post* case

---

[6] Indeed, Senator Durbin warned on the Senate floor that "[a]s long as big banks are guaranteed the same interchange revenue no matter how much or how little fraud they have, the banks have no incentive to keep fraud costs low."  156 Cong. Rec. 10,441 (2010) (statement of Sen. Durbin).

was spot on in explaining that because "reimbursement for fraud losses is certainly covered *and* contingent on issuers complying with particular fraud prevention measures," "[t]he Board's anticipatory payments to issuers for potential fraud losses without ensuring issuers comply with fraud prevention measures is an ultra vires act that cannot stand." *Corner Post*, 794 F. Supp. 3d at 636.

The D.C. Circuit's decision in *NACS v. Board of Governors of Federal Reserve System*, 746 F.3d 474 (D.C. Cir. 2014), upholding the Board's authority to permit recovery of this third category of costs, does not support a contrary result. The D.C. Circuit upheld Regulation II applying the now-overruled *Chevron* framework, concluding only that permitting the recovery of such in-between costs was a permissible reading under *Chevron* Step Two. *See id.* at 477, 484. Under the *de novo* review required by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024), the Board's interpretation fails.

In this case, the Board has improperly attempted to resurrect *Chevron* under another name by arguing that the language of the statute "expresses an intent to 'empower the agency to fill up the details of the statutory scheme.'" R. Doc. 61, at 9. But the Durbin Amendment puts statutory guardrails around the Board's actions—and *Loper Bright* teaches that courts must decide what those guardrails mean without deference to the agency. *Batterton v. Francis*, on which the Board relied below, addressed a statute that empowered an agency to adopt "standards" to

8

define the term "unemployment." 432 U.S. 416, 428 (1977). Critically, however, the Supreme Court found no guidance in the statute as to the kind of standards to be prescribed. *Id.*; *see* 42 U.S.C. § 607(a) (1976). In this case, by contrast, the statutory directive to "establish standards" is immediately circumscribed by constraints governing which costs may and may not be considered and how. As the district court in *Corner Post* persuasively explained, "[t]he Durbin Amendment is akin to a funnel—it starts with a broad purpose and narrows to particular boundaries for the Board's actions." 794 F. Supp. 3d at 624. "[J]ust as a person cannot lop off the restrictive half of a funnel and expect it to function as originally designed, the Board cannot overlook or discard Congress's mandates and still implement the Durbin Amendment as Congress intended." *Id.*

The district court mistakenly accepted the Board's labored grammatical argument that the absence of a comma before the "which" clause in Section 920(a)(4)(B)(ii) "allows the Board to rely on an unenumerated third category." R. Doc. 61, at 16. But a missing comma is not a license to legislate and invent out of whole cloth a third category of costs that Congress did not intend. As the district court in *Corner Post* put it, "Congress did not hide an 'easter egg' of a third cost category in the Durbin Amendment, particularly when those additional costs would benefit banks at the expense of merchants and consumers." 794 F. Supp. 3d at 632.

The district court took the view that Linney's Pizza's reading would leave the

9

statutory phrases "reasonable" and "proportional" superfluous.  R. Doc. 61, at 18. That is not true.  *If* a cost is a recoverable "incremental cost," 15 U.S.C. § 1693*o*-2(a)(4)(B)(i), *then* the Board may apply reasonableness and proportionality principles.  But the Board may not adopt an interpretation that would "render superfluous whole sections containing congressional mandates" regarding incremental versus fixed costs, network fees, and fraud-related costs.  *Corner Post*, 794 F. Supp. 3d at 624.

B.    <u>The broader statutory and regulatory context confirms that the Board has exceeded its statutory authority.</u>

The broader context of the Durbin Amendment's adoption reinforces what the plain text compels.  Prior to the Durbin Amendment's enactment in 2010, debit interchange fees were not regulated and were set at exorbitant levels by card networks competing for a small number of large issuers' business.[7]  By the time of the 2008 recession, retailers' interchange expenses (including the costs of processing both debit and credit cards) had become a burdensome cost of operating for

