No. 25-6038

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

LINNEY'S PIZZA, LLC,

*Plaintiff-Appellant,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Eastern Kentucky
(No: 3:22-cv-00071) (Van Tatenhove, J.)

## BRIEF OF UNITED STATES SENATOR RICHARD J. DURBIN AS *AMICUS CURIAE* SUPPORTING APPELLANT

David P. Germaine
Sperling Kenny Nachwalter, LLC
321 N. Clark Street, 25th Floor
Chicago, IL 60654
312.641.3200
dgermaine@sperlingkenny.com

May 6, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................... ii

INTEREST OF *AMICUS CURIAE*...........................................................1

INTRODUCTION ................................................................................2

ARGUMENT ......................................................................................4

I.      The Durbin Amendment Was Carefully Crafted to Rein in Interchange Fee-Fixing, and the Amendment Gave the Board Specific Directives, Not Broad Discretion, to Apply Toward that Goal...........................................4

      A.  The Durbin Amendment responded to the problem of card-issuing banks using payment card networks' centrally fixed interchange fee rates to avoid normal marketplace competition and excessively subsidize issuer costs. ..................................................4

      B.  The Durbin Amendment assigned the Board specific directives with respect to cost considerations...........................................7

      C.  The Board's Final Rule failed to follow Congress' statutory directives ...............................................................9

II.     The Board's Inclusion of "Third Category" Bank Costs in its Rulemaking Was Contrary to the Durbin Amendment's Text and Purpose..................................................................................12

III.    The Specific "Third Category" Costs Included by the Board Were Clearly Contrary to the Durbin Amendment's Text and Purpose..................................................................................16

IV.   The Durbin Amendment Has Brought Improvements to the Debit Card System, but Its Positive Effects Have Been Diminished by the Board's Inclusion of Third-Category Costs that Contravened the Amendment's Text and Purpose..................................22

CONCLUSION ...................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
No. 25-3000 (8th Cir. December 30, 2025) ............................................................... 17

*NACS v. Board of Governors of the Federal Reserve System*,
746 F.3d 474 (D.C. Cir. 2014) ..............................................................................3, 16

## Statutes

Electronic Fund Transfer Act § 920,
15 U.S.C. §1693o ..............................................................................................*passim*

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, 124 Stat. 1376 (2010) ..........................................................1, 7

Federal Reserve Act of 1913,
38 Stat. 265 .................................................................................................................8

## Administrative Materials

Board of Governors of the Federal Reserve System, "2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," Dec. 2025, *available at*
http://federalreserve.gov/paymentsystems/files/debitfees_costs_2023.pdf
................................................................................................................6, 23, 25

Debit Card Interchange Fees and Routing, Final Rule, 76 Fed. Reg. 43,394 *et. seq.* (July 20, 2011) "Regulation II" (codified at 12 C.F.R. pt. 235)……………………………………………………………….. 1, 2, 13, 20

Debit Card Interchange Fees and Routing: Proposed Rule, 75 Fed. Reg. 81,722 *et. seq.* (Dec. 28, 2010) ............................................................................10

## Legislative Materials

156 Cong. Rec. S3589 (daily ed. May 12, 2010)
(statement of Sen. Richard J. Durbin)......................................................................7

156 Cong. Rec. S3696 (daily ed. May 13, 2010)
(statement of Sen. Richard J. Durbin)....................................................................9, 13

156 Cong. Rec. S4839 (daily ed. June 10, 2010)
(statement of Sen. Richard J. Durbin......................................................................2

156 Cong. Rec. S4841 (daily ed. June 10, 2010)
(statement of Sen. Richard J. Durbin)....................................................................19

156 Cong. Rec. S4930 (daily ed. June 15, 2010)
(statement of Sen. Richard J. Durbin)....................................................................13

157 Cong. Rec. S3574 (daily ed. June 8, 2011)
(statement of Sen. Richard J. Durbin)....................................................................12

157 Cong. Rec. S3594 (daily ed. June 8, 2011)
(roll call vote rejecting Amendment 392) ...............................................................10

Senate Amendment 392,
157 Cong. Rec. S3558-9 (daily ed. June 7, 2011) ..................................................10

**Other Authorities**

American Bankers Association, "Survey: Most Americans Pay Nothing for Bank Services," Aug. 18, 2015, *available at* https://www.thetimes-tribune.com/2015/09/01/survey-most-americans-pay-nothing-for-bank-services/ ................................................................................................................. 23

American Bankers Association, "ABA Survey Shows  Majority of Bank Customers Pay Nothing for Monthly Bank Services," Oct. 7, 2010, *available at* http://www.prnewswire.com/news-releases/aba-survey-shows-majority-of-bank-customers-pay-nothing-for-monthly-bank-services-104516904.html......................23

Amicus Brief of Senator Richard J. Durbin in Support of Petitioners, *NACS, et al. v. Board of Governors of the Federal Reserve System,* 746 F.3d 474 (D.C. Cir. 2014), on Petition for Writ of Certiorari, September 18, 2014 "2014 Durbin Amicus), *available at*  https://sblog.s3.amazonaws.com/wp-content/uploads/2014/09/Sen.-Durbin-Amicus-Brief_NACS-v.-Board-of-Governors-14-200.pdf..................................................................................3, 16

Board of Governors of the Federal Reserve press release, "Exemption for small debit card issuers from interchange fee standards working as intended," (May 23, 2013), *available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20130523a.htm ..23

