No. 25-6038

# In the United States Court of Appeals for the Sixth Circuit

LINNEY'S PIZZA, LLC,

*Plaintiff-Appellant,*

v.

BOARD OF GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

*Defendant-Appellee,*

and

BANK POLICY INSTITUTE and
THE CLEARING HOUSE ASSOCIATION L.L.C.,

*Proposed Intervenors-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Kentucky
(No. 3:22-cv-00071) (The Hon. Gregory F. Van Tatenhove)

## BRIEF FOR PROPOSED INTERVENORS-APPELLEES

JEFFREY B. WALL
JUDSON O. LITTLETON
ABBY H. WALTERS
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
Telephone: (202) 955-8500
jwall@gibsondunn.com
jlittleton@gibsondunn.com
ahwalters@gibsondunn.com

*Counsel for Proposed Intervenors-
Appellees Bank Policy Institute and
The Clearing House Association
L.L.C.*

Case: 25-6038    Document: 40    Filed: 05/29/2026    Page: 2

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, Bank Policy Institute and The Clearing House Association L.L.C. make the following disclosures:

Bank Policy Institute is not a publicly traded corporation, has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

The Clearing House Association L.L.C. is not a publicly traded corporation, has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

No publicly owned corporation has a substantial financial interest in the outcome of this litigation.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................... i

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................... vii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 7

STATEMENT OF THE ISSUES ......................................................... 8

STATEMENT OF THE CASE ............................................................ 9

     A.    Factual Background ........................................................... 9

         1.    Electronic-debit transactions ....................................... 9

         2.    The Durbin Amendment .............................................. 10

         3.    Regulation II ................................................................ 12

         4.    Merchants' challenges to Regulation II ..................... 19

     B.    Procedural Background ....................................................... 20

SUMMARY OF ARGUMENT .......................................................... 23

ARGUMENT ................................................................................... 26

I.    The Durbin Amendment Does Not Restrict The Board To Considering Only Incremental ACS Costs. ................................ 27

     A.    The Durbin Amendment Requires The Board To Consider All Transaction-Related Costs And Provide A Reasonable Return. .......................................................... 28

     B.    Linney's Pizza Misinterprets The Durbin Amendment's Requirements. .............................................. 35

1.    Linney's Pizza incorrectly ties the fee cap only to incremental ACS costs ........................................... 35

2.    Linney's Pizza incorrectly denies issuers a reasonable return. ...................................................... 46

II.    The Durbin Amendment Does Not Prohibit Consideration Of The Four Challenged Costs. ........................................ 48

A.    The Board Correctly Considered Transaction-Monitoring Costs ................................................................ 48

B.    The Board Correctly Considered Fraud-Loss Costs. ........ 53

C.    The Board Correctly Considered Network-Processing Costs. ............................................................... 56

D.    The Board Correctly Considered Fixed ACS Costs ........... 59

III.    The Durbin Amendment Does Not Require The Board To Adopt An Issuer-Specific And Transaction-Specific Interchange-Fee Cap. ................................................. 63

IV.    Linney's Pizza's Challenges To The Board's Decisionmaking Process Likewise Fail. ...................................... 68

CONCLUSION ............................................................ 70

iii

# TABLE OF AUTHORITIES

Page(s)

CASES

*Aetna Cas. & Sur. Co.* v. *Comm'r of Ins.*,
263 N.E.2d 698 (Mass. 1970) ...................................................35

*Am. Bus. Ass'n* v. *Slater*,
231 F.3d 1 (D.C. Cir. 2000) ....................................................64

*Bath Iron Works Corp.* v. *Dir., Off. of Workers'
Comp. Programs*,
506 U.S. 153 (1993) .................................................................43

*Brooks-Scanlon Co.* v. *R.R. Comm'n*,
251 U.S. 396 (1920) .................................................................47

*Calfarm Ins. Co.* v. *Deukmejian*,
771 P.2d 1247 (Cal. 1989) .......................................................34

*Chrysler Corp.* v. *Brown*,
441 U.S. 281 (1979) .................................................................43

*Citizens Coal Council* v. *EPA*,
447 F.3d 879 (6th Cir. 2006)...................................................70

*City of Charlottesville* v. *FERC*,
774 F.2d 1205 (D.C. Cir. 1985) ..............................................33

*Corner Post, Inc.* v. *Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .................................................................21

*Corner Post, Inc.* v. *Bd. of Governors of Fed. Rsrv. Sys.*,
794 F. Supp. 3d 610 (D.N.D. Aug. 6, 2025) ...........................20

*Duquesne Light Co.* v. *Barasch*,
488 U.S. 299 (1989) .................................................................34

*ExxonMobil Oil Corp.* v. *F.E.R.C.*,
  487 F.3d 945 (D.C. Cir. 2007) ...........................................................3, 33

*FPC* v. *Hope Nat. Gas Co.*,
  320 U.S. 591 (1944) .....................................................................3, 33, 34

*Guaranty Nat'l Ins. Co.* v. *Gates*,
  916 F.2d 508 (9th Cir. 1990).............................................................33, 34

*Lamar, Archer & Cofrin, LLP* v. *Appling*,
  584 U.S. 709 (2018) ...............................................................................32

*Loughrin* v. *United States*,
  573 U.S. 351 (2014) ...............................................................................44

*In re MCP No. 185*,
  124 F.4th 993 (6th Cir. 2025) .................................................................64

*Michigan Bell Tel. Co.* v. *Engler*,
  257 F.3d 587 (6th Cir. 2001)..........................................................33, 34, 47

*Milman* v. *Fiegers & Fieger, P.C.*,
  58 F.4th 860, 869 (6th Cir. 2023) ...........................................................67

*NACS* v. *Bd. of Governors of Fed. Rsrv. Sys.*,
  746 F.3d 474 (D.C. Cir. 2014) ........................................................*passim*

*NACS* v. *Bd. of Governors of Fed. Rsrv. Sys.*,
  958 F. Supp. 2d 85 (D.D.C. 2013)......................................................19, 20

*Nielsen* v. *Preap*,
  586 U.S. 392 (2019) ...............................................................................65

*NLRB* v. *Noel Canning*,
  573 U.S. 513 (2014) ...............................................................................65

*Sierra Club* v. *U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) ..................................................................70

*TCF Nat'l Bank* v. *Bernanke*,
    643 F.3d 1158 (8th Cir. 2011)..................................................................46

STATUTES AND REGULATIONS

5 U.S.C. § 701 .............................................................................................8

7 U.S.C. § 940f...........................................................................................34

15 U.S.C. § 1693*o*-2..........................................................................*passim*

28 U.S.C. § 1291 .........................................................................................8

28 U.S.C. § 1331 .........................................................................................7

28 U.S.C. § 2401 .......................................................................................21

Debit Card Interchange Fees and Routing,
    76 Fed. Reg. 43,394 (July 20, 2011) ............................................*passim*

Debit Card Interchange Fees and Routing,
    80 Fed. Reg. 48,684 (Aug. 14, 2015)..................................14, 49, 51, 52

Pub. L. No. 111-203, 124 Stat. 1376 (2010)..............................................2

OTHER AUTHORITIES

17 The Oxford English Dictionary (2d ed. 1989).....................................65

Federal Reserve System, *Federal Reserve Payment
    Study: 2022 Triennial Initial Data Release*........................................1

Merriam-Webster's Collegiate Dictionary (11th ed. 2005).....................65

Webster's Third New International Dictionary (2002).....................33, 34

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

This appeal from the district court's order granting summary judgment presents a question of law about the meaning of a provision of the Dodd-Frank Act known as the Durbin Amendment. That provision establishes a limit on the interchange fees that debit-card issuers can receive for their role in effectuating electronic-debit transactions. The Durbin Amendment requires that interchange fees for debit-card transactions be "reasonable and proportional" to issuers' transaction costs, and directs the Federal Reserve Board to issue implementing regulations. 15 U.S.C. § 1693*o*-2(a)(2) and (3). Linney's Pizza's mistaken interpretation of the Durbin Amendment would require the Board to dramatically reduce the interchange fees that issuers can receive for each of over 106 billion transactions per year—making issuers unable even to recover the costs they incur in processing such transactions. Given the competing statutory interpretations and the profound economic implications of this Court's decision, oral argument is warranted.

## INTRODUCTION

Paying by debit card is fast, convenient, and secure. Consumers and merchants alike appreciate the efficiency and reliability of the instantaneous, cashless payment that debit-card transactions provide. Indeed, debit transactions have increased more than any other noncash payment method in the last quarter-century, with 106 billion such transactions in the U.S. in 2021 alone. *See* Board of Governors of the Federal Reserve System, *Federal Reserve Payment Study: 2022 Triennial Initial Data Release*, https://tinyurl.com/2zas9ye4 (last visited May 25, 2026). None of that would be possible without the substantial investments and services provided by the members of the Bank Policy Institute and The Clearing House Association L.L.C. (the Associations) that issue debit cards.[1]

The Associations' members are compensated for these valuable investments and services largely through interchange fees they receive

---

[1] On December 5, 2025, the Associations moved to intervene in this appeal as appellees. *See* App. ECF No. 13. On March 9, 2026, this Court referred the determination of the Associations' motion to the merits panel and permitted the Associations to file this brief. *See* App. ECF No. 23.

for the transactions they facilitate.  For nearly 15 years, the amount of those interchange fees has been capped under a Federal Reserve Board regulation known as Regulation II.  That regulation implements a provision of the Dodd-Frank Act of 2010, commonly called the Durbin Amendment, which limits the interchange fees that debit-card issuers can receive for debit transactions.  *See* Pub. L. No. 111-203, § 1075, 124 Stat. 1376, 2068-2074 (2010).  Specifically, Congress provided that interchange fees must be "reasonable and proportional to the cost incurred" by issuers in processing debit transactions, and it directed the Board to issue regulations setting that limit.  15 U.S.C. § 1693*o*-2(a)(2) and (3)(A).

Congress did not pluck that language out of thin air.  When Congress provided that debit interchange fees must be "reasonable and proportional" to issuers' transaction costs, it invoked a statutory phrase with a long history in ratemaking statutes and price regulations.  Those other statutes and rules impose price limits on private businesses, but they do so consistent with the Fifth Amendment's Takings Clause by allowing businesses to recoup their costs and obtain a reasonable return

2

on their provision of services to the public. *See, e.g.*, *FPC* v. *Hope Nat. Gas Co.*, 320 U.S. 591, 603, 605 (1944); *ExxonMobil Oil Corp.* v. *F.E.R.C.*, 487 F.3d 945, 951 (D.C. Cir. 2007).

In promulgating Regulation II, the Board did not entirely adhere to these commands, but its departures hurt issuers and consumers, not merchants like Linney's Pizza. The Board mostly followed Congress's overall directive in Paragraph (2) to account for "the cost incurred" by issuers for debit transactions. 15 U.S.C. § 1693o-2(a)(2). It took into account the costs issuers bear to authorize, clear, and settle transactions (so-called ACS costs), including expenses associated with transaction monitoring, fraud losses, and network-processing fees. But the Board declined to consider other transaction-related costs that issuers incur, including non-fraud-related cardholder inquiries, insufficient-funds losses, and the costs of complying with state and federal regulations governing debit-card transactions. The Board then set a fee cap in Regulation II equal to the costs it had decided to consider, without ensuring that issuers receive a reasonable return on the valuable debit services they offer.

