No. 25-6038

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LINNEY'S PIZZA, LLC,

*Plaintiff-Appellant,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellee,*

and

BANK POLICY INSTITUTE and CLEARING HOUSE ASSOCIATION, LLC,

*Proposed Intervenors.*

On Appeal from the United States District Court for the
Eastern District of Kentucky, No. 3:22-cv-00071 (Van Tatenhove, J.)

**BRIEF OF APPELLEE FEDERAL RESERVE BOARD**

> Joshua P. Chadwick
> Assistant General Counsel
> Yvonne F. Mizusawa
> Yonatan Gelblum
> Monika Moore
> Senior Counsels
> Board of Governors of the
>   Federal Reserve System
> 20th Street and Constitution
>   Avenue, N.W.
> Washington, D.C. 20551
> (202) 263-4835
>
> *Attorneys for Defendant-Appellee*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ..................................xi

STATEMENT OF JURISDICTION ......................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE ...............................................................1

    A.    The Durbin Amendment ..........................................................1

    B.    The Board's Notice of Proposed Rulemaking and Final Rule ..............................................................................4

    C.    The First Challenge to Regulation II and the D.C. Circuit's Decision .................................................................8

    D.    Linney's Complaint and the District Court's Judgment ......11

SUMMARY OF THE ARGUMENT .......................................................13

STANDARD OF REVIEW...................................................................15

ARGUMENT......................................................................................16

I.    The Best Reading of the Durbin Amendment Is That It Delegated Substantial Discretion to the Board ...........................16

II.    The Board Properly Included the Challenged Costs .....................21

    A.    The Statute Permits Consideration of Costs That Were Not Excluded .........................................................................21

i

1.   The Board's Reading Gives Meaning to All the Statute's Terms, While Linney's Reading Renders Important Statutory Text Superfluous........................23

2.   Contrary to Linney's Argument, the Board Correctly Interpreted Section 920(a)(4)(B) as Permitting Consideration of Costs That Are Not Prohibited by Section 920(a)(4)(B)(ii)................................................28

    a.   Linney's Disregards the Statute's Non-Interlocking Language .......................................28

    b.   Linney's Reading Fails to Give Meaning to the Restrictive "Which" Clause in Section 920(a)(4)(B)(ii).......................................................35

B.   The Board Was Permitted to Include the Four Cost Categories That Linney's Contests .......................................38

1.   The Board Properly Considered and Included "Fixed" ACS Costs, Which Are Specific to Particular Electronic Debit Transactions and Would Be Practically Impossible to Separate From Those ACS Costs That Must Be Considered .....38

2.   The Board Properly Considered and Included Transaction-Monitoring Costs, Which Are Incurred in the Authorization of Specific Electronic Debit Transactions and Are Not Precluded by the Separate Fraud-Prevention Adjustment...............................................................41

3.   The Board Properly Considered and Included Issuer Fraud Losses, Which Are Costs Resulting from the Authorization, Clearance, and Settlement of a Specific, Apparently Valid Transaction That Is Later Identified as Fraudulent ...............................................................45

4.　The Board Properly Considered and Included Network Processing Fees, Which Are Incurred by Issuers for Their Role in ACS .......................................48

III.　The Board Properly Adopted Uniform Fee Standards ...................51

IV.　Supposed Procedural Irregularities Do Not Provide Grounds for Vacating the Rule .......................................................59

A.　The Board Engaged in Reasoned Rulemaking in Compliance With All Procedural Requirements...................60

B.　Any Purely Procedural Flaws Would Not Warrant Vacatur ..................................................................65

CONCLUSION ......................................................................................68

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page

**Cases**

*Bailey v. Maine Commission on Governmental Ethics and Election Practices,*
900 F. Supp. 2d 75 (D. Me. 2012) ...................................................63

*Barnhart v. Thomas,*
540 U.S. 20 (2003) .......................................................................36

*Batterton v. Francis,*
432 U.S. 416 (1977) ......................................................................18

*Cboe Global Markets, Inc. v. SEC,*
155 F.4th 704 (D.C. Cir. 2025)........................................................53

*Chamber of Commerce of U.S. v. Whiting,*
563 U.S. 582 (2011) ......................................................................34

*Cleveland-Cliffs Iron Co. v. ICC,*
664 F.2d 568 (6th Cir. 1981) .........................................................53

*Coalition for Government Procurement v. Federal Prison Indus., Inc.,*
365 F.3d 435 (6th Cir. 2004) .........................................................60

*Consolidated Rail Corp. v. United States,*
619 F.2d 988 (3d Cir. 1980)...........................................................54

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System,*
603 U.S. 799 (2024) ................................................................12, 67

*DOL v. Americare Healthcare Services, Inc.,*
171 F.4th 838 (6th Cir. 2026)........................................................15

*Driscoll v. Montgomery County Board of County Commissioners,*
173 F.4th 794 (6th Cir. 2026).......................................................15

*EPA v. Calumet Shreveport Refining, LLC,*
  605 U.S. 627 (2025) ......................................................................55

*General Medicine P.C. v. Azar,*
  963 F.3d 516 (6th Cir. 2020) ........................................................25

*Hibbs v. Winn,*
  542 U.S. 88 (2004) .......................................................................34

*Increased Rates on Coal, Bn, Montana to Superior, Wisconsin,*
362 I.C.C. 625 (I.C.C. 1980), *aff'd in part, rev'd in part,*
*Cleveland-Cliffs,*
  664 F.2d 568 ...............................................................................53

*Iowa Public Service Co. v. ICC,*
  643 F.2d 542 (8th Cir. 1981) ........................................................53

*Johnson v. U.S. Postal Service,*
No. 86–2189, 1988 WL 122962 (6th Cir. 1988)
(unpublished table decision) ...............................................................53

*Lesko v. United States,*
  161 F.4th 1352 (Fed. Cir. 2025) ...................................................17

*Liljeberg v. Health Services Acquisition Corp.,*
  486 U.S. 847 (1988) .....................................................................58

*Linney's Pizza, LLC v. Board of Governors of the*
*Federal Reserve System,*
  804 F. Supp. 3d 717 (E.D. Ky. 2025) ..........13, 16, 19, 22, 23, 27, 31
  .........................................................32, 33, 35, 36, 50, 51, 57, 58

*Linney's Pizza, LLC v. Board of Governors of the*
*Federal Reserve System,*
  2023 WL 6050569 (E.D. Ky. Sept. 15, 2023) .................................12

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024) ...................................................16, 17, 18, 19, 53

*Loughrin v. United States,*
573 U.S. 351 (2014) .........................................................28, 30, 37

*NACS v. Board of Governors of the Federal Reserve System,*
574 U.S. 1121 (2015) .............................................................9, 11

*NACS v. Board of Governors of the Federal Reserve System,*
746 F.3d 474 (D.C. Cir. 2014) ..... 9, 10, 11, 18, 30, 31, 32, 36, 37, 39
...............................................................40, 49, 50, 51

*NACS v. Board of Governors of the Federal Reserve System,*
958 F. Supp. 2d 85 (D.D.C. 2013) .....................................................9

*Ohio Telecom Ass'n v. FCC,*
150 F.4th 694 (6th Cir. 2025)....................................................26

*Pickens v. Hamilton-Ryker IT Solutions, LLC,*
133 F.4th 575 (6th Cir. 2025).......................................................17

*Pulsifer v. United States,*
601 U.S. 124 (2024) .......................................................24

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
566 U.S. 639 (2012) ...............................................................25, 27

*Reichert v. Kellogg Co.,*
170 F.4th 473 (6th Cir. 2026).......................................................33

*Reno v. Bossier Parish School Board,*
528 U.S. 320 (2000) .......................................................59

*Russello v. United States,*
464 U.S. 16 (1983) ...............................................................28, 30

*Sai Kwan Wong v. Doar,*
571 F.3d 247 (2d Cir. 2009)........................................................19

*San Antonio, Texas by & Through City Pubic Service Board v. United States*, 631 F.2d 831 (D.C. Cir. 1980), *rev'd on other grounds sub nom. Burlington Northern, Inc. v. United States*,
459 U.S. 131 (1982) ..................................................................53, 54

*Schaffner v. Monsanto Corp.*,
113 F.4th 364 (3d Cir. 2024) ..........................................................18

*Schneiderman v. American Chemical Society*,
172 F.4th 158 (2d Cir. 2026) ....................................................26, 27

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025) ............................................................16, 40, 53

*Sierra Club v. EPA*,
60 F.4th 1008 (6th Cir. 2023).............................................65, 66, 67

*Sierra Club v. EPA*,
161 F.4th 934 (6th Cir. 2025)..................................................60, 62

*Simms v. NHTSA*,
45 F.3d 999 (6th Cir. 1995) .............................................................61

*U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*,
508 U.S. 439 (1993) ........................................................................36

*U.S. Sportsmen's Alliance Foundation v. CDC*,
167 F.4th 813 (6th Cir. 2026).........................................................21

*United States v. Alabama G.S.R. Co.*,
142 U.S. 615 (1892) ........................................................................19

*United States v. Bedford*,
914 F.3d 422 (6th Cir. 2019) .........................................................25

*United States v. Detroit Medical Center*,
833 F.3d 671 (6th Cir. 2016) .........................................................44

*United States v. Pritchett,*
    470 F.2d 455 (D.C. Cir. 1972) ........................................................36

*United States v. Ron Pair Enterprises, Inc.,*
    489 U.S. 235 (1989) .....................................................................37

*United States v. Wilkes,*
    78 F.4th 272 (6th Cir.2023)................................................25, 28, 30

*Varity Corp. v. Howe,*
    516 U.S. 489 (1996) .................................................................26, 27

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .................................................................20, 21

## Statutes

1 U.S.C. § 1 ...........................................................................................55

5 U.S.C. § 553(c).................................................................................66

5 U.S.C. § 706 .....................................................................................15

28 U.S.C. § 1291....................................................................................1

28 U.S.C. § 1331....................................................................................1

28 U.S.C. § 2401(a) .............................................................................12

49 U.S.C. § 10704(a)(2) (1982) ...........................................................54

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ......................2
    § 1075, 124 Stat. 1376 ..................................................................1, 2

Electronic Fund Transfer Act of 1978 (as amended) § 920,
    (codified at 15 U.S.C. § 1693*o*-2)............................................*passim*

## Regulations

12 C.F.R. § 235.4 ...................................................................................43

12 C.F.R. § 235.6(a) .............................................................................50

12 C.F.R. § 235.6(b) .............................................................................50

## Regulatory Materials

Debit Card Interchange Fees and Routing,
    88 Fed. Reg. 78,100 (Nov. 14, 2023) ..........................................7, 8

Debit Card Interchange Fees and Routing (Clarification),
    80 Fed. Reg. 48,684 (Aug. 14, 2015) ..................................11, 42, 44

Debit Card Interchange Fees and Routing,
    77 Fed. Reg. 46,258 (Aug. 3, 2012) ..................................................7

Debit Card Interchange Fees and Routing,
    76 Fed. Reg. 43,478 (July 20, 2011)...........................................7, 43

Debit Card Interchange Fees and Routing (Final Rule / Regulation II),
    76 Fed. Reg. 43,394 (July 20, 2011).......................................*passim*

Debit Card Interchange Fees and Routing (NPRM),
    75 Fed. Reg. 81,722 (Dec. 28, 2010)....................4, 19, 20, 30, 57, 63

## Other Authorities

Antonin Scalia & Bryan Garner, *Reading Law*:
    *The Interpretation of Legal Texts* (2012) ...................................25, 37

H.W. Fowler, *A Dictionary of Modern English Usage* (2d ed. 1965) ......36

*The Chicago Manual of Style* (16th ed. 2010) .........................................36

*The Merriam Webster Dictionary* (2009) .......................................... 46, 55

William Strunk Jr. and E.B. White,
  *The Elements of Style* (4th ed. 2000) ............................................ 36

x

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Board of Governors of the Federal Reserve System ("Board") respectfully requests oral argument. The Board believes that argument would facilitate a full presentation of the important and complex statutory interpretation questions at issue in this appeal.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's judgment. Judgment, R.62, PageID#1105. Appellant Linney's Pizza, LLC ("Linney's") timely filed a notice of appeal on November 11, 2025. Notice, R.63, PageID#1106.

## STATEMENT OF THE ISSUES

1.    Did the district court correctly hold that Congress's instruction to the Board in the Durbin Amendment, 15 U.S.C. § 1693*o*-2—to establish "standards for assessing whether" interchange transaction fees received by debit card issuers are "reasonable and proportional to" issuer costs—allowed the Board to consider costs that the statute neither mandated nor prohibited it from considering?

2.    Did the district court correctly hold that the statute permits the Board to adopt a uniform fee cap?

3.    Did the district court correctly hold that the Board's actions were not arbitrary or capricious?

## STATEMENT OF THE CASE

### A.    The Durbin Amendment

Section 1075 of the Dodd-Frank Act added a new section 920 to

the Electronic Fund Transfer Act ("EFTA"), codified at 15 U.S.C.

§ 1693*o*-2 ("section 920" or "Durbin Amendment"), regarding debit card

transactions.[1] Among other things, section 920(a) gives the Board

direction and authority to prescribe regulations establishing standards

for assessing interchange fees for debit cards. Specifically, section

920(a)(2) provides that "[t]he amount of any interchange transaction fee

that an issuer may receive or charge with respect to an electronic debit

transaction shall be reasonable and proportional to the cost incurred by

the issuer with respect to the transaction."[2] 15 U.S.C. § 1693*o*-2(a)(2).

Section 920(a)(3)(A) requires the Board to prescribe regulations "to

establish standards for assessing whether the amount of any

interchange transaction fee described in paragraph (2) is reasonable

---

[1] *Dodd-Frank Wall Street Reform and Consumer Protection Act,* Pub. L. No. 111-203, § 1075, 124 Stat. 1376 (July 21, 2010).

[2] The Durbin Amendment defines "electronic debit transaction" as "a transaction in which a person uses a debit card." 15 U.S.C. § 1693*o*-2(c)(5). "[I]nterchange transaction fee" is defined as "any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction." *Id.* § 1693*o*-2(c)(8). An "issuer" is "any person who issues a debit card, or credit card, or the agent of such person with respect to such card." *Id.* § 1693*o*-2(c)(9).

and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A).

In prescribing regulations under paragraph (3)(A), the statute states that the Board shall "(A) consider the functional similarity between – (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par." 15 U.S.C. § 1693o-2(a)(4)(A). Section 920(a)(4)(B) further provides that the Board shall "distinguish between – (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement ['ACS'] of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)." *Id.* § 1693o-2(a)(4)(B). The statute provides no other factors that the Board must consider in establishing standards for assessing whether interchange fees are "reasonable" and "proportional" to costs. *See* Regulation II, R.39-2, PageID##365, 397 ("Rule" or "Final Rule"); *see also id.* at #395. A separate provision of the statute, section 920(a)(5)(A), provides that "[t]he Board may allow for

3

an adjustment to the fee amount" permitted by its interchange fee standards if "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions." *Id.* § 1693*o*-2(a)(5)(A)(i).

### B.    The Board's Notice of Proposed Rulemaking and Final Rule

Shortly after enactment of the Dodd-Frank Act, Board staff began meeting with parties interested in the interchange fee rulemaking, including representatives of merchants, card-issuing banks, networks, and others, to discuss the provisions of the Durbin Amendment. The Board distributed surveys to debit card issuers, acquirers,[3] and networks requesting information on, among other things, costs associated with debit card transactions. *See Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking*, R.39-6, PageID##517, 519-20 ("NPRM").

On December 28, 2010, the Board requested public comment on a proposed rule implementing the Durbin Amendment. *Id.* Over 11,500

---

[3] An acquirer is the merchant's bank, which pays the interchange fee to the issuing bank. Regulation II, R.39-2, PageID#367.

4

commenters responded, including issuers, payment card networks, merchants, consumers, trade associations, and members of Congress. Regulation II, R.39-2, PageID#365. The Board thoroughly reviewed all comments, survey data, and other relevant information before promulgating the final regulation. *Id.*

The Rule, published July 20, 2011 as the Board's Regulation II,[4] establishes standards for assessing whether the amount of any interchange fee is reasonable and proportional to the cost incurred by the issuer with respect to the transaction, as directed by Congress. *See id.* at #391. Specifically, it permits each issuer to receive, for a transaction subject to the interchange fee standards, a fee that does not exceed 21 cents (the "base component") plus 5 basis points multiplied by the value of the transaction (the "*ad valorem* component"), cutting in half the pre-Rule average of 44 cents per transaction. *Id.* at #393; *see also id.* at #368.

In establishing these standards, the Board determined, based on the Durbin Amendment's language, that it could permissibly consider

---

[4] Pronounced "eye eye."

5

costs in addition to incremental ACS costs (which the Board must consider under section 920(a)(4)(B)(i)), as long as those additional costs are specific to a particular debit card transaction and thus not excluded from consideration by section 920(a)(4)(B)(ii). *Id.* at ##397-98. Consequently, the Rule's interchange fee standards are based on certain costs incurred by issuers in effecting a debit card transaction: both "fixed" and "variable" ACS costs (such as network connectivity, software, hardware, equipment, and associated labor), network processing fees, costs of processing chargebacks and other non-routine transactions, transaction-monitoring costs, and issuer fraud losses. *Id.* at ##400-02. Several other costs that issuers may incur in connection with debit card programs were excluded. *Id.* at ##375, 398-400. For example, the Board excluded general corporate overhead shared across product lines (*e.g.*, senior executive compensation), costs associated with establishing the account relationship, card production and delivery costs, marketing costs, research and development costs, and network membership fees, because they are not specific to particular debit card transactions. *Id.* at ##375, 398-99.

The values of the base and *ad valorem* components in the Rule

6

were determined using data reported on the Board's 2010 survey of covered[5] debit card issuers. These values reflect costs incurred by a "representative issuer in a representative electronic debit transaction," *id.* at #394, and, as such, the interchange fee standards apply uniformly to all subject issuers and transactions. The Board sought comments on this approach as well as on a fee cap that could vary for each issuer, and ultimately adopted the uniform cap based on "the language and purpose of the statute and the practical results of various interpretations." *Id.* at #393.[6,7]

---

[5] The Durbin Amendment exempts certain transactions and issuers from the interchange fee standards, including issuers with less than $10 billion in consolidated assets. 15 U.S.C. § 1693*o*-2(a)(6)(A).

[6] A separate interim final rule, issued simultaneously with the Rule, adopted a fraud-prevention adjustment of 1 cent per transaction for eligible issuers, consistent with section 920(a)(5) of EFTA. 76 Fed. Reg. 43,478 (July 20, 2011); *see also* 77 Fed. Reg. 46,258 (Aug. 3, 2012) (finalizing this rule). The fraud-prevention adjustment is in addition to the amount permitted under the interchange fee standards (i.e., the base component and *ad valorem* component). The base component, *ad valorem* component, and fraud-prevention adjustment are collectively referred to as the "interchange fee cap."

[7] On November 14, 2023, the Board published a Notice of Proposed Rulemaking seeking comment on whether to update the components of the interchange fee cap (base, *ad valorem*, and fraud-prevention adjustment) based on the then-latest reported cost data, and to "update[e] the three components . . . every other year going forward." *Debit Card Interchange Fees and Routing, Notice of Proposed*

7

### C. The First Challenge to Regulation II and the D.C. Circuit's Decision

Shortly after publication of the Rule in July 2011, several trade associations representing merchants, including the National Association of Convenience Stores ("NACS"), the National Retail Federation, the Food Marketing Institute, and the National Restaurant Association, as well as two individual merchants, sued the Board seeking to invalidate the rule. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, No. 1:11-cv-02075 (D.D.C., filed Nov. 22, 2011). Among other things, the first amended *NACS* Complaint—which Linney's complaint parallels—challenged the portion of the Rule establishing interchange fee standards. First Amended Complaint (*NACS* Dkt. 18), filed March 2, 2012 ("*NACS* Compl."). Like Linney's, the *NACS* plaintiffs claimed that the Board's interchange fee standards "vastly expand[ed] the categories of recoverable costs and thus the allowable debit interchange transaction fee." *NACS* Compl. ¶ 5.

---

*Rulemaking*, 88 Fed. Reg. 78,100, 78,101 (Nov. 14, 2023). Under the proposal, the base component would initially be lowered from 21 cents to 14.4 cents, the *ad valorem* component would decrease from 5 to 4 basis points (multiplied by the value of the transaction), and the fraud-prevention adjustment would increase from 1 cent to 1.3 cents. *Id.*

In July 2013, the district judge found that the interchange fee provisions of the Rule violated the APA, *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 958 F. Supp. 2d 85 (D.D.C. 2013), but the D.C. Circuit reversed. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 746 F.3d 474 (D.C. Cir. 2014), *cert. denied*, 574 U.S. 1121 (2015) ("*NACS*"). The D.C. Circuit held that "section 920(a)(4)(B)(i) *requires* the Board to include 'incremental cost[s] incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction,' and that section 920(a)(4)(B)(ii) *prohibits* the Board from including 'other costs incurred by an issuer which are not specific to a particular electronic debit transaction.'" *Id.* at 483 (quoting 15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii)). It further held that the Board had appropriately determined, based on the statutory language, "that the statute splits costs into three categories: (1) incremental ACS costs, which the Board must allow issuers to recover; (2) costs specific to a particular transaction, other than incremental ACS costs, which the Board may, but need not, allow issuers to recover; and (3) costs not specific to a particular transaction, which the Board may not allow issuers to recover." *Id.* at 488.

The court next turned to a determination of whether the Board properly included "the four specific types of costs the merchants challenged: 'fixed' ACS costs, network processing fees, [issuer] fraud losses, and transactions-monitoring costs," *id.* at 489, which are identical to the costs Linney's challenges. *See, e.g.*, Complaint, R.1, PageID##21, 28-32, 38. The D.C. Circuit carefully reviewed each and determined that the statute permitted the Board to consider all four. 746 F.3d at 489-92.

With respect to transaction-monitoring costs, the court "agree[d] with the Board that transactions-monitoring costs can reasonably qualify both as costs 'specific to a particular . . . transaction' (section 920(a)(4)(B)) [considered within the interchange fee standards] and as fraud-prevention costs (section 920(a)(5)) [considered within the fraud-prevention adjustment]." *Id.* at 492. The court further held that, although "the Board may well be able to articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment" but within the interchange fee standards (and specifically the base component), "the Board has yet to do so." *Id.* at 493. Accordingly, the court remanded

10

without vacatur to the Board for additional explanation of its inclusion of transaction-monitoring costs in the base component, rather than in the fraud-prevention adjustment, and reversed the grant of summary judgment to the *NACS* plaintiffs. *Id.* at 493, 496; *see also id.* at 477 ("we remand one minor issue—the Board's treatment of so-called transactions-monitoring costs—to the Board for further explanation"). The Supreme Court subsequently denied certiorari. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 574 U.S. 1121 (2015).

On August 14, 2015, the Board published a clarification on transaction-monitoring costs as required by the D.C. Circuit without amending the Rule. *Debit Card Interchange Fees and Routing, Clarification*, 80 Fed. Reg. 48,684 (Aug. 14, 2015) ("Clarification"). The *NACS* plaintiffs did not challenge the Clarification and consented to entry of judgment for the Board. *NACS* Dkt. 53, at 3, ¶¶ 5, 6.

### D.    Linney's Complaint and the District Court's Judgment

Linney's filed suit on December 9, 2022. Complaint, R.1, PageID##1-40. Like the *NACS* plaintiffs, Linney's contends that Regulation II must be vacated because the Board considered certain costs it claims are prohibited under the statute. *Compare* Complaint,

11

R.1, PageID##21, 28-32, 38, *with NACS* Compl. ¶ 5. In addition, Linney's argues the Board could not adopt a uniform fee cap based on industrywide data and that various purported missteps during the rulemaking process render the Rule arbitrary and capricious. Compl. ¶¶ 14, 104.

By Opinion and Order of September 15, 2023, the district court granted the Board's motion to dismiss, finding Linney's claims time-barred. *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Res. Sys.*, 2023 WL 6050569 (E.D. Ky. Sept. 15, 2023). Linney's appealed, R.18, PageID#1, and, while that appeal was pending, the Supreme Court held that an APA claim does not accrue for purposes of 28 U.S.C. § 2401(a)'s six-year statute of limitations until the plaintiff is injured by final agency action. *Corner Post, Inc. v. Bd. of Governors of the Fed. Res. Sys.*, 603 U.S. 799, 825 (2024). This Court therefore vacated the judgment and remanded.

In early 2025, the parties cross moved for summary judgment. The district court resolved the motions in its September 15, 2025 Opinion, concluding that the Board acted within the scope of authority granted by the Durbin Amendment and that Regulation II faithfully implements

12

the statute. *See* R.61; *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Res. Sys.*, 804 F. Supp. 3d 717 (E.D. Ky. 2025). The court determined that the Board's reading of the statute "has it best," *id.* at 728, and that the Board could include ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees when setting the fee cap. *Id.* at 731-36. The court further held that the statute permits the Board to set a uniform fee cap, *id.* at 736-38, and it rejected Linney's arguments that the rulemaking process was arbitrary and capricious. *Id.* at 738-40.

## SUMMARY OF THE ARGUMENT

The Board's reading of the statute is the best reading.

1.     Subject to certain statutory guardrails, Congress granted the Board substantial discretion to implement the Durbin Amendment by, *inter alia*, directing that the Board "establish standards" for "assessing" whether an interchange fee received by a debit card issuer is "reasonable and proportional" to the cost incurred with respect to the transaction. As the district court recognized, Linney's argues that the Board's role in implementing the Durbin Amendment is functionally ministerial, which would render Congress's directives a nullity and is

13

not the best reading of the statute.

2.    The district court correctly held that Linney's interpretation of the Durbin Amendment's separate cost consideration provisions is likewise not the best reading. Linney's construction erroneously dismisses the statute's grammar and punctuation and would render yet more of Congress's instructions surplusage. The Board's reading, by contrast, gives meaning to all of the statute's text, heeds its grammar and punctuation, and accounts for costs "incurred by the issuer with respect to the transaction"—as the Durbin Amendment instructs—that are not directly addressed by the statute.

3.    Linney's assertion that the Board cannot consider four categories of costs is erroneous because these costs are not among those Congress prohibited as "not specific to a particular" transaction. The Board properly determined that these costs are specific to particular transactions and, for certain of the costs, no transaction could occur without them. Once again, the Board's reading is the best one, and its determinations with respect to these cost categories are entirely consistent with the statute.

4.    The district court correctly held that the Board could adopt a

14

uniform fee cap based on industrywide data. The Board drew reasonable lines in establishing interchange fee standards and its approach is faithful to the statutory text and avoids the absurdity of a reading that would be impossible to implement for reasons including the unavailability of real-time per-transaction costs.

**5.** The district court correctly held that the Board adequately considered similarities between debit-card and check transactions when formulating the Rule and that the Board's rulemaking process was not arbitrary or capricious. And to the extent that the Board adopted an otherwise-permissible rule but erred solely in its analysis during the rulemaking, the appropriate remedy would be remand without vacatur.

## STANDARD OF REVIEW

The Court reviews the district court's summary judgment ruling, and underlying questions of statutory interpretation, *de novo. Driscoll v. Montgomery Cnty. Bd. of Cnty. Comm'rs*, 173 F.4th 794, 799 (6th Cir. 2026). In reviewing agency action under the APA, this Court must "decide all relevant questions of law" and "interpret . . . statutory provisions." *DOL v. Americare Healthcare Servs., Inc.*, 171 F.4th 838, 843 (6th Cir. 2026) (quoting 5 U.S.C. § 706). "Courts 'must exercise

15

their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires,'" *id.* (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)), but "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA]'s deferential arbitrary-and-capricious standard." *Seven Cty. Infrastructure Coal v. Eagle Cty.,* 605 U.S. 168, 179-80 (2025).

## ARGUMENT

### I.    The Best Reading of the Durbin Amendment Is That It Delegated Substantial Discretion to the Board

The district court correctly held that the Board was granted a "broad mandate" to ensure debit card fees are "reasonable and proportional" to costs. *Linney's*, 804 F. Supp. 3d at 729. As the Supreme Court explained in *Loper Bright*, "the best reading of a statute" may be that it "delegates discretionary authority to an agency." 603 U.S. at 395. In such instances, courts "fix the boundaries of the delegated authority and ensure the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up).

Here, the "best reading" of the statute is that the Board has substantial discretion to establish standards for assessing whether a

16

debit card interchange fee is reasonable and proportional, subject to specific statutory guardrails, which, as explained in Sections II and III below, Regulation II fully respected. Linney's assertion that the Board claims authority "from statutory silence," Linney's Br. 23, misapprehends how such statutory grants of discretion are applied. When these statutes' guardrail provisions do not prohibit particular action, courts will not imply additional limitations, which is precisely what Linney's urges this Court to do. *See Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 590 (6th Cir. 2025) (if "Congress chose not to specify" a particular limit on agency discretion, "neither will we").

Indeed, Linney's argument about "statutory silence" entirely fails to account for the statute's delegation provisions. The Durbin Amendment authorizes the Board to "prescribe regulations . . . regarding any interchange transaction fee . . . to implement this subsection (including related definitions)." 15 U.S.C. § 1693*o*-2(a)(1). This language "empower[s] an agency to . . . 'fill up the details' of [the] statutory scheme" subject to any limitations imposed by Congress. *Loper Bright*, 603 U.S. at 395; *Lesko v. United States*, 161 F.4th 1352, 1359-60 (Fed. Cir. 2025) (authorization to "'prescribe regulations . . .

17

necessary for the administration of this subchapter' . . . is a fill-up-the-details delegation"); *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 382 (3d Cir. 2024) (authorization "to prescribe regulations to carry out [statute's] provisions" empowers the agency to "fill up the details" (quoting *Loper Bright*, 603 U.S. at 395)).

The Durbin Amendment further instructs the Board "to establish standards for assessing whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer," 15 U.S.C. § 1693*o*-2(a)(3)(A), which underscores Congress's expectation that the Board exercise discretion. Commanding the Board to "establish standards" for "assessing" whether fees are "reasonable and proportional" would make little sense if the Board's role were purely ministerial. *See Batterton v. Francis*, 432 U.S. 416, 428 (1977) ("Congress itself must have appreciated that the meaning of the statutory term was not self-evident, or it would not have given the Secretary the power to prescribe standards."); *Loper Bright*, 603 U.S. at 395-96 (referencing the statute in *Batterton* as an example of a grant of discretion); *see also NACS*, 746 F.3d at 488 ("[T]he merchants assert that the Board . . . improperly reads a delegation of authority into

18

congressional silence. . . . But section 920(a)(3)(A) clearly grants the Board authority to promulgate regulations ensuring that interchange fees are reasonable and proportional to costs issuers incur."). As the district court explained, Linney's "reading reduces the Board to a mere calculator, sifting costs into one bucket or the other," which "glosses over" the separate statutory requirement that costs be "reasonable and proportional." *Linney's*, 804 F. Supp. 3d. at 731.

Moreover, although in no way controlling, the Board's construction of Congress's limits, adopted "roughly contemporaneously with enactment of the statute," is entitled to "very great respect," particularly because it has "remained consistent over time." *Loper Bright*, 603 U.S. at 385-86 (citations omitted).[8] Here, the Board's longstanding and consistent construction of the Durbin Amendment is that it permits the Board to (1) consider "costs that are specific to a particular transaction other than incremental [ACS] costs," NPRM,

---

[8] *Accord, e.g.*, *Sai Kwan Wong v. Doar*, 571 F.3d 247, 262 (2d Cir. 2009) (according "substantial weight" to 15-year-old construction in agency manual adopted within a year of the statute's enactment); *United States v. Ala. G.S.R. Co.*, 142 U.S. 615, 621 (1892) (finding enactment-era executive interpretation "continued for nine years" persuasive), *cited by Loper Bright*, 603 U.S. at 386.

R.39-6, PageID#530 (requesting comment on "whether [to] allow recovery through interchange fees of other costs"); Regulation II, R.39-2, PageID#397 (construing the statute as not precluding consideration of other costs), and (2) impose a uniform fee cap. NPRM, R.39-6, PageID#521 (requesting comment on a uniform fee cap); Regulation II, R.39-2, PageID#375 (adopting a uniform fee cap).

Linney's reliance on the major questions doctrine as an alternate basis for implying additional limits on the Board's discretion is also misplaced. The doctrine precludes agencies from invoking "rarely . . . used" statutes to assert "unheralded . . . 'regulatory authority'" without "clear[]" statutory authorization, *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), but this case presents the opposite circumstances.

Here, Regulation II reflects the Board's longstanding position since close to the Durbin Amendment's enactment, and Linney's asserts that the Board is *underregulating*, rather than "expan[ding] regulatory authority." *West Virginia*, 597 U.S. at 724. Linney's wrongly argues that Regulation II implicates the doctrine because it governs transactions representing a "significant portion of the American economy." Linney's Br. 31 (quoting *West Virginia*, 597 U.S. at 722). But *Congress's* decision

20

to regulate such matters isn't an "[agency]'s claim of 'unheralded' regulatory power.'" *West Virginia*, 597 U.S. at 722. And Linney's argument that Regulation II "enable[s] the transfer of billions of dollars," CP Br. 31, proves too much. Such transfers occurred before Regulation II, which limited their magnitude, and Linney's complains the rule doesn't limit them *enough* and is thus *insufficiently* transformative. However, the doctrine serves to prevent a "transformative *expansion* [of] regulatory authority," *West Virginia*, 597 U.S. 724, not as a means of forcing *additional* regulation.

Moreover, the doctrine is not a "magic-words" rule forcing Congress to "explicitly say" what specific provisions an agency may adopt, as long as Congress authorized the *type* of agency action at issue. *U.S. Sportsmen's All. Found. v. CDC*, 167 F.4th 813, 821 (6th Cir. 2026). Here, Congress did so by instructing the Board to establish standards to ensure interchange fees are reasonable and proportional to costs. This is simply not a major questions case.

## II.    The Board Properly Included the Challenged Costs

### A.    The Statute Permits Consideration of Costs That Were Not Excluded

As mandated by Congress, Regulation II establishes standards for

assessing whether the amount of any interchange fee is reasonable and proportional to the cost incurred by the issuer with respect to the transaction, reducing interchange fees by approximately half compared to the pre-Rule level. In so doing, the Board properly: (1) considered issuers' incremental ACS costs, as directed in section 920(a)(4)(B)(i); and (2) excluded "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," as directed in section 920(a)(4)(B)(ii). The Board concluded, based on the statute's text, grammar, and structure, that, while the statute prohibited consideration of costs not specific to particular transactions, it did not bar consideration of costs "that are specific to a particular electronic debit transaction but that are not incremental [ACS] costs." Regulation II, R.39-2, PageID#397. The Board properly exercised discretion to consider four such categories of costs—"fixed" ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees—which it concluded, after detailed analysis, are specific to particular transactions.

The district court agreed with the Board, finding that, "while Congress was, regrettably, imperfect in drafting the statute at issue, the

22

Board's reading has it best." *Linney's*, 804 F. Supp. 3d at 728. The court held that "[t]he inclusion of [the included and excluded cost] categories does not imply the exclusion of the third [category] in context because the statute also requires that the fee standard promulgated by the Board be 'reasonable and proportionate' to the costs incurred by issuers." *Id.* at 729. After careful analysis, the court correctly concluded that, "[p]ut together, §1693*o*-2 plainly allows the Board to consider other costs it is not mandated to consider, as long as they are not costs it is prohibited from considering[, and the Board's] . . . reading of the statute gives full effect to all of its terms and further reflects that the Board's role in implementing it involves something more than mere calculation." *Id.* at 731.

### 1. The Board's Reading Gives Meaning to All the Statute's Terms, While Linney's Reading Renders Important Statutory Text Superfluous

Section 920(a)(2) broadly instructs the Board that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2). In mandating in section

920(a)(3)(A) that the Board prescribe regulations "to establish standards for assessing" interchange fees, Congress specifically referred back to section 920(a)(2)'s directive that fees be "reasonable" and "proportional" to issuers' costs. *See* 15 U.S.C. § 1693*o*-2(a)(3)(A). The Board's Rule gives meaning to all these and other relevant statutory terms: it considers only costs required or permitted to be considered, and creates standards distinguishing a reasonable interchange fee from an unreasonable one, which is set by reference to issuers' costs—thereby ensuring that interchange fees are proportional to those costs—and is the best reading of the statute. Regulation II, R.39-2, PageID#394.

Because Linney's reading treats Congress's overall mandate that interchange fees be "reasonable and proportional" to issuer costs— which was sufficiently important that Congress repeated it twice in separate subsections *and* referred back to it in the costs considerations—as mere surplusage, simply anticipatory of section 15 U.S.C. § 1693*o*-2(a)(4)(B)'s cost considerations, and having no independent significance, *see* Linney's Br. 41-42, it is not the best reading. *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction . . . render[s] an entire subparagraph

24

meaningless, this Court has noted [that] the canon against surplusage applies with special force" (internal quotation omitted)); *United States v. Wilkes*, 78 F.4th 272, 280 (6th Cir. 2023) ("Courts avoid constructions of statutes that would render Congress's chosen words superfluous."); *Gen. Med. P.C. v. Azar*, 963 F.3d 516, 521 (6th Cir. 2020) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (internal quotation omitted)); *United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019) (same).

Linney's counters that, in case of "conflict," a specific provision supersedes a general provision, and that when a general and "more limited, specific authorization exist side-by-side," the "terms of the specific authorization must be complied with" to avoid "the superfluity of a specific provision that is swallowed by the general one." Linney's Br. 41 (citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). This argument is flawed for several reasons.

First, this is not a case of a general provision "swallow[ing] up" an

25

overlapping "authorization." As explained above, by providing for the Board to "establish standards" for assessing whether fees are reasonable and proportional, the Durbin Amendment grants *discretion*. *See supra* at 18. In contrast, the requirement to consider incremental ACS costs is a type of *prohibition*; in exercising the aforementioned discretion, the Board cannot refuse to consider these costs. Neither provision is superfluous under a reading allowing (but not requiring) the Board to consider costs beyond incremental ACS costs. *Cf. Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 715-16 (6th Cir. 2025) (purportedly "specific" authorization that did not fully overlap with more general authorization did not limit the latter's scope).

Moreover, contrary to Linney's assertion, there is no "conflict" to resolve. The "specific governs the general" canon only prevents courts from "applying a general provision when doing so would undermine limitations created by a more specific provision." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996). Here, reading the first provision as providing that the Board *may* consider various costs in its discretion does not undermine the latter's requirement that the Board *must always* consider incremental ACS costs. *Schneiderman v. Am. Chem. Soc'y*, 172

26

F.4th 158, 181 (2d Cir. 2026) (specificity canon has no applicability where "[t]here is no irreconcilable conflict" (citing *Howe*, 516 U.S. at 511)).

Lastly, the canon "can be overcome by textual indications that point in the other direction." *RadLAX*, 566 U.S. at 646-47. Here, as previously explained, reading the incremental ACS cost requirement to completely override the discretion given elsewhere would render the latter provision—and language Congress considered important enough to restate twice—a nullity.

Ultimately, as the district court correctly observed, "if the statute were as restrictive and mechanical as Linney's Pizza suggests, there would be no need to require the fee standard to be 'reasonable and proportional.' Instead, the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i)." *Linney's,* 804 F. Supp. 3d at 731.

27

**2.    Contrary to Linney's Argument, the Board Correctly Interpreted Section 920(a)(4)(B) as Permitting Consideration of Costs That Are Not Prohibited by Section 920(a)(4)(B)(ii)**

    **a.    Linney's Disregards the Statute's Non-Interlocking Language**

Section 920(a)(4)(B)(i) requires the Board to consider "the incremental cost incurred by the issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). But the counterpart provision, identifying costs "which . . . shall not be considered," employs different language: "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* § 1693*o*-2(a)(4)(B)(ii). Under ordinary canons of construction, use of different words in the prohibited costs clause is presumed to mean that Congress "intended a differen[t] meaning" than in the preceding clause. *Loughrin v. United States*, 573 U.S. 351, 358 (2014); *see also Russello v. United States,* 464 U.S. 16, 23 (1983) (if "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely" (internal quotation omitted)); *Wilkes*, 78 F.4th at 280 ("when

28

Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—it intended a difference in meaning" (cleaned up)).

Had Congress meant that the *only* costs that could be considered in determining what is "reasonable" and "proportional" are incremental ACS costs identified in section 920(a)(4)(B)(i), *see* Linney's Br. 17-21, 42, 47, there are numerous straightforward ways it could have made that clear. It could have written section 920(a)(4)(B)(ii) as simply excluding "all other costs"; it could have written section 920(a)(4)(B)(i) to say "consider *only*" incremental costs incurred for ACS, and eliminated section 920(a)(4)(B)(ii) altogether; it could have provided in sections 920(a)(2) and (a)(3)(A) that fees must be "reasonable and proportional to the incremental cost incurred by the issuer in authorization, clearance, or settlement of a transaction"; or it could have used interlocking language by stating that the Board must consider incremental ACS costs but may not consider any cost that is not an incremental ACS cost, to name just a few obvious possibilities. *See* Regulation II, R.39-2, PageID#397 ("Had Congress intended otherwise, it would have prohibited consideration of all costs other than those required to be

29

considered, rather than simply prohibiting consideration of a particular set of costs.").

Congress chose none of these obvious options, however, and instead described costs the Board *may not* consider using *different language* than that used to describe costs the Board *must* consider. In so doing, under ordinary canons of construction, Congress did not limit the Board to considering only incremental ACS costs. Rather, Congress only barred the Board from considering other costs if they were not specific to a particular transaction. *See Loughrin*, 573 U.S. at 358; *Russello*, 464 U.S. at 23; *Wilkes*, 78 F.4th at 280.[9]

The D.C. Circuit in *NACS* concluded as much, holding that "nothing in the statute's language compel[s]" the Board to bifurcate costs into two categories and consider only incremental ACS costs. 746 F.3d at 484. Rather, using ordinary principles of statutory construction, the D.C. Circuit determined that Congress neither

---

[9] Contrary to Linney's assertion that the Board initially interpreted the Durbin Amendment as only permitting recovery of costs specifically listed in section 920(a)(4)(B)(i), Linney's Br. 7, the Board consistently recognized that the Durbin Amendment's cost provisions do not cover the entire universe of issuer costs. *See* NPRM, R.39-6, PageID#530 (requesting comment on "whether [to] allow recovery through interchange fees of other costs").

30

required nor prohibited the inclusion of costs specific to a particular electronic debit transaction that were not incremental ACS costs, and therefore the Board was not barred from considering them. *Id.* at 485 ("had Congress wanted to allow issuers to recover only incremental ACS costs, it could have done so directly"). The district court here reached a similar conclusion. *Linney's Pizza*, 804 F. Supp. 3d at 731 (if "the statute were as restrictive and mechanical as Linney's Pizza suggests," then "the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i)").

Linney's urges the Court to disregard Congress's non-interlocking language, and instead cobbles together unpersuasive arguments for its claim that § 1693*o*-2(a)(4)(B)(ii) prohibits the Board from considering "all other" costs even though that is not what the statute says. Linney's Br. 67; *see also id.* at 18-22, 37-47. Linney's cites a recent Supreme Court decision for the uncontroversial proposition that the word "'shall' . . . 'imposes a mandatory command.'" *Id.* at 19. But the Board followed Congress's mandatory commands in its cost consideration decisions, so it is not at all clear how this is relevant.

Nor does a direction to "distinguish" between the two identified

31

cost categories in any way negate the existence of one or more additional categories, as Linney's suggests without any persuasive support, and the Board's reading *does* distinguish the identified categories. *NACS*, 746 F.3d at 488. Although Linney's argues that "the word 'between' generally refers to choosing from two options or categories," Linney's Br. 19, and "denot[es] only two categories of costs," *id.* at 19-20, this argument ignores the non-interlocking language of the included and excluded costs provisions, and the restrictive "which" clause, and is not the best reading. Congress's instruction that the Board "distinguish between" the two identified cost categories in no way negates the existence of a third. To the contrary, as *NACS* and the district court correctly determined, "no definition of 'distinguish' inherently limits the distinguishing being done to only two entities." *Linney's,* 804 F. Supp. 3d at 729; *NACS*, 746 F.3d at 487-88 ("the terms 'distinguish between' and 'other costs' hardly compel the conclusion that the Board must interpret section 920(a)(4)(B) as encompassing all costs that issuers incur").

Moreover, Linney's argument that "the words Congress used to describe the categories of costs—'incremental cost' and 'other costs'"—

32

limits the Board to considering *only* those two categories, Linney's Br. 20, ignores important statutory language, including the overall mandate of reasonableness and proportionality and the non-interlocking language of the included and excluded cost provisions. As the district court held, although "Congress enumerated only two categories, . . . the very nature of those categories" anticipates "the existence of a third." *Linney's*, 804 F. Supp. 3d at 729; *see also id.* ("The inclusion of those categories does not imply the exclusion of the third in context because the statute also requires that the fee standard promulgated by the Board be 'reasonable and proportionate' to the costs incurred by issuers, a command that Linney's Pizza simply glosses over."). "The distinguishing Congress required the Board to engage in merely staked out what Congress considered essential to include and essential to exclude—it did not speak to the array of other possible costs relevant to determining a reasonable and proportional fee." *Id.* Here, Linney's reading would "render . . . meaningless" critical statutory language and is not the best reading of the statute. *Reichert v. Kellogg Co.*, 170 F.4th 473, 484 (6th Cir. 2026).

33

Unlike Linney's reading, the Board's interpretation, which both considers and includes required costs and excludes prohibited costs as required by 15 U.S.C. § 1693*o*-2(a)(4)(B)(i) and (ii), and sets an interchange transaction fee cap that is reasonable and proportional to costs, as required by § 1693*o*-2(a)(2) and (3)(A), gives effect to all statutory provisions and is the best interpretation.[10] *See* Regulation II, R.39-2, PageID#397 ("the requirement that one set of costs be considered and another set of costs be excluded suggests that Congress left to the implementing agency discretion to consider costs that fall into neither category"); *Azar*, 963 F.3d at 521 ("'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).

---

[10] Nor can indeterminate floor statements of the legislation's sponsor trump this plain language of the statute, as Linney's concedes. Linney's Br. 35-36; *see Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's 'authoritative statement is the statutory text, not the legislative history.'").

34

### b.  Linney's Reading Fails to Give Meaning to the Restrictive "Which" Clause in Section 920(a)(4)(B)(ii)

Linney's argument that the Board may consider *only* incremental ACS costs in establishing standards for reasonable and proportional interchange fees is erroneous for another important reason. Rather than remaining true to the text, grammar, and punctuation of section 920(a)(4)(B)(ii), Linney's asks the Court to ignore the restrictive "which" clause in the prohibited costs provision and instead interpret that provision as prohibiting consideration of *all other costs* that aren't incremental ACS. Linney's Br. 47; *see also id.* at 37-46. But the district court thoroughly analyzed the statutory language and correctly rejected this argument. *Linney's,* 804 F. Supp. 3d at 729.

Linney's contends that the district court "fixat[ed] on the lack of a comma" in its analysis, Linney's Br. 43, and "expected perfect grammar from Congress," *id.* at 45, but the district court's reading is the most faithful to the text. Under ordinary principles of statutory construction, had Congress intended "which are not specific to a particular electronic debit transaction" merely to describe—but not restrict—"other costs," it would have set the "which" clause off with a comma or parentheses. *See*

35

*Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (in the statutory phrase "any other kind of substantial gainful work which exists in the national economy," the "which" phrase qualifies "substantial gainful work"); *United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972) (interpreting a statutory phrase not set off by commas as modifying the immediately preceding phrase); H.W. Fowler, *A Dictionary of Modern English Usage* 698 (2d ed. 1965) ("A comma preceding *which* shows that the *which*-clause is nondefining, and the absence of such a comma shows that it is defining."); William Strunk Jr. and E.B. White, *The Elements of Style* 4 (4th ed. 2000) ("[r]estrictive clauses, by contrast [to non-restrictive clauses], are not parenthetic and are not set off by commas"); *The Chicago Manual of Style* 314 (16th ed. 2010) (same).

As the district court rightly observed, "'the meaning of a statute will typically heed the commands of its punctuation.'" *Linney's,* 804 F. Supp. 3d at 730 (quoting *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 454 (1993)). Here, as the D.C. Circuit held in *NACS,* "the absence of commas matters far more than Congress's use of the word 'which' rather than 'that,'" which is "a style preference rather than an ironclad grammatical rule." 746 F.3d at 487. Indeed, "elsewhere

36

in the Durbin Amendment Congress demonstrated that it is among those writers who ignore the distinction between descriptive 'which' and restrictive 'that,'" and "in the Durbin Amendment Congress set aside *every* clearly descriptive clause with commas." *Id.* (emphasis added).[11] The absence of commas in the "which" clause therefore dictates Congress's restrictive meaning, and where a "reading is . . . mandated by the grammatical structure of the statute," it is the court's duty to give effect to the statute as written. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989).

Finally, Linney's reading of the section 920(a)(4)(B)(ii) "which" clause renders it mere surplusage—along with the other important statutory language discussed above—compounding Linney's error.[12] *Loughrin*, 573 U.S. at 358; *Azar*, 963 F.3d at 521.

---

[11] Some notable commentators have observed that because legislatures can be inconsistent in this area, the grammar cannon can be "a weak basis for deciding statutory meaning" in this context. *See Scalia* & Garner*, supra*, at 142-43. But Congress was *not* inconsistent about the use of commas with descriptive clauses in the Durbin Amendment, and there is every reason to adopt its consistent usage in this case. *See also id.* at 161 ("No intelligent construction of a statute can ignore its punctuation.").

[12] Linney's argues "the canon against surplusage is not an absolute rule," Linney's Br. 46, which is a correct statement so far as it goes and

**B.    The Board Was Permitted to Include the Four Cost Categories That Linney's Contests**

Contrary to Linney's arguments, Linney's Br. 47-59, the Board properly included four specific costs in establishing interchange fee standards. All four—"fixed" ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees—are specific to particular electronic debit transactions and therefore not prohibited by section 920(a)(4)(B)(ii).

**1.    The Board Properly Considered and Included "Fixed" ACS Costs, Which Are Specific to Particular Electronic Debit Transactions and Would Be Practically Impossible to Separate From Those ACS Costs That Must Be Considered**

The Board properly considered—and included—all ACS costs incurred by an issuer in effecting an electronic debit transaction, including both "fixed" and "variable" ACS costs. *See* Regulation II, R.39-2, PageID##375, 400. Citing a dictionary definition, Linney's argues that "[f]ixed ACS costs are not and cannot be the same as incremental ACS costs . . . because they do 'not fluctuate with changes in output or

---

true of canons generally. But "[l]awyers rarely argue that an entire provision should be ignored," Scalia & Garner, *supra*, at 175, and adoption of Linney's interpretation would unreasonably negate whole portions of the statute.

business activity.'" Linney's Br. 48. But the Board properly determined based on the statutory language that "fixed" ACS costs are specific to a particular debit card transaction and may properly be considered because, without these costs (which can fluctuate depending on time and transaction volume), no transaction could occur. Regulation II, R.39-2, PageID#398 ("no electronic debit transaction can occur without incurring [ACS] costs, making them costs specific to each and every electronic debit transaction").

Although Linney's argues that the Board should have defined "fixed or variable costs," Linney's Br. 49, the Durbin Amendment notably does not use the terms "fixed" or "variable."[13] Nor does it require exclusion of fixed ACS costs. As the Board noted, "[u]nder the framework established by the statute, all costs related to a particular transaction may be considered, and some—the incremental costs

---

[13] Nor did the Board define "incremental cost." As the Board explained, not only was there "no single generally-accepted definition of . . . 'incremental cost,'" Regulation II, R.39-2, PageID#397, but the possible definitions did "not correspond to a per-transaction measure of incremental cost that could be applied to any particular transaction." *Id*. at #398; *see also NACS*, 746 F.3d at 484 ("the phrase 'incremental cost' has several possible definitions . . . [that] would not necessarily encompass all costs that are 'specific to a particular electronic debit transaction'").

incurred by the issuer for its role in authorization, clearance, and settlement—must be considered." Regulation II, R.39-2, PageID#398. As the Board also explained, the concepts of fixed versus variable costs are not readily severable in practice for various reasons, notably including "the relevant time horizon and volume range" of the costs as well as the fact that "issuers' cost-accounting systems are not generally set up to differentiate between fixed and variable costs" and differing cost accounting systems are used when issuers outsource debit card operations. *Id.*

Accordingly, as the D.C. Circuit recognized in *NACS*, throughout the rulemaking process the merchants themselves "never argued that issuers should be allowed to recover only costs incurred as a result of processing individual, isolated transactions," and "any distinction between fixed and variable costs would prove artificial and unworkable" in practice. 746 F.3d at 489-90. In this regard, it is significant that, as explained below (at 51-52), binding precedents hold that agencies have broad latitude in making "line-drawing" distinctions that, as here, often require consideration of technical measurement or classification challenges. *See, e.g., Seven Cty.*, 605 U.S. at 183 ("Courts should afford

40

substantial deference and should not micromanage those agency [technical line-drawing] choices so long as they fall within a broad zone of reasonableness.").

Thus, the Board explained, "[b]y considering all costs [including both fixed and variable ACS costs] for which it had data other than prohibited costs, the Board has complied with the statutory mandate not to consider costs identified in section 920(a)(4)(B)(ii), has fulfilled the statutory mandate requiring consideration of the costs identified in section 920(a)(4)(B)(i), and has chosen to consider other costs specific to particular electronic debit transactions to the extent consistent with the purpose of the statute." Regulation II, R.39-2, PageID#398.

> **2. The Board Properly Considered and Included Transaction-Monitoring Costs, Which Are Incurred in the Authorization of Specific Electronic Debit Transactions and Are Not Precluded by the Separate Fraud-Prevention Adjustment**

Second, the Board properly considered and included in the interchange fee standards transaction-monitoring costs, which are pre-authorization activities "integral to transaction authorization." Regulation II, R.39-2, PageID#401. As the Board explained, "[t]ransactions monitoring systems assist in the authorization process

41

by providing information to the issuer before the issuer decides to approve or decline the transaction." *Id*. During this process, the issuer may use transaction-monitoring programs such as neural network and fraud-risk scoring systems to assist in the authorization process by providing information to the issuer before it decides whether to approve or decline the transaction. *Id*. #401-02; Clarification, R.39-7, PageID#561. While these transaction-monitoring activities inherently include a fraud-prevention component, they are part and parcel of the authorization process for a particular transaction, and therefore were properly includable in the interchange fee standards. *See* Clarification, R.39-7, PageID#561 ("Transactions-monitoring systems . . . provid[e] information needed by the issuer in deciding whether the issuer should authorize the transaction" and are "integral to an issuer's decision to authorize a specific transaction.").

Linney's fails to appreciate this distinction, erroneously arguing that "'[t]ransaction-monitoring costs' is simply another name for fraud prevention costs." Linney's Br. 51. Linney's reasons that "[t]he Durbin Amendment already addresses fraud prevention through a separate, conditional adjustment—after the base fee is set, and only for issuers

42

who comply with Board-established standards." *Id.* at 51-52 (citing 15 U.S.C. § 1693*o*-2(a)(5)(i)-(ii)). Thus, in Linney's view, the Board was "improperly double-count[ing] fraud-prevention-type costs in the fee standard." *Id.* at 51. But there was no such double counting. The Board distinguished, and included in the interchange fee standards, *pre-authorization* activities integral to the authorization process, from fraud-prevention costs incurred *over a broad spectrum of transactions*, which are separately addressed by section 920(a)(5)(A) and accounted for in the fraud-prevention adjustment, which was the subject of a separate rulemaking. *See* 76 Fed. Reg. at 43,478 (July 20, 2011); 12 C.F.R. § 235.4 (permitting a 1 cent per transaction fraud-prevention adjustment "in addition to any interchange transaction fee" for eligible issuers).

Additionally, transaction-monitoring costs are not only integral to the authorization of specific electronic debit transactions, and therefore appropriately considered, but the Board appropriately concluded that it was permissible to include them in the interchange fee standards because the language of section 920(a)(5)(A) differs significantly from section 920(a)(4)(B), indicating that these provisions refer to different

43

(although potentially overlapping) categories of costs. *Compare* 15 U.S.C. § 1693*o*-2(a)(5)(A)(i), *with id.* § 1693*o*-2(a)(4)(B).

As the Board explained in the Clarification, unlike transaction-monitoring costs, which are inextricably linked to the authorization of specific electronic debit transactions and included in the interchange fee standards, "fraud-prevention costs that the Board used to calculate the separate fraud-prevention adjustment authorized under section 920(a)(5) were not necessary to effect a particular transaction and were not part of the authorization, clearing, or settlement process, and thus a particular electronic debit transaction could occur without the issuer incurring these costs." Clarification, R.39-7, PageID#561. Indeed, Congress's use of the more general phrase "in relation to" rather than "particular," along with its use of the plural "transactions" in section 920(a)(5)(A)(i), indicates that the fraud-prevention adjustment may take into account an issuer's fraud-prevention costs over a broad spectrum of transactions not linked to a particular transaction. *United States v. Detroit Med. Ctr.*, 833 F.3d 671, 678 (6th Cir. 2016) ("Where Congress includes particular language in one section of a statute . . . but omits it in another section of the same Act . . . it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)). Thus, by its plain terms, section 920(a)(5)(A) does not preclude the Board from considering transaction-monitoring costs.

> **3.** **The Board Properly Considered and Included Issuer Fraud Losses, Which Are Costs Resulting from the Authorization, Clearance, and Settlement of a Specific, Apparently Valid Transaction That Is Later Identified as Fraudulent**

The third category, issuer fraud losses, are "losses incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers." Regulation II, R.39-2, PageID#402. As explained in the Rule, fraud losses are squarely "specific to a particular transaction" and were properly included in the interchange fee standards because they are "generally the result of the authorization, clearance, and settlement of an apparently valid transaction that the cardholder later identifies as fraudulent," most commonly because of "counterfeit card fraud, lost and stolen card fraud, and card-not-present fraud." *Id.* In other words, fraud losses are quintessentially specific to a particular transaction because the issuer would not have incurred the fraud loss

45

but for its authorization, clearance, and settlement of the transaction. *Id.*

Having determined that issuer fraud losses are specific to a particular transaction, and therefore includable in the interchange fee standards, the Board found that "[p]ermitting issuers to recover at least some fraud losses through interchange fees is reasonable given that the source of fraud could be any participant in an electronic debit transaction and that the exact source of fraud often is unknown." *Id.* The Board also appropriately determined that, because the "cost of a fraud loss varies with the amount of the transaction," the allowance for fraud losses is "best assessed through an *ad valorem* [or percentage of the value of the transaction] component." *Id.*

Linney's counters that "fraud losses are not 'costs'" and that they were therefore improperly included in the interchange fee standards, citing a dictionary definition of costs as the "'[t]he amount paid or charged for something.'" Linney's Br. 54 (quoting Black's Law Dictionary). But the dictionary also defines costs to include a "loss or penalty involved in gaining something," *The Merriam Webster Dictionary* 90 (2009), which encompasses a loss from fraud. Moreover, as the Board

46

explained, fraud losses are logically classified as costs. Not only are they incurred by the issuer as a result of ACS of a particular transaction that later turns out to be fraudulent, but they are specific to particular transactions. Regulation II, R.39-2, PageID#402.

Linney's further argues that "merchants pay the 0.05% fraud-loss reimbursement fee for every transaction, regardless of whether any loss occurs on that particular transaction. These constitute anticipatory transfers for 'potential loss,' not actual incurred 'costs.'" *Id.* at 55. But Linney's fails to account for the fact that interchange fee rates are established by a network well in advance of any transaction, before the costs of particular transactions are known (if such costs can ever be determined at all), and that the full cost of a transaction is not necessarily borne by the issuer at the time the interchange fee is charged, as in the case of fraud losses, which may be incurred weeks or even months after a specific transaction is authorized, cleared, and settled.

Nor does including fraud losses in the interchange fee standards "wreck[] the statutory scheme" given the separate fraud prevention adjustment in § 1693*o*-2(a)(5). *See* Linney's Br. 55-56. Fraud losses are

47

often unavoidable, or preventable by other participants in the transaction, Regulation II, R.39-2, PageID#402, and issuers retain substantial incentive to prevent fraud because, *inter alia*, the fraud loss component of the interchange fee only ensures recovery of a portion of the loss borne on any individual transaction that later turns out to be fraudulent. *Id.* ("Allowing a portion of fraud losses to be recovered through interchange fees will not eliminate the incentive for issuers to monitor and prevent fraud. Issuers will continue to bear the cost of some fraud losses . . . ."). And there is no double counting. *See id.* at n.127 ("The amount of the fraud-prevention adjustment permitted under the accompanying interim final rule published separately in the Federal Register does not include consideration of fraud losses.").

### 4. The Board Properly Considered and Included Network Processing Fees, Which Are Incurred by Issuers for Their Role in ACS

Fourth, the Board properly included in the interchange fee standards network processing fees, which networks charge issuers to process a debit card transaction. Regulation II, R.39-2, PageID#401. The total amount of network processing fees charged to an issuer "is determined by the amount of electronic debit transactions processed for

48

that issuer." *Id.* Thus, these fees are "both specific to a particular transaction and incurred for the issuer's role in authorization, clearance, and settlement." *Id.*

Linney's argues that network processing fees were wrongly included because they "are not *'incremental* cost[s] incurred by an issuer' for its role in ACS of a particular transaction." Linney's Br. 58 (emphasis in original) (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(i)). But as explained in the Rule, R.39-2, PageID##367, 401, network processing fees are paid by an issuer to the network for each transaction, and thus are necessarily incurred "for the role of the issuer" despite flowing to the network. They vary with the number of transactions processed; no particular electronic debit transaction can authorize, clear, or settle without them; and, although paid by issuers to networks, they are incurred "for the role of the issuer" in ACS, 15 U.S.C. § 1693*o*-2(a)(4)(B)(i), because issuers play a role in receiving authorization requests from networks, communicating approval or denial back to the networks, and receiving settlement information from the network. Regulation II, R.39-2, PageID#367. This would not be possible if an issuer did not participate in the network, a necessary condition of which

49

is that it pay network processing fees.

Although Linney's further asserts that "the statute defines 'network fee' as 'any fee charged and received by a payment card network with respect to an electronic debit transaction, *other than an interchange transaction fee,*'" Linney's Br. 57 (quoting 15 U.S.C. § 1693*o*-2(c)(10)), and that "the statute explicitly orders the Board to ensure that 'a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction,'" *id.* (quoting 15 U.S.C. § 1693*o*-2(a)(8)(B)(i)); *see also id.* at 59, the district court appropriately rejected Linney's reasoning on this point. Indeed, the D.C. Circuit held that "the merchants should have left it out entirely." *NACS*, 746 F.3d at 491. This is because the separate provision permitting the Board to prescribe rules concerning network fees, which the Board implemented at 12 C.F.R. § 235.6(a) and (b), is distinct from the interchange fee standards. In particular, the fees or other amounts "received by an issuer from a payment card network," *id.* § 235.6(b), which are the subject in part of section 920(a)(8), are different from network processing fees an issuer pays to a network as part of ACS. *See,*

50

*e.g.*, Regulation II, R.39-2, PageID#401.[14]

As the D.C. Circuit held, "section 920(a)(8)(B) is designed to prevent issuers and networks from circumventing the Board's interchange fee rules, not to prevent issuers from recovering reasonable network processing fees through the interchange fee." *NACS*, 746 F.3d at 491; *see also Linney's*, 804 F. Supp. 3d at 736. Contrary to Linney's argument, nothing in section 920(a)(8), or elsewhere, prohibits the Board from considering network processing fees when setting interchange fee standards.

## III.   The Board Properly Adopted Uniform Fee Standards

Linney's contends that the Board improperly adopted uniform fee standards based on industrywide data by construing references to "the issuer" and "the transaction" as referencing costs incurred by a representative issuer in a representative transaction. It is unclear whether Linney's demands a transaction-specific (varying for each transaction), or issuer-specific (based on aggregate transaction data at

---

[14] Although Linney's argues that "a network fee cannot simultaneously be *not* an interchange fee but also a *component* of the interchange fee," Linney's Br. 57 (emphasis in original), this ignores the statutory structure and is in any event false. A window is not a house though it is a component of a house, etc.

51

the issuer level) standard. *Compare, e.g.*, Linney's Br. 59 (asserting the fee "must be issuer- and transaction-specific"), *with id.* (referencing "transactions" in the plural when asserting that "the statute instructs that each issuer's recoverable fee must reflect its own *specific* costs for its own *specific* transactions"), *and id.* at 62 (contending the standard it wants is feasible because the Board initially proposed "an issuer-specific measurement of costs and fees"). But Linney's is wrong either way. Its argument is precluded by binding precedent recognizing broad agency discretion over line-drawing (including this Court's prior holding allowing use of a uniform value in comparable circumstances); a factual finding of impossibility during the rulemaking rendering a transaction-specific reading absurd; and interpretive canons that foreclose mandating a standard that is issuer- but not transaction-specific.

Linney's attempt to dictate whether the Board must draw the line at the regulated industry, issuer, or transaction level when assessing costs disregards jurisprudence holding that agencies have "broad latitude" in making line-drawing decisions. *Seven Cty.*, 605 U.S. at 183; *see also id.* ("Courts should afford substantial deference and should not micromanage those agency [technical line-drawing] choices so long as

52

they fall within a broad zone of reasonableness."); *Cboe Glob. Markets, Inc. v. SEC*, 155 F.4th 704, 722 (D.C. Cir. 2025) (describing line-drawing as an exercise receiving deferential judicial review) (citing *Seven Cty.*, 605 U.S. 168; *Loper Bright*, 603 U.S. at 392); *Johnson v. U.S. Postal Serv.*, No. 86–2189, 1988 WL 122962, at *3 (6th Cir. 1988) (unpublished table decision) (deferential review of agency decision because "the line must be drawn somewhere").

Indeed, this Court, like other appellate courts, has upheld an agency's use of a uniform industrywide rate to proxy individual businesses' costs when setting caps on permissible charges. In *Cleveland-Cliffs Iron Co. v. ICC*, 664 F.2d 568 (6th Cir. 1981), it upheld the agency's use (on policy grounds) of the statutory tax rate rather than an individual business's effective tax rate[15] when estimating costs for an individual business. *Id.* at 586. Other courts reached the same conclusion. *See, e.g.*, *Iowa Pub. Serv. Co. v. ICC*, 643 F.2d 542, 547 (8th Cir. 1981) ("declining to second-guess" the agency's choice to use the

---

[15] The effective tax rate at issue was specific to the business and reflected its particular tax characteristics. *Increased Rates on Coal, Bn, Montana to Superior, Wisconsin*, 362 I.C.C. 625, 679 (I.C.C. 1980), *aff'd in part, rev'd in part* by *Cleveland-Cliffs*, 664 F.2d 568.

statutory rate as "a reasonable substitute for computation of actual taxes"); *accord Consol. Rail Corp. v. United States*, 619 F.2d 988, 1000 (3d Cir. 1980); *San Antonio, Tex. by & Through City Pub. Serv. Bd. v. United States*, 631 F.2d 831, 847 (D.C. Cir. 1980), *rev'd on other grounds sub nom. Burlington N., Inc. v. United States*, 459 U.S. 131 (1982).

Although Linney's argues that the Durbin Amendment's use of the definite article before "issuer" and "transaction" requires an issuer- and transaction-specific standard, Linney's Br. 59-60, the *Cleveland-Cliffs* line of cases indicates otherwise. The controlling statute in these cases charged the agency with adopting "standards" to account for certain financial characteristics of "*the business*" in setting a permissible rate. 49 U.S.C. § 10704(a)(2) (1982) (emphasis added).[16] In this regard, its language is similar to the Durbin Amendment's command that the Board "establish standards" tied to costs of "*the issuer*." 15 U.S.C. § 1693*o*-2(a)(3)(A) (emphasis added). Yet this Court did not appear to view use of the definite article before "business" as limiting discretion to use the (uniform) statutory tax rate.

---

[16] Unlike section 10704(a)(2), the Durbin Amendment expressly requires consideration of costs but does not refer to "profit" or "return." 15 U.S.C. § 1693*o*-2(a)(2), (a)(3)(A), (a)(4)(B).

54

Linney's assertion about the definite article also glosses over the rules of grammar, a rule of construction imposed by Congress, and related jurisprudence indicating that use of the definite article is not dispositive. As a matter of usage, a definite article can indicate "any one typical of or standing for the entire class named," *The Merriam Webster Dictionar*y 414 (2009), just as a representative issuer and representative transaction "stand[s] for the entire class named." And as a matter of law, Congress expressly adopted a rebuttable presumption that use of the singular in the United States Code also includes the plural, 1 U.S.C. § 1. Thus, as the Supreme Court recently reaffirmed, "in the absence of other evidence . . . use of the definite article 'the' is too thin a reed to support" an assertion that what follows refers to an individual entity. *EPA v. Calumet Shreveport Ref., LLC*, 605 U.S. 627, 641-42 (2025) (applying 1 U.S.C. § 1).

Linney's also argues that use of "specific" and "particular" before "transaction" in the provisions concerning required and prohibited costs, 15 U.S.C. § 1693*o*-2(a)(4)(B), compels standards that vary the fee from transaction to transaction, Linney's Br. 61-62. But this subsection's opening language makes clear that it serves to require the

55

Board to "distinguish" between mandatory and prohibited costs, 15 U.S.C. § 1693*o*-2(a)(4)(B). In this context, "particular" and "specific" distinguish costs, like general overhead not specifically incurred to effect a "particular" transaction, from incremental costs "specific" to a "particular" transaction, and thus merely address *what* costs must be considered or excluded rather than how to measure them.

Moreover, to the extent Linney's argues the Durbin Amendment requires a fee varying based on each transaction's cost, such a reading runs afoul of the absurdity canon given the Board's factual finding during the rulemaking that such a mandate would be "virtually impossible" to implement. Regulation II, R.39-2, PageID#393. *Inter alia,* some transaction-specific cost data necessary to set such a fee *are not available* at the time the transaction (and associated interchange fee) is processed. *Id.* The record supported this finding, as even those commenters objecting to an industrywide approach argued for use of a representative transaction to set the permissible interchange fee rate at the issuer level, rather than for a transaction-specific approach. *Id.* Similarly, the comment letter of Visa, one of the two main networks processing debit transactions, explained that, for multiple reasons, a

true transaction-specific approach would be impossible to implement.[17]

Although Linney's attempts to argue around this factual impossibility, it points to nothing showing that a transaction-specific standard is feasible. Its reliance on the Board's initial proposal for an *issuer*-specific fee cap, Linney's Br. 62, is misplaced; that proposed fee cap was tied to the average cost of *all of an issuer's transactions*, NPRM, R.39-6, PageID#550, *i.e.*, the cost of a representative transaction based on aggregate data rather than the cost of individual transactions. And while Linney's notes that the Durbin Amendment legally "empowered" the Board to collect information, Linney's Br. 62, this *legal* authority has no bearing on the *factual* finding that it is not possible to obtain the necessary information because, *inter alia*, it *does not exist* when the fee is calculated.

The district court therefore correctly concluded, given the impossibility of implementing a transaction-specific approach, that

---

[17] *See* Letter from Visa Inc. to Louise L. Roseman, Director, Div. of Res. Bank Operations & Payment Sys., Bd. of Governors of the Fed. Res. Sys., at 9-10 (Nov. 8, 2010) (noting the impossibility of monitoring or proving compliance under a true transaction-specific approach or knowing the costs at the time a transaction is settled), *available at* https://www.federalreserve.gov/newsevents/rr-commpublic/ visa_comment_letter_20101108.pdf.

57

reading the statute to require this approach would violate the absurdity cannon, *Linney's*, 804 F. Supp. 3d at 738, which counsels against construing statutes in a manner making compliance impossible. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861 (1988). Linney's retort is that "practical considerations . . . do not justify departing from the statute's clear text," Linney's Br. 61, but as explained above, the statutory text does not compel a transaction-specific standard, and such a standard is not merely impractical, but rather impossible to implement.

Lastly, to the extent Linney's actually demands an issuer-specific fee cap varying based on aggregate costs of each issuer's collective transactions, *cf., e.g.*, Linney's Br. 62 (arguing the Board's assertions of impossibility are belied by its initial consideration of an "issuer-specific" standard), it fares no better. Beyond contradicting Linney's own arguments about when statutory language compels granularity, any demand for an issuer-specific but not transaction-specific approach is precluded by basic principles of statutory construction. As the Board explained in rejecting this approach, it does not comport with parallel use of "the issuer" and "the transaction" in the same sentence.

Regulation II, R.39-2, PageID#393; *accord Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000) ("we refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence"). And if the statute allows such a fee cap based on aggregated transaction cost data at the issuer level, Linney's has not explained why the Board lacked discretion to instead aggregate at the industry level, given controlling precedents recognizing broad agency discretion when drawing such lines. *See supra* at 51-52.

## IV. Supposed Procedural Irregularities Do Not Provide Grounds for Vacating the Rule

As an alternate basis for reversal, Linney's claims Regulation II is arbitrary and capricious because, *inter alia*, it is procedurally flawed due to a purported failure to address similarities with checking transactions and "define adequately key terms" in a manner leading to "internally inconsistent treatment of similar costs." Linney's Br. 63-70. But the record shows the Board considered all required matters and defined all necessary terms. Moreover, such matters that can potentially be addressed through further clarification without changing the substance of the rule should be addressed by remand without vacatur, as vacatur would be needlessly wasteful and unnecessary and

59

Linney's cannot claim prejudice from lack of vacatur.

### A. The Board Engaged in Reasoned Rulemaking in Compliance With All Procedural Requirements

Linney's cannot meet its burden of showing the Rule was arbitrary and capricious, which implicates "the least demanding review of an administrative action [and] requires the party challenging the agency's action to 'show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations.'" *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 475 (6th Cir. 2004) (citations omitted). "When assessing whether an agency's action was arbitrary or capricious, '[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.'" *Sierra Club v. EPA*, 161 F.4th 934, 942 (6th Cir. 2025) (citation omitted).

Linney's argues the Board "ignored" Congress's directive to "consider the functional similarity between . . . electronic debit transactions; and . . . checking transactions," 15 U.S.C. § 1693*o*-2(a)(4)(A); *see* Linney's Br. 66, but this is incorrect. The Board not only analyzed the overall similarities with, and differences between, debit

and checking, as Linney's concedes, Linney's Br. 64; *see* Regulation II, R.39-2, PageID##369-71, but considered such similarities and differences when deciding whether to include or exclude specific costs. *See, e.g.*, Regulation II, R.39-2, PageID#400 (excluding customer inquiry costs in part because "[p]ayor's banks . . . do not receive reimbursement for these costs from the payee's bank"); *id.* at #401 (including network processing fees because, *inter alia*, "such an arrangement would be similar to traditional paper-check processing"). Thus, the Board did not entirely fail to consider an important aspect of the problem or otherwise act arbitrarily or capriciously in considering similarities between check and debit card transactions. *See, e.g.*, *Simms v. NHTSA*, 45 F.3d 999, 1006 (6th Cir. 1995) (agency did not act in an arbitrary and capricious manner where it considered "relevant factors" and followed a "reasoned path").

Linney's further claim that the fee standards are arbitrary and capricious because the Board did not consider *only* incremental ACS also lacks merit. Linney's Br. 68. As explained, Congress did not limit the Board to considering *only* incremental ACS, and did not prohibit the Board from considering other costs, provided they are "specific to

61

particular electronic debit transactions." Regulation II, R.39-2, PageID#398; *see supra* at 21-37. Linney's claim that the Rule is arbitrary and capricious because it adopted a single fee cap, Linney's Br. 70-71, likewise rests on an incorrect construction of the Durbin Amendment. *See supra* at 50-58. Thus, the Board did not "rel[y] on factors which Congress has not intended it to consider," *Sierra Club*, 161 F.4th at 942, and it provided a rational explanation. *Id.* (requiring "a rational connection between the relevant facts and the decision made" by the agency).

Nor is the Rule arbitrary and capricious due to purported failure to define "fixed," "variable," "incremental," or "ACS." Linney's Br. 68. The Durbin Amendment notably does not use the terms "fixed" or "variable," and the meanings of those terms vary significantly based, *inter alia*, on whether an issuer "performs its transactions processing in-house [or] outsource[s] to a third-party processor that charge[s] a per-transaction fee based on its entire cost, including both fixed and variable costs." Regulation II, R.39-2, PageID#398; *see also supra* at 38-41. With respect to "incremental," as the Board explained, there is "'no single generally-accepted definition of the 'incremental cost.'" *Id.*

62

PageID#397. With respect to ACS costs, the Board explained that "transaction processing costs," for which it provided a detailed definition, *see id.* PageID##400-01 (incorporating costs described at NPRM, R.39-6, PageID#550, as well as additional costs), include fixed and variable ACS costs. *Id.* PageID#400. The Board thus fulfilled Congress's mandate in section 920(a)(4)(B)(i) to consider, and include, incremental ACS costs by including both these and other costs that were specific to a debit-card transaction. *See Bailey v. Maine Comm'n on Gov't Ethics & Election Pracs.*, 900 F. Supp. 2d 75, 90 (D. Me. 2012) ("Agencies are not required to promulgate rules defining every statutory term that might be called into question."). Linney's does not claim the Board failed to consider or permit recovery of any incremental ACS costs in the fee standards as required by the statute, and as explained above (at 21-41), the Board could include other costs, so it was not necessary to separately break out incremental ACS costs to comply with the statute's mandate.

Lastly, Linney's argues the Board acted arbitrarily in deciding which costs to include, noting that it included fraud loss costs but not non-sufficient funds handling costs, and included fixed ACS costs such

as equipment costs while excluding overhead costs like buildings and salaries. Linney's Br. 68-70. But the Board provided a reasoned explanation for these distinctions. Ultimately, the Board complied with the statutory prohibitions and, to the extent that lines needed to be drawn, the courts have held that such line-drawing tasks are discretionary policy and technical decisions within the agency's discretion. *See supra* at 51-52.

The Board rationally explained the legal constraints limiting its discretion, as well as policy and technical reasons that led it to it draw the lines as it did in exercising this discretion to exclude or exclude various costs. The Board explained, for example, that even if issuers choose to offer debit cards, they can choose to decline transactions resulting in insufficient funds. Regulation II, R.39-2, PageID#381. On the other hand, issuers offering debit cards cannot choose not to be defrauded on some of these transactions. With respect to real estate and executive management costs covering "general business operations [that] are shared across all product lines," as well as account relationship costs, issuers would incur these costs even if customers made no debit card transactions, *id.* PageID#398-99, and these are thus

64

not "specific" to particular transactions. In contrast, the Board explained that, to effect debit card transactions, issuers must maintain certain equipment, and that these costs were therefore recoverable. *Id.* PageID##400-01.

## B.    Any Purely Procedural Flaws Would Not Warrant Vacatur

In the event it were to prevail, Linney's seeks vacatur with a six-month stay. Linney's Br. 72. But if this Court holds that the Durbin Amendment permitted the decisions the Board made on which costs to consider and how to measure them, while ruling for Linney's on procedural grounds (such as its arguments concerning the Board's analysis of similarities between checking and debit transactions), the appropriate remedy would be remand without vacatur.

"In general, whether vacatur is appropriate depends on the seriousness of the agency error and the disruptive consequences of vacatur." *Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023) (internal quotation omitted). The seriousness of the agency's error depends on "how likely it is the [agency] will be able to justify its decision on remand." *Id.* If an agency could "adopt the same rule," but must "offer[] better reasoning" or "comply[] with procedural rules," this

65

factor "advises against vacatur." *Id.* at 1022-23. Therefore, if the Court rules that the Board *could* have adopted the rule it did, but did not correctly go about doing so, this factor weighs against vacatur. As for the disruptive effect of vacatur, in seeking a six-month stay, Linney's itself concedes that vacatur would create "regulatory disruption" by returning debit-card transactions to their unregulated state. Linney's Br. 72. And the vacatur-with-a-stay that Linney's requests instead would result in potentially avoidable delay and diversion of public resources, since a new notice-and-comment rulemaking would be required to replace the vacated Rule. 5 U.S.C. § 553(c). In contrast, any alleged problems with the Board's explanation that may not implicate the contents of the Rule itself might be cured with further explanation or clarification, as the Board did with its Clarification following remand in *NACS*.

Linney's nonetheless makes the remarkable claim that, despite its own request to stay any vacatur order, denying vacatur altogether would leave it "without redress." Linney's Br. 71. But as this Court recognized in *Sierra Club*, vacatur is not necessary to redress errors limited to the rulemaking process. Other sufficient remedial action,

such as "offering better reasoning" or "complying with procedural rules" sufficiently redresses any error. *Id.* at 1022-23. And Linney's assertion that the Board "conceded" that only vacatur would provide adequate relief during oral argument in *Corner Post* (which concerned the statute of limitations, rather than remedies), Linney's Br. 71-72, grossly mischaracterizes the cited statement. In the course of responding to a question about standing, counsel merely noted that it was "possible" that the only available relief was vacatur, but added "I'm not certain that's right," Tr. of Oral Arg. at 76, *Corner Post*, 603 U.S. 799, which is hardly the concession Linney's portrays.

Consequently, the delay and expenditure of resources associated with a potentially unnecessary rulemaking that could reenact the same rule, and Linney's inability to claim prejudice from lack of vacatur given that it seeks a stay of any vacatur, mean that "the overall equities and practicality of the alternatives," *Sierra Club*, 60 F.4th at 1022, would favor remand without vacatur. Accordingly, should the Court find that the Board could have adopted the regulation it did, but failed to provide adequate reasoning or committed some other procedural error, the Court should remand without vacating.

# CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: May 29, 2026

Respectfully submitted,


/s/ Joshua P. Chadwick
Joshua P. Chadwick
Assistant General Counsel
Yvonne F. Mizusawa
Yonatan Gelblum
Monika Moore
Senior Counsels
Board of Governors of the
   Federal Reserve System
20th Street and Constitution
   Avenue, N.W.
Washington, D.C. 20551
joshua.p.chadwick@frb.gov
(202) 263-4835

*Attorneys for Defendant-Appellee Board of
Governors of the Federal Reserve System*

68

**CERTIFICATE OF COMPLIANCE**

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,997 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

/s/ Joshua P. Chadwick
Joshua P. Chadwick

*Attorney for Defendant-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Joshua P. Chadwick
Joshua P. Chadwick

*Attorney for Defendant-Appellee*

# ADDENDUM

## Designation of Relevant Documents

| Record Entry | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1-40 |
| 18 | Linney's Pizza Notice of Appeal (Nov. 8, 2023) | 180-181 |
| 39-2 | Ex. A – Regulation II | 364-446 |
| 39-6 | Ex. E – Proposed Rule | 516-558 |
| 39-7 | Ex. F – Clarification | 559-562 |
| 61 | Opinion and Order | 1070-1104 |
| 62 | Judgment | 1105 |
| 63 | Linney's Pizza Notice of Appeal (Nov. 10, 2025) | 1106-1107 |