No. 25-6038

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

LINNEY'S PIZZA, LLC

Plaintiff-Appellant

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM.

Defendant-Appellee

BANK POLICY INSTITUTE; CLEARING HOUSE ASSOCIATION, LLC

Proposed Intervenors

_____

On Appeal from the United States District Court

for the Eastern District of Kentucky at Frankfort

Case No. 3:22-cv-00071

_____

## BRIEF OF AMICUS CURIAE PROGRESSIVE POLICY INSTITUTE IN SUPPORT OF APPELLEE

_____

Laura C. Cannon
**Hinshaw & Culbertson LLP**
400 Poydras Street, Ste. 3150
New Orleans, Louisiana 70130
Telephone: (504) 904-8063
lcannon@hinshawlaw.com

Joshua Vincent
**Hinshaw & Culbertson LLP**
151 North Franklin St., Ste 2500
Chicago, Illinois 60606
Telephone: (312) 704-3463
jvincent@hinshawlaw.com

*Counsel for Amicus Curiae*

#103783469v1

1099444\329355497.v2

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF AMICUS CURIAE .......................................................................1

SUMMARY OF ARGUMENT ..............................................................................1

ARGUMENT ..........................................................................................................3

    I.    The widespread use of debit and credit cards relies upon a complex and efficient electronic payment system developed and protected by issuers. ...................................................................3

        A.    Debit and credit cards, which save the U.S. economy billions in efficiency costs annually, have become ubiquitous. ..............................................................................3

        B.    The electronic payment system is essential to the safe and efficient use of debit and credit cards. ........................................7

    II.    Regulation II reflects a compromise between merchants and issuers and aimed (albeit unsuccessfully) to benefit consumers...........8

        A.    Congress directed the Federal Reserve to establish caps on debit interchange fees. ...........................................................8

        B.    The Fed proposes a Rule and seeks input from stakeholders and consumers........................................................10

        C.    The Final Rule reflects compromise following Notice and Comment ................................................................................11

    III.    Regulation II did not provide benefits to consumers but vacating it would only cause further harm. ...................................................14

        A.    Evidence does not show any measurable benefit to consumers through reduced prices.............................................15

        B.    Banks offset their losses by raising fees, reducing services, and emphasizing credit card use. ...............................................18

C.  Vacating Regulation II's interchange fee cap would only exacerbate harm to consumers. ...................................................21

IV.  Vacating the interchange fee cap would undermine the stability of the payment system at a time of increasing fraud and more sophisticated attacks on the electronic payments system....................22

CONCLUSION ...............................................................................................26

CERTIFICATE OF COMPLIANCE .................................................................27

CERTIFICATE OF SERVICE ..........................................................................28

ii

1099444\329355497.v2

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes and Regulations**

15 U.S.C. §1693o-2(a) ...................................................................................9

Electronic Fund Transfer Act (15 U.S.C. 1693 *et seq*.)..................................8

12 C.F.R. § 235.5 ........................................................................................13

75 Fed. Reg. 81,722 (Dec. 28, 2010) ..........................................................10

76 Fed. Reg. 43,394 (July 20, 2011)....................................................11, 12, 13

**Other Authorities**

Annual Payment Fraud Intelligence Report: 2025, Recorded Future
(2026),
https://assets.recordedfuture.com/Reports/Annual_Payment_Fraud
_Intelligence_Report_2025.pdf ..........................................................24

Benjamin S. Kay, Mark D. Manuszak, Cindy M. Vojtech,
*Competition and complementarities in retail banking: Evidence
from debit card interchange regulation*, 34 Journal of Financial
Intermediation 91 (2018) ...................................................................14

Berhan Bayeh, Emily Cubides, and Shaun O'Brien*, 2024 Findings
from the Diary of Consumer Payment Choice*, The Federal Reserve
System: Financial Services (2024),
https://www.frbservices.org/binaries/content/assets/crsocms/news
/research/2024-diary-of-consumerpayment-choice.pdf....................17

Berhan Bayeh, et al, *2025 Findings from the Diary of Consumer
Payment Choice*, The Federal Reserve System (2025),
https://www.frbservices.org/binaries/content/assets/crsocms/news/r
esearch/2025-diary-ofconsumer-payment-choice.pdf.......................19

Board of Governors of the Federal Reserve System, 2*023 Interchange
Fee Revenue, Covered Issuer Costs, and Covered Issuer and
Merchant Fraud Losses Related to Debit Card Transactions*
(December 2025) ..............................................................................22

1099444\329355497.v2

Board of Governors of the Federal Reserve System, The 2007 Federal Reserve Payments Study: Noncash Payment Trends in the United States (2007) ..............................................................................4

Clearing House Association, et al., Comment Letter on Proposed Rule on Debit Card Interchange Fees and Routing, Docket No. R-1818, RIN 7100-AG67 (May 10, 2024), https://bpi.com/wp-content/uploads/2024/05/Joint-Trades-Reg-II-Comment-Letter-2024.05.10.pdf...........................................22, 23, 24

Mark Zandi & Abhilasha Singh, The Impact of Payment Cards on Economic Growth, Moody's Analytics (November 22, 2021), https://usa.visa.com/content/dam/VCOM/regional/na/us/visa-everywhere/documents/the-impact-of-payment-cards-on-economic-growth.pdf..............................................................................6

Federal Reserve: Financial Services, 2026 Key Findings from the Federal Reserve Financial Services Financial Institution Risk Officer Survey (2026), https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2026-risk-officer-survey.pdf................................................23

Jonathan Rose, Electronic Point-of-Sale Payments, Federal Reserve History (September 25, 2024), https://www.federalreservehistory.org/essays/electronic-point-of-sale-payments......................................................................3, 4

Michael Waters, Debit Card Revolution, The Atlantic (September 9, 2025), https://www.theatlantic.com/family/archive/2025/09/debit-cards-credit-debt/684144/ .............................................................4

Mike Kaiman, Payment Systems Evolution: How Does Money Move from a Buyer to Seller?, Federal Reserve Bank of St. Louis Page One Economics (Jan. 2, 2024), https://www.stlouisfed.org/publications/page-one-economics/2024/01/02/payment-systems-evolution-how-does-money-move-from-a-buyer-to-seller ...............................................7

Nick Bourke, How Proposed Interchange Caps Will Affect Consumer Costs, Working Paper (Jan. 24, 2024), ......................................16, 19

1099444\329355497.v2

*Retailers, Consumers, and Cash Use*, Federal Reserve System: Cash Product Office, 4 (August 2019), https://www.frbservices.org/binaries/content/assets/crsocms/news/research/cash-me-if-you-can-august.pdf................................5

Robert Shapiro & Jerome Davis, The Unanticipated Costs and Consequences of Federal Reserve Regulation of Debit Card Interchange Fees, Progressive Policy Institute (December 2005), https://www.progressivepolicy.org/wp-content/uploads/2025/12/PPI_The-Unanticipated-Costs-and-Consequences-of-Federal-Reserve-Regulation-of-Debit-Card-Interchange-Fees_V3.pdf................................ 3, 4, 6, 7, 8, 14, 16, 17, 18, 19, 24

Ronald J. Mann, *Credit Cards and Debit Cards in the United States and Japan*, 55 Vanderbilt Law Review 1055, 1100 (2002) ...............................4

Rossman, Glenn, *The True Impact of Interchange Regulation: How Government Price Controls Increase Consumer Costs and Reduce Security*, Cornerstone Advisors, https://protectinterchange.com/wp-content/uploads/2023/06/True-Impact-of-Interchange-Regulation_CornerstoneAdvisors_June_2023-1.pdf....................................23, 24

Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris, *Price Controls on Payment Card Interchange Fees: The U.S. Experience*, International Center for Law and Economics, White Paper 2014–2 .......................................................................14, 18

Urban Institute & Brookings Institution, *Briefing Book: State and Local Tax Policies*, Tax Policy Center (January 2024), https://taxpolicycenter.org/briefing-book/how-do-state-and-local-general-sales-and-gross-receipts-taxes-work........................................................6

Vladimir Mukharlyamov and Natasha Sarin, *The Impact of the Durbin Amendment on Banks, Merchants, and Consumers,* Penn Carey Law, University of Pennsylvania (2019)............................................................16

Vladimir Mukharlyamov and Natasha Sarin, *Price regulation in two-sided markets: empirical evidence from debit cards,* 172 Journal of Financial Economics 1 (2025) .................................................................18, 20

1099444\329355497.v2

Zhu Wang, Scarlett Schwartz, and Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Economics Quarterly 183, 194 (2014). ...............................................................................15

1099444\329355497.v2

## INTEREST OF AMICUS CURIAE[1]

The Progressive Policy Institute (PPI), based in Washington, D.C., is a catalyst for policy innovation and political reform. Its mission is to create radically pragmatic ideas for moving the United States beyond ideological and partisan deadlock.

The Board of Governors for the Federal Reserve System and the Proposed Intervenors analyze the Durbin Amendment, using its text and other tools of statutory interpretation, to show that the Board complied with the congressional intent and the Administrative Procedures Act when crafting the interchange fee standard in Regulation II. *Amicus* endorses but does not replicate that analysis. Instead, consistent with PPI's mission and expertise, this brief focuses on the broad economic and security harms that would result from adopting Appellant's position.

## SUMMARY OF ARGUMENT

As the Board of Governors of the Federal Reserve System  and Proposed Intervenors ably explain in their Briefs, the District Court properly held that the interchange fee cap for debit transactions established in Regulation II is consistent with the Durbin Amendment and that Regulation II's fee cap is neither contrary to

---

[1] The Progressive Policy Institute has confirmed that all parties do not opposing the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), PPI confirms that no counsel for a party authored this brief in whole or in part and that no person other than PPI, its  members, or its counsel has made any monetary contributions intended to fund the preparation or submission of this brief.

1

law nor arbitrary or capricious. The Board properly considered non-incremental costs associated with authorizing, clearing, and settling (ACS) debit transactions—costs not addressed by the Durbin Amendment—when establishing an interchange fee standard that is both reasonable and proportional to the costs incurred by an issuer per transaction.

The interchange fee cap promulgated in Regulation II is a well-intentioned, though ultimately flawed, regulation that resulted out of a compromise balancing the interests of retailers, issuers, and consumer groups. Upholding the legality of Regulation II's fee cap maintains the status quo in place these fifteen years, which has allowed for the continued development, and protection of, the ubiquitous and efficient electronic payment system this country relies upon.

Recent economic studies have confirmed that Regulation II's interchange fee cap has not provided financial relief to consumers: consumers have not benefited from the anticipated, reduced retail prices and have instead been confronted with higher banking fees and in some cases a reduction of services from their banks and credit unions. If this Court were to adopt Appellant's position, conclude that the Board may only consider incremental ACS costs when fixing the interchange fee cap, and vacate this portion of Regulation II, the result would necessarily be substantially lower interchange fees for merchants. However, as recent history has shown, retailers still would not lower prices and banks and other issuers would

1099444\329355497.v2

recoup their losses by passing the cost onto consumers through fees for other services.

## ARGUMENT

**I.     The widespread use of debit and credit cards relies upon a complex and efficient electronic payment system developed and protected by issuers.**

A.     <u>Debit and credit cards, which save the U.S. economy billions in efficiency costs annually, have become ubiquitous.</u>

Banks in the United States began issuing credit cards in the 1950s and debit cards in the 1970s.[2] Their use has steadily grown in the decades since. According to the Federal Reserve, Americans used debit and credit cards for nearly $9.8 trillion in purchases and payments in 2022—$4.34 trillion by debit card and $5.42 trillion by credit card.[3] By 2024 Americans used credit cards and debit cards for nearly two-thirds of their purchases and payments.[4]

---

[2] Jonathan Rose, *Electronic Point-of-Sale Payments*, Federal Reserve History (September 25, 2024), https://www.federalreservehistory.org/essays/electronic-point-of-sale-payments.

[3] Robert Shapiro & Jerome Davis, The Unanticipated Costs and Consequences of Federal Reserve Regulation of Debit Card Interchange Fees, Progressive Policy Institute (December 2005), p. 8, https://www.progressivepolicy.org/wp-content/uploads/2025/12/PPI_The-Unanticipated-Costs-and-Consequences-of-Federal-Reserve-Regulation-of-Debit-Card-Interchange-Fees_V3.pdf

[4] *Id.* at 9.

1099444\329355497.v2

While credit cards predated debit cards and were generally in wider circulation, debit card use grew substantially during the 1990s and 2000s.[5] In 1999, debit cards were used in about thirty-two percent of all card-based transactions.[6] By the mid-2000s, debit card use surpassed credit card use by volume.[7] And by 2007, debit transactions exceeded the number of credit card payments in the United States.[8]

The increase in debit card use that existed by the mid-2000s in part prompted the passage of the Durbin Amendment and the resulting promulgation of Regulation II, which sought to reduce the interchange fees issuers could charge merchants.[9] In the fifteen years Regulation II came into force, credit cards have regained their preeminence,  with credit cards covering 49 percent of the value of all retail purchases, debit cards covering 33 percent, and cash covering 6 percent.[10]

---

[5] Rose, *supra* note 1.

[6] Ronald J. Mann, *Credit Cards and Debit Cards in the United States and Japan*, 55 Vanderbilt Law Review 1055, 1100 (2002).

[7] Rose, *supra* note 1.

[8] Board of Governors of the Federal Reserve System, The 2007 Federal Reserve Payments Study: Noncash Payment Trends in the United States (2007); *see also* Michael Waters, *The Debit Card Revolution*, The Atlantic (September 9, 2025), https://www.theatlantic.com/family/archive/2025/09/debit-cards-credit-debt/684144/

[9] *See* Rose, *supra* note 1.

[10] Shapiro, *supra* note 1, at 12.

1099444\329355497.v2

The economic savings and other benefits derived from the now ubiquitous use of debit and credit cards are substantial. First, credit and debit cards save both merchants and consumers considerable time, and therefore, significant money. When a consumer uses a debit card or credit card instead of cash, the parties to the transaction save approximately 16.5 seconds per purchase.[11] Across all purchases over a one-year period, the U.S. economy saves at least $25.4 billion in labor costs.[12] In addition to time saved, electronic payments also involve lower operational costs than cash payments, which have increased handling and transport costs as well as additional banking fees.[13]

Analysts have also found that credit and debit card use increases consumer personal spending, and therefore the economy's associated growth, by giving Americans easy and efficient access to their funds or lines of credit. A 2021 study from Moody's Analytics calculated that the use of debit and credit cards in the United States raised the country's Gross Domestic Product from 2015 to 2019 by

---

[11] *Id.* at 7.

[12] *Id.*

[13] Claire Wang, *Cash Me If You Can: The Impacts of Cashless Businesses on Retailers, Consumers, and Cash Use*, Federal Reserve System: Cash Product Office, 4 (August 2019), https://www.frbservices.org/binaries/content/assets/crsocms/news/research/cash-me-if-you-can-august.pdf

1099444\329355497.v2

0.12 percent annually.[14] If that rate held, debit and credit use accounted for $35 billion in the United States' GDP in 2024.[15]

In addition to the time and labor savings as well as the increased GDP, higher overall retail spending also increases state and local tax revenues.[16] Finally, increased card usage also benefits the federal government. A recent report from the Government Accountability Office concluded that federal entitles collected over $43 billion in card payments and $488 million in rebates.[17]

The increased reliance on debit and credit cards benefit not just consumers, merchants, and banks, but also the U.S. economy generally and local, state, and federal governments.

---

[14] Mark Zandi & Abhilasha Singh, *The Impact of Payment Cards on Economic Growth*, Moody's Analytics (November 22, 2021), https://usa.visa.com/content/dam/VCOM/regional/na/us/visa-everywhere/documents/the-impact-of-payment-cards-on-economic-growth.pdf

[15] Shapiro, *supra* note 2, at 8.

[16] Urban Institute & Brookings Institution, *Briefing Book: State and Local Tax Policies*, Tax Policy Center (January 2024), https://taxpolicycenter.org/briefing-book/how-do-state-and-local-general-sales-and-gross-receipts-taxes-work.

[17] U.S. Gov't Accountability Off., GAO, Payments Cards: Costs and Benefits for Federal Entities (April 2005).

1099444\329355497.v2

B.    <u>The electronic payment system is essential to the safe and efficient use of debit and credit cards.</u>

While a tap, insert, or swipe of a debit or credit card and an issuer's approval of a charge takes mere seconds, behind that approval lies a complex electronic payments system that issuers have spent decades developing, improving, and investing billions in to perfect and protect.[18] After a consumer swipes or enters their debit card pin, the merchant sends the data to its bank through a processing service.[19] The merchant's bank then routes it to the Visa, MasterCard, or another electronic payment network, which sends the data to the bank that issued the debit card and holds the user's bank account.[20] The consumer's bank evaluates the transaction based on the funds in the cardholder's account while also applying fraud prevention protocols.[21] Based on the availability of funds and whether any fraud is flagged, the bank authorizes (or does not authorize) the transaction to the merchant's bank through the payment network and transfers the full amount from its client's bank

---

[18] *See* Mike Kaiman, Payment Systems Evolution: How Does Money Move from a Buyer to Seller?, Federal Reserve Bank of St. Louis *Page One Economics* (Jan. 2, 2024), https://www.stlouisfed.org/publications/page-one-economics/2024/01/02/payment-systems-evolution-how-does-money-move-from-a-buyer-to-seller.

[19] Shapiro, *supra* note 2, at 6.

[20] *Id.*

[21] *Id.*

7

account to the merchant's bank account *after* deducting an "interchange fee" from the merchant's payment.[22]

While often taking less than a second, that quick approval belies the complex system beneath it. The near universal and efficient use of debit and credit cards cannot exist without a protected and evolving electronic payment system.

## II. Regulation II reflects a compromise between merchants and issuers and aimed (albeit unsuccessfully) to benefit consumers.

In part due to increased debit card usage in the United States in the late 2000s, Congress passed the Durbin Amendment, which directed the Federal Reserve to set a reasonable limit on interchanges fees that issuers could charge merchants for debit card transactions. After hearing from major stakeholders, the Federal Reserve promulgated Regulation II, which established a cap on interchange fees that considered the concerns of merchants and issuers and aimed to benefit consumers through lowered retail prices.

A.  <u>Congress directed the Federal Reserve to establish caps on debit interchange fees.</u>

The Dodd-Frank Wall Street Reform and Consumer Protection Act was enacted on July 21, 2010. Section 1075 of this law, more commonly known as the Durbin Amendment, amended the Electronic Fund Transfer Act (15 U.S.C. 1693 *et*

---

[22] Shapiro, *supra* note 2, at 6.

8

*seq.*) by adding Section 920, which governs interchange transaction fees and payment card transaction rules.

Under Section 920(a)(2), any interchange fee an issuer charges or receives for an electronic debit transaction must be reasonable and proportional to the issuer's cost for that transaction. 15 U.S.C. §1693o-2(a)(2). Section 920(a)(3) directs the Federal Reserve Board to establish standards for determining whether these fees are "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(3)(A).

In establishing that standard, the text of the Durbin Amendment distinguished between "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," (incremental ACS costs)—which the Board must consider in setting the standard— and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction"—which the Board could not consider in crafting the standard. 15 U.S.C. §1693o-2(a)(4)(B). Finally, Section 920(a)(5) allows the Board to permit an adjustment to interchange fees to account for fraud-prevention costs, as long as the issuer complies with the Board's fraud-prevention standards. 15 U.S.C. §1693o-2(a)(5).

9

1099444\329355497.v2

B.    The Fed proposes a Rule and seeks input from stakeholders and consumers.

Following Congress's directive, the Board issued its Notice of Public Rulemaking. *See* Debit Card Interchange Fees and Routing, NPRM, 75 Fed. Reg. 81,722 (Dec. 28, 2010). The Board initially proposed a cap at 12 cents per transaction. In its Notice, the Board requested comment on two potential standards for determining whether an interchange transaction fee is reasonable and proportional to the issuer's costs. *See id.*

Under Alternative 1, an issuer could comply by calculating its "allowable costs" and ensuring that it does not receive interchange fees from any network that exceed those costs unless it chooses to use the safe harbor described below. 75 Fed. Reg. at 81,726.  The Board defined allowable costs as costs that are both (1) directly related to the issuer's role in authorizing, clearing, and settling transactions and (2) vary based on the number of transactions processed during the year (*i.e.*, variable costs). *See id.*

To determine the allowable cost per transaction, the issuer would (1) add up all allowable costs for electronic debit transactions over a calendar year and (2) then divide that total by the number of transactions for which it received or charged an interchange fee during that year. *Id.* Even with this calculation, the fee would be capped at 12 cents per transaction. *Id.* Under Alternative 1, an issuer could choose a

10

simpler option: comply by charging no more than a 7-cent safe harbor fee per transaction without calculating its allowable costs. *Id.*

Under Alternative 2, an issuer would comply as long as it does not receive or charge an interchange fee above a fixed cap, initially set at 12 cents per transaction. *Id.* Payment card networks would be responsible for setting interchange fees so that issuers do not exceed this cap. *Id.*

C.      The Final Rule reflects compromise following Notice and Comment

The Board received approximately 11,500 comments on the proposed rule. *See* 76 Fed. Reg. 43,394 (July 20, 2011). As discussed above, the proposal included two approaches (1) Alternative 1, which allowed issuer-specific fees with a 7-cent safe harbor and a 12-cent cap, and (2) Alternative 2, which set a uniform 12-cent cap for all issuers.

In their comments, merchants and groups representing their interests strongly supported Alternative 1, arguing that issuer-specific pricing would better reflect market conditions and that many issuers' costs were well below the proposed cap. 76 Fed. Reg. at 43,402. Some merchants also urged the Board to lower the cap further, suggesting a 4-cent limit based on average transaction costs. *Id.*

Issuers and organizations representing their interests favored Alternative 2. *Id.* They argued that calculating issuer-specific fees would be administratively complex and could reduce revenue. *Id.* Issuers also pushed for a broader definition

11

of allowable costs, including fraud losses, network processing fees, and customer service expenses. *Id.*

The Board also received more than 1,300 comments from individual consumers and consumer groups. 76 Fed. Reg. at 43,459-43,460. Many commenters, including issuers and payment networks, argued that the rule would harm consumers. *Id.* They predicted that lower interchange fee revenue would lead issuers to increase deposit account fees, reduce of debit card benefits (such as rewards or liability protections), limit debit card usage, and reduce access to debit cards altogether. *Id.* They emphasized that lower-income consumers could be most affected, as higher banking costs might push them out of the traditional banking system. *Id.* These commenters also argued that consumers would not benefit from lower interchange fees because merchants are not required to pass savings on through lower prices. *Id.* In their view, the rule would simply transfer revenue from banks to merchants. *Id.*

Other commenters, mostly merchants and several consumer advocacy groups, took the opposite view. 76 Fed. Reg. at 43,460. They argued that interchange fees are already built into retail prices, so reducing those fees would lower costs for consumers. *Id.* In competitive markets, they contended, merchants would be forced to pass savings on through lower prices. *Id.* They also suggested that lower-income consumers would benefit the most from reduced prices. *Id.* Some noted that

12

merchants might reinvest savings into better services or expanded operations. *Id.*

Considering the comments and research, the Board concluded that the rule's ultimate impact on consumers would depend on how merchants and issuers respond. *Id.* Lower interchange fees would likely reduce merchants' costs. *Id.* In highly competitive markets, the Board mused that much of these savings could be passed on to consumers through lower prices, while in less competitive markets, merchants might retain more of the savings. *Id.* Overall, the Board expected at least some reduction in consumer prices. But the Board acknowledged that other effects could offset these benefits. *Id.* For example, if issuers encouraged consumers to switch from debit to credit cards (which are more expensive for merchants), overall merchant costs could increase. *Id.* The Board also acknowledged that issuers were expected to respond to lost revenue by increasing fees on deposit accounts or debit card usage, reducing or eliminating rewards programs, or cutting costs, potentially by reducing account or card benefits. *Id.*

In the end, the Board adopted a compromise. The final rule set the interchange fee cap at 21 cents per transaction plus 5 basis points (1/2 percent) of the transaction value. 76 Fed. Reg. at 43,422; *see also* 12 C.F.R. § 235.5. When arriving at this number, the Board considered the incremental ACS costs, as required by the Durbin Amendment, and other costs not prohibited by the Durbin Amendment, including non-incremental ACS costs, which are akin overhead expenses necessary to

13

1099444\329355497.v2

authorize, clear, and settle debit card transactions; costs incurred as a result of fraud transaction monitoring; fraud losses; and network processing fees. 76 Fed. Reg. at 43,429-31.

It also allowed adjustments for fraud-prevention costs and included exemptions for smaller issuers and certain programs. *See id.* This approach aimed to balance competing concerns: merchants' desire for lower and more transparent fees, and issuers' concerns about revenue loss, compliance burdens, and operational impacts.

As addressed in the next section, merchants generally did not pass along the savings they gained by the lowered interchange fee rates, but instead raised prices, due to the realities of retail pricing and their reliance on a diversity of payment methods. Issuers, in an attempt to recoup their lost revenue from interchange fees, responded by increasing bank fees, reducing debit card benefits, and limiting access to free checking accounts. As a result, consumers—who largely did not see lower retail prices—absorbed much of the cost.

### III. Regulation II did not provide benefits to consumers but vacating it would only cause further harm.

While the Board anticipated that consumers would see benefits under Regulation II, its price control mechanism did the opposite.[23] Merchants who

---

[23] Shapiro, *supra* note 2, at 13; *see generally* Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris, *Price Controls on Payment Card Interchange Fees: The U.S. Experience*, International Center for Law and Economics, White Paper 2014–

14

benefited from the price control did not pass their savings along to consumers, and banks, confronted with costs that exceeded the cap on the interchange fees, turned to other mechanisms to recoup their losses, including increasing banking fees and cutting preexisting consumer benefits.

If this Court were to reverse the District Court and grant Appellant's requested relief, which would only allow the Federal Reserve to consider incremental ACS costs for each particular transaction in setting a new standard, the interchange fee cap would be significantly lower. Recent history shows us the party most injured by such an action would be consumers.

A.   <u>Evidence does not show any measurable benefit to consumers through reduced prices.</u>

The evidence shows that merchants largely did not pass cost savings on to consumers. A survey conducted in the first few years after implementation of Regulation II found that 77.2 percent of merchants made no price changes, 21.6 percent raised prices, and only 1.2 percent lowered them.[24] With more data over time, economists reached a consistent conclusion: the interchange fee cap produced

---

2; Benjamin S. Kay, Mark D. Manuszak, Cindy M. Vojtech, *Competition and complementarities in retail banking: Evidence from debit card interchange regulation*, 34 Journal of Financial Intermediation 91 (2018).

[24] Zhu Wang, Scarlett Schwartz, and Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Economics Quarterly 183, 194 (2014).

1099444\329355497.v2

little to no consumer benefit. A 2019 study noted there was "limited evidence" that Regulation II led to "across-the board consumer gains" through lower merchant prices.[25] A separate 2024 analysis concluded that any "reduction in the cost of consumer goods and services is debatable and ultimately not measurable."[26]

More than a decade of data helps explain why these expected benefits never materialized. First, the fee cap was set using the median cost among affected banks, leaving roughly half of them with higher costs and therefore losses on debit transactions.[27] To compensate, these banks raised other fees for their customers, discussed in the next section.

Second, the structure of the capped fee limited potential savings for merchants, especially on small purchases that constitute many debit purchases (as compared to credit). The base interchange fee of about 21 cents represents a large share of low-value transactions, such as about 4.45 percent of a $5.00 purchase.[28] These percentages approach or exceed typical retail profit margins, which average

---

[25] Vladimir Mukharlyamov and Natasha Sarin, *The Impact of the Durbin Amendment on Banks, Merchants, and Consumers*, p. 4, Penn Carey Law, University of Pennsylvania (2019).

[26] Nick Bourke, *How Proposed Interchange Caps Will Affect Consumer Costs*, Working Paper (Jan. 24, 2024), 13.

[27] Shapiro, *supra* note 2, at 14.

[28] *Id.*

1099444\329355497.v2

about 4.6 percent for general retail and 2.0 percent for groceries.[29] Because a significant share of debit transactions are for small amounts,[30] many of these sales became unprofitable. As a result, rather than passing along savings, merchants often needed to raise prices to remain viable.

The original expectation that competition would force merchants to pass along lower costs focused almost exclusively on merchant behavior and overlooked how retail pricing operates. In practice, most retail transactions use payment methods unaffected by the cap, such as credit cards, cash, and other forms of payment. Because the cap reduced costs for only a minority of transactions, merchants faced practical challenges in passing along savings.[31] They could not easily charge different prices based on payment method without upsetting customers, and spreading small savings across all purchases would yield only minimal price reductions. Unsurprisingly, most merchants chose not to adjust prices at all.

---

[29] Shapiro, *supra* note 2, at 14.

[30] *See* Berhan Bayeh, Emily Cubides, and Shaun O'Brien*, 2024 Findings from the Diary of Consumer Payment Choice*, The Federal Reserve System: Financial Services (2024), https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2024-diary-of-consumerpayment-choice.pdf

[31] Shapiro, *supra* note 2, at 14.

1099444\329355497.v2

B.    Banks offset their losses by raising fees, reducing services, and emphasizing credit card use.

In addition to looking at how merchants responded to Regulation II, researchers also analyzed how banks and payment networks responded. Debit card markets operate as two-sided markets, with banks on one side, merchants on the other, and payment networks in between. When regulation reduced interchange fee revenue, banks had strong incentives to make up the difference elsewhere.

That is exactly what happened. Banks responded by increasing account fees, reducing access to free checking, raising minimum balance requirements, and scaling back account benefits.[32] Early estimates suggest that the regulation reduced bank revenues by $6 to $8 billion, prompting widespread fee increases and service reductions.[33] Some studies anticipated that the resulting consumer losses—through higher fees and reduced access—might outweigh any potential savings a consumer may see in retail prices.[34]

Subsequent research confirms these patterns. Banks significantly reduced the availability of free checking accounts and increased both monthly fees and minimum

---

[32] Shapiro, *supra* note 2, at 15; *see* Vladimir Mukharlyamov and Natasha Sarin, *Price regulation in two-sided markets: empirical evidence from debit cards*, 172 Journal of Financial Economics 1, 11 (2025).

[33] *See* Zywicki, *supra* note 22.

[34] *Id.*

18

balance requirements.[35] In some cases, free checking rates dropped sharply while fees rose by more than 50 percent. With these costs and changes helped banks recover a substantial portion of lost revenue.

These changes disproportionately affected lower-income households, which are more sensitive to account fees and minimum balance requirements. As fees rose, many lower-income consumers reduced their use of debit accounts or left the banking system altogether.[36] Surveys show that high fees and balance requirements are now among the leading reasons households remain unbanked.[37]

Banks took other approaches to recoup these losses. Since the Federal Reserve capped debit card interchange fees, credit card use has grown far more quickly than debit card use. Between 2012 and 2024, the share of purchases made with credit cards rose by 85 percent, while debit card use increased by just 3 percent and cash use fell by 60 percent.[38]

---

[35] Mukharlyamov, *supra* note 24, at 4; Bourke, *supra* note 25, at 13.

[36] Mukharlyamov, *supra* note 24, at 4.

[37] Federal Deposit Insurance Corporation (FDIC), 2023 FDIC National Survey of Unbanked and Underbanked Households (November 2024).

[38] Berhan Bayeh, et al, *2025 Findings from the Diary of Consumer Payment Choice*, The Federal Reserve System: Financial Services (2025), https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2025-diary-ofconsumer-payment-choice.pdf.

19

When Regulation II was enacted, debit cards accounted for 36.5 percent of purchases, cash for 34 percent, and credit cards for 23 percent.[39] By 2024, credit cards had become the dominant payment method, used for 43 percent of purchases, compared to 38 percent for debit cards and just 14 percent for cash.[40] A similar shift appears in the value of transactions: over this period, the total value of credit card purchases increased by 63 percent, while debit card spending declined by 7 percent and cash fell by 62 percent.[41] By 2024, credit cards represented 49 percent of the total value of retail purchases, compared to 33 percent for debit cards and 6 percent for cash.[42]

Regulation II likely played a significant role in this shift.[43] By capping interchange fees for debit cards but not for credit cards, Congress and the Board reduced banks' incentives to promote debit cards while strengthening their incentives to expand credit card use. The financial incentives for banks to favor credit cards are substantial, as reflected in the significant differences in interchange

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Vladimir Mukharlyamov and Natasha Sarin, *Price regulation in two-sided markets: empirical evidence from debit cards*, 172 Journal of Financial Economics 1, 11 (2025).

1099444\329355497.v2

fees. These fees vary by card type, rewards, credit limits, and payment network, but the interchange fee for credit cards are consistently much higher, often double the current interchange fee cap for debit cards.[44] While credit card interchange fees were already higher than debit fees before the cap, Regulation II widened the gap by sharply reducing debit card fees while leaving credit card fees largely unchanged. This growing disparity has reinforced banks' incentives to promote credit cards, helping drive the longer-term shift away from debit cards and toward credit cards.

C.    Vacating Regulation II's interchange fee cap would only exacerbate harm to consumers.

Appellant asks this Court to reverse the District Court and vacate the interchange fee cap set by Regulation II. The Court should reject this request to vacate a fifteen-year-old regulation. The District Court correctly concluded that the non-incremental ACS costs are still related to a particular debit card transaction, and therefore, could be considered by the Board when performing the permitted interchange fee calculation. If these costs cannot be considered as part of the interchange fee, and the interchange fee is further reduced, history shows us who would bear the cost of this reduction: consumers.

The past fifteen years have shown us that due to complexities in pricing and the diversity of payment methods used, merchants do not base their prices on

---

[44] *Id.* at 10.

21

1099444\329355497.v2

interchange rates for debit cards, and therefore, do not pass potential savings to consumers. On the other side of the coin, banks and other issuers, in an attempt to offset their losses with lower interchange fees, have taken substantial steps to pass along those costs or reduce services to consumers. Reducing the interchange fee further could increase banking fees even more, reduce services, or both, without any added benefit to consumers.

**IV.    Vacating the interchange fee cap would undermine the stability of the payment system at a time of increasing fraud and more sophisticated attacks on the electronic payments system.**

If this Court were to reverse and vacate the District Court, banks and other issuers would be permitted to recover only ACS costs specific to each transaction. In addition to being unworkable and throwing the regulatory market into disarray, any such reduced interchange fees would cause significantly lower revenue for banks and other issuers, decreasing the resources these institutions have to invest in securing, developing, and advancing the electronic payment system at a time of unprecedented financial fraud and amidst extraordinary technological changes.

The incidence rates and the sophistication of electronic payments fraud have been increasing. Between 2011 and 2021, fraud incidences more than tripled.[45] That

---

[45] Clearing House Association, et al., Comment Letter on Proposed Rule on Debit Card Interchange Fees and Routing, Docket No. R-1818, RIN 7100-AG67 (May 10, 2024), p. 5, https://bpi.com/wp-content/uploads/2024/05/Joint-Trades-Reg-II-Comment-Letter-2024.05.10.pdf

22

trend continued upward with fraud loss rates for debit card transactions increasing from 2021 to 2023.[46] A recent survey of banks and credit unions by the Federal Reserve show that debit card fraud was the most reported type of fraud: 75 percent of institutions reported attempts and 56 percent reported experiencing losses from it.[47] Additionally, debit card fraud accounted for 40 percent of their institutions' total losses from payments fraud.[48]

The required scale of investment by banks and electronic payment systems to combat payment fraud cannot be understated, with one example showing the magnitude of the required investment. As recently as 2022, Visa, the largest payment network, employed six hundred full-time cybersecurity specialists.[49] Between 2017 and 2022, Visa invested more than $10 billion in technology and infrastructure and

---

[46] Board of Governors of the Federal Reserve System, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* (December 2025), p. 18

[47] Federal Reserve: Financial Services, *2026 Key Findings from the Federal Reserve Financial Services Financial Institution Risk Officer Survey* (2026), p. 4, https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2026-risk-officer-survey.pdf

[48] *Id.*

[49] Rossman, Glenn, *The True Impact of Interchange Regulation: How Government Price Controls Increase Consumer Costs and Reduce Security*, Cornerstone Advisors, 26, https://protectinterchange.com/wp-content/uploads/2023/06/True-Impact-of-Interchange-Regulation_CornerstoneAdvisors_June_2023-1.pdf

1099444\329355497.v2

$500 million in artificial intelligence and data infrastructure in its attempt to combat fraud.[50]

That required investment keeps growing because of the evolving mechanisms of fraud. A prominent cybersecurity company recently acquired by Mastercard warned that payment fraud has grown more complex and difficult to detect and prevent because of AI-enabled technology used by threat actors.[51] Combatting this level of fraud will require substantial, and evolving, financial investment by issuers.[52]

But this increased fraud comes at a time where banks and issuers are seeing reduced interchange fees and where courts are considering actions that would reduce them further. A study conducted between 2020 and 2021 by the Credit Unions of North America found that fraud and related program expenses increased while interchange revenue declined.[53]

Banks and other issuers rely upon revenue collected from interchange fees to invest in and improve the security and fraud prevention networks that support all

---

[50] *Id.*

[51] Annual Payment Fraud Intelligence Report: 2025, Recorded Future (2026), https://assets.recordedfuture.com/Reports/Annual_Payment_Fraud_Intelligence_Report_2025.pdf

[52] *Id.*

[53] Rossman, *supra* note 48, at 26.

24

debit transactions.[54] With decreased revenue, issuers have less money and less incentive to invest in fraud prevention and other improvements to the electronic payment systems. Issuers have cautioned that further reductions in recoverable interchange fees would result in "the degradation of the safety and soundness of the payments system (including system failures and security breaches) at a time when harmful actors and risks abound" and would "further constrain financial institutions' ability to operate and serve their communities in a safe and sound manner."[55]

---

[54] Clearing House Association, et al., Comment Letter on Proposed Rule on Debit Card Interchange Fees and Routing, Docket No. R-1818, RIN 7100-AG67 (May 10, 2024), p. 5.

[55] *Id.* at 31.

## CONCLUSION

This Court should affirm the District Court, which held that the Board of the Federal Reserve System properly considered non-incremental ACS fees when developing the interchange fee standard. Vacatur of the interchange fee cap established by Regulation II would have real and tangible consequences for consumers, who are the ones ultimately harmed by artificially low interchange fee caps, and for the security of the electronic payments system as a whole.

Respectfully Submitted,

/s/   Laura Cannon

Laura C. Cannon
**Hinshaw & Culbertson LLP**
400 Poydras Street, Ste. 3150
New Orleans, Louisiana 70130
Telephone: (504) 904-8078
lcannon@hinshawlaw.com

Joshua Vincent
**Hinshaw & Culbertson LLP**
151 North Franklin St., Ste 2500
Chicago, Illinois 60606
Telephone: (312) 704-3463
jvincent@hinshawlaw.com

26

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type style requirements of Fed. R. App. P. 32(a)(6), and the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it is proportionally spaced, has a typeface of 14 point Times New Roman, and contains 5,280 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

*/s/ Laura Cannon*
Laura Cannon

27

1099444\329355497.v2

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/   Laura Cannon*
Laura Cannon

1099444\329355497.v2