No. 25-6038

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LINNEY'S PIZZA, LLC.,

Plaintiff-Appellant,

vs.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
No. 3:22-cv-00071
Honorable Gregory F. VanTatenhove

BRIEF OF *AMICUS CURIAE* URBAN LEAGUE OF GREATER ATLANTA IN
SUPPORT OF DEFENDANT-APPELLEE AND IN SUPPORT OF AFFIRMING

PHILIP D. BARTZ
Bryan Cave Leighton Paisner LLP
1155 F St. NW
Washington, DC 20004
philip.bartz@bclplaw.com
Tel. (202) 508-6022

STEPHEN M. SCANNELL
Bryan Cave Leighton Paisner LLP
211 N. Broadway #3600
St. Louis, MO, 63102

JESSICA L. LIMBAUGH
Bryan Cave Leighton Paisner LLP
221 Boliver St. #101
Jefferson City, MO 65101

Counsel for URBAN LEAGUE OF GREATER ATLANTA

**DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* the Urban League of Greater Atlanta hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock. *Amicus* further certifies that the Urban League of Greater Atlanta is a nonprofit, tax-exempt organization under Internal Revenue Code §501(c)(3), is incorporated in Atlanta Georgia, and has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

/s/ *Philip D. Bartz*
Philip D. Bartz
*Counsel for Amicus Curiae*
Urban League of Greater Atlanta

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ...........................................................................i

INTEREST OF *AMICUS CURIAE*.................................................................1

SUMMARY OF THE ARGUMENT .................................................................3

ARGUMENT .....................................................................................................4

    I.    UPSETTING THE INTERCHANGE-FEE CAP WOULD RESULT IN FURTHER CUTS TO VALUABLE CONSUMER BANKING SERVICES AND PLACE COMMUNITY BANKS AT RISK. ..........6

    II.    CONSUMERS WOULD NOT EXPERIENCE REDUCED PRICES IF THE CURRENT INTERCHANGE FEE CAP WAS DISPLACED. ......................................................................................9

    III.    VULNERABLE AMERICANS, SUCH AS THOSE SERVED BY URBAN LEAGUE OF GREATER ATLANTA, WILL BE DISPROPORTIONATELY HARMED IF THE INTERCHANGE FEE CAP IS DISTURBED. ..............................................................11

CONCLUSION..................................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) .......5

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610 (D.N.D. 2025) ..................................................................................................5

*Linney's Pizza, LLC v. Bd. of Governors of Fed. Rsrv. Sys.*, 804 F. Supp. 3d 717 (E.D. Ky. 2025).............................................................................................4

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474 (D.C. Cir. 2014) .........4

**Statutes**

15 U.S.C. § 1693o–2 ..............................................................................................4

**Other Authorities**

156 Cong. Rec. S4839...........................................................................................9

Consumer Bankers Association, *How Proposed Interchange Fee Caps Will Affect Consumer Cost*, https://consumerbankers.com/wpcontent/uploads/2024/04/CBA20Interchange20 Fee20Caps20Two-Pager_Feb202024201.pdf ..................................................7

David S. Evans, Howard H. Chang & Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis* 2 (Coase-Sandor Inst. for Law & Econ., Working Paper No. 658, 2013), https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1651&context =law_and_economics................................................................................ 6, 7, 9

Electronic Payments Coalition, *Out of Balance: How the Durbin Amendment has Failed to Meet its Promise* (December 2018), https://www.electronicpaymentscoalition.org/wpcontent/uploads/2018/12/EPC. DurbinStudiesPaper.pdf ...................................................................... 8, 10, 11

FDIC, *Executive Summary FDIC National Survey of Unbanked and Underbanked Households* (2023), https://www.fdic.gov/household-survey/2023-fdic-national-survey-unbanked-and-underbanked-households-executive-summary ................13

Glenn Grossman, *The True Impact of Interchange Regulation: How Government Price Controls Increase Consumer Costs and Reduce Security*, Cornerstone Advisors,  https://protectinterchange.com/wpcontent/uploads/2023/06/True-ImpactofInterchangeRegulation_CornerstoneAdvisors_June_2023-1.pdf. ......8, 9

Patrick C. McGinnis, *Misguided Regulation of Interchange Fees: The Consumer Impact of the Durbin Amendment*, 25 Loy. Consumer L. Rev. 285 (2013) ....8, 11

Todd J. Zywicki, Geoggrey A. Manne & Julian Morris, *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses*, ICLE White Paper (April 25, 2017) https://laweconcenter.org/images/articles/icle-durbin_update_2017_final.pdf ..7, 10, 12, 13

Urban League of Greater Atlanta, A Tale of Two States: State of Black Georgia 2022, https://cdn.prod.websitefiles.com/636d9f747d1f025dbf4d275b/647db8a c7b1a5df29f86a9fb_SOBG%20-%20A%20Tale%20of%20Two%20States%20R eport.pdf ……………………………………………………………..14

Valdmir Mukharlyamov & Natasha Sarin, *The Impact of the Durbin Amendment on Banks, Merchants, and Consumers*, 172 J. Fin. Econ. 1 (2019).....................12

Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Fed. Res. Bank of Richmond Econ. Q. 183 (2014)............................................................................ 10, 11

iv

## INTEREST OF *AMICUS CURIAE*[1]

For more than 100 years, the Urban League of Greater Atlanta[2] has been dedicated to the economic success of African Americans and low to moderate income underserved communities. As one of the local affiliates of the National Urban League, the Urban League of Greater Atlanta is part of a broader network which collectively serves 300 communities in 37 states, providing direct services to improve the lives of more than two million Americans. The Urban League of Greater Atlanta operates its programs under the umbrella of its Financial Empowerment and Economic Resilience Center which advances initiatives including business acceleration, first-time homebuyer education and assistance, and financial coaching. The Urban League of Greater Atlanta also partners with Bank On Atlanta, a division of the national Bank On movement, which connects residents to safe and affordable accounts at partner banks and credit unions in the Atlanta area.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(2), *Amicus Curiae* state that all parties have consented to the filing of this amicus brief. *Amicus Curiae* state that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than *Amicus Curiae* or its counsel made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

[2] The views expressed in this brief are those of the Urban League of Greater Atlanta and do not reflect the opinions of any specific, individual counselor affiliated with the Urban League of Greater Atlanta.

The Urban League of Greater Atlanta's interest in this appeal is that it believes access to essential banking services is one of the key components to financial health for Americans from all walks of life. The Urban League of Greater Atlanta's interest is not political but rather is rooted in the non-partisan concern of promoting the economic empowerment of underserved communities. If the district court's decision were reversed and interchange fees were capped far below most issuer's transaction costs, it would ultimately force banks to raise consumer checking fees, increase minimum balances, and abandon free checking. As a result, access to essential banking services would become more difficult, disproportionately affecting low and moderate-income consumers. Because reversing the district court's decision would further endanger the financial health of low- and moderate-income Americans, the Urban League of Greater Atlanta has a direct and vital stake in this litigation.

## SUMMARY OF THE ARGUMENT

Regulation II was promulgated pursuant to the Durbin Amendment to the Electronic Funds Transfer Act of 2010 ("Durbin Amendment"). More than fifteen years ago proponents of the Durbin Amendment argued that imposing an interchange fee cap on debit cards would benefit consumers because merchants would pass through their savings and reduce consumer prices. Consumer prices, however, did not decrease. Instead, the quality and availability of banking services declined. Consumers lost debit card rewards, had reduced access to free checking, and faced higher banking fees. The adverse repercussions of the Durbin Amendment and Regulation II were not confined to consumers; community banks suffered millions of dollars in revenue losses as well.

Lawyers frequently assert that a court ruling will have dire consequences and widespread repercussions. Often, these arguments are hyperbolic and speculative. Not so here. The adverse effects of reversing the district court's decision are readily observable from fifteen years of experience with Regulation II.

To elaborate, when Regulation II was issued and an interchange fee cap below issuer's transactions costs was imposed, American consumers suffered the negative consequences. Reversing Regulation II and further lowering the interchange-fee cap would simply inflict more harm to American consumers. Accordingly, this Court should affirm the district court's decision to prevent this additional harm.

3

**ARGUMENT**

"Debit cards and their associated fees are big business, with over a trillion dollars a year in transactions occurring via debit card." *Linney's Pizza, LLC v. Bd. of Governors of Fed. Rsrv. Sys.*, 804 F. Supp. 3d 717, 722 (E.D. Ky. 2025). Prior to 2009, interchange fees for debit-card transactions "reached, on average, 55.5 cents per transaction, including a 44 cent interchange fee, a 6.5 cent network processing fee charged to the issuer, and a 5 cent network processing fee charged to the acquirer." *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 479 (D.C. Cir. 2014).

Responding to the financial crisis and concerned about rising debit-card transaction fees, Congress passed the Durbin Amendment which, in part, instructed the Board of Governors of the Federal Reserve System to promulgate regulations ensuring that interchange transaction fees were "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id*. at 480 (quoting 15 U.S.C. § 1693o–2(a)(3)(A)).  In substance, the Durbin Amendment placed price controls on debit card interchange fees. Small banks, those with assets of less than $10 billion, were exempted from these price controls. 15 U.S.C. § 1693o–2(a)(6)–(7)(A). Ultimately, the Board set the interchange fee cap to 21 cents plus an ad valorem tax of .05 percent of the transaction's value. *NACS,* 746 F.3d at 481.

The Board's decision was immediately subject to litigation. In 2014, Regulation II was largely upheld by the D.C. Circuit. *Id*. at 483-493. However, that

4

was not the end. Several years later, new challenges were brought, including this case and parallel litigation in the Eighth Circuit. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610 (D.N.D. 2025).

That the Board of Governors correctly implemented the Durbin Amendment in promulgating Regulation II is discussed at length in the other briefs submitted to this Court. Accordingly, the Urban League of Greater Atlanta joins in those arguments supporting the Board of Governors and will not repeat them here. The Urban League of Greater Atlanta writes to highlight that reversal of the district court's decision will only serve to exacerbate the adverse impact that the Durbin Amendment has had on consumers.

First, reducing the Regulation II interchange-fee cap would further diminish essential banking services for consumers and destabilize community banks by reducing a critical revenue stream. Second, history has shown that a reduction in interchange would not benefit consumers at the point of sale, as merchants have historically retained interchange-fee savings rather than passing them on as lower prices. Third, these adverse effects on consumers would fall most acutely on low- and moderate-income Americans, who are least able to absorb higher banking costs.

5

**I.     UPSETTING THE INTERCHANGE-FEE CAP WOULD RESULT IN FURTHER CUTS TO VALUABLE CONSUMER BANKING SERVICES AND PLACE COMMUNITY BANKS AT RISK.**

Banks use revenue from interchange fees to offer banking services and consumer incentives for debit-card use. David S. Evans, Howard H. Chang & Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis* 2 (Coase-Sandor Inst. for Law & Econ., Working Paper No. 658, 2013), https://chicagounbound.uchicago.edu/cgi/view content.cgi?article=1651&context=law_and_economics. Prior to Regulation II, these incentives included programs such as free checking, limited and affordable fees, and rewards points programs. *Id*. at 4. The interchange fee cap set by Regulation II resulted in a 45% decrease to the average debit-card interchange fee. *Id*. at 16. This 45% reduction in fees had a staggering aggregate effect and upset the flow of revenue used to finance these programs. Since 2011, banks have lost approximately $7.3 billion in annual revenue from interchange fees. *Id*. at 2. In the 15 years following Regulation II's passage, this amounts to roughly $109.5 billion in lost revenue. As a result of this lost interchange revenue, banks reduced these services and consumers lost many benefits that they previously enjoyed.

To elaborate, banks incur yearly maintenance costs between $280 and $450 per individual checking account, a cost that largely was funded through interchange and overdraft fees. Todd J. Zywicki, Geoffrey A. Manne & Julian Morris,

*Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses* 10, ICLE White Paper (April 25, 2017) https://laweconcenter.org/images/articles/icle-durbin_update_2017_final.pdf. Because this revenue helped cover account maintenance costs, 65% of banks offered free checking in 2010. *Id.* at 11. Following Regulation II, this percentage initially fell to 45% and has remained around 40% since. *Id.* As a result, consumers now have less access to free checking accounts.

Not only were consumers more likely to pay fees for checking accounts, but banks were also forced to increase overdraft fees and raise minimum balance requirements. In a 2012 Checking Survey, Bankrate.com found that in 2011:

> The average monthly maintenance fee for non-interest checking accounts rose 25 percent. The average minimum balance required to avoid fees rose 23 percent. The average fee charged by banks to their customers for using an out-of-network ATM rose 11 percent, in addition to a 4 percent increase in the fee charged by ATM owners.

Evans, at 48. For covered banks, this amounted to an average $200 increase in the minimum account balance to avoid charges. Consumer Bankers Association, *How Proposed Interchange Fee Caps Will Affect Consumer Cost*, https://consumerbankers.com/wpcontent/uploads/2024/04/CBA20Interchange20Fe e20Caps20Two-Pager_Feb202024201.pdf. Average monthly checking fees more than doubled, from $5.90 in 2009 to $13.25 in 2016. Zywicki, at 10.

7

In addition to increased fees, consumers also lost debit-card rewards. Prior to Regulation II, about one third of consumers enjoyed debit-card reward programs. Electronic Payments Coalition, *Out of Balance: How the Durbin Amendment has Failed to Meet its Promise* 7 (July 2023), https://www.electronic paymentscoalition.org/wpcontent/uploads/2018/12/EPC.DurbinStudiesPaper.pdf. That changed after Regulation II was announced. *See* Patrick C. McGinnis, *Misguided Regulation of Interchange Fees: The Consumer Impact of the Durbin Amendment*, 25 Loy. Consumer L. Rev. 285, 299 (2013). In total, 30% of banks eliminated or downsized rewards programs, and 81% stated they would not plan to offer a rewards program in the future. Electronic Payments Coalition, at 7-8.

Even though banks holding less than $10 billion in assets are exempt from Regulation II, they utilize the same payments network as larger banks. *Id*. at 13. As a result, exempt institutions lost 19.3% of their revenue on debit card interchange transactions from single-message networks. Glenn Grossman, *The True Impact of Interchange Regulation: How Government Price Controls Increase Consumer Costs and Reduce Security*, Cornerstone Advisors, 15 https://protectinterchange. com/wpcontent/uploads/2023/06/TrueImpactofInterchangeRegulation_Cornerstone Advisors_June_2023-1.pdf. Unlike larger banks, community banks work on smaller margins and have fewer revenue streams to offset losses in interchange income. Electronic Payments Coalition, at 13. While not solely attributable to reduced

interchange fees, one third of exempted institutions have closed or merged since 2011, a reduction of more than 5,100 community banks. Grossman, at 16.

In sum, the landscape of consumer banking was dramatically altered after the Durbin Amendment and Regulation II, and not for the good. Many banks no longer offered free checking accounts, fees increased, and debit-card rewards were substantially curtailed. Though exempted from the terms of Regulation II, community banks were still adversely impacted and, unlike their larger peers, were far less able to withstand the resulting revenue losses. Further reducing the Regulation II interchange fee cap would only result in the situation further deteriorating.

## II.   CONSUMERS WOULD NOT EXPERIENCE REDUCED PRICES IF THE CURRENT INTERCHANGE FEE CAP WAS DISPLACED.

On the flip side of banking losses, merchants have amassed approximately $109.5 billion in savings from reduced interchange fees since Regulation II was adopted in 2011. *See* Evans, at 48-49 (finding that annually $7.3 billion was shifted from the income of banks to the income of merchants following Regulation II's imposition). Proponents of the Durbin Amendment predicted that these savings would "help every single Main Street business that accepts debit cards keep more of their money, ***which is a savings they can pass on to their consumers***." 156 Cong. Rec. S4839 (daily ed. June 10, 2010) (statement of Sen. Richard Durbin) (emphasis added). That prediction proved to be completely untrue.

Even though merchants have amassed significant savings following Regulation II, it has not resulted in decreased prices or savings for consumers. Just 1.2% of merchants reduced prices following the imposition of Regulation II, while a majority, 77.2%, did not change their prices at all. Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Fed. Res. Bank of Richmond Econ. Q. 183, 194 (2014).

Indeed, 21.6% of merchants actually ***increased their prices*** following Regulation II. *Id*. The reason is clear. Before Regulation II many networks tailored debit-card fees based on merchant type and size of purchase, allowing banks to offer lower interchange fees on small-ticket items. Electronic Payments Coalition, at 12. When interchange fees were capped and networks lost the revenue stream to help merchants with small-ticket items, banks eventually settled into a one-size-fits-all fee structure. *Id*. For some merchants that enjoyed the pre-cap discounts, the imposition of this new flat-fee system resulted in increased debit costs. Zywicki, at 21-22.

For example, prior to Regulation II the interchange fee for signature debit purchases set by Visa and Mastercard on transactions involving small-ticket items of $15.00 or less was 1.55% of the transaction value, plus $0.04. Electronic Payments Coalition, at 12. This yielded an interchange fee of $0.11 for a $5.00 purchase. However, after the implementation of the Durbin amendment and ensuing

elimination of small-ticket interchange discounts, the fee on that same $5.00 transaction doubled to $0.23. *Id.* (citing Richmond study). As a result, some merchants reacted by raising prices on low-cost goods. McGinnis, at 299.

Despite articulated good intentions, Regulation II did not result in lower prices for consumers. In fact, over 20% of merchants raised their prices. Given that merchants did not pass through interchange savings in the past, they are unlikely to do so in the event caps under Regulation II are further reduced.

## III. VULNERABLE AMERICANS, SUCH AS THOSE SERVED BY URBAN LEAGUE OF GREATER ATLANTA, WILL BE DISPROPORTIONATELY HARMED IF THE INTERCHANGE FEE CAP IS DISTURBED.

Regulation II imposed new burdens on consumers by increasing banking fees while providing no benefit in terms of reduced prices. While these results may have a relatively small effect on high-to-moderate-income consumers, lower-income Americans are particularly vulnerable to changes in banking-associated costs.

As detailed in Section II, *supra*, while most merchants did not lower their prices following Regulation II, the subset of merchants that specialize in small-value transactions were more likely to raise their prices as a result of increased transaction costs. This poses particular concern to low-income consumers because grocers and fast-food merchants were among those that were more likely to face increased debit costs. Debit costs rose for 65.7% of fast-food merchants and 54.1% of grocery stores. Wang, at 194. Because low-income households spend between 14-16% of their

11

income on food, as compared to wealthier households which spend approximately 10%-13%, these increased transaction costs on small-value transactions likely had a disproportionate effect on low-income consumers. Zywicki, at 35.

Beyond being particularly vulnerable to price increases, moderate and lower-income Americans face harsher and more widespread adverse effects from increased banking fees. Wealthier households have higher average account balances as compared to lower-income households. Valdmir Mukharlyamov & Natasha Sarin, *The Impact of the Durbin Amendment on Banks, Merchants, and Consumers*, 172 J. Fin. Econ. 1, 33 (2019). As a result only 5% of wealthier households maintain monthly balances below the minimum to avoid monthly maintenance fees while more than 70% of consumers in the lowest income quintile do not. *Id*. Thus, low-income Americans shoulder the bulk of elevated post-Regulation-II minimum balance fees, with some studies estimating that low-income Americans have transferred roughly $1-3 billion a year to banks. Zywicki, at 38.

Likewise, the increase in fees associated with maintaining a bank account following Regulation II led to an increase in the number of households in which no person holds a checking or savings account, i.e. "unbanked" households. In a survey of unbanked people, the FDIC found that 42% stated they were unbanked due to an inability to meet minimum balance requirements and 33% cited reasons related to fees or a minimum balance. FDIC, *Executive Summary FDIC National Survey of*

12

*Unbanked and Underbanked Households* 3 (2023), https://www.fdic.gov/household -survey/2023-fdic-national-survey-unbanked-and-underbanked-households-executive-summary. Being unbanked imparts a wide array of adverse effects. While high- and low-income Americans utilize debit cards at fairly similar rates, only 37.8% of very-low and 66.7% of low-income Americans utilize credit cards as compared to 91% of high-income Americans. Zywicki, at 35. Faced with rising debit-card costs and unable to access credit cards, unbanked individuals frequently turn to alternative payment methods such as prepaid cards or money orders. *Id*. These alternatives not only are more expensive, they do not allow unbanked Americans to build credit. This, in turn, adds to the list of financial difficulties associated with being unbanked, including the inability to secure low-cost loans, reliance on higher-cost lenders, logistical issues with transacting payments in cash, and higher fees associated with receiving payments by check. *Id*. at 37-38.

To be sure, disturbing Regulation II will have a significant adverse impact on certain communities more than others. Black Americans have historically faced unique financial impediments of the exact type Regulation II exacerbated.  For example, in 2021, 46% of Blacks who applied for credit were denied or approved for less than they requested as compared to 22% of Whites. Urban League of Greater Atlanta, *A Tale of Two States: State of Black Georgia 13 2022*, https://cdn.prod.website-files.com/636d9f747d1f025dbf4d275b/647db8ac7b1a5d

13

f29f86a9fb_SOBG%20-%20A%20Tale%20of%20Two%20States%20Report.pdf.

Loan approvals are also a challenge: black-owned businesses are still 20 percent less likely than white-owned businesses to obtain a loan from a large bank. *Id*. Given the revenue losses many banks experienced following Regulation II—and the resulting limitations on access to banking services—any further disruptions to Regulation II would only deepen the disparities facing the communities served by the Urban League of Greater Atlanta.

In short, the effects of imposing an interchange-cap fee below issuer's transaction costs are not a mystery. Banking became more expensive and consumer prices for goods did not decrease following the imposition of Regulation II. As a result, opening and maintaining a bank account became more expensive and less available, particularly for low-income and Black Americans. Americans should not be closed out of opportunities for home ownership, generational-wealth building, and day-to-day financial stability, simply because banks cannot afford to offer key consumer services. Further reducing the Regulation II fee cap will only magnify these problems.

## CONCLUSION

*Amicus Curiae* respectfully urge the panel to affirm the district court's judgment.

14

Dated:  June 2, 2026

By:  */s/ Philip D. Bartz*
Philip D. Bartz
philip.bartz@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F St. NW
Washington, DC 20004
philip.bartz@bclplaw.com
Tel. (202)508-6022

Stephen M. Scannell
stephen.scannell@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway, Suite 3600
St. Louis, MO, 63102

Jessica L. Limbaugh
jessica.limbaugh@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
221 Boliver St. #101
Jefferson City, MO 65101

*Attorneys for Amicus Curiae*
*Urban League of Greater Atlanta*

15

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5), because this brief contains 3,055 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced 14-point Times New Roman font.

Dated: June 2, 2026

By: **Bryan Cave Leighton Paisner LLP**

<u>/s/ *Philip D. Bartz*</u>
Philip D. Bartz
*Counsel for Amicus Curiae*
*Urban League of Greater Atlanta*

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2026, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: June 2, 2026                    By: **Bryan Cave Leighton Paisner LLP**

/s/ Philip D. Bartz
Philip D. Bartz
*Counsel for Amicus Curiae*
*Urban League of Greater Atlanta*

17