---

[7] One indication that these financial institutions were exploiting their market power to extract rents from merchants and consumers is that U.S. interchange fees during this period were much higher than in other nations.  *See, e.g.*, Terri Bradford, *Developments in Interchange Fees in the United States and Abroad*, Payments Sys. Research Briefing (Federal Reserve Bank of Kansas City Apr. 2008), https://www.kansascityfed.org/documents/695/briefings-psr-briefingapr08.pdf.

merchants.[8]

Congress recognized that the situation gave debit-card issuers and card networks undue leverage over those who accepted debit cards, leading to excessive charges and supracompetitive profits. Congress responded with the Durbin Amendment, a provision enacted as part of Dodd-Frank. *See* Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (2010), codified at 15 U.S.C. § 1693*o*-2. Senator Durbin explained that the Durbin Amendment aimed to "enhance competition, transparency and choice in the debit system and squeeze out inefficiencies by reducing … rates … thereby compelling large issuers to compete against each other to manage their other costs more efficiently."[9] Thus, the Durbin Amendment was intended to create a cost-recovery regime that would establish a standard for debit interchange fees at a level that reflected the banks' actual costs to process each transaction. *See, e.g.*, 15 U.S.C. § 1693*o*-2(a)(2) (interchange fee to be "reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*" (emphasis added)). Congress anticipated that this change would both increase

---

[8] *See* U.S. Gov't Accountability Off., GAO-10-45, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* (2009), https://www.gao.gov/assets/gao-10-45.pdf.

[9] Brief of *Amicus Curiae* United States Senator Richard J. Durbin in Support of Plaintiffs-Appellees at 18-19, *NACS v. Bd. of Governors of the Fed. Rsrv. Sys.*, 746 F.3d 474 (D.C. Cir. 2014).

competition and ensure prices at more competitive levels—*i.e.*, levels that reflected marginal cost rather than market power.

Unfortunately, issuers successfully pressured the Board to distort Congress' direction to benefit their interests. The Board's *proposed* rule was more consistent with Congress' intent: it sought to impose a meaningful cap on debit interchange fees by proposing either a cap set at 7 cents per transaction (with an allowance for 12 cents based on different cost experiences of specific card issuers) or a 12-cent cap for all transactions. *See Debit Card Interchange Fees and Routing*, Notice of Proposed Rulemaking, 75 Fed. Reg. 81,722, 81,736-39 (Dec. 28, 2010). As a member of the Board explained, the proposal "exclude[d] fixed costs, such as network connectivity costs, and common or overhead costs" because "these categories of costs generally cannot be attributed to any particular transaction, given that they could not be avoided if any particular transaction did not occur."[10] As such, the Board member continued, the **"exclusion of fixed costs is required by the statute's explicit directive that the Board may not consider costs that are not specific to a particular transaction**."[11]

---

[10] *Understanding the Federal Reserve's Proposed Rule on Interchange Fees: Implications and Consequences of the Durbin Amendment: Hearing Before the Subcomm. on Fin. Institutions & Consumer Credit of the H. Comm. on Fin. Servs.*, 112th Cong. (2011) (testimony of Sarah Bloom Raskin, Governor, Federal Reserve Board), https://www.federalreserve.gov/newsevents/testimony/raskin20110217 a.htm (emphasis added).

[11] *Id.* (emphasis added).

12

Despite recognizing this explicit directive in its proposed rule, the Board, with inappropriate concern for the impact on banks' revenue that overrode its previous reading of the requirements of the statute, "issued a Final Rule that almost doubled the proposed cap." *NACS*, 746 F.3d at 481. It did so by effectively, and impermissibly, rewriting the statute.

Although Congress divided the universe of issuer costs into two categories and then directed the Board how to consider each, the Board concocted a third category—costs it deemed to be "specific to a particular transaction" yet inexplicably not incremental to the card issuer's role in ACS. The Board then placed into the new extra-statutory category the Prohibited Costs that Congress explicitly directed them not to consider, because they "are not specific to a particular" transaction. Rather, they are "fixed," "common," or "overhead" costs that "could not be avoided if any particular transaction did not occur." Raskin, *supra* note 10. Thanks to this rewriting, banks were permitted to recover their ACS costs generally without regard to the statutory distinction between fixed and variable costs, as well as variable costs that were not tied to ACS at all. The impact of this unlawful regulation on retailers has been immense.

## II. The inclusion of the prohibited costs in Regulation II's fee cap imposes unreasonable costs on merchants.

From the moment it was promulgated, Regulation II has permitted issuing banks to earn disproportionate profits at the expense of all retailers that accept debit

13

cards—from the corner store that pays the full interchange fee when a customer purchases a pack of gum to major retailers that pay outsized fees on the full range of products that they sell.  The imbalance has only grown over the past decade, as the debit interchange fee base component has remained fixed at 21 cents while consumers' debit usage has exploded and issuers' average per-transaction ACS costs have been cut in half.  At the same time, Regulation II has helped issuers shift fraud losses over to merchants, even as merchants have expended billions of dollars on anti-fraud technologies.[12]  The result is an intolerable situation for retailers, who strive to keep customers' costs low but are increasingly squeezed by banks and card networks under Regulation II's unlawful and unfair interchange rate.

A.      Regulation II has permitted banks to extract unreasonable profits from retailers, and these profits are increasing.

Regulation II's interchange fee cap has permitted issuers to extract unreasonably high profits from retailers.  The card issuers have successfully demanded interchange fees at no less than the cap level,[13] and there is no functioning market to drive interchange fees any lower than that level.  Crucially, when the

---

[12] Board of Governors of the Federal Reserve System, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* at 22-23 (Dec. 2025), https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2023.pdf ("2023 Board Report").

[13] *See* 2023 Board Report at 14 (average interchange fees always at or above 21-cent base fee cap).

Board established the interchange fee base component of 21 cents in 2011, its own data showed that the transaction-weighted average of per-transaction base component costs across covered issuers was 7.7 cents.[14] In other words, Regulation II initially permitted recovery at a 2.7x multiplier. This base interchange rate of 270% of cost is equivalent to the Board setting a regulated net profit rate of 63% for issuers.[15] Of course, such a profit margin is in direct conflict with the Durbin Amendment, which directed the Board to consider the functional similarities between debit cards and personal checks (where no transaction fees are collected at all despite the more labor-intensive process needed to process them). *See* 15 U.S.C. § 1693*o*-2(a)(4)(A).

Allowing banks to earn profits at this level is particularly unfair given that banks already operate at far larger profit margins than retailers do. NYU Stern Professor Aswath Damodaran, who regularly analyzes margin data, reports that average bank profit margins are roughly 28.89%.[16] By contrast, retailers of all sizes operate in highly competitive segments with low profit margins and the dollars that

---

[14] *Debit Card Interchange Fees and Routing*, Notice of Proposed Rulemaking, 88 Fed. Reg. 78,100, 78,105 (Nov. 14, 2023).

[15] Comments of Merchant Advisory Group at 7, Docket No. R-1818 (Bd. of Governors of the Fed. Reserve Sys. May 12, 2024) ("MAG Comments").

[16] *See* Aswath Damodaran, *Margins by Sector (US)* (data as of Jan. 2026), https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html ("New York University, *Margins by Sector (US)*") (showing Money Center Bank net profit margins at 28.89% and Regional Bank net profit margins at 27.49%).

are diverted from retailers to banks by virtue of Regulation II are meaningfully injurious.[17]   There is no justification for this redistribution from retailers to banks, and it is clearly a symptom of a broken market in which a duopoly stifles competition.   Merchants must accept global credit card networks as a matter of necessity and they do not receive any tangible benefit from higher interchange fees.

Retailers of all sizes have been impacted by these fees.  For example, small-ticket merchants like Walgreens, who operate on narrow profit margins, are greatly affected by high debit interchange fees.   Approximately 66% of Walgreens customers use debit cards when picking up their prescriptions or making retail purchases.[18]  Similarly, Target processes approximately 3 billion retail transactions each year, and Target's guests use debit cards more than any other form of payment.[19]  The burden of high debit interchange fees is even more damning to the bottom line of small retail establishments.  Ultimately, these costs must be borne by the entire retail ecosystem, including consumers.

While retailers and merchants shoulder this burden, issuers' actual costs have

---

[17]  For example, the profit margin for general retail is 5.61% and 1.32% for grocery and food.  *See* Aswath Damodaran, *Margins by Sector (US)*.

[18] Comments of Walgreens at 2, Docket No. R-1818 (Bd. of Governors of the Fed. Reserve Sys. May 9, 2024).

[19] Comments of Target at 1, Docket No. R-1818 (Bd. of Governors of the Fed. Reserve Sys. May 12, 2024) ("Target Comments").

dropped 47% from 7.7 cents to 4.1 cents between 2009 and 2023.[20]  Yet despite the fact that issuers' costs have been reduced by half, Regulation II's universal fee cap has remained in place at great cost to retailers.  In addition, because the 21-cent cap is pegged to average costs, it has permitted high-volume issuers—who are able to take advantage of increased volume to significantly lower their per-transaction costs—to earn even more extravagant profits.  High-volume issuer ACS costs per transaction were $0.036 by 2023, while mid-volume issuers' costs were nearly 4 times as high ($0.121) and low-volume issuers' costs were 30 times as high ($1.088).[21]   These high-volume issuers (roughly 50 banks) processed the vast majority of all regulated debit transactions by dollar value in 2023—approximately 94 percent.  Thus, in 2023, such issuers had combined ACS costs of approximately $3.41 billion on an annual basis.[22]   Yet under Regulation II's inclusion of the Prohibited Costs in the cap calculation, they were permitted to charge $19.88 billion just for the base component on these debit transactions.  In other words, high-volume issuers currently enjoy excess profits of approximately $16.47 billion per year—

---

[20]  2023 Board Report at 24. Indeed, the Board has said it "believes it is necessary to revise the interchange fee standards to reflect the decline since 2009 in base component costs."  88 Fed. Reg. at 78,105.

[21] 2023 Board Report at 38.

[22] The Board reports a total volume of 100.7 billion transactions in 2023, *id.* at 9, of which the high-volume issuers account for 94%, *id.* at 7, that is, 94.7 billion transactions.

nearly a *500%* profit margin.[23]  Indeed, the three very largest issuers (Wells Fargo, Bank of America, and JPMorgan Chase) made up nearly 50% of all regulated spending and transactions in 2021.  Because these entities likely have even lower costs, their per-transaction profit margin is almost certainly even higher than the margin for high-volume issuers as a whole.[24]

Market trends suggest that the situation for retailers will get even worse as debit usage continues to increase.  Due to a spike in online shopping during the pandemic, debit usage grew by nearly 20% in 2021, the "largest [increase] observed since Regulation II came into effect."[25]  This trend has continued since 2021.  U.S. general purpose debit volume for the Visa and Mastercard networks has grown from $3.78 trillion in 2020 to $5.10 trillion in 2023.[26]  As a result of these forces, the scale of the transfer from retailers to big banks over the past decade is staggering. Regulation II's base interchange fee of 21 cents overcompensated issuers for their recoverable costs by roughly *$73 billion* from the time Regulation II was

---

[23] For comparison, Major League Baseball collectively brings in annual revenue of about $12 billion. Michael Ozanian, *CNBC's Official MLB Team Valuations 2025: Here's How the 30 Franchises Stack Up*, CNBC (Apr. 11, 2025), https://www.cnbc.com/2025/04/11/cnbcs-official-mlb-team-valuations-2025.html.

[24] Comments of Retail Industry Leaders Ass'n at 15, Docket No. R-1818 (Bd. of Governors of the Fed. Reserve Sys. May 10, 2024) ("RILA Comments").

[25] *Id.* at 2.

[26] *See* MAG Comments at 1 & n.3.

implemented through 2021.[27]  Given that, as of 2023, annual excess profits exceeded $16 billion per year, *supra* at 17, it is likely that the total exceeded $100 billion by 2025.  This is exactly the lopsided situation the Durbin Amendment was passed to prevent.

> B.    Regulation II's inclusion of the prohibited costs has also effectively forced merchants to indemnify issuers for fraud losses.

Regulation II further permits issuers to recover fraud losses from merchants via the *ad valorem* component of the debit interchange fee cap.  Like the Prohibited Costs, this fraud reimbursement is not specific to "a particular electronic debit transaction," and thus "shall not be considered" by the Board in setting interchange transaction fees.  *Cf.* 15 U.S.C. § 1693o-2(a)(4)(B)(i).  Moreover, this approach makes little sense; by shifting the burden of issuers' fraud losses onto merchants, Regulation II has reduced the incentive for issuers to detect and eliminate fraud.  This impermissible cost has also been tremendously expensive for retailers and other merchants.

The reason is simple—covered issuers have taken advantage of Regulation II to impose the majority of fraud losses on retailers.  They have done so by pocketing the Board's up-front award of an *ad valorem* component while also benefiting from network rules that increasingly shift fraud losses onto merchants and consumers.  As

---

[27] *Id.* at 5.

the Board itself has observed, "[f]rom 2011 to 2023, for all transactions, the share of fraud losses absorbed by issuers fell from 59.8 percent in 2011 to 28.3 percent in 2023, while the equivalent shares rose for merchants (from 38.3 percent in 2011 to 49.9 percent in 2023) and for cardholders (from less than 1.8 percent in 2011 to 21.8 percent in 2023)."[28]  In other words, issuers are charging back nearly *three quarters* of fraud losses to merchants and cardholders, even though merchants and ultimately consumers are *already* paying the *ad valorem* fee on every covered transaction ostensibly to cover the costs of preventing such fraud losses.  As the Board recently noted: "Since the Board adopted the interchange fee standards in 2011, the Board has observed an overall increase in fraud losses to all parties related to covered issuer transactions, but the share of such fraud losses absorbed by covered issuers (*i.e.*, issuer fraud losses) has declined during that time."[29]

The chart below demonstrates the devastating effect on retailers of the policies issuers and networks have established.[30]  As the chart shows, since 2011, issuer fraud losses have remained mostly stable.  But beginning in 2013, merchant losses

---

[28] 2023 Board Report at 23.

[29] 88 Fed. Reg. at 78,108.

[30] *See* Federal Reserve Board, *Data Tables: Interchange Fee Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions*, Table 14 (2021), http://www.federalreserve.gov/payment systems/files/regiireportsdata.xls (data through 2021); 2023 Board Report at 37 (data for 2023).

increased every year and nearly tripled in size from 2013 to 2023. The same is true for cardholder losses, which grew steadily from 2013 to 2019, and then grew dramatically between 2019 and 2023. Today, issuers bear less than 1/3 of the overall burden of debit card fraud, even though—as the Durbin Amendment recognized—they are the parties best equipped to address it. Regulation II's *ad valorem* component continues to impose issuers' costs on everyone else in the system even though the cost of fraud is already higher for their ratepayers than it is for the banks themselves.



Finally, as discussed above, the statute requires the Board to account for the "fraud prevention and data security costs expended by … retailers" and the "costs of fraudulent transactions absorbed by each party involved in such transactions," including "retailers." 15 U.S.C. § 1693*o*-2(a)(5)(B)(ii)(IV)-(V). But in practice, the Board has not done so, ignoring the billions of dollars retailers and other merchants

have spent on fraud prevention since 2012.  Retailers have spent tens of billions of dollars in infrastructure investments since 2012 on EMV terminal technology; indeed, merchants incurred the vast majority of the cost associated with migrating the U.S. payment system to that more secure technology.[31]  For example, 7-Eleven has spent hundreds of millions of dollars to upgrade or replace fuel pumps and in-store pin pad payment devices, as well as accompanying IT development costs.[32]  Yet such expenditures have not reduced the debit interchange rates to which retailers are subject.

In short, the status quo requires merchants to reimburse issuers' entire share of fraud loss through the *ad valorem* interchange fee; pay the fraud prevention adjustment on every covered transaction, with minimal inquiry into whether the issuer actually has an effective fraud prevention system in place; and bear their own significant costs to implement additional fraud prevention measures.[33]   In these respects as well, Regulation II has imposed tremendous costs on retailers.

---

[31] MAG Comments at 10; Comments of National Retail Federation at 11, Docket No. R-1818 (Bd. of Governors of the Fed. Reserve Sys. May 12, 2024) (estimating $30 billion in EMV costs).

[32] Comments of 7-Eleven, Inc. ("SEI") at 2-3, Docket No. R-1818 (Bd. of Governors of the Fed. Reserve Sys. May 10, 2024).

[33] Target Comments at 9.

## III.    The Banks' policy justifications for including the prohibited costs in Regulation II's fee cap lack merit.

Issuers have suggested various rationales in support of Regulation II, but none is persuasive. As an initial matter, some context is essential. Banks and card networks have consistently sought to take advantage of the Board's regulations to pad their bottom lines. The retail community has been compelled multiple times to request that the Federal Reserve and the Federal Trade Commission issue clarifications on issues related to routing requirements, including their applicability to e-commerce transactions as well as the impact of technological updates (in the form of misleading consumer-facing screens) that the global networks used as opportunities to attempt to circumvent the routing rules.[34] Thus, the Federal Trade Commission recently took action against Mastercard when it used a new technology to constrain merchants' ability to route transactions over competing networks.[35] And

---

[34] *See* Letter from James W. Frost, Office of Policy & Coordination, Bureau of Competition, FTC, to Julie B. Rottenberg, Deputy General Counsel, Chief Counsel, North America, Risk and Merchant Solutions Visa Inc. (Nov. 22, 2016), https://www.ftc.gov/system/files/documents/closing_letters/nid/closing_ letter_from_james_frost_to_visa_-_11-22-16.pdf; *see generally* Reuters, *Visa, Mastercard Draw FTC Inquiry Over Debit Card Transactions - Bloomberg Law*, Reuters (Nov. 13, 2019), https://www.reuters.com/article/us-ftc-visa-mastercard-probe/visa-mastercard-draw-ftc-inquiryover-debit-card-transactions-bloomberg-law-idUSKBN1XN291.

[35] *See* Press Release, FTC, *FTC Approves Final Order Requiring Mastercard to Stop Blocking the Use of Competing Debit Payment Networks* (May 30, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-approves-final-order-requiring-mastercard-stop-blocking-use-competing-debit-payment-networks.

23

Visa was sued over new fees it implemented to frustrate dual routing and protect its market share (and high prices) from the competitive dynamics that the Durbin Amendment was intended to facilitate. *See Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 491-94 (5th Cir. 2022) (explaining how Visa's "Fixed Acquirer Network Fee" (or FANF) was used, after the Durbin Amendment, to protect Visa's debit market share while keeping total fees as high or higher than before).

Such efforts continue today. The Department of Justice is presently suing Visa for violating the antitrust laws in the context of debit interchange fees.[36] And the banks claim that they are still using debit interchange to fund unrelated bank operations. Thus, the American Bankers Association warned in a statement issued after the Board's recent rulemaking announcement that the "proposal has the potential to make checking accounts, debit cards and *a range of financial products* more expensive for American consumers."[37] This statement makes a mockery of the statute, which is clear that debit interchange fees are meant only to cover the variable ("incremental") ACS costs of debit transactions.

---

[36] *See* Complaint, *United States v. Visa, Inc.*, No. 24-cv-7214 (S.D.N.Y. Sept. 24, 2024), ECF No. 1; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585 (S.D.N.Y. 2025) (denying Visa's motion to dismiss).

[37] Press Release, American Bankers Ass'n, *ABA Statement on Federal Reserve's Proposed Regulation II Changes* (Oct. 25, 2023), https://web.archive.org/web/20251017214017/https://www.aba.com/about-us/press-room/press-releases/federal-reserve-proposed-regulation-ii-changes (emphasis added).

24

In short, card networks and covered financial institutions have a track record of trying to evade regulation.[38]   Understood in this context, the banks' policy justifications for including a range of costs not allowed by the Durbin Amendment in Regulation II's cap are not persuasive.

The bank *amici*, in their brief filed in the district court, insist that "[i]ssuers are not earning exorbitant profits from debit card transactions" and "are not even permitted to recover all of the costs associated with debit card transactions." R. Doc. 59, at 11. But as already described, banks are today reaping nearly 500% profit margins on these debit transactions.   *Supra* at 18.   Regardless, the Durbin Amendment does not limit issuers to recovering less than their costs, as the banks claim. It does the opposite, requiring that the Board consider all the relevant costs the banks should be able to recover from a merchant, namely, the costs "specific to a particular electronic debit transaction" involving a particular merchant and the issuer.   15 U.S.C. § 1693o-2(a)(4)(B)(ii).   What the Durbin Amendment does *not* permit is exactly what the Board has done in Regulation II—impose fees that are disproportionate to issuers' costs by forcing merchants to subsidize banks' fixed costs rather than paying for the service provided to that merchant.   This forced

---

[38] Congress was well aware of this track record.   The Durbin Amendment specifically authorized the Board to "prescribe regulations[] … to prevent the circumvention [of] or evasion of" the Durbin Amendment."   15 U.S.C. § 1693o-2(a)(1).

subsidy is what is to blame for driving up the price of goods to the consumer, not the absence of lower-cost alternatives to debit card networks, as the banks suggest. *See* R. Doc. 59, at 13-14.

Nor is there any risk that enforcing the Durbin Amendment will put small banks in financial trouble or reduce the quality of debit-card services, as the banks suggest. *See* R. Doc. 59, at 15-16. As to the former, the debit interchange cap does not apply to issuers with less than $10 billion in assets. For larger covered issuers in the asset range of $10-$30 billion who report their gross debit interchange revenue, this revenue only represents 2.1% of their overall total. Further, for these same banks, their 2022 profit margin ranged from 20% to 35%, indicating healthy financial performance (albeit at levels far less than what the Board's regulation allows on debit transactions). The Board's interpretation confers windfalls on issuers subject to it and does not apply at all to small issuers.[39]

A reduction in debit interchange revenue need not be made up through additional cardholder fees or cuts to checking account features. Financial institutions have myriad sources of revenue, and enjoy net profit margins around 30%, meaning they are fully capable of continuing to offer debit programs and other account features and services without collecting extra-statutory debit interchange fees to which they are not entitled and, indeed, that the statutory text prohibits them

---

[39] *See generally* RILA Comments at 33.

26

from collecting. Moreover, covered issuers that cut checking account features purportedly due to reductions in debit interchange revenue risk losing their customer base to other issuers, including the thousands of issuers who are not covered by Regulation II at all. Making such changes to the detriment of consumers would be a voluntary choice on the part of the banks, to be evaluated in the context of a competitive marketplace—not something compelled by financial necessity.

## CONCLUSION

The judgment of the district court should be reversed.

Dated:  May 6, 2026

Respectfully submitted,

/s/ Adam G. Unikowsky

| | |
|---|---|
| Monica Welt | Adam G. Unikowsky |
| Josh Moore | Krister Rasmussen |
| RETAIL LITIGATION CENTER, INC. | JENNER & BLOCK LLP |
| 99 M Street S.E. Suite 700 | 1099 New York Ave. N.W. Suite 900 |
| Washington, DC 20003 | Washington, DC  20001-4412 |
| (202) 869-0200 | (202) 639-6000 |
| | aunikowsky@jenner.com |

*Counsel for* Amici Curiae

27

## APPENDIX A: INTEREST OF AMICI

The **Retail Litigation Center, Inc. ("RLC")** is a 501(c)(6) nonprofit trade association that represents national and regional retailers, including many of the country's largest and most innovative retailers, across a breadth of retail verticals. The RLC is the only trade association solely dedicated to representing the retail industry in the courts. The RLC's members employ millions of people throughout the United States, provide goods and services to tens of millions more, and account for tens of billions of dollars in annual sales. The RLC offers retail-industry perspectives to courts on important legal issues and highlights the industry-wide consequences of significant cases. Since its founding in 2010, the RLC has filed more than 250 *amicus* briefs on issues of importance to the retail industry. Its *amicus* briefs have been helpful to courts across the United States, as evidenced by citation to RLC *amicus* briefs in numerous precedential opinions. *See, e.g., South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 184 (2018); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 542 (2013); *Chewy, Inc. v. U.S. Dep't of Lab.*, 69 F.4th 773, 777–78 (11th Cir. 2023); *State v. Welch*, 595 S.W.3d 615, 630 (Tenn. 2020).

**FMI, the Food Industry Association**, works with and on behalf of the entire food industry to advance a safer, healthier, and more efficient consumer food supply. FMI brings together a wide range of members across the value chain—from retailers who sell to consumers, to producers who supply the food, as well as the wide variety

28

of companies providing critical services—to amplify the collective work of the industry.  FMI's membership includes nearly 1,000 supermarket member companies that collectively operate almost 45,000 food retail outlets and employ approximately 6 million workers.  Those companies also operate approximately 12,000 pharmacies inside retail grocery stores throughout the United States.

The **Merchant Advisory Group ("MAG")** is a merchant trade association focused on payments. The MAG plays a critical role in shaping innovative approaches to payments by fostering unparalleled collaboration and networking opportunities for over 200 merchants, which account for over $4.8 trillion in annual sales at over 580,000 locations across the U.S. and online.  MAG members employ over 14 million associates.  Through its engagement with diverse stakeholders, MAG advocates for merchants' interests, driving meaningful change across the payments landscape.

The **National Association of Convenience Stores ("NACS")** is an international trade association representing the convenience store industry with more than 1,300 retail and 1,600 supplier companies as members, the majority of whom are based in the United States. In 2025, the industry employed approximately 2.75 million employees and generated $817.5 billion in total sales, representing approximately 2.7% of U.S. Gross Domestic Product. The industry, however, is truly an industry of small business. More than 60% of convenience stores are single-store

29

operators. Less than 0.2% of convenience stores that sell gas are owned by a major oil company and about 4% are owned by a refining company. More than 95% of the industry, then, are independent businesses. Members of the industry process more than 160 million transactions every single day, the equivalent of serving about half of the U.S. population. The industry paid a total of $21.3 billion in debit and credit card swipe fees in 2025.

The **National Federation of Independent Business Small Business Legal Center, Inc. ("NFIB Legal Center")** is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. NFIB Legal Center is an affiliate of the National Federation of Independent Business, Inc. ("NFIB"), which is the nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

The **Restaurant Law Center** is the only independent public policy organization created specifically to represent the interests of the food-service industry in the courts. The industry is comprised of over one million restaurants and other foodservice outlets employing 15.7 million people—approximately ten percent of the U.S. workforce, making it the second-largest private-sector employer in the

30

United States. Through regular participation in amicus briefs on behalf of the industry, the Restaurant Law Center provides courts with the industry's perspective on legal issues significantly impacting its members and highlights the potential impact of pending cases like this one.

The **Kentucky Retail Federation (KRF)** is a 501(c)(6) non-profit trade association created to improve the retail business climate in Kentucky. The KRF has organizational roots going back to 1939 and represents businesses throughout the entire commonwealth of Kentucky. As "The Voice of Retailing in Kentucky," KRF is a strong advocate for the retail industry and represents members' interests in the legislative, executive, and judicial branches of state government. The Federation also provides value-added services, programs, and education that retailers need to succeed in today's marketplace. Members are as diverse as the products and services they sell, from department stores, drug stores, hardware, apparel, building supply, auto repair, hair salons, and many more.

The **Michigan Retailers Association (MRA)**, represents the interests of its nearly 5,000 member businesses, their 15,000 stores and websites that employ over 870,000 Michiganders, and the countless citizens who visit and shop in its members' retail establishments every day.  MRA is a voluntary nonprofit association of corporate and other business interests that form the voice of Michigan's retail industry.  Established in 1940, MRA provides various business services, education,

31

and advice to its members in order to promote Michigan's retail and economic climate. Through its wholly owned subsidiary, Michigan Retailers Services, Inc., MRA provides credit card processing services to its members and merchants, with total volume in excess of $1 billion dollars each year. As an advocate for its membership, MRA represents its members' interests before state and federal legislatures, executive branch agencies, and the courts. Through these advocacy efforts, MRA seeks to promote good policy that positively impacts the retail industry and the economy as a whole by reducing costs and other burdens for its members.

The **Minnesota Retailers Association** represents retailers of all sizes across the state, from main street businesses to regional stores and national brands, across a wide range of retail formats and business models. Retail is a cornerstone of Minnesota's economy and communities, supporting jobs in every corner of the state, with nearly one in four Minnesota jobs connected to the retail industry.

The **Arkansas Retailers Association**, **Iowa Retail Federation**, and **Missouri Retailers Association** are dedicated to serving, promoting and protecting the grocery and retail industries of their respective states through legislative efforts, education and member services. These retailers' associations promote retail-friendly policies that support the growth and success of retailers.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type style requirements of Fed. R. App. P. 32(a)(6), and the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it is proportionally spaced, has a typeface of 14 point Times New Roman, and contains 6,248 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

*/s/ Adam G. Unikowsky*
Adam G. Unikowsky

33

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Adam G. Unikowsky*
Adam G. Unikowsky

34