Dennis Carlton, *Externalities in Payment Card Networks: Theories and Evidence, Commentary*, The Changing Retail Payments Landscape: What Role for Central Banks, proceedings of a conference held at the  Federal Reserve Bank of Kansas City (Nov. 9-10, 2009) at 125, 129, (finding that "in seven of the eight countries with the highest debit card usage per capita there is no interchange fee..."), available at: https://www.kansascityfed.org/documents/4148/session-3.pdf …...........................................................................................................7

Consumer Price Index figures at https://www.bls.gov/charts/consumer-price-index/consumer-price-index-by-category-line-chart.htm .............................24

"Despite Durbin, Debit Card Reward Programs Remain  Vibrant," *CU Today*, March 29, 2016, *available at* http://www.cutoday.info/Fresh-Today/Despite-Durbin-Debit-Card-Reward-Programs-Remain-Vibrant ................24

Frank Keating, President and CEO of the American  Bankers Association, "Who won and who lost with the Federal Reserve's final debit interchange rule?", American Bankers Association Washington Perspective (July 1, 2011), *available at* https://www.durbin.senate.gov/imo/media/doc/american_bankers _association_washington_perspective_-_july_1_2011.pdf...................................10

Andrew Martin, "How Visa, Using Card Fees, Dominates a Market," *The New York Times*, (Jan. 4, 2010) ("Martin").......................................................6, 7

Moody's Investor Service, "New Debit Rules Hurt Banks and Reshape the Payment Processor Market," June 20, 2012 .........................................................24

Ylan Q. Mui, "Banks convince Fed to raise swipe fee limit," *The Washington Post*, June 29, 2011.........................................................................11

Producer Price Index figures at https://fred.stlouisfed.org/series/PCUARETTRARETTR.......................................24

Pymnts.com, "United Airlines' New Card Capitalizes on Debit Rewards Trend," Nov. 4, 2025, *available at:* https://www.pymnts.com/news/loyalty-and-rewards-news/2025/united-airlines-new-debit-card-taps-checking-accounts-to-fuel-travel-benefits/ ......................................................................................24

Robert Schmidt and Timothy R. Homan, "Fed's 21-Cent Swipe-Fee Cap Leaves Banks, Merchants Unsatisfied," *Bloomberg*, June 30, 2011……………...11

Shareholder Letter from Jamie Dimon, Chairman and CEO, JPMorgan Chase (Apr. 4, 2011), *available at*: https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/2010-JPMC-AR-letter.pdf...................................15

U.S. Gov't Accountability Office, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges*, GAO-10-45 (Nov. 2009)......................................................................15

Kevin Wack, "*Free Checking Increased After Durbin: Study*," The American Banker, (Dec. 11, 2013).................................................................23

## INTEREST OF *AMICUS CURIAE*

Senator Richard J. Durbin is the primary author of the statutory provision at issue in this litigation, Section 920 of the Electronic Fund Transfer Act ("EFTA") (15 U.S.C. §1693o-2), which is commonly known as the "Durbin Amendment." Senator Durbin offered Section 920 as an amendment on the Senate floor during the consideration of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") (Pub. L. No. 111-203, 124 Stat. 1376 (2010)), and the amendment was adopted by a bipartisan vote and ultimately enacted into law. Senator Durbin has a strong interest in ensuring the proper understanding and application of the law he authored. Senator Durbin submits this brief to inform the Court of several ways in which 12 C.F.R. Part 235 ("Regulation II"), the regulation issued by the Board of Governors of the Federal Reserve ("Board") to implement the Durbin Amendment, fails to follow the plain text and purpose of the Durbin Amendment to the detriment of American merchants and consumers.[1]

---

[1] As required by Fed. R. App. P. 29(a)(2), amicus has obtained the consent of all parties to the filing of this brief. Amicus further affirms, as required by Fed. R. App. P. 29(a)(4)(E), that no counsel for a party authored this brief in whole or in part and that no person other than amicus or his counsel made any monetary contributions intended to fund the preparation or submission of this brief.

1

## INTRODUCTION

Congress enacted the Durbin Amendment ("Amendment") in 2010 with the goals of: (1) enhancing competition, transparency and choice in the debit system; (2) squeezing out inefficiencies in the debit system by reducing network-fixed interchange fees to cover only a limited measure of incremental cost, thereby compelling large card-issuing banks to compete against each other to manage their other costs more efficiently; and (3) "help[ing] every single Main Street business that accepts debit cards keep more of their money, which is a savings they can pass on to their consumers." 156 Cong. Rec. S4839 (daily ed. June 10, 2010) (statement of Sen. Richard J. Durbin).   The text of the amendment was carefully crafted, and its purpose was clearly expressed in legislative history.   Unfortunately, the final rulemaking promulgated by the Board failed to follow the text and purpose of the law in several critical ways.   Debit Card Interchange Fees and Routing, Final Rule, 76 Fed. Reg. 43,394 *et seq*. (July 20, 2011) (codified at 12 C.F.R. pt. 235) ("Final Rule").

After the Durbin Amendment was enacted, the Board initially issued a proposed rule that was consistent with the law's text and purpose, but the Board later altered its proposed rule significantly in response to heavy lobbying by the banking industry.   The result was a Final Rule that perpetuated the interchange system's inefficient and excessive subsidization of banks' fixed costs and fraud losses through

2

high debit fees that are centrally fixed by the Visa and Mastercard card network companies. The excessive fees and inefficiencies permitted by the Board's Final Rule are ultimately borne by consumers in the form of higher retail prices.

The Board's decision to include so-called "third category" costs, such as fixed costs and fraud losses, in the Final Rule was in conflict with the Durbin Amendment's plain text and legislative history. As explained herein, the Durbin Amendment was not silent on these "third category" costs. In fact, costs other than the incremental costs of authorization, clearance and settlement ("ACS") of a debit transaction are prohibited by the plain text of the Amendment from being included in interchange fee rates fixed by networks on behalf of regulated issuers unless those costs are identified as costs incurred by "the" specific issuer for "the" specific debit transaction.[2] Under the Durbin Amendment's plain text, no general approximation of other "third category" costs as they apply to a generic issuer or a generic transaction can be included in an interchange fee rate fixed by networks on behalf of regulated issuers—only incremental ACS costs. This text is in accord with the Amendment's purpose, which was to stop the centrally-fixed interchange rates that Visa and Mastercard establish on behalf of their card-issuing banks from uniformly and excessively subsidizing costs that issuers should be competing with each other

---

[2] Senator Durbin pointed out this important aspect of the Amendment's text in his 2014 Durbin Amicus in support of a petition for certiorari relating to *NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474 (D.C. Cir. 2014).

to manage efficiently.  Congress recognized that card-issuing banks might not like this, but knew that those banks were (and still are) free to fix their own debit fee rates rather than letting Visa and Mastercard centrally fix rates on all their behalf, and that under the Durbin Amendment doing so would remove those banks' fees from regulation altogether.

The deviations that the Board made from the Durbin Amendment's text and purpose in Regulation II have caused the debit system to suffer greater inefficiency and unnecessarily excessive fees with American businesses and consumers paying the price.  The district court failed to recognize how the Board's Final Rule contravened the text and purpose of the Durbin Amendment, and this Court should reverse the district court's judgment.

## ARGUMENT

I.    **The Durbin Amendment Was Carefully Crafted to Rein in Interchange Fee-Fixing, and the Amendment Gave the Board Specific Directives, Not Broad Discretion, to Apply Toward that Goal.**

A.  **The Durbin Amendment responded to the problem of card-issuing banks using payment card networks' centrally fixed interchange fee rates to avoid normal marketplace competition and excessively subsidize issuer costs.**

The Durbin Amendment was enacted to rein in the interchange fee collusion that thousands of card-issuing financial institutions were engaging in through the payment card network companies Visa and Mastercard in order to reduce the excessive debit interchange fees that were being charged to merchants and passed

4

on to consumers in the form of higher retail prices. The Amendment was motivated by years of Congressional hearings, Government Accountability Office reports, Federal Reserve studies, academic articles, and press reports that demonstrated that the interchange fee system was not a properly functioning market.[3]  From these analyses, Congress learned that the interchange fee system was designed and operated by payment card networks and their card-issuing banks to avoid transparency and competition for the purpose of generating high fees that exceeded what could be sustained in a normal competitive market environment.  For years, card-issuing banks had agreed to let the Visa and Mastercard networks fix the schedule of interchange fee rates that every bank in their respective networks deducted from transaction amounts each time a Visa or Mastercard-branded debit card is used.  This centralized fee-fixing reduced the card-issuing banks' incentive to manage their operational and fraud costs efficiently, because all banks were guaranteed the same set of network-fixed interchange fees regardless of the efficiency or security of their card operations.  Further, Visa and Mastercard (which also collect and retain their own network fees on each debit card transaction) had incentive to constantly increase interchange fees in order to encourage banks to issue more cards and urge cardholders to use them more often.  Given those networks'

---

[3] *See, e.g.,* 2014 Durbin Amicus at nn. 2-6 (collecting these sources).

enormous market power, there was no countervailing market force available for those who accepted debit cards as payment (merchants, universities, charities, government agencies, etc.) to temper those fee increases.[4] The result was ever-rising debit interchange fees that subsidized bank inefficiencies, and the billions charged annually through these fees ($16.2 billion in 2009, rising to approximately $34.1 billion in 2023)[5] have ultimately been passed on to consumers in the form of higher retail prices.  As Senator Durbin explained on the Senate floor prior to the vote on the Durbin Amendment:

> This amendment is needed. It is a response to price fixing by Visa and MasterCard. Interchange fees are received by the card-issuing bank in a debit transaction. However, Visa and MasterCard—which control 80 percent of the debit market—set the debit interchange fee rates that apply to all banks within their networks. Every bank gets the same interchange fee rate regardless of how efficient they have been in conducting debit transactions. Visa and MasterCard do not allow banks to compete with one another or negotiate with merchants over interchange rates, and there is no constraint on Visa's and MasterCard's ability to fix rates at unreasonable levels.

---

[4] *See e.g.,* Andrew Martin, "How Visa, Using Card Fees, Dominates a Market," *The New York Times*, Jan. 4, 2010 ("Competition, of course, usually forces prices lower. But for payment networks like Visa and MasterCard, competition in the card business is more about winning over banks that actually issue the cards than consumers who use them. Visa and MasterCard set the fees that merchants must pay the cardholder's bank. And higher fees mean higher profits for banks, even if it means that merchants shift the cost to consumers.").

[5] *See* 76 Fed. Reg. at 43,397; *see also* Board of Governors of the Federal Reserve System, "2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," Dec. 2025, at 2.

156 Cong. Rec. S3589 (daily ed. May 12, 2010) (statement of Sen. Richard J. Durbin).  Congress also learned through past experience in the United States[6] and contemporaneous examples in other countries[7] that banks could easily offer debit card services without the subsidy of high interchange fees.

The enactment of the Durbin Amendment reflected a bipartisan recognition in Congress that interchange reform was needed to bring transparency, competition and choice to a system that lacked it.  The Amendment was adopted on the Senate floor by a bipartisan vote of 64-33 on May 13, 2010, and it was maintained in conference committee with the House of Representatives and signed into law as part of Dodd-Frank on July 21, 2010.

## B. The Durbin Amendment assigned the Board specific directives with respect to cost considerations.

The Durbin Amendment was carefully crafted to give the Board specific directives, not the broad discretion the Board claims.  First, Congress mandated in the Durbin Amendment that if a card network establishes a debit interchange fee on

---

[6] *See e.g.,* Martin, *supra* note 4 ("Fees were not an issue when debit cards first gained traction in the 1980s…. Merchants were not charged a fee for accepting PIN debit cards, and sometimes they even got a small payment because it saved banks the cost of processing a paper check. That changed after Visa entered the debit market.").

[7] *See e.g.,* Dennis Carlton, *Externalities in Payment Card Networks: Theories and Evidence, Commentary*, The Changing Retail Payments Landscape: What Role for Central Banks, proceedings of a conference held at the Federal Reserve Bank of Kansas City, Nov. 9-10, 2009 at 125, 129, (finding that "in seven of the eight countries with the highest debit card usage per capita there is no interchange fee...").

behalf of large card-issuing banks with over $10 billion in assets, the fee amount set by the network must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. §1693o-2(a)(2).  Congress then directed the Board in §1693o-2(a)(3)(A) to prescribe implementing regulations "to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction," and instructed the Board in §1693o-2(a)(4) on the considerations it could and could not apply when establishing these standards under (a)(3)(A).  In §1693o-2(a)(4)(A), Congress instructed the Board to "consider the functional similarity between: (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par."[8]  In §1693o-2(a)(4)(B), Congress directed the Board to "distinguish between: (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)…".

---

[8] Since the enactment of the Federal Reserve Act of 1913, federal law has required that check payments clear without fees being deducted from the transaction amount. *See* Federal Reserve Act of 1913, 38 Stat. 265, ch. 6, § 16; 76 Fed. Reg. at 43,400 ("In the check system payments clear at par.").

Congress strictly limited the cost considerations available for the Board to apply when crafting its standards because Congress intended to create a closer equivalency between the debit card system and the checking system in which transactions are regulated to clear at par.[9]  In so limiting network-established debit interchange fees to the incremental cost of authorization, clearance and settlement, Congress identified what it saw as the core cost of actually conducting an electronic debit transaction no matter the issuer, which was the only cost permitted to be covered by a centrally-established interchange fee.  In doing so, the Amendment sought to incentivize card issuers to manage all other costs of their debit card operations, such as fixed costs and fraud losses, more efficiently.

**C. The Board's Final Rule failed to follow Congress' statutory directives.**

The mandate and the directives Congress gave to the Board were clearly articulated in the Durbin Amendment's text and were reinforced by Senator Durbin's statements of legislative intent.  Accordingly, the Board issued a draft rulemaking in December 2010 that proposed to implement the Amendment in a way that was

---

[9] Senator Durbin explained the rationale: "All that happens in a debit card transaction is you deduct money from your bank account.  It is akin to writing a check.  That is why debit cards are advertised as check cards.  Right now in the United States there are zero transaction fees deducted when you use a check.  The Federal Reserve does not allow transaction fees to be charged for checks.  But when it comes to debit cards, Visa and MasterCard charge high interchange fees just as they do for credit.  Why? Because they can get away with it.  There is no regulation, there is no law, there is no one holding them accountable." 156 Cong. Rec. S3696 (daily ed. May 13, 2010) (statement of Sen. Richard J. Durbin).

9

largely consistent with its plain text and express purpose. *See* Debit Card Interchange Fees and Routing: Proposed Rule, 75 Fed. Reg. 81,722 *et seq*. (Dec. 28, 2010). The Board's proposed rule was centered around a 7 to 12 cent cap for debit interchange fees fixed by networks on behalf of issuers with over $10 billion in assets -- a standard the Board based on data it collected on an issuer's per-transaction variable ACS cost. *See* 76 Fed. Reg. at 43,424.

The banking industry expressed outrage with the Board's proposed rulemaking and launched an aggressive lobbying campaign to weaken the proposed rule and preserve more of the industry's existing interchange revenue stream.[10] The industry pushed for a Senate vote on legislation that would delay the Board's rulemaking and direct the Board to "consider all fixed and incremental costs associated with debit card transactions" in issuing final rules. Senate Amendment 392, 157 Cong. Rec. S3558-9 (daily ed. June 7, 2011) (emphasis added). This legislation faced bipartisan opposition and was rejected in a Senate floor vote on June 8, 2011. 157 Cong. Rec. S3594 (daily ed. June 8, 2011) (roll call vote rejecting Amendment 392).

---

[10] *See* Frank Keating, President and CEO of the American Bankers Association, "Who won and who lost with the Federal Reserve's final debit interchange rule?" American Bankers Association Washington Perspective (July 1, 2011). ("It's clear to me that the aggressive six-month campaign that ABA, state bankers associations and bankers waged on this issue had a real bottom-line impact.")

Nevertheless, the industry succeeded in influencing the Board to announce a Final Rule on June 29, 2011 that deviated from the plain text and purpose of the Durbin Amendment as enacted by Congress.[11]   The Board made the Final Rule significantly more generous to issuing banks than the draft rulemaking by including fixed costs and other costs beyond incremental ACS costs in its cap.  *See* 76 Fed. Reg. at 43,429.   The resulting cap permitted regulated issuers to receive an interchange fee of 21 cents plus 5 basis points plus a one cent fraud prevention adjustment on each debit transaction. *Id.* at 43,397. Commentators noted that the Board appeared to "split the baby" between banks and merchants by setting a cap at approximately half of the pre-existing 44-cent average fee.[12]

Congress neither instructed nor empowered the Board to impose its own policy judgments and engage in a line-drawing exercise to find compromise between merchants' desire for low fees and banks' desire for high fees.  In enacting the Durbin Amendment, Congress made its own policy determination to reduce network-fixed

---

[11] *See id.* ("I am pleased that the Fed took what action it could to ease the rule's impact on banks. . . . I had urged the Fed—and the board agreed—to include more of a bank's costs in setting the new cap…. they practically doubled their originally proposed 12-cent cap");); *see also* Ylan Q. Mui, "Banks convince Fed to raise swipe fee limit," *The Washington Post*, June 29, 2011.

[12] *See, e.g.,* Robert Schmidt and Timothy R. Homan, "Fed's 21-Cent Swipe-Fee Cap Leaves Banks, Merchants Unsatisfied," *Bloomberg*, June 30, 2011 (citing analyst Robert Litan: "It looks like they split the baby in half.").

debit interchange fees to cover only incremental ACS costs so that large card-issuing banks would be compelled to compete against each other to manage their other costs more efficiently. The Senate reaffirmed this approach eleven months after the Durbin Amendment was enacted when legislation that specifically sought to require the Board to include fixed issuer costs in its rulemaking was defeated.[13] Congress tasked the Board to follow the law Congress enacted, not to circumvent it at the request of the banking industry.

## II. The Board's Inclusion of "Third Category" Bank Costs in its Rulemaking Was Contrary to the Durbin Amendment's Text and Purpose.

Although the Durbin Amendment carefully circumscribed the Board's authority with respect to the setting of interchange fee standards, the Board asserts that it was given broad discretion to include within its interchange standards a category of bank costs not authorized by Congress and precluded by the law's plain text. Specifically, the Board in its Final Rule claimed that there was a universe of costs not mentioned in 15 U.S.C. §1693o-2(a)(4)(B) – namely, costs "that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in [ACS]" – that the Board was permitted to consider as

---

[13] *See* 157 Cong. Rec. S3574 (daily ed. June 8, 2011) (statement of Senator Richard J. Durbin) ("The Tester-Corker amendment requires the Fed to allow interchange fees to cover 'all fixed and incremental costs associated with debit card transactions and program operations, including incentives.' This is a truck-size loophole the banks are begging for, because they know they can get up to 44 cents and beyond…").

part of creating interchange fee standards by virtue of the statute's silence regarding those costs. 76 Fed. Reg. 43,394 at 43,426.

However, the statute was not silent on these costs. Contrary to the Board's claims, the "third category" of costs the Board seized upon ("costs specific to a particular transaction, other than incremental ACS costs") is precluded from consideration by the precise language of 15 U.S.C. §1693o-2(a)(2) and (a)(3)(A). In paragraph (a)(2), Congress mandated that regulated interchange fees be reasonable and proportional "to the cost incurred by the issuer with respect to the transaction" for which the fee was charged or received. In subparagraph (a)(3)(A), Congress directed the Board to establish standards for assessing whether an interchange fee is reasonable and proportional "to the cost incurred by the issuer with respect to the transaction." Congress' focus on "the" relevant issuer and "the" relevant transaction in (a)(2) and (a)(3)(A) reflected Congress' intent to reform the existing system in which card networks had set a uniform schedule of fees across all issuers regardless of differences in those issuers' costs. Congress sought to require that regulated fees be linked more closely to the specific costs that regulated issuers incurred in conducting the particular transaction, as Senator Durbin made clear.[14]

---

[14] *See, e.g.*, 156 Cong. Rec. S3696 (daily ed. May 13, 2010) (statement of Sen. Richard J. Durbin) ("The amendment requires that debit card interchange fees be reasonable and proportional … to the cost incurred in processing the transaction.") (emphasis added); 156 Cong. Rec. S4930 (daily ed. June 15, 2010) (statement of Sen. Richard J. Durbin) ("When I said in this amendment that we really want those

13

Thus, the statute was not silent on whether "costs specific to a particular transaction, other than incremental ACS costs" could be considered at the Board's discretion under (a)(2) and (a)(3)(A).  Rather, the statute's plain text precludes such costs from consideration because they do not constitute costs "incurred by the issuer with respect to the transaction" for which the fee rate is being fixed.  The statute only permits the Board to deviate from (a)(2)'s and (a)(3)(A)'s focus on "the" issuer and "the" transaction in one circumstance: clause (a)(4)(B)(i)'s directive that "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" be considered under (a)(2) and also be considered in the Board's regulations prescribed under (a)(3)(A).  In doing so, the statute reflects Congress' policy judgment that an assessment of incremental ACS costs incurred by "an" issuer in "a" debit transaction could be considered as an allowable proxy for the exact costs incurred by "the" issuer for "the" transaction in every case in which a fee was charged.  This limited exception, however, does not change the fact that the plain text of (a)(2) and (a)(3)(A) precludes the Board from issuing regulations that incorporate any other costs, beyond what was stated in (a)(4)(B)(i), unless those costs were incurred by "the" issuer with respect to "the" transaction (and any fee amount established by

---

fees to reflect the reasonable and proportional cost of processing the transaction, [the banks] screamed bloody murder …") (emphasis added).

card networks that incorporates such costs must be reasonable and proportional to those costs).

It was a rational policy decision by Congress not to give the Board discretion to deviate in other ways beyond clause (a)(4)(B)(i) from the focus in (a)(2) and (a)(3)(A) on "the" exact issuer and transaction involved. Congress knew that the banking industry had long tried to justify high interchange fees by claiming the fees were needed to cover a wide range of fixed and operational banking costs - even though many of these costs (like fraud losses) were not necessarily associated with the debit transaction on which the fee was being charged and even though banks also charged numerous other checking account fees, credit card fees and ATM fees purportedly to cover the same costs.[15] If Congress permitted the Board to establish a "reasonable and proportional" standard that was linked to an unspecified universe of costs beyond the incremental ACS costs specified in the statute, then any interchange fee, no matter how exorbitant, could be justified as reasonable and proportional. The effectiveness of the Durbin Amendment's "reasonable and

---

[15] *See, e.g.,* U.S. Gov't Accountability Office, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges*, GAO-10-45 (Nov. 2009) at 21 ("Although issuers incur costs for offering cards, concerns remain about the extent to which interchange fee levels closely relate to the level of card program expenses or whether they are set high so as to increase issuer profits."); *see also* Shareholder Letter from Jamie Dimon, Chairman and CEO, JPMorgan Chase, Apr. 4, 2011, at 25 (arguing that banks need debit interchange fees to pay for the "fixed costs of servicing checking accounts and debit cards" such as "the costs of ATMs and branches.").

proportional" mandate necessarily depended on the carefully limited nature of the costs that could be considered.

For this reason, the district court as well as the appellate court in the *NACS* case erred when they approved the Board's interpretation of the statute as permitting the incorporation of a third category of "costs specific to <u>a</u> particular transaction, other than incremental ACS costs." *NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474, 488 (D.C. Cir. 2014). Those courts' analysis of the Durbin Amendment's text failed to properly account for (a)(2)'s and (a)(3)(A)'s explicit references to "the" issuer and "the" transaction, and instead misread (a)(3)(A) as providing a broader grant of authority for the Board to generally consider "costs issuers incur." Those courts should have recognized that key words in (a)(2) and (a)(3)(A) constrained the Board's discretion in line with the statute's clearly-expressed purpose and legislative history.

Simply put, the interpretation advanced by the Board contravenes the plain text of the statute and should not prevail.

## III. The Specific "Third Category" Costs Included by the Board Were Clearly Contrary to the Durbin Amendment's Text and Purpose.

None of the "third category" costs that the Board included in its Final Rule - fixed costs, fraud losses, transaction monitoring costs, or network fees - were intended by the Durbin Amendment to be included as allowable costs in the Board's standards for network-fixed debit interchange fees, nor were they permitted to be

16

included under the Amendment's text.  This section explains why for each of those costs.

   **Fixed costs.**  Fixed costs were excluded from consideration under the text of the Amendment, which is why bank supporters offered legislation after the Amendment's passage to try to include fixed costs in the Board's considerations.  Recognizing the Amendment's exclusion of fixed costs, the Board initially applied the law properly in its proposed rulemaking when it stated that the interchange fee standard should cover average variable cost and that "[t]his measure would *not* consider costs that are common to all debit card transactions and could never be attributed to any *particular* transaction (*i.e.*, fixed costs), even if those costs are specific to debit card transactions as a whole." 75 Fed. Reg. at 81,735-36 (emphasis in original).

   The Board now claims in its brief before the 8th Circuit on this issue that conflating variable and fixed ACS costs is justified because "the concepts of fixed versus variable costs are not readily severable in practice." Brief for Appellant Federal Reserve Board ("Board's Brief) at 42, *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, No. 25-3000 (8th Cir. December 30, 2025).  This claim, however, is belied by the fact that Board severed such concepts in its own proposed rulemaking and was able to segment out data specifically on variable cost.  As the Board stated in its proposed rulemaking:

17

> To determine an appropriate value for a cap, the Board used data from responses to the card issuer survey described earlier. The Board used data on transaction volumes and <u>the variable cost of authorization, clearing and settlement</u> (the allowable costs under an issuer-specific determination) to compute an issuer's per-transaction cost.

75 Fed. Reg. at 81,737 (emphasis added). In order to make its Final Rule consistent with the Durbin Amendment's text and purpose, the Board should return to the analysis it applied in its proposed rule and exclude fixed costs from network-established interchange rates.

**Fraud losses.** The Board's erroneous inclusion of fraud losses as an allowable cost demonstrates precisely why the text of the Durbin Amendment was crafted <u>not</u> to let the Board include costs beyond incremental ACS costs unless they are costs specific to "the" issuer and "the" transaction.

As the Board conceded in its 8th Circuit brief, "fraud losses are quintessentially specific to <u>a</u> particular transaction". Board's Brief at 47 (emphasis added). Some debit transactions have fraud and some do not, and the extent to which an issuer invests in effective fraud prevention (such as cardholder authentication technology) plays a large role in determining whether fraud occurs. The Durbin Amendment reflected Congress' decision to not allow networks to set uniform interchange fee rates across <u>all</u> transactions at levels that subsidize fraud losses that only occur on <u>some</u> transactions. When all card issuers in a network receive the same network-established interchange fee rates that include anticipated fraud losses,

18

it reduces the incentive for particular issuers to invest in minimizing actual fraud since they will receive the same interchange fees regardless of whether they are better or worse than other issuers at combating fraud. Additionally, Congress knew that issuers often charge back fraud losses to the merchant or cardholder when fraud happens on a particular transaction, which further eliminates any need for centrally fixed interchange fees to include estimated fraud losses.[16]

Allowing fraud losses to be universally pre-paid through centrally-fixed interchange inflates the fee rates that merchants and their customers ultimately bear without providing fraud reduction benefits. That is why Congress did not allow for fraud losses to be considered as allowable interchange costs; instead, the Amendment sought to incentivize card issuers to invest in reducing fraud by specifically creating a fraud-prevention adjustment that issuers could earn if the issuer met Board-established standards demonstrating that the specific issuer is taking effective steps to reduce the occurrence and cost of debit fraud. 15 U.S.C. §1693o-2(a)(5).

---

[16] See, e.g., 156 Cong. Rec. S4841 (daily ed. June 10, 2010) (statement of Sen. Durbin). ("When debit fraud does happen today, the big banks usually try to charge back the fraud loss to the merchants on the grounds that the merchants somehow violated Visa's and MasterCard's operating rules. As long as big banks are guaranteed the same interchange revenue no matter how much or how little fraud they have, the banks have no incentive to keep fraud costs low. My amendment will give big banks a real incentive to reduce fraud.")

The Final Rule's inclusion of a uniform *ad valorem* interchange fee component for fraud losses that are not specific to "the" issuer on "the" transaction is thus contrary to the Durbin Amendment's text and should be corrected.

**Transaction monitoring costs.** As the Board admitted in its Final Rule, transaction monitoring is a "fraud-prevention activity." 76 Fed. Reg. 43,394 at 43,397. Yet, the Amendment made clear that the Board is not authorized to include the costs of "fraud prevention" activity like transaction monitoring within the base interchange standards the Board established pursuant to (a)(3)(A). Instead, the Amendment permitted the Board to make an adjustment to interchange fee amounts involving an "allowance for costs incurred by the issuer in preventing fraud". 15 U.S.C. §1693o-2(a)(5)(A)(i). If such an adjustment for fraud prevention costs is to be permissible, however, the Amendment requires that the specific issuer must be in compliance with standards established by the Board under (a)(5)(B) requiring qualifying issuers to "take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology." 15 U.S.C. §1693o-2(a)(5)(A)(ii)(II).

The Board's inclusion of costs for a "fraud-prevention activity" in the base interchange fee standard improperly adjusts interchange fee amounts for every issuer that receives network-fixed fees, regardless of whether the issuer complies with the

20

fraud prevention standards under (a)(5)(B) and regardless of whether "such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer." 15 U.S.C. §1693o-2(a)(5)(A)(i) (emphasis added). The Board's Final Rule thus rewards all issuers with an upward interchange base fee adjustment for transaction monitoring even if a particular issuer is entirely ineffective in preventing fraud or even if the issuer incurs no transaction monitoring costs at all.

In short, the clear statutory language of §1693o-2(a)(5) forecloses fraud prevention adjustments of interchange fee amounts for an issuer without that particular issuer having complied with standards requiring effective prevention of fraud. Thus, the Board's inclusion of transaction monitoring costs in the base interchange standard is contrary to the Amendment's text and should be corrected.

**Network fees.** The Board's Final Rule also expressly contradicts the Durbin Amendment's text by including network fees in the base interchange fee standard. 76 Fed. Reg. at 43,430. The Durbin Amendment defines "network fee" as "any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange fee." 15 U.S.C. §1693o-2(c)(10). Congress gave the Board discrete and limited authority to prescribe regulations regarding network fees under the Durbin Amendment, stating that the Board's authority to prescribe regulations regarding any network fee "shall be limited to regulations to

21

ensure that (i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and (ii) a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection." 15 U.S.C. §1693o-2(a)(8)(B).

The Board plainly was not given the authority or discretion by Congress to issue any regulations regarding network fees that do not fall within those two specified situations. Further, the Board's inclusion of network fees in the amount of interchange fees that issuers receive on debit transactions directly contradicts Congress' directive that the Board was only authorized to prescribe regulations regarding network fees to ensure that a network fee is <u>not</u> used to compensate an issuer with respect to a debit transaction. 15 U.S.C. §1693o-2(a)(8)(B)(i).

The statute is clear about the Board's limited authority to issue regulations concerning network fees, and the Board has both exceeded that authority and run afoul of Congress' explicit directive in (a)(8)(B)(i). The Board's inclusion of network processing fees thus should be corrected.

**IV.  The Durbin Amendment Has Brought Improvements to the Debit Card System, but Its Positive Effects Have Been Diminished by the Board's Inclusion of Third-Category Costs that Contravened the Amendment's Text and Purpose.**

Congress enacted the Durbin Amendment because American consumers and businesses deserve a debit system that is efficient, subject to competitive market forces, and free from excessively high network-established interchange fees. The

22

Amendment was carefully crafted to promote these goals while avoiding possible negative impacts on consumers, small issuers, fraud prevention, and the overall viability of the debit system.  In most respects, the Durbin Amendment is working as Congress intended.  The debit system remains vibrant and growing.[17]  Small banks and credit unions have been able to continue competing successfully in the debit card issuance market, with the Board acknowledging that the Durbin Amendment's fee regulation exemption for small issuers "is working as intended."[18]  Despite claims from the banking industry that free checking decreased after the Durbin Amendment, statistics published by the American Bankers Association (ABA) found that in 2015, "the majority of Americans – 61 percent – pay nothing at all for bank services" – an increase from the 53 percent the ABA reported had free checking when the Durbin Amendment was enacted in 2010.[19]  Debit rewards cards remain

---

[17] Board of Governors of the Federal Reserve System, "2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," *supra* note 5, at 1.

[18] Board of Governors of the Federal Reserve press release, "Exemption for small debit card issuers from interchange fee standards working as intended." May 23, 2013.

[19] *See* American Bankers Association, "Survey: Most Americans Pay Nothing for Bank Services," Aug. 18, 2015; *see also* American Bankers Association, "ABA Survey Shows Majority of Bank Customers Pay Nothing for Monthly Bank Services," Oct. 7, 2010; Kevin Wack, "*Free Checking Increased After Durbin: Study*," The American Banker Dec. 11, 2013.

widely available for consumers to choose from after the Amendment took effect.[20]

Evidence also shows that the modest savings achieved by the Final Rule's fee reductions were passed on to consumers through retail price competition, which helped to partially offset inflation and hold prices down in the years following the Amendment's enactment.[21]

However, the Board's impermissible inclusion of third category costs in its Final Rule has countermanded the Durbin Amendment's goal of reducing the burden of excessively high interchange fees for businesses and consumers.  By incorporating fixed costs, fraud losses, and other "third category" costs into its Final Rule, the Board ended up allowing Visa and Mastercard to fix debit interchange fee

---

[20] *See e.g.*, "Despite Durbin, Debit Card Reward Programs Remain Vibrant," *CU Today*, March 29, 2016 (noting that "[a]ccording to a new report from the Mercator Advisory Group, a majority of the country's top banks and credit unions offer debit card reward programs: 14 of the 25 largest banks and 13 of the 25 largest credit unions."); Pymnts.com, "United Airlines' New Card Capitalizes on Debit Rewards Trend," Nov. 4, 2025.

[21] Other merchant costs increased in the years following the Durbin Amendment, and Moody's expected that merchants would use debit fee savings "to help shield customers from the impact of these other rising costs."  Moody's Investor Service, "New Debit Rules Hurt Banks and Reshape the Payment Processor Market," June 20, 2012, at 10.  This was reflected in the data.  From October 2011 when the Final Rule took effect through the end of 2016, the Producer Price Index for retail industries rose 9.4 percent while the Consumer Price index increase only 4.3 percent, indicating that merchants used debit savings to help keep consumer prices lower than they otherwise would have been if they had reflected producer cost increases. *See* Producer Price Index figures and Consumer Price Index figures.

rates at 22 to 24 cents per transaction—far in excess of the 4.1 cents per transaction that regulated issuers currently incur in incremental ACS costs.[22]

If the Board's improper inclusion of "third category" costs is not corrected, not only will businesses and consumers continue to bear the burden of excessively high debit interchange fees, but fraud prevention will continue to be undermined. Every cost beyond incremental ACS costs that the Board permits to be subsidized by centrally-fixed interchange fees is a cost that issuing banks lose incentive to manage efficiently. The fact remains that debit issuers have not been properly incentivized to invest in effective fraud prevention, in part, because the Board's Final Rule allowed fraud losses to be subsidized for all debit issuers through interchange (and in part because the Board did not appropriately implement the Amendment's requirement to issue fraud prevention adjustment standards that rewarded only those issuers that demonstrated effectiveness in reducing fraud - a topic not at issue in the current litigation). Indeed, fraud has steadily gone up on debit transactions from 7.8 basis points per transaction value in 2011 to 17.6 basis points per transaction value today.[23]

---

[22] Board of Governors of the Federal Reserve System, "2023 Interchange Fee Revenue," *supra* note 5, at 2-3.

[23] *Id*. at 2.

Requiring the Board to implement the Durbin Amendment according to its text and purpose and to exclude fixed costs, fraud losses and other "third category" costs from the Final Rule will limit banks' ability to insulate their debit operations from competitive market forces and will help achieve the more robust savings that Congress intended when it limited centrally-fixed interchange fees to incremental ACS costs.

## CONCLUSION

This Court should reverse the decision of the court below to give proper effect to the text and purpose of the Durbin Amendment by correcting the Board's Final Rule, which will aid in the efficient operation of the debit system for the benefit of consumers and our nation.

Dated: May 6, 2026                          Respectfully submitted,

By: /s/ *David P. Germaine*
David P. Germaine
Sperling Kenny Nachwalter, LLC
321 North Clark Street, 25th Floor
Chicago, Illinois 60654
Tel: (312) 641-3200
dgermaine@sperlingkenny.com

*Counsel for Amicus Curiae*
*Senator Richard J. Durbin*

26

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit specified in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. 32(f), it contains 6,310 words. The document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 6, 2026                    Respectfully submitted,

By: /s/ *David P. Germaine*
David P. Germaine
Sperling Kenny Nachwalter, LLC
321 North Clark Street, 25th Floor
Chicago, Illinois 60654
Tel: (312) 641-3200
dgermaine@sperlingkenny.com

*Counsel for Amicus Curiae*
*Senator Richard J. Durbin*

27

## CERTIFICATE OF SERVICE

I certify that on May 6, 2026, the foregoing was electronically filed with the Court via the Court's CM/ECF system, and a copy of the same was automatically served on all parties registered with the CM/ECF system on the same date.


Dated: May 6, 2026                    Respectfully submitted,

By: /s/ *David P. Germaine*
David P. Germaine
Sperling Kenny Nachwalter, LLC
321 North Clark Street, 25th Floor
Chicago, Illinois 60654
Tel: (312) 641-3200
dgermaine@sperlingkenny.com

*Counsel for Amicus Curiae*
*Senator Richard J. Durbin*