3

None of that gives Linney's Pizza any basis to complain about how the Board implemented Congress's mandate in Paragraph (2). But Linney's Pizza seizes on a different provision of the Durbin Amendment to argue that the Board still set the fee cap too high. In particular, in Paragraph (4)—which is entitled "Considerations; consultation"—Congress specified that in setting the fee cap the Board should consider incremental ACS costs and should ignore costs not specific to particular debit transactions. 15 U.S.C. § 1693*o*-2(a)(4)(B)(i)-(ii). As Linney's Pizza sees it, Congress in Paragraph (4)(B) "bifurcated the universe of possible costs into only [those] two categories." Br. 18. As a result, Linney's Pizza argues, Paragraph (4)(B) requires the Board to consider *only* incremental ACS costs in setting the fee cap—and nothing else. On that view, the current cap is actually too high because it includes other types of issuers' costs.

The most fundamental problem for Linney's Pizza is that Paragraph (4)(B) says nothing about transaction-specific costs that are not incremental ACS costs. It is *silent* on those types of costs. And in the absence of more specific guidance in Paragraph (4), the general

4

command in Paragraph (2) governs:  interchange fees must be "reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*."  15 U.S.C. § 1693*o*-2(a)(2) (emphasis added). If a given cost is incurred by issuers "with respect to" debit transactions, the Board must consider it.  And because all four of the categories of costs that Linney's Pizza challenges—transaction-monitoring costs, fraud losses, network-processing fees, and so-called "fixed" ACS costs— are transaction-related costs necessary to process debit transactions, the Board properly considered them.

Applying this straightforward reading of the statute, the district court correctly rejected Linney's Pizza's challenge to Regulation II.  The district court explained that the "inclusion" of the two "categories" in Paragraph (4) "does not imply the exclusion of" other costs "because the statute also requires that the fee standard promulgated by the Board be 'reasonable and proportiona[l]' to the costs incurred by issuers, a command that Linney's Pizza simply glosses over."  Op. & Ord., R.61, PageID# 1084.  The court thus reached the same conclusion reading the plain text of the Durbin Amendment that the D.C. Circuit reached a

5

decade ago under the *Chevron* framework.  *See NACS* v. *Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474 (D.C. Cir. 2014).

To be sure, the Board and the Associations have different views on precisely what the Durbin Amendment requires.  The Board's view is that, because Paragraph (4) is silent on transaction-related costs other than incremental ACS costs, the Board has discretion whether to consider those other costs in setting the fee cap.  The Associations' view is that, in the absence of specific guidance in Paragraph (4), the overarching directive in Paragraph (2) controls:  the Board must consider any "cost incurred by the issuer with respect to the transaction," 15 U.S.C. §§ 1693*o*-2(a)(2), (3)(A), and set a cap that is "reasonable" and "proportional" to all such costs.  But the Board and Associations agree on the bottom line:  in no way does the statute *prohibit* the consideration of transaction-related costs other than incremental ACS costs.

The district court was also right to reject Linney's Pizza's argument that the Board unlawfully adopted a single, universal fee cap.  As the court correctly held, nothing in the statutory text compels the

6

Board to tailor the fee cap to each of hundreds of issuers and each of the billions of transactions that take place each year. Such a requirement would be "nigh impossible to accomplish," given that the "fees and associated costs for these transactions are calculated" after the interchange fees are charged. Op. & Ord., R.61, PageID# 1100. And because the statute does not require transaction-specific fees, a consistent reading dictates that it "does not require issuer-specific fees either." *Id.* The district court also correctly rejected Linney's Pizza's largely redundant arbitrary-and-capricious arguments. *Id.*, PageID# 1102.

All told, adopting Linney's Pizza's reading of the Durbin Amendment would require this Court to radically upend a regulatory regime that has been in place for more than a decade, and shift the ultimate costs for debit-card services from merchants to issuers and consumers. That is not remotely compelled by the text of the Durbin Amendment. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the complaint raises claims under the laws of the United

7

States, specifically 5 U.S.C. § 701 *et seq.* This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment entered on September 15, 2025. *See* Judgment, R.62. Linney's Pizza filed a timely notice of appeal on November 10, 2025. Notice of Appeal, R.63.

## STATEMENT OF THE ISSUES

1.   Whether the district court correctly held that the Board may consider all of a debit-card issuer's transaction-related costs because the interchange-fee cap must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2).

2.   Whether the district court correctly held that the Board properly considered four different categories of costs in Regulation II because those costs are "incurred by [issuers] with respect to" debit transactions. 15 U.S.C. § 1693*o*-2(a)(2).

3.   Whether the district court correctly held that the Board may prescribe a single, universal fee cap instead of an issuer-specific and transaction-specific standard.

4.      Whether the district court correctly held that the Board did not act arbitrarily or capriciously in adopting Regulation II.

## STATEMENT OF THE CASE

### A.      Factual Background

#### 1.      Electronic-debit transactions

Debit transactions involve four principal actors:  (1) the consumer or business that uses a debit card to make a purchase from a merchant, (2) the merchant's bank (referred to as the acquirer), (3) the bank that issued the debit card to its customer (the issuer), and (4) the networks that connect these parties (such as Visa or Mastercard).  The swipe of a debit card initiates a complex, behind-the-scenes process to authorize, clear, and settle the transaction.

To seek authorization, the acquirer sends the cardholder's account information and transaction value to the issuer via the network.  The issuer determines whether the cardholder has sufficient funds and whether the transaction appears fraudulent, and then either approves or declines the transaction.  If the transaction is approved, then it must be cleared, which involves a "formal request for payment sent from the merchant on the network to the issuer"; and it must be settled, which

9

"involves the actual transfer of funds from the issuer to the acquirer." *NACS*, 746 F.3d at 478.  Through this "ACS" process, debit transactions offer inexpensive and effective electronic-payment options to individual and corporate cardholders, along with assured payments to merchants.

Debit-card issuers incur substantial costs to offer this efficient and secure payment service.  To name only a few, issuers must pay for the cards themselves, the ACS process, monitoring transactions, fees to the networks, fraud prevention and losses, and regulatory compliance. Issuers recoup many of these costs through interchange fees charged with every transaction.  The fees are set by the card networks and paid by acquirers (or merchants' banks), which typically pass the costs down to their merchants.  Merchants pay these fees because they substantially benefit from debit-card transactions, including from increased business from cardholders and a safe, efficient method of accepting payment.

### 2.    The Durbin Amendment

Concerned that networks were setting interchange fees too high, Congress adopted the Durbin Amendment in 2010 as part of the Dodd-Frank Act to place a limit on the interchange fees issuers could receive. *See* 15 U.S.C. § 1693*o*-2.  The Durbin Amendment has a straightforward

10

structure.  Starting with Subsection (a), Paragraph (1) grants the Board general authority to issue rules relating to interchange fees.  Paragraph (2) then establishes the limit on interchange fees:  any fee "that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  *Id.* § 1693*o*-2(a)(2).  And Paragraph (3) directs the Board to implement that limit by "establish[ing] standards for assessing whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  *Id.* § 1693*o*-2(a)(3)(A).

In Paragraph (4), Congress set forth certain "[c]onsiderations" for the Board to take into account "[i]n prescribing regulations under [P]aragraph 3(A)."  15 U.S.C. § 1693*o*-2(a)(4).  First, Congress directed the Board to "consider the functional similarity between" electronic-debit transactions and checking transactions.  *Id.* § 1693*o*-2(a)(4)(A).  Second, as particularly relevant here, the statute instructs the Board to "distinguish between" two types of costs:  the "incremental cost" associated with "authorization, clearance, or settlement of a particular

11

electronic debit transaction" (or incremental ACS costs), which the Board "shall" consider, *id.* § 1693*o*-2(a)(4)(B)(i); and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," which the Board "shall not" consider, *id.* § 1693*o*-2(a)(4)(B)(ii).  And third, the statute instructs the Board to "consult, as appropriate, with" several federal agencies.  *Id.* § 1693*o*-2(a)(4)(C).

Also relevant here, Congress separately provided that the Board could allow issuers to recover a higher interchange fee to account for issuers' costs in combatting fraud across the debit-card system. Specifically, Paragraph (5) says that the Board "may allow for an adjustment to the fee amount received or charged by an issuer" if it "is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions" and the issuer complies with fraud-related standards separately promulgated by the Board.  15 U.S.C. § 1693*o*-2(a)(5)(A).

### 3.    Regulation II

To implement the Durbin Amendment's directive, the Board issued Regulation II in 2011.  *See* Debit Card Interchange Fees and

12

Routing, 76 Fed. Reg. 43,394 (July 20, 2011) (2011 Final Rule).  The Board observed that, although Paragraph (4) requires consideration of incremental ACS costs and prohibits consideration of costs that "are not specific to a particular electronic debit transaction," it does not address costs "that are specific to a particular electronic debit transaction but that are not incremental [ACS costs]." *Id.* at 43,426.  In the Board's view, Congress's silence as to that category of costs left it to the Board to determine which of those costs to consider "to the extent necessary and appropriate to fulfill the purposes of the statute." *Id.*

a.     Based on that understanding, the Board then explained which costs it had decided to factor into its fee cap.

*Transaction-Monitoring Costs.*  The Board determined that transaction-monitoring costs should be factored into the cap because they are specific to the authorization of debit transactions. "Transactions monitoring systems assist in the authorization process by providing information to the issuer before the issuer decides to approve or decline the transaction." 2011 Final Rule, 76 Fed. Reg. at 43,430.  As a result, "[t]ransaction monitoring is as integral to the authorization

13

decision as confirming that a card is valid and authenticating the cardholder." *Id.* at 43,431.[2]

*Fraud Losses.* The Board also "include[d] an allowance for fraud losses in determining the interchange fee standard." 2011 Final Rule, 76 Fed. Reg. at 43,431. The Board explained that an "issuer's fraud losses are generally the result of the authorization, clearance, and settlement of an apparently valid transaction . . . later identifie[d] as fraudulent" and often cannot otherwise be recouped by an issuer through chargebacks or other methods. *Id.* The Board determined both that "[f]raud losses are costs that are specific to a particular transaction" and that it was "reasonable" to "[p]ermit[] issuers to recover at least some fraud losses through interchange fees." *Id.*

---

[2] After a 2014 decision by the D.C. Circuit—discussed below—that upheld Regulation II against a very similar challenge to this one, but remanded to the Board with instructions to clarify how it chose to include transaction-monitoring costs, *see NACS*, 746 F.3d at 477, the Board issued a clarification reiterating that transaction-monitoring costs are allowable cost considerations because they are costs issuers incur in authorizing specific transactions. Debit Card Interchange Fees and Routing, 80 Fed. Reg. 48,684, 48,685 (Aug. 14, 2015) (2015 Clarification).

*Network-Processing Fees.*    The Board also "included network processing fees in determining the standard for interchange fees." 2011 Final Rule, 76 Fed. Reg. at 43,430.    The Board noted that "[n]etwork processing fees are incurred by issuers in the course of effecting electronic debit transactions," are "determined by the amount of electronic debit transactions processed for that issuer," and are thus based on the number of specific transactions an issuer processes.    *Id.* The Board accordingly found "that network processing fees are both specific to a particular transaction and incurred for the issuer's role in authorization, clearance, and settlement."    *Id.*

*"Fixed" ACS Costs.*    In the proposed rule, the Board proposed distinguishing between "fixed" and "variable" ACS costs.    After considering the comments, however, the Board ultimately determined that describing certain costs as "fixed" was a misnomer, including because labeling ACS costs as either "fixed" or "variable" was artificial in the context of the debit-card payment system.    "[T]he meanings of fixed costs and variable costs depend on a variety of factors" and the distinction between the two categories "depends on the relevant time

15

horizon and volume range," among other considerations. 2011 Final Rule, 76 Fed. Reg. at 43,427. Thus, "the same type of cost may appear variable in one year, but fixed in a different year" for any single issuer. *Id.* Such distinctions also could vary widely between issuers based on their accounting judgments and use of third-party processors. *Id.* Noting that the statute itself does not use the terms "fixed" or "variable" or require any such distinction, the Board abandoned the distinction and focused on whether each such cost was "specific to" debit transactions.

The Board went on to determine that various issuer costs that could be characterized as "fixed" were part of the ACS process and necessary for the issuer to effect each transaction. 2011 Final Rule, 76 Fed. Reg. at 43,426-43,427, 43,429. For example, "an issuer must maintain and use network connectivity" to receive and send all relevant ACS messages; must "maintain and use computer equipment that can process each authorization request"; and "must . . . employ staff to operate and maintain the computer equipment involved in transaction processing." *Id.* at 43,429-43,430. Because "[e]ach transaction uses the equipment, hardware, software and associated labor, and [because] no

16

particular transaction can occur without incurring these costs," such processing costs (*e.g.*, network connectivity costs and the associated hardware, software, and labor costs) are "specific to a particular transaction." *Id.* at 43,430.

b.      The Board also decided to exclude a range of other costs for "various reasons," despite acknowledging that at least some of these costs were specific to a particular electronic debit transaction. 2011 Final Rule, 76 Fed. Reg. at 43,427; *see, e.g., id.* at 43,429 (noting that the Board did not have the data "to accurately separate out and assess cost data for customer inquiries related solely to particular debit transactions"). For example, the Board excluded the costs of (1) non-fraud-related cardholder inquiries; (2) insufficient funds handling; (3) insufficient fund losses; (4) transaction-specific compliance; (5) card production and delivery; and (6) rewards and other incentives. Together, the Board found that these excluded costs amounted to a median cost of 8.5 cents per transaction. *Id.* at 43,427, 43,428.

c.      Ultimately, the Board set a cap on interchange fees consisting of a base component of no more than 21 cents; plus an *ad*

17

*valorem* amount equal to .05 percent of the value of the transaction; and a fraud-prevention adjustment of no more than 1 cent. 2011 Final Rule, 76 Fed. Reg. at 43,422. Contrary to the views expressed in numerous comment letters, the Board concluded that the statute did not require that issuers receive a reasonable return and, as a result, "did not include a level of profit or a rate of return" in setting the cap. *Id.* at 43,421, 43,427 n.119.

The Board also determined that the fee cap would apply across the industry to all issuers. The Board reasoned that the statute's generic references to "*an* issuer" and "*an* electronic debit transaction" indicated that Congress intended that the Board craft a single standard for a representative issuer and transaction, rather than devise many standards for every individual issuer. 2011 Final Rule, 76 Fed. Reg. at 43,422 (emphases added). The Board concluded that this approach would avoid "imposing undue compliance burdens on issuers and networks" and would "provide transparency to issuers, networks, acquirers, merchants, and supervisors that will result in the most effective monitoring and enforcement of compliance." *Id.*

18

The Board explained that it had "considered an alternative interpretation" that would require the calculation of an interchange fee for "a particular covered issuer . . . for the particular transaction." 2011 Final Rule, 76 Fed. Reg. at 43,422.  But the Board found that such an interpretation would be "virtually impossible to implement" because "interchange fees are computed at the time of the transaction, and an issuer's costs for a specific transaction cannot be ascertained" on the spot.  *Id.*  In addition, the Board explained, "transaction-specific interchange fees would result in an exceedingly complex matrix of interchange fees," and trying to apply such a matrix to "tens of billions of electronic debit transactions . . . would introduce tremendous complexity and administrative costs for issuers, networks, acquirers, and merchants." *Id.*

### 4.    Merchants' challenges to Regulation II

Shortly after the Board promulgated Regulation II, merchant trade groups challenged the rule, claiming that the Board had set the interchange-fee cap too high.  *See NACS* v. *Bd. of Governors of Fed. Rsrv. Sys.*, 958 F. Supp. 2d 85, 95-96 (D.D.C. 2013).  Just as Linney's Pizza does here, the *NACS* plaintiffs argued that the Durbin

19

Amendment allowed the Board to consider *only* incremental ACS costs when setting the interchange-fee cap, meaning that the Board had violated the statute by factoring in other costs. *Id.*

The district court agreed with the challengers, but the D.C. Circuit reversed. *See NACS*, 746 F.3d at 477. It held that the statute gives the Board discretion to consider costs beyond incremental ACS costs, because the Board must "promulgate regulations ensuring that interchange fees are reasonable and proportional to the costs issuers incur." *Id.* at 488. The court rejected the merchants' narrower reading of the statute, reasoning that "had Congress wanted to allow issuers to recover only incremental ACS costs, it could have done so directly." *Id.* at 485.

## B.   Procedural Background

In 2021, a decade after the Board issued Regulation II and more than seven years after the D.C. Circuit upheld it, two North Dakota trade associations (joined later by Corner Post, Inc.) brought a copycat suit in the Northern District of North Dakota to relitigate Regulation II. *See Corner Post, Inc.* v. *Bd. of Governors of Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610 (D.N.D. Aug. 6, 2025). In 2022, Plaintiff Linney's

20

Pizza (represented by the same counsel) filed this identical challenge to Regulation II in the Eastern District of Kentucky.  Complaint, R.1.

In September 2023, the district court dismissed the complaint as barred by the six-year statute of limitations in 28 U.S.C. § 2401(a). Order, R.17.  Linney's Pizza appealed that dismissal, and this Court held that appeal in abeyance pending the Supreme Court's consideration of Corner Post's parallel appeal.  *Linney's Pizza, LLC* v. *Bd. of Governors of Fed. Rsrv. Sys.*, No. 23-5993 (6th Cir. 2024).  The Supreme Court ultimately held that the statute of limitations had not begun to run for Corner Post's challenge until it opened for business in 2018.  *Corner Post, Inc.* v. *Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 825 (2024). This Court then vacated the dismissal of Linney's Pizza's complaint and remanded for further proceedings.  *Linney's Pizza*, 2024 WL 4129195 (6th Cir. Sept. 5, 2024).

After the Supreme Court's decision made clear that the district court would reach the merits of Linney's Pizza's challenge, the Associations promptly moved to intervene to participate in summary-judgment briefing.  Intervention Mot., R.26.  The district court denied

21

intervention in part on the ground the Associations could participate as amici. Order, R.56, PageID# 964-65.

The district court subsequently granted summary judgment to the Board. Op. & Ord., R.61. The court recognized that, in *Corner Post*, the district court there had held that Regulation II is unlawful. *See* Op. & Ord., R.61, PageID# 1075 (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, No. 1:21-cv-00095 (D.N.D. Aug. 6, 2025)). But the court here was not persuaded. The court rejected Linney's Pizza's argument that Paragraph (4) of the Durbin Amendment "bifurcat[es]" permissible and impermissible costs. *Id.* Instead, the court reasoned that Paragraph (4) must be interpreted in light of Paragraphs (2) and (3). *Id.* Reading all of those provisions together, the court held that the Board properly included transaction-monitoring costs, fraud losses, network-processing fees, and "fixed" ACS costs in its calculation of the interchange-fee cap. *Id.*, PageID# 1088-96.

The court also rejected Linney's Pizza's challenge to Regulation II's "representative issuer" model. *Id.*, PageID# 1097-1101. The court held that the plain text of the statute permits the representative-issuer

22

model the Board adopted and noted that Linney's Pizza's issuer- and transaction-specific standard would be "nigh impossible to accomplish." *Id.*, PageID# 1100. Finally, the court denied Plaintiff's arbitrary-and-capricious challenge to Regulation II, which recycled many of the same arguments, for similar reasons. *Id.*, PageID# 1101-03. The district court did not directly address the Associations' distinct statutory arguments in reaching its decision.

## SUMMARY OF ARGUMENT

I.    The Durbin Amendment requires the Board to consider all transaction-related issuer costs and provide for a reasonable return when calculating the interchange-fee cap because that is the only way in which the Board can fulfill Congress's mandate to establish an interchange-fee cap that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2), (3).

A.    The statute's plain language compels this conclusion. The Durbin Amendment begins with a broad statutory mandate that interchange fees should be reasonable and proportional to the cost incurred by the issuer. The only limitation in that section on the type of

23

costs that may be considered is costs *with respect to the transaction*. The statute repeats this formulation in the next paragraph directing the Board to implement that mandate, and then proceeds to describe the methodology and "[c]onsiderations" the Board must employ to achieve Congress's objective.  Rather than supersede the statute's mandate, those considerations are entirely consistent with it; they prohibit the Board from considering *only* those costs "not specific to a particular electronic debit transaction."  15 U.S.C. § 1693*o*-2(a)(4)(B)(ii).

The interchange-fee limit must allow issuers to recover a reasonable return because the statute's directive to set a fee cap that is "reasonable and proportional" to the costs incurred by the issuer is analogous to ratemaking statutes that courts have consistently interpreted to provide for costs plus a reasonable return.  Capping the interchange fee below issuers' costs would raise serious constitutional concerns because the Takings Clause forbids the government from dictating prices at an amount that has a "confiscatory" effect.  Linney's Pizza turns the constitutional-avoidance canon on its head by embracing

24

an atextual reading of the statute that needlessly raises serious constitutional concerns.

B.    Under the statute's plain text, the Board must determine the "cost incurred by the issuer with respect to the transaction," and then set a fee cap "reasonable and proportional" to that total cost that allows an issuer to collect a reasonable return for the service it offers. 15 U.S.C. § 1693*o*-2(a)(2).    Linney's Pizza gets both of those requirements wrong.  It argues that the statute does not permit the Board to consider any transaction-related costs other than those for authorization, clearance, and settlement of an individual transaction—*i.e.*, incremental ACS costs.  And it ignores that the plain text of the Durbin Amendment confirms Congress's intent to ensure that issuers receive a reasonable return.

II.    Properly understood, the Durbin Amendment not only permits but requires the Board to consider the four categories of costs that were included in Regulation II's interchange-fee calculation: transaction-monitoring costs, fraud losses, network-processing fees, and so-called "fixed" ACS costs.  All of these costs are an integral part of an

25

issuer's role in authorizing, clearing, and settling electronic-debit transactions, and no particular transaction could occur without incurring these costs.

III.   Nor does anything in the Durbin Amendment require the Board to adopt an incredibly complex scheme that tailors interchange fees to each particular issuer and each particular transaction. Such an approach is inconsistent with the statutory text and purpose, and would be virtually impossible to implement.

IV.   Finally, Linney's Pizza's repackaged arbitrary-and-capricious arguments fail for largely the same reasons as its statutory arguments. The Board considered the relevant factors prescribed by the statute, and Linney's Pizza's disagreement with how the Board weighed those factors does not warrant relief under the APA.

## ARGUMENT

The district court correctly rejected Linney's Pizza's challenge to Regulation II. First, the court held that the Durbin Amendment does not require the Board to consider only issuers' incremental ACS costs when setting a limit on interchange fees. In fact, the statute actually *requires* the Board to factor in all transaction-related costs incurred by

26

issuers and to ensure a reasonable return.   Second, in light of its statutory interpretation, the district court determined that the Board had properly considered the four specific categories of costs challenged by Linney's Pizza.   Again, the Board was *required* by the plain text of the statute to consider those costs.   Third, the district court disagreed that the Durbin Amendment mandates a separate interchange-fee cap tailored to each individual issuer and individual transaction.   That reading would depart from the plain language of the statute and be entirely unworkable.   Finally, repackaging Linney's Pizza's statutory arguments under the APA makes no difference; the arguments are wrong for nearly all the same reasons.

## I.   The Durbin Amendment Does Not Restrict The Board To Considering Only Incremental ACS Costs.

Linney's Pizza's primary argument is that, when the Board calculated issuers' costs in setting an interchange-fee cap, the Board considered costs that Congress supposedly instructed it to ignore. Specifically, Linney's Pizza contends that the Durbin Amendment limits the Board to considering only "the incremental cost incurred by an issuer for the role of the issuer in the [ACS process] of a particular debit

27

transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(i). That reading gets the Durbin Amendment entirely backward.

## A. The Durbin Amendment Requires The Board To Consider All Transaction-Related Costs And Provide A Reasonable Return.

The Durbin Amendment contains a simple mandate: the Board must consider the costs incurred by issuers in processing debit transactions, and set a fee cap that is proportional to those costs and ensures a reasonable return. Congress did not allow issuers to charge fees untethered to their transaction costs, but neither did Congress require issuers to provide debit-card services at a loss.

1. The text of the Durbin Amendment is codified at 15 U.S.C. § 1693o-2. As relevant here, that statute does four things in order. In Paragraph (1), it authorizes the Board to prescribe regulations regarding the interchange fees that issuers may receive or charge. *See* 15 U.S.C. § 1693o-2(a)(1). Congress then established a limit on those fees in Paragraph (2): "The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be *reasonable and proportional to the cost incurred by the issuer with respect to the transaction*." *Id.* § 1693o-2(a)(2) (emphasis

added).  On its face, that language is straightforward:  for any debit transaction, the issuer may receive a fee that is "reasonable and proportional" to the cost it incurs.

Congress repeated that same formulation in Paragraph (3).  It ordered the Board to prescribe rules by early 2011 that "establish standards for assessing whether the amount of any interchange transaction fee described in [P]aragraph (2) is *reasonable and proportional to the cost incurred by the issuer with respect to the transaction*."  15 U.S.C. § 1693*o*-2(a)(3)(A) (emphasis added).  Thus, using the same language in two separate places, the Durbin Amendment tells the Board to set a limit on interchange fees—and that limit must be reasonable and proportional to issuers' transaction-related costs.

Notably, in both Paragraphs (2) and (3), Congress placed only one restriction on the type of cost that the Board may consider:  it must be "the cost incurred by the issuer *with respect to the transaction*." 15 U.S.C. § 1693*o*-2(a)(2), (3)(A) (emphasis added).  Issuers may not recoup costs that are not transaction-related.  But for costs that *are* transaction-related, Congress placed nothing out of bounds.  Rather,

Congress twice referred to "*the cost* incurred by the issuer with respect to the transaction." *Id.* (emphasis added). For any given transaction, the statute treats all of the issuer's related expenses as a single cost. The Board must set a limit that permits an issuer to receive a fee "reasonable and proportional" to that total transaction-related cost.

Finally, in Paragraph (4), which is entitled "Considerations," Congress gave the Board some guidance in establishing standards. In particular, Congress directed the Board to "distinguish between" two different kinds of costs. 15 U.S.C. § 1693*o*-2(a)(4)(B). The first is "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under [P]aragraph (2)." *Id.* § 1693*o*-2(a)(4)(B)(i). As explained above, Paragraph (2) is the overall mandate that sets a reasonable-and-proportional limit. So Congress made clear that in setting the fee limit, the Board must consider issuers' incremental costs for "the authorization, clearance, or settlement" of an electronic debit transaction. *Id.*

30

By contrast, Congress made equally clear that "other costs incurred by an issuer which are not specific to a particular electronic debit transaction . . . shall not be considered under [P]aragraph (2)." 15 U.S.C. § 1693o-2(a)(4)(B)(ii).  That provision is consistent with the statutory mandate to set the interchange-fee cap in proportion "to the cost incurred by the issuer *with respect to the transaction*."  *Id.* § 1693o-2(a)(2) (emphasis added).  In determining whether a cost is "with respect to [a] transaction," the cost must be "specific to a particular electronic debit transaction."  *Id.*  § 1693o-2(a)(4)(B)(ii). Again, all transaction-related costs are to be considered by the Board in setting the fee cap.

In this respect, the Board and the Associations have different views as to what the Durbin Amendment requires.  The Board's view is that, because Paragraph (4) is silent on transaction-related costs other than ACS costs, the Board has discretion whether to consider those costs in setting the fee cap. The Associations' view is that, in the absence of specific guidance in Paragraph (4), the overarching directive in Paragraph (2) controls:  the Board must consider *any* "cost incurred by

31

the issuer with respect to the transaction." 15 U.S.C. §§ 1693*o*-2(a)(2), (3)(A). The Board and Associations agree, however, that in no way does the statute *prohibit* the consideration of such costs.

2.      The Durbin Amendment's approach was not plucked out of thin air. When Congress provided for interchange fees "reasonable and proportional" to issuers' transaction costs, it invoked a phrase with a long history of judicial interpretation in ratemaking statutes and price regulations. *See, e.g.*, *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U.S. 709, 721-22 (2018) ("When Congress used the materially same language . . . it presumptively was aware of the longstanding judicial interpretation of the phrase and intended for it to retain its established meaning."). Those other statutes and rules impose price limits on private businesses, but they do so consistent with the Fifth Amendment's Takings Clause by allowing businesses to obtain a reasonable return on their provision of valuable services to the public.

Courts have repeatedly interpreted statutory language requiring prices or rates to be "just" or "reasonable" as allowing providers to charge a fee that covers their costs plus a reasonable return. For

example, in *FPC* v. *Hope Natural Gas Co.*, the Supreme Court held that a statutory requirement of "'just and reasonable' rates" allows a "return" that is "commensurate with returns on investments in other enterprises having corresponding risks" and "sufficient to assure confidence in the financial integrity of the enterprise." 320 U.S. at 603, 605; *see, e.g.*, *ExxonMobil*, 487 F.3d at 951 (requirement of "just and reasonable" rates means "rates [that] yield[] sufficient revenue to cover all proper costs . . . plus a specified return on invested capital") (quoting *City of Charlottesville* v. *FERC*, 774 F.2d 1205, 1207 (D.C. Cir. 1985)); *Michigan Bell Tel. Co.* v. *Engler*, 257 F.3d 587, 595-596 (6th Cir. 2001); *Guaranty Nat'l Ins. Co.* v. *Gates*, 916 F.2d 508, 515 (9th Cir. 1990).

Here, even without the old soil attached to the phrase "reasonable and proportional," those terms would permit issuers to earn a reasonable return over and above their transaction-related costs. A "reasonable" fee is one that is "moderate" or "that allows a fair profit." Webster's Third New International Dictionary 1892 (2002). And "proportional" in this context means "corresponding in size, degree, or intensity" to, or "regulated or determined in size or degree with

33

reference to," issuers' transaction costs. *Id.* at 1819. If Congress had wanted to limit issuers to recovering *only* their transaction costs (or any subset of them), it would have said so. *See, e.g.*, 7 U.S.C. § 940f(c)(2) ("amount of the fee . . . shall be equal to the modification cost").

Reading the Durbin Amendment to permit issuers to recoup their transaction costs and a reasonable return also avoids constitutional concerns. The Takings Clause bars the government from dictating prices at an amount that has a "confiscatory" effect—a price so low as to be "inadequate to compensate current equity holders for the risk associated with their investments." *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 307, 312 (1989). When the government regulates prices, it must at a minimum "enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." *Hope Nat. Gas*, 320 U.S. at 605. Applying these principles, courts have repeatedly held that price-control regulations that are limited to costs—and thus fail to allow a reasonable return—are unconstitutional. *See, e.g.*, *Michigan Bell*, 257 F.3d at 595-96; *Guaranty Nat'l*, 916 F.2d at 515; *Calfarm Ins. Co.*

34

v. *Deukmejian*, 771 P.2d 1247, 1255-1256 (Cal. 1989); *Aetna Cas. & Sur. Co.* v. *Comm'r of Ins.*, 263 N.E.2d 698, 703 (Mass. 1970).

### B. Linney's Pizza Misinterprets The Durbin Amendment's Requirements.

Under the statute's plain text, the Board must do two things: determine the "cost incurred by the issuer with respect to the transaction," and then set a fee cap "reasonable and proportional" to that total cost that allows an issuer to collect a reasonable return for the debit service it offers. 15 U.S.C. § 1693*o*-2(a)(2). Linney's Pizza gets both of those requirements wrong. It is wrong that the Board may not consider *any* transaction-related costs other than those for authorization, clearance, and settlement of an individual transaction— *i.e.*, incremental ACS costs. And its interpretation would wrongfully prevent issuers from earning a reasonable return on the valuable services they provide.

### 1. Linney's Pizza incorrectly ties the fee cap only to incremental ACS costs.

As explained earlier, the plain text of the statute distinguishes between costs that are transaction-related and those that are not—but it draws *no* distinction among costs that *are* transaction-specific. To get

35

around that text, Linney's Pizza makes a creative move. Remember that in Paragraph (4), entitled "Considerations," Congress said that the Board must consider "incremental [ACS] cost" in setting the fee cap, but it may not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii); *see supra*, p. 4. Linney's Pizza argues (at 18) that Paragraph (4)(B) "bifurcates" the "entire universe of [possible] costs" the Board might consider. In other words, the Board may consider *only* incremental ACS costs in setting the fee cap—and Congress treated everything else as out of bounds. That reading cannot be squared with the statute's text and structure, and it creates an obvious and unavoidable surplusage problem.

a.    The most fundamental problem for Linney's Pizza is that Paragraph (4)(B) says nothing about how to treat transaction-specific costs other than incremental ACS costs. It is *silent* on that question. In the absence of more specific guidance in Paragraph (4), the district court correctly reverted to the general command in Paragraph (2): the Board must set a fee cap "reasonable and proportional *to the cost incurred by*

*the issuer with respect to the transaction.*"  15 U.S.C. § 1693*o*-2(a)(2) (emphasis added); Op. & Ord., R.61, PageID# 1087.  The only question then is whether any given cost is incurred by issuers "with respect to" debit transactions.

Linney's Pizza argues (at 42) that Paragraph (4) "narrows" the general command in Paragraph (2) to set a fee cap that is reasonable and proportional to an issuer's total transaction-specific cost.    That argument is a red herring.    It is certainly true that, in the "Considerations" provision, Congress gave the Board some guidance on how to establish the fee cap.  *See* 15 U.S.C. § 1693*o*-2(a)(4).  But as explained above, properly understood, Paragraph (4) is completely consistent with Paragraph (2)'s mandate.  Paragraph (4) requires the Board to consider incremental ACS costs, which are a type of cost "incurred by the issuer with respect to the transaction" under Paragraph (2).  *Id.* § 1693*o*-2(a)(2).

Indeed, Linney's Pizza's reading does not even follow from the wording of Paragraph (4) itself.  For starters, that provision is entitled "Considerations."    It tells the Board to do three specific things in

37

prescribing regulations, but nothing about its text indicates that Congress's "[c]onsiderations" were exhaustive or somehow meant to cover the field. For instance, the Board had to "consider the functional similarity" between "electronic debit transactions" and certain "checking transactions." 15 U.S.C. § 1693*o*-2(a)(4)(A). But that hardly means the Board could not consider similarities with other types of transactions, like credit-card transactions. *See* 2011 Final Rule, 76 Fed. Reg. at 43,424. So too, the Board had to "consult, as appropriate," with other financial regulators. 15 U.S.C. § 1693*o*-2(a)(4)(C). But no one would think the Board could not consult other governmental agencies.

Turning to the particular consideration at issue, Paragraph (4)(B) instructs the Board to "distinguish between" incremental ACS costs and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B). The Board did exactly that in promulgating Regulation II. It distinguished between incremental ACS costs, which were among the costs the Board considered in calculating the fee cap—and costs not tied to particular debit transactions, which were not. Simply put, Regulation II satisfies

38

the plain terms of Paragraph (4). Congress told the Board to distinguish between two types of costs, and the Board did that.

Linney's Pizza argues (at 18) that by directing the Board to "distinguish between" those two types of costs, Congress "bifurcated" the entire universe of costs into one or the other. On that approach, the Board was required to "distinguish between two (and only two) categories of costs." Br. 42. But as the district court recognized, "no definition of 'distinguish' inherently limits the distinguishing being done to only two entities." Op. & Ord., R.61, PageID #1084. Or as the D.C. Circuit put it in rejecting this argument in an earlier challenge to Regulation II, if "you make a deal . . . to distinguish between rookie cards, which you must hand over, and other cards less than five years old, which you must not[,] . . . you could certainly hand over a 1960 Harmon Killebrew Topps card"—which is neither a rookie card nor less than five years old—"without violating the terms of the deal." *NACS*, 746 F.3d at 488. In other words, merely drawing a distinction between A and B does not itself mean that there is no C or D.

39

To use an analogy, suppose that Congress instructed an agency to issue rules that advance U.S. energy independence, and directed the agency to distinguish between domestic coal mining, which shall be supported, and other forms of energy that are purchased from foreign countries, which shall not be supported.  That hypothetical statute obviously would not prohibit the agency from supporting domestic natural-gas production; in fact, the agency would likely be *required* to do so in order to fulfill its overarching mandate to advance U.S. energy independence.  Likewise here, the Board must factor in transaction-related costs other than incremental ACS costs in order to meet its mandate to set an interchange-fee cap that is "reasonable and proportional" to issuers' transaction costs.

That understanding is confirmed by the particular text here. Paragraph (4) broadly defines the category of *excludable* costs as "other costs incurred by an issuer which are not specific to a particular electronic debit transaction."  15 U.S.C. § 1693*o*-2(a)(4)(B)(ii).  But Congress did not use any similarly broad language when it came to incremental ACS costs.  It instructed the Board to consider incremental

40

ACS costs, *see id.* § 1693*o*-2(a)(4)(B)(i), without using any language that indicates incremental ACS costs are the only type of transaction-specific cost the Board may consider. The reasonable inference is that Congress wanted to ensure the fee cap would cover one kind of transaction-specific cost (*i.e.*, incremental ACS costs)—not that Congress silently disallowed consideration of all other transaction-specific costs.

For the same reasons, Linney's Pizza is wrong to argue (at 42) that including one type of allowable costs in Paragraph (4)(B)— *i.e.*, incremental ACS costs—implies the exclusion of all other types of allowable costs. The district court correctly rejected that *expressio unius* argument. In this statute, Congress did not leave the exclusion of other allowable costs to any negative inference. Rather, Congress explicitly addressed the category of excludable costs: "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii). In short, Congress said that one category of costs was in and one category of costs was out— and it was silent in Paragraph (4)(B) on how to treat other types of costs.

41

b.     Linney's Pizza's reading has its own critical difficulty: namely, it renders most of Paragraph (4)(B)(ii) superfluous.  If only incremental ACS costs may be considered, there was no reason for Congress to direct exclusion of "other costs incurred by an issuer *which are not specific to a particular electronic debit transaction.*"  15 U.S.C. § 1693$o$-2(a)(4)(B)(ii) (emphasis added).  That latter clause was wholly unnecessary if Congress really meant to preclude consideration of "everything 'other' than incremental ACS costs."  Br. 21.  Congress would simply have told the Board to exclude "other costs incurred by an issuer"—and stopped the provision there.

In truth, the problem for Linney's Pizza is even more fundamental than that.  If Congress had wanted the Board to consider incremental ACS costs and nothing more, that would have been easy to accomplish. Congress could have written Paragraph (2)'s overall mandate to say that the interchange-fee cap must be reasonable and proportional to issuers' incremental ACS costs.  Or Congress could have written Paragraph (4) to say that the Board should consider only incremental ACS costs in setting the fee cap.  Congress instead drafted the Durbin Amendment

42

to focus not once, but twice, on "the cost incurred by the issuer with respect to the transaction."   15 U.S.C. § 1693*o*-2(a)(2), (3)(A).   That would be a remarkably odd way to disallow all transaction-related costs other than incremental ACS costs.[3]

Linney's Pizza tries to brush aside the surplusage problem as inartful drafting.   Normally Congress's use of "which" without a preceding comma would signify a restrictive clause:   the category of excludable costs is limited to those other costs that are not specific to particular transactions.   Linney's Pizza does not appear to disagree with that grammatical principle, but criticizes the district court for "fixating on the lack of a comma before the first 'which'" in Paragraph (4)(B)(ii). Br. 43.   In its view, Congress could have intended the comma-less

---

[3]   The district court correctly dismissed Linney's appeals to "bits of legislative history."   Op. & Ord., R.61, PageID# 1083.   Senator Durbin's unadopted statements cannot overcome the statute's plain text and structure.   The Supreme Court has long cautioned that courts are to "give no weight to a single reference by a single Senator during floor debate."   *Bath Iron Works Corp.* v. *Dir., Off. of Workers' Comp. Programs*, 506 U.S. 153, 166 (1993); *see Chrysler Corp.* v. *Brown*, 441 U.S. 281, 311 (1979).   That is particularly true here because neither Senator Durbin's Senate-floor remarks nor his post-hoc amicus brief before this Court tracks the statutory text that Congress enacted.   *See* Durbin Amicus Br. 12-22.

clause—"which are not specific to a particular electronic debit transaction"—to be descriptive rather than restrictive. *Id.* According to Linney's Pizza, Congress was merely describing the entire universe of "other costs" the Board could not consider rather than specifying *which* "other costs" the Board could not consider. *See id.*

That argument does not work for two reasons. First, as both the D.C. Circuit in *NACS* and the district court here correctly explained, while the use of "which" and "that" may boil down to a "style preference," grammar rules "*require* that commas set off descriptive clauses." *NACS*, 746 F.3d at 487 (emphasis added); Op. & Ord., R.61, PageID# 1085-1086. Congress followed that rule later in Paragraph (4)(B)(ii) itself, placing a comma before "which costs shall not be considered." *See Loughrin* v. *United States*, 573 U.S. 351, 358 (2014) (use of particular language in one section but not another indicates that Congress "intended a difference in meaning"). Reading the clause restrictively—*i.e.,* to define *which* other costs Congress wanted the Board to ignore—is the only reading that conforms with rules of grammar and Congress's own usage in the very provision at issue.

44

Second, even reading the clause descriptively does not cure the surplusage problem. There was still no reason for Congress to describe the "other costs incurred by an issuer" as those "which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(ii). Simply as a descriptive matter, if Congress had intended to divide the universe between incremental ACS costs (allowable) and all other costs (not allowable), Congress could have stopped after "other costs incurred by an issuer." Try as it might, Linney's Pizza cannot avoid that its reading leaves the remaining text of Paragraph (4)(B)(ii) with no work to do.[4]

---

[4] Linney's Pizza also argues (at 28-33) that Paragraph (4) bars the consideration of any unmentioned costs because of the major-questions doctrine. In its view, because the Board's decision to include or exclude certain types of costs in Regulation II has "vast" economic implications, the Board cannot assert such authority absent a clear statement from Congress. Br. 30 (citation omitted). But as the district court recognized, Linney's Pizza is the one that "seeks to compel the Board to take action with a *greater* economic impact." Op. & Ord., R.61, PageID# 1081 (emphasis added). Its argument would require the Board to uproot decades of market practice and radically reshape the electronic-debit market. If anything, it is *that* interpretation that triggers the major-questions doctrine. Absent a clear statement, Congress should not be taken to have made issuers subsidize debit transactions to the tune of billions of dollars a year.

45

### 2.    Linney's Pizza incorrectly denies issuers a reasonable return.

Although the district court denied the Associations' motion to intervene in part on the ground that they could make their arguments in an amicus brief, it did not expressly consider the Associations' argument that the Durbin Amendment requires a reasonable return.  But that is another flaw in Linney's Pizza's reading:  it would leave debit-card issuers unable to even recoup their transaction costs, let alone earn a reasonable return for the essential service they provide to the market.  That result flouts Congress's expressed intent.  As explained earlier, Congress's use of the "reasonable and proportional" formulation confirms that it intended the Board to consider all transaction-related costs *and* ensure issuers a reasonable return.  *See supra*, pp. 32-35.

Reading the Durbin Amendment to prevent issuers from even recovering the full costs they incur to facilitate debit-card transactions would raise serious constitutional concerns.  Congress did not (and could not) require issuers to give these services away.  To be sure, shortly after the statute was enacted, another court of appeals turned away a facial constitutional challenge to the Durbin Amendment.  *See TCF Nat'l Bank*

46

v. *Bernanke*, 643 F.3d 1158 (8th Cir. 2011).  But the Associations are not arguing here that the Durbin Amendment is facially unconstitutional. When Congress required that interchange fees be "reasonable and proportional to" issuers' transaction-related costs, it incorporated a long line of judicial interpretations of similar language requiring that providers subject to price controls be allowed to obtain a reasonable return.  In other words, Congress wrote the statute as it did to ensure that it did *not* cross longstanding constitutional boundaries when placing a cap on issuers' ability to pursue their business.

Moreover, in *TCF National Bank*, the court of appeals merely affirmed a district-court decision that had declined to preliminarily enjoin implementation of the Durbin Amendment.  The court of appeals did so based in part on its belief that issuers might be able to make up for their losses by charging more for their other services.  *See* 643 F.3d at 1164.  But courts have long recognized that businesses subjected to government price controls are "not required to subsidize their regulated services . . . with revenues generated from unregulated services." *Michigan Bell*, 257 F.3d at 594 (citing *Brooks-Scanlon Co.* v. *R.R.*

47

*Comm'n*, 251 U.S. 396 (1920)). *TCF National Bank* did not address that legal principle, and its decision in that preliminary posture did not purport to hold as a matter of law that the Durbin Amendment is free from constitutional concerns. Interpreting the statute to require the Board to account for issuers' transaction-related costs and allow them to earn a reasonable return avoids those concerns.

**II.    The Durbin Amendment Does Not Prohibit Consideration Of The Four Challenged Costs.**

Because it read the statute right, the district court rejected Linney's Pizza's argument that the Board had unlawfully considered four categories of costs in calculating the interchange-fee cap: transaction-monitoring costs, fraud losses, network-processing fees, and so-called "fixed" ACS costs. All four categories are transaction-related costs that issuers must incur in order to process debit transactions, so the Durbin Amendment requires the Board to consider them. Op. & Ord., R.61, PageID# 1088-1096.

**A.    The Board Correctly Considered Transaction-Monitoring Costs.**

The Board correctly considered a category of costs characterized as "transaction-monitoring costs" in formulating its interchange-fee cap.

48

Transaction-monitoring systems "assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction before the issuer decides to approve or decline the transaction." 2015 Clarification, 80 Fed. Reg. 48,684, 48,685 (Aug. 14, 2015). These sophisticated systems may use "neural networks and fraud-risk scoring systems" to instantaneously flag a transaction as suspicious before it is authorized, or require further verification from the merchant before a transaction is approved. 2011 Final Rule, 76 Fed. Reg. at 43,430–43,431. Accordingly, transaction monitoring, "[l]ike other authorization steps," is "integral to an issuer's decision to authorize a specific transaction." 2015 Clarification, 80 Fed. Reg. at 48,685; *see* Op. & Ord., R.61, PageID# 1091. The Board was thus correct to conclude that these are not only transaction-related costs that fall within Paragraph (2)'s overarching mandate, but also incremental ACS costs that Congress *required* to be considered under Paragraph (4)(B)(i).

Even Linney's Pizza does not expressly challenge that these transaction-monitoring costs fall within the scope of incremental ACS

49

costs that Paragraph (4) requires the Board to consider. But Linney's Pizza nonetheless contends that the Board unlawfully factored these costs into its interchange-fee cap. In its view, because transaction monitoring is related to preventing fraud and Congress separately provided for a fraud-prevention adjustment in Paragraph (5) of the Durbin Amendment, Regulation II "improperly double-counted fraud-prevention-type costs." Br. 51.

There is no "double-count[ing]" because they are two separate categories of costs. Br. 51. The statute makes clear that the fraud-adjustment provision in Paragraph (5) addresses an entirely different set of costs—namely, costs related to broader, more programmatic efforts to limit and combat fraud in the debit-card payments system—for which issuers can receive a separate adjustment to their interchange fees. The fact that some transaction-related costs also relate to preventing fraudulent transactions does not somehow take them outside the scope of the "cost" issuers incur and may recover under Paragraphs (2) through (4).

50

The plain text reflects this distinction. There are fundamental differences between how Congress described the base interchange-fee limit in Paragraphs (2) to (4) and how it described matters covered by the fraud-prevention adjustment in Paragraph (5). Paragraphs (2) through (4) speak in terms of costs incurred in processing individual transactions—*i.e.*, "an electronic debit transaction," 15 U.S.C. § 1693*o*-2(a)(2), or "a particular electronic debit transaction," *id.* § 1693*o*-2(a)(4)(B)(i). By contrast, Paragraph (5) refers more broadly to "preventing fraud in relation to electronic debit transactions involving that issuer." *Id.* § 1693*o*-2(a)(5)(A)(i). By referring to fraud "preventi[on]" "in relation to" plural "transactions," Paragraph (5)(A) is best understood to encompass more programmatic "fraud prevention costs ... that are not linked to a particular transaction." 2015 Clarification, 80 Fed. Reg. at 48,686.

That distinction also explains why Linney's Pizza's superfluity argument regarding Paragraph (5) does not work. Br. 52-53. The fact that Congress separately incentivized these broader fraud-prevention efforts does not change the fact that transaction-monitoring costs are an

51

essential part of the ACS process. As the district court correctly held, Paragraph (5) "does nothing to prevent the Board from including transaction monitoring costs as part of the base fee standard, nor does it undermine Congress'[s] statutory scheme set out in the Durbin Amendment." Op. & Ord., R.61, PageID# 1093.

Funneling all costs related to fraud prevention through Paragraph (5)'s fraud adjustment also makes little practical sense. After all, as the Board explained, "most costs of the authorization process . . . assist in preventing some type of fraud." 2015 Clarification, 80 Fed. Reg. at 48,685. For example, the authorization process ensures that a customer has sufficient funds, and it can confirm her identity by requiring her to enter a personal identification number or PIN. Under Linney's Pizza's reasoning, because these steps are related to preventing fraud, they must be captured by the Paragraph (5) adjustment to avoid double-counting—but all agree that Congress wanted issuers to be able to recoup the costs of the authorization process through interchange fees. Simply put, Linney's Pizza fails to distinguish between the costs of

52

monitoring transactions for fraud and the costs of broader, programmatic anti-fraud efforts.

### B.    The Board Correctly Considered Fraud-Loss Costs.

The Board likewise properly considered the costs associated with fraud losses in calculating the interchange-fee cap.  The Board defined fraud losses as losses that result from fraudulent debit-card transactions, are "incurred by the issuer," and "are not recovered through chargebacks to merchants or debits to or collections from customers."  2011 Final Rule, 76 Fed. Reg. at 43,431.  Because these losses are typically "the result of the authorization, clearance, and settlement of an apparently valid transaction that the cardholder later identifies as fraudulent," the Board reasoned that they are "specific to a particular transaction."  *Id.*  And because the "cost of a fraud loss varies with the amount of the transaction," the Board allowed issuers to recover "a portion of fraud losses" through an "*ad valorem* component" of the interchange-fee cap.  *Id.*

Linney's Pizza nonetheless argues that the Durbin Amendment prohibits the Board from considering fraud losses in its interchange-fee calculation for three separate reasons, none of which is correct.  First,

53

Linney's Pizza asserts (at 54) that fraud losses are not "costs" at all, because they are not "amounts paid or charged for" something upfront but are only known after the fact. That is an overly cramped understanding of costs. There are numerous costs whose precise amount cannot always be known ahead of time. Payroll is indisputably a central cost of many businesses, even though the exact amount of that cost may not be calculable until a particular pay period has ended. Nor does issuers' inability to know in advance *which* transactions will be allegedly fraudulent mean they are not a transaction-related cost. As the Board found and every debit-card issuer knows, fraud losses are an unfortunate but unavoidable cost of doing business.

Second, Linney's Pizza argues (at 55) that fraud losses are not incurred by the issuer "in a *particular* transaction." It maintains that, because the "0.05% fraud-loss reimbursement" is charged "for every transaction," those charges constitute "anticipatory transfers" rather than "actual incurred 'costs.'" But Linney's Pizza does not dispute that fraudulent transactions occur, nor that they impose transaction-related "losses *incurred by the issuer*" that are not recovered elsewhere.

54

2011 Final Rule, 76 Fed. Reg. at 43,431 (emphasis added).  Nor does Linney's Pizza dispute that interchange fees are charged at the time of the transaction, when it is impossible to know whether that transaction will be fraudulent.  Nothing prevented the Board from compensating issuers for that known category of costs by calculating an *ad valorem* component that would compensate issuers for only "*a portion* of fraud losses" borne by issuers.  *Id.* (emphasis added); *see* Op. & Ord., R.61, PageID# 1095.

Third, as with transaction-monitoring costs, Linney's Pizza argues (at 55-56) that the Board's consideration of fraud losses "wrecks the statutory scheme" by "letting issuers recover fraud losses automatically," rather than through Paragraph (5)'s fraud-prevention adjustment.  Again, this misunderstands the Durbin Amendment's basic distinction between compensating issuers for transaction-related costs pursuant to Paragraph (2)—including fraud losses—and incentivizing issuers to undertake programmatic improvements to "prevent[] fraud" more generally pursuant to Paragraph (5).  There is no overlap between

55

the fraud losses issuers may be compensated for in the base interchange-fee cap and the separate fraud-prevention adjustment.

### C.   The Board Correctly Considered Network-Processing Costs.

The Board correctly included network-processing fees in its calculation of the interchange-fee cap.  As the D.C. Circuit put it, "[t]his is easy."  *NACS*, 746 F.3d at 490.  Issuers must pay these fees to the network for each transaction as part of authorizing, clearing, and settling a transaction.  They are accordingly not only costs "incurred by the issuer with respect to" debit transactions within the meaning of Paragraph (2), but are also incremental ACS costs that must be considered within the meaning of Paragraph (4)(B). *See* 2011 Final Rule, 76 Fed. Reg. at 43,430.

Linney's Pizza argues (at 57-59) that the Board could not consider network-processing fees for three reasons, none of which makes sense. First, it argues that the Durbin Amendment prohibits the Board from including network fees in the interchange-fee cap because the statute separately defines "network fee" as a fee charged by networks "other than an interchange transaction fee."  Br. 57 (quoting 15 U.S.C. § 1693*o*-

56

2(c)(10)). But that is just a statutory definition, not an instruction to the Board about how to calculate interchange fees. Indeed, the term "network fee" does not appear in any of the provisions relevant to the interchange-fee cap.

Linney's Pizza asserts (at 57) that "a network fee cannot simultaneously be *not* an interchange fee but also a *component* of the interchange fee." The exact opposite is true. Components of things are different from the things themselves. Bread is not the same as a sandwich, but it is a component of a sandwich. Here, incremental ACS costs are not themselves "interchange transaction fees," but even Linney's Pizza agrees that incremental ACS costs must be included as a component of interchange fees.

Second, Linney's Pizza contends (at 57-59) that yet another provision of the Durbin Amendment in Paragraph (8) prohibits the Board from including network-processing fees in the interchange-fee cap. According to Linney's Pizza, because Paragraph (8)(B)(i) prohibits network fees from being "used to directly or indirectly compensate an issuer with respect to an electronic debit transaction," 15 U.S.C.

§ 1693*o*-2(a)(8), network fees could not be used to calculate the interchange-fee cap. As the D.C. Circuit commented when merchant challengers previously made this same argument, they "should have left it out entirely." *NACS*, 746 F.3d at 491.

Paragraph (8) directs the Board to regulate network fees that networks may charge. It thus empowers the Board to regulate network fees to "prevent issuers and networks from circumventing the Board's interchange fee rules," *NACS*, 746 F.3d at 491—by, for example, charging inflated network fees directly to merchants and acquirers and then sharing those inflated revenues with issuers. 2011 Final Rule, 76 Fed. Reg. at 43,441-43,442. This separate regulatory authority has nothing to do with the Board's mandate under Paragraph (3) to set interchange-fee limits that are reasonable and proportional to issuers' transaction costs. And it does not change the fact that network fees are plainly "cost[s] incurred by" issuers for facilitating debit transactions.

Third, Linney's Pizza argues (at 58) that network-processing fees are not "*incremental cost[s] incurred by an issuer*" because those fees are "costs the networks charge" for every transaction. The point seems

58

to be that, because they are charged for every transaction, network fees "are simply another 'fixed' cost." *Id.* That makes no sense. Issuers must use the network to effectuate electronic-debit transactions; networks charge issuers fees to do so; and issuers must pay those network fees. Just as printing costs and filing fees are lawyers' costs inherent in litigation, network fees are issuers' costs inherent in processing debit transactions. Such fees are an "eas[ily]" identifiable "per-transaction" issuer cost. *NACS*, 746 F.3d at 490.

### D.    The Board Correctly Considered Fixed ACS Costs.

Finally, the Board correctly decided to consider a group of ACS-related costs that some commenters had characterized as "fixed" costs, including costs associated with network connectivity, hardware, software, equipment, and associated labor. 2011 Final Rule, 76 Fed. Reg. at 43,429. The Board concluded in the Final Rule that the labels of "fixed" and "variable" ACS costs were unhelpful and misleading, because the same costs could variably be characterized as "fixed" or "variable" from year to year or issuer to issuer. *Id.* at 43,426-43,427. Although its notice of proposed rulemaking had originally contemplated excluding these so-called fixed costs, the Board ultimately included them

59

because it found that "no electronic debit transaction can occur without incurring these costs, making them costs specific to each and every electronic debit transaction." *Id.*; *see* Op. & Ord., R.61, PageID# 1090.

The Board correctly included these costs in its fee cap. Issuers necessarily "incur[]" these costs "with respect to" every transaction. 15 U.S.C. § 1693*o*-2(a)(2). Issuers cannot facilitate the ACS process for even a single transaction without having incurred the significant costs of setting up the sophisticated hardware, software, and equipment necessary to complete that process. Such costs are necessary to effectuate each of the billions of electronic-debit transactions that occur each year. By the same token, these costs are "specific to" every transaction, and thus do not fall within Paragraph (4)'s exclusion. *Id.* § 1693*o*-2(a)(4)(B)(ii).

Linney's Pizza argues (at 48-51) that the Board was prohibited from considering these costs because they are not incremental ACS costs. Of course, as explained above, the statute does not limit the Board's consideration only to incremental ACS costs, *see supra*, pp. 26-

60

35, and that alone disposes of this argument, *see* Op. & Ord., R.61, PageID# 1089-90.

In any event, Linney's Pizza focuses almost entirely on a supposed definitional distinction between "fixed" and "variable" ACS costs. But those terms do not appear in the statute, and the Board ultimately rejected that distinction as illusory. *See* Op. & Ord., R.61, PageID# 1090. As the Board explained, costs such as hardware, software, and associated labor are not categorically "fixed" or "variable" within the context of debit-card payment systems. *See* 2011 Final Rule, 76 Fed. Reg. at 43,426-43,427. Instead, "the meanings of fixed costs and variable costs depend on a variety of factors," including "the relevant time horizon and volume range," an issuer's accounting practices, and whether an issuer processes transactions in-house or outsources that function to a third party. *Id.* at 43,427.

Indeed, the Board noted that even "the same type of cost may appear variable in one year, but fixed in a different year." 2011 Final Rule, 76 Fed. Reg. at 43,427. For instance, the same issuer might classify labor as a variable cost for one year because "labor costs

61

happened to vary based on transaction volume over that year," but a fixed cost the next year because those costs were untied from transaction volume. *NACS*, 746 F.3d at 490. The point is not that it may be a "difficult task" to distinguish between fixed and variable costs, but that there is no clear distinction between those categories in this context.

In any event, even if Linney's Pizza were right that the Board may consider only incremental ACS costs under Paragraph (4), equipment and labor costs fit that definition. As the Board explained, "incremental cost" is not a term of art and does not have a set meaning within the context of the debit-card industry. 2011 Final Rule, 76 Fed. Reg. at 43,426. In this field, that term is best understood as "the difference between the cost incurred by a firm if it produces a particular quantity of a good and the cost incurred by the firm if it does not produce the good at all." *Id.* In other words, a given cost is an incremental ACS cost if the issuer incurs it only because of the issuer's role in the ACS process. That is true of all of the costs described as "fixed" ACS costs. The costs of network connectivity, software, hardware, equipment, and associated labor are some of the principal costs necessary to facilitate the ACS

62

process for even a single debit transaction.  The Board was thus not merely permitted, but affirmatively required, to consider these costs.

## III.  The Durbin Amendment Does Not Require The Board To Adopt An Issuer-Specific And Transaction-Specific Interchange-Fee Cap.

The Board's decision to adopt a single interchange-fee cap applicable to all issuers and transactions likewise complied with the statute.  In deciding how to "establish standards for assessing" whether interchange fees are "reasonable and proportional to the cost incurred by the issuer," 15 U.S.C. § 1693o-2(a)(2), (3)(A), the Board considered two options:  separate standards for each issuer according to its respective costs (*i.e.*, an issuer-specific standard), or a single fee cap that would apply to all issuers based on a calculation of the average allowable costs across the industry.  The Board chose the latter.  It determined that a single, universal interchange-fee cap was consistent with the overarching statutory mandate in Paragraph (2), which refers generically to the fees that "an issuer" may receive for "an electronic debit transaction."  2011 Final Rule, 76 Fed. Reg. at 43,422-43,423.  And that approach represented the only practical way to implement the

63

mandate "without imposing undue compliance burdens on issuers or networks." *Id.* at 43,422.

Linney's Pizza nonetheless argues that the Durbin Amendment requires a third approach that "none" of the thousands of commenters on proposed Regulation II "argued for":  an issuer-specific *and* transaction-specific standard.  2011 Final Rule, 76 Fed. Reg. at 43,422. According to Linney's Pizza (at 60), because the second half of Paragraph (2) refers to "*the* cost incurred by *the* issuer with respect to *the* transaction," 15 U.S.C. § 1693*o*-2(a)(2) (emphases added), the Board must issue standards that are tailored to each individual transaction and each individual issuer.

That argument fails for several reasons.  For starters, it misreads the text.  The statute's overarching mandate in Paragraph (2) imposes a limit on interchange fees "that *an* issuer may receive or charge with respect to *an* electronic debit transaction."  15 U.S.C. § 1693*o*-2(a)(2) (emphases added).  Congress's use of "a" or "an" has a "generalizing force," *Am. Bus. Ass'n* v. *Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000); *see In re MCP No. 185*, 124 F.4th 993, 1010 (6th Cir. 2025), indicating that

64

Congress was referring to a representative issuer and representative transaction. When Congress then spoke of "the issuer" and "the transaction" in the second half of the sentence (and repeated those terms in Paragraph (3)), it was simply referring to the representative issuer and transaction it had just mentioned.

In other words, Congress used "the" in the second half of Paragraph (2) as "a function word . . . indicat[ing] that a following noun or noun equivalent is definite *or has been previously specified by context*." *Nielsen* v. *Preap*, 586 U.S. 392, 408 (2019) (alterations in original; emphasis added) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)); *see NLRB* v. *Noel Canning*, 573 U.S. 513, 527 (2014) ("[T]he word 'the' . . . can also refer 'to a term used generically or universally.'") (quoting 17 The Oxford English Dictionary 879 (2d ed. 1989)). Congress was not, as Linney's Pizza maintains, using "the" in that phrase to mandate that each individual interchange fee must be "reasonable and proportional" to each individual issuer's costs for each individual transaction.

65

Moreover, the reason not a single commenter advocated for Linney's Pizza's interpretation is because it would be virtually impossible to implement. Op. & Ord., R.61, PageID# 1099-1101. As the Board explained, "interchange fees are computed at the time of the transaction," and thus "an issuer's costs for a specific transaction *cannot* be ascertained" at that moment. 2011 Final Rule, 76 Fed. Reg. at 43,422 (emphasis added). Transaction costs vary based on "a variety of factors, including factors that may not be known to the issuer at the time it charges or receives the interchange fee." *Id.* As a result, there is no apparent way to limit the amount of an interchange fee for a particular transaction to the costs incurred by the issuer for that transaction. And even setting aside that practical impossibility, transaction-specific fees would "result in an exceedingly complex matrix of interchange fees" requiring separate calculations for each of "tens of billions of electronic debit transactions and a large and growing number of covered issuers." *Id.* As the district court correctly recognized, these "practical" realities confirm that "[t]ransaction-specific fees are not what was contemplated by the statutory text." Op. & Ord., R.61, PageID# 1100.

66

Linney's Pizza criticizes the court's reasoning, proclaiming that "practical considerations" do not justify ignoring statutory text and "[a]gencies cannot rewrite statutory commands because they are difficult." Br. 61. But the district court did not disagree with that. The court had already held that Linney's Pizza's interpretation is *not* compelled by the statute. Op. & Ord., R.61, PageID# 1098-1099. In acknowledging that Linney's Pizza's reading would be "nigh impossible to accomplish," the district court was simply applying the general principle that "courts should not 'impose nonsensical readings of a statute if alternative interpretations consistent with the legislative purpose are available.'" *Id.*, PageID# 1099-1100 (quoting *Milman* v. *Fiegers & Fieger, P.C.*, 58 F.4th 860, 869 (6th Cir. 2023) (citation and quotations omitted)).

Nor is Linney's Pizza correct that other provisions of the Durbin Amendment give the Board tools to accomplish the impossible. The fact that the statute authorizes the Board to collect from issuers "such information as may be necessary" to carry out its mandate, Br. 62 (quoting 15 U.S.C. § 1693*o*-2(a)(3)(B)), only begs the question of what

that mandate is. Regardless, if even the issuers cannot determine their costs for a particular transaction at the time it occurs (and the interchange fee is charged), then there is no information issuers can provide that would help the Board make that determination.

## IV. Linney's Pizza's Challenges To The Board's Decisionmaking Process Likewise Fail.

Finally, Linney's Pizza largely reframes its statutory arguments as arbitrary-and-capricious claims, asserting that the Board irrationally considered prohibited costs and adopted a universal interchange-fee cap. Repackaging those arguments does not give them any more force. The district court correctly concluded that, for the same reasons Linney's Pizza is wrong about its interpretation of the Durbin Amendment, it is wrong about its claims that the Board engaged in unreasoned decisionmaking. *See* Op. & Ord., R.61, PageID# 1101-1103.

In its one distinct APA argument, Linney's Pizza contends (at 63-66) that Regulation II is arbitrary and capricious because the Board "ignored the functional similarity between debit-card and checking transactions." This argument relies on Paragraph 4(A) of the Durbin Amendment, which directs the Board to "consider the functional

68

similarity between . . . electronic debit transactions" and "checking transactions that are required . . . to clear at par." 15 U.S.C. § 1693o-2(a)(4)(A). But as the district court held, the Board did exactly that: it expressly considered the similarities and differences between these two types of transactions. Op. & Ord., R.61, PageID# 1101-02. In particular, the Board described the significant differences between checking and electronic debit transactions, and explained how those differences impose increased costs on issuers in processing debit transactions as compared to processing checks. *Id.*, PageID# 1101-03; 2011 Final Rule, 76 Fed. Reg. at 43,399-43,401. That is all the Durbin Amendment—and thus the APA—required the Board to do.

To avoid this straightforward conclusion, Linney's Pizza claims (at 66) that Congress did not want "issuers to recover costs that banks cannot recover with respect to check transactions." But nothing in the statute says that. The Durbin Amendment does not require absolute parity between checking transactions and debit-card transactions. Instead, Congress directed that interchange fees must be "reasonable and proportional to the cost incurred by the issuer with respect to" debit

69

transactions, and simply instructed the Board to "consider" how debit and checking transactions are alike when setting standards for what cap is "reasonable and proportional." Congress frequently directs agencies to consider enumerated factors or circumstances before promulgating rules without "dictat[ing] particular decisional outcomes." *Sierra Club* v. *U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015); *see Citizens Coal Council* v. *EPA*, 447 F.3d 879, 903 (6th Cir. 2006) (similar). That is precisely what happened here, and it is not the courts' role to superintend that consideration.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

70

Dated: May 29, 2026

Respectfully submitted,

/s/ *Jeffrey B. Wall*
JEFFREY B. WALL
JUDSON O. LITTLETON
ABBY H. WALTERS
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
Telephone: (202) 955-8500
jwall@gibsondunn.com
jlittleton@gibsondunn.com
ahwalters@gibsondunn.com

*Counsel for Proposed
Intervenors-Appellees Bank
Policy Institute and The
Clearing House Association
L.L.C.*

71

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1) and 6th Cir. R. 32(a), I certify that as required by Fed. R. App. P. 32(a)(7)(B)(i) the attached brief contains 12,862 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

The document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

Dated: May 29, 2026                    /s/ *Jeffrey B. Wall*
                                       JEFFREY B. WALL

                                       *Counsel for Proposed*
                                       *Intervenors-Appellees Bank*
                                       *Policy Institute and The*
                                       *Clearing House Association*
                                       *L.L.C.*

72

**CERTIFICATE OF SERVICE**

I certify that on May 29, 2026, the foregoing was electronically filed with the Court via the Court's appellate CM/ECF system, and a copy of the same was automatically served on all parties registered with the CM/ECF system on the same date.

Dated: May 29, 2026                    /s/ *Jeffrey B. Wall*
                                       JEFFREY B. WALL

                                       *Counsel for Proposed*
                                       *Intervenors-Appellees Bank*
                                       *Policy Institute and The*
                                       *Clearing House Association*
                                       *L.L.C.*

73

## STATUTORY ADDENDUM

**15 U.S.C. § 1693*o*-2 – Reasonable fees and rules for payment card transactions**

**(a) Reasonable interchange transaction fees for electronic debit transactions**

**(1) Regulatory authority over interchange transaction fees**
The Board may prescribe regulations, pursuant to section 553 of Title 5, regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection.

**(2) Reasonable interchange transaction fees**
The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(3) Rulemaking required**

**(A) In general**
The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(B) Information collection**
The Board may require any issuer (or agent of an issuer) or payment card network to provide the Board with such information as may be necessary to carry out the provisions of

1a

this subsection and the Board, in issuing rules under subparagraph (A) and on at least a bi-annual basis thereafter, shall disclose such aggregate or summary information concerning the costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks in connection with the authorization, clearance or settlement of electronic debit transactions as the Board considers appropriate and in the public interest.

**(4) Considerations; consultation**
In prescribing regulations under paragraph (3)(A), the Board shall—

**(A)** consider the functional similarity between--

**(i)** electronic debit transactions; and

**(ii)** checking transactions that are required within the Federal Reserve bank system to clear at par;

**(B)** distinguish between—

**(i)** the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

**(ii)** other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

**(C)** consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board,

2a

the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

## (5) Adjustments to interchange transaction fees for fraud prevention costs

### (A) Adjustments

The Board may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2), if—

**(i)** such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer; and

**(ii)** the issuer complies with the fraud-related standards established by the Board under subparagraph (B), which standards shall—

**(I)** be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i) and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and

**(II)** require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology.

**(B) Rulemaking required**

**(i) In general**
The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for making adjustments under this paragraph.

**(ii) Factors for consideration**
In issuing the standards and prescribing regulations under this paragraph, the Board shall consider—

**(I)** the nature, type, and occurrence of fraud in electronic debit transactions;

**(II)** the extent to which the occurrence of fraud depends on whether authorization in an electronic debit transaction is based on signature, PIN, or other means;

**(III)** the available and economical means by which fraud on electronic debit transactions may be reduced;

**(IV)** the fraud prevention and data security costs expended by each party involved in electronic debit transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

**(V)** the costs of fraudulent transactions absorbed by each party involved in such transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

**(VI)** the extent to which interchange transaction fees have in the past reduced or increased incentives for

4a

parties involved in electronic debit transactions to reduce fraud on such transactions; and

**(VII)** such other factors as the Board considers appropriate.

## (6) Exemption for small issuers

### (A) In general
This subsection shall not apply to any issuer that, together with its affiliates, has assets of less than $10,000,000,000, and the Board shall exempt such issuers from regulations prescribed under paragraph (3)(A).

### (B) Definition
For purposes of this paragraph, the term "issuer" shall be limited to the person holding the asset account that is debited through an electronic debit transaction.

## (7) Exemption for government-administered payment programs and reloadable prepaid cards

### (A) In general
This subsection shall not apply to an interchange transaction fee charged or received with respect to an electronic debit transaction in which a person uses—

**(i)** a debit card or general-use prepaid card that has been provided to a person pursuant to a Federal, State or local government-administered payment program, in which the person may only use the debit card or general-use prepaid card to transfer or debit funds, monetary value, or other assets that have been provided pursuant to such program; or

**(ii)** a plastic card, payment code, or device that is—

**(I)** linked to funds, monetary value, or assets which are purchased or loaded on a prepaid basis;

**(II)** not issued or approved for use to access or debit any account held by or for the benefit of the card holder (other than a subaccount or other method of recording or tracking funds purchased or loaded on the card on a prepaid basis);

**(III)** redeemable at multiple, unaffiliated merchants or service providers, or automated teller machines;

**(IV)** used to transfer or debit funds, monetary value, or other assets; and

**(V)** reloadable and not marketed or labeled as a gift card or gift certificate.

**(B) Exception**

Notwithstanding subparagraph (A), after the end of the 1-year period beginning on the effective date provided in paragraph (9), this subsection shall apply to an interchange transaction fee charged or received with respect to an electronic debit transaction described in subparagraph (A)(i) in which a person uses a general-use prepaid card, or an electronic debit transaction described in subparagraph (A)(ii), if any of the following fees may be charged to a person with respect to the card:

**(i)** A fee for an overdraft, including a shortage of funds or a transaction processed for an amount exceeding the account balance.

**(ii)** A fee imposed by the issuer for the first withdrawal per month from an automated teller machine that is part of the issuer's designated automated teller machine network.

6a

**(C) Definition**
For purposes of subparagraph (B), the term "designated automated teller machine network" means either—

**(i)** all automated teller machines identified in the name of the issuer; or

**(ii)** any network of automated teller machines identified by the issuer that provides reasonable and convenient access to the issuer's customers.

**(D) Reporting**
Beginning 12 months after July 21, 2010, the Board shall annually provide a report to the Congress regarding—

**(i)** the prevalence of the use of general-use prepaid cards in Federal, State or local government-administered payment programs; and

**(ii)** the interchange transaction fees and cardholder fees charged with respect to the use of such general-use prepaid cards.

**(8) Regulatory authority over network fees**

**(A) In general**
The Board may prescribe regulations, pursuant to section 553 of Title 5, regarding any network fee.

**(B) Limitation**

The authority under subparagraph (A) to prescribe regulations shall be limited to regulations to ensure that—

7a

**(i)** a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and

**(ii)** a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection.

### (C) Rulemaking required
The Board shall prescribe regulations in final form before the end of the 9-month period beginning on July 21, 2010, to carry out the authorities provided under subparagraph (A).

## (9) Effective date
This subsection shall take effect at the end of the 12-month period beginning on July 21, 2010.

## (b) Limitation on payment card network restrictions

### (1) Prohibitions against exclusivity arrangements

#### (A) No exclusive network
The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed to—

**(i)** 1 such network; or
**(ii)** 2 or more such networks which are owned, controlled, or otherwise operated by—

**(I)** affiliated persons; or

8a

**(II)** networks affiliated with such issuer.

**(B) No routing restrictions**
The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

**(2) Limitation on restrictions on offering discounts for use of a form of payment**

**(A) In general**
A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards to the extent that—

**(i)** in the case of a discount or in-kind incentive for payment by the use of debit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network;

**(ii)** in the case of a discount or in-kind incentive for payment by the use of credit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network; and

**(iii)** to the extent required by Federal law and applicable State law, such discount or in-kind incentive is offered to all

9a

prospective buyers and disclosed clearly and conspicuously.

**(B) Lawful discounts**
For purposes of this paragraph, the network may not penalize any person for the providing of a discount that is in compliance with Federal law and applicable State law.

**(3) Limitation on restrictions on setting transaction minimums or maximums**

**(A) In general**
A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability—

**(i)** of any person to set a minimum dollar value for the acceptance by that person of credit cards, to the extent that--

**(I)** such minimum dollar value does not differentiate between issuers or between payment card networks; and

**(II)** such minimum dollar value does not exceed $10.00; or

**(ii)** of any Federal agency or institution of higher education to set a maximum dollar value for the acceptance by that Federal agency or institution of higher education of credit cards, to the extent that such maximum dollar value does not differentiate between issuers or between payment card networks.

10a

**(B) Increase in minimum dollar amount**

The Board may, by regulation prescribed pursuant to section 553 of Title 5, increase the amount of the dollar value listed in subparagraph (A)(i)(II).

**(4) Rule of construction**
No provision of this subsection shall be construed to authorize any person—

**(A)** to discriminate between debit cards within a payment card network on the basis of the issuer that issued the debit card; or

**(B)** to discriminate between credit cards within a payment card network on the basis of the issuer that issued the credit card.

**(c) Definitions**
For purposes of this section, the following definitions shall apply:

**(1) Affiliate**
The term "affiliate" means any company that controls, is controlled by, or is under common control with another company.

**(2) Debit card**
The term "debit card"—

**(A)** means any card, or other payment code or device, issued or approved for use through a payment card network to debit an asset account (regardless of the purpose for which the account is established), whether authorization is based on signature, PIN, or other means;

**(B)** includes a general-use prepaid card, as that term is defined in section 1693$l$-1(a)(2)(A) of this title; and

11a

**(C)** does not include paper checks.

**(3) Credit card**
The term "credit card" has the same meaning as in section 1602 of this title.

**(4) Discount**
The term "discount"—

   **(A)** means a reduction made from the price that customers are informed is the regular price; and

   **(B)** does not include any means of increasing the price that customers are informed is the regular price.

**(5) Electronic debit transaction**
The term "electronic debit transaction" means a transaction in which a person uses a debit card.

**(6) Federal agency**
The term "Federal agency" means—

   **(A)** an agency (as defined in section 101 of Title 31); and

   **(B)** a Government corporation (as defined in section 103 of Title 5).

**(7) Institution of higher education**
The term "institution of higher education" has the same meaning as in 1001[1] and 1002 of Title 20.

**(8) Interchange transaction fee**
The term "interchange transaction fee" means any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction.

12a

**(9) Issuer**
The term "issuer" means any person who issues a debit card, or credit card, or the agent of such person with respect to such card.

**(10) Network fee**
The term "network fee" means any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee.

**(11) Payment card network**
The term "payment card network" means an entity that directly, or through licensed members, processors, or agents, provides the proprietary services, infrastructure, and software that route information and data to conduct debit card or credit card transaction authorization, clearance, and settlement, and that a person uses in order to accept as a form of payment a brand of debit card, credit card or other device that may be used to carry out debit or credit transactions.

## (d) Enforcement

**(1) In general**
Compliance with the requirements imposed under this section shall be enforced under section 1693*o* of this title.

**(2) Exception**
Sections 1693m and 1693n of this title shall not apply with respect to this section or the requirements imposed pursuant to this section.

13a

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g), the Associations hereby designate the following portions of the record on appeal:

| Record Entry (R.) | Description | PageID Range |
|---|---|---|
| 1 | Complaint | 1-40 |
| 26 | Associations' Motion to Intervene | 200-01 |
| 26-1 | Associations' Memorandum of Law in Support of Motion to Intervene | 203-26 |
| 37 | Linney's Pizza's Opposition to Associations' Motion to Intervene | 291-314 |
| 38 | Board's Response to Associations' Motion to Intervene | 315 |
| 39 | Linney's Pizza's Motion for Summary Judgment | 316-17 |
| 39-1 | Linney's Pizza's Memorandum in Support of Motion for Summary Judgment | 318-63 |
| 43 | Associations' Reply in Support of Motion to Intervene | 627-44 |
| 44 | Associations' Motion for Leave to File Cross-Motion for Summary Judgment and Opposition to Linney's Pizza's Motion for Summary Judgment | 645-47 |
| 44-1 | Associations' Memorandum in Support of Leave to File | 648-51 |
| 44-3 | Associations' Motion for Summary Judgment | 653-55 |
| 44-4 | Associations' Memorandum in | 656-87 |

14a

| Record Entry (R.) | Description | PageID Range |
|---|---|---|
| | Support of Motion for Summary Judgment | |
| 45 | Board's Opposition to Linney's Pizza's Motion for Summary Judgment and Memorandum in Support of Cross-Motion for Summary Judgment | 689-732 |
| 46 | Board's Cross-Motion for Summary Judgment | 733-34 |
| 53 | Linney's Pizza's Combined Response in Opposition to Board's Cross-Motion for Summary Judgment and Reply in Support of Linney's Pizza's Motion for Summary Judgment | 859-94 |
| 54 | Associations' Motion for Leave to File Reply | 895-97 |
| 54-1 | Associations' Memorandum in Support of Leave to File Reply | 898-901 |
| 54-3 | Associations' Reply in Support of Summary Judgment | 903-21 |
| 55 | Board's Reply in Support of Summary Judgment | 922-47 |
| 56 | Order on Motion to Intervene | 948-66 |
| 57 | Associations' Amicus Brief | 967-98 |
| 61 | Opinion and Order on Motions for Summary Judgment | 1070-1104 |
| 62 | Judgment | 1105 |
| 63 | Notice of Appeal | 1106-07 |

15a