# United States Court of Appeals

*for the*

# Sixth Circuit

Case No. 25-6038

LINNEY'S PIZZA, LLC,

*Plaintiff-Appellant,*

– v. –

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellee.*

BANK POLICY INSTITUTE; CLEARING HOUSE ASSOCIATION, LLC,

*Proposed Intervenors.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY AT FRANKFORT
IN CASE NO. 3:22-cv-00071, HONORABLE GREGORY F. VAN TATENHOVE

## BRIEF OF *AMICUS CURIAE* THE BULL MOOSE PROJECT IN SUPPORT OF THE DEFENDANT-APPELLEE

JOEL THAYER
THAYER, P.L.L.C.
*Attorneys for Amicus Curiae The Bull
    Moose Project*
1255 Union Street NE, 7th Floor
Washington, DC 20002
*(*760) 668-0934

COUNSEL PRESS
A ▷ Proceed Service
The Appellate Experts®    (800) 4-APPEAL • (393549)

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 25-6038          Case Name: Linney's Pizza, LLC v. Board of Govern

Name of counsel:  Joel Thayer

Pursuant to 6th Cir. R. 26.1, The Bull Moose Project
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ Joel Thayer _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ *Joel Thayer*

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF *AMICUS CURIAE*..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT .......................................................................................................2

    I.     The Government's Affordability Agenda and the Role the
          Board Plays.................................................................................2

    II.    Appellant's Reading of Court Precedent Invites the Court to
          Make Policy Decisions...............................................................5

CONCLUSION...................................................................................................13

CERTIFICATE OF COMPLIANCE...................................................................14

CERTIFICATE OF SERVICE ..........................................................................15

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alabama Assn. of Realtors v. Department of Health and Human Servs.*,
594 U. S. 758 (2021)......................................................................................6

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
464 U. S. 89 (1983).......................................................................................11

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*,
467 U.S. 837 (1984)................................................................... 7, 10

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000).......................................................................................6

*Linney's Pizza, LLC v. Board of Governors of the Federal Reserve System*,
804 F.Supp.3d 717 (E.D. Ken. 2025).....................................5, 8, 11, 12

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)................................................................ *passim*

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*,
512 U. S. 218 (1994).......................................................................................6

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)...............................................................................10, 11

*U.S. v. Butler*,
297 U.S. 1 (1936)..........................................................................................13

*United States v. Mead Corp.*,
533 U.S. 218 (2001)................................................................... 7, 10

*Utility Air Regulatory Group v. EPA*,
573 U. S. 302 (2014)....................................................................................6, 8

*West Virginia v. EPA*,
597 U.S. 697 (2022)........................................................... 2, 5, 6, 7

*Whitman v. American Trucking Associations*,
531 U.S. 457 (2001)......................................................................................8

**Statutes and Other Authorities:**

15 U.S.C. § 1693o-2................................................................................. 2, 12

15 U.S.C. § 1693o-2(a) ...............................................................................12

15 U.S.C. § 1693o-2(a)(1) .........................................................................3, 4

Fed. R. App. P. 29(a)(4)(E) .........................................................................1

Pub. L. No. 111-203, § 1075, 124 Stat. 1376, 2068–74 (2010)................................2

4 Admin. L. & Prac. § 11:37 (3d ed.).........................................................10

Bd. of Governors of the Fed. Rsrv. Sys., Regulation II (Debit Card
    Interchange Fees and Routing), Docket No. R-1404, Notice of
    Proposed Rulemaking,
    75 Fed. Reg. 81722 (Dec. 28, 2010).............................................. 2-3

*In Search of the Modern Skidmore Standard*,
    107 Col. L. Rev. 1235 (2007) .............................................................7

## INTEREST OF *AMICUS CURIAE*[1]

The Bull Moose Project is a 501(c)(4) think tank based in Washington, D.C. The organization's mission is to advocate for a dominant American future. Its advocacy is inspired by the legacy of President Theodore Roosevelt and promotes policies that will put America First, invest in our communities, and protect American workers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The free-standing Durbin Amendment was passed by the Senate 64–33 on May 13, 2010. Roll Call Vote 111th Congress – 2nd Session for Durbin Amendment (May 13, 2010), https://www.senate.gov/legislative/LIS/roll_call_votes/vote1112/vote_111_2_00149.htm. The Durbin Amendment's mission was simple: allow the Board of Governors of the Federal Reserve System (the "Board") to write regulations "regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction."

https://www.law.cornell.edu/uscode/text/15/1693o-2

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than amicus curiae, their members, and their counsel made a monetary contribution to fund the preparation or submission of this brief. See Fed. R. App. P. 29(a)(4)(E).

However, the Appellant's challenge has the effect of gutting the Board's authority to effectively regulate those markets over a mild policy disagreement. In this brief, the Bull Moose Project advances two simple claims. The first is that the Board can play a critical role in advancing the government's affordability agenda by exercising the discretion Congress granted it under the Durbin Amendment. The second is that Appellant's understanding of certain Supreme Court precedent, *i.e.*, *West Virginia v. EPA*, 597 U.S. 697 (2022) and *Loper Bright v. Raimondo*, is fundamentally flawed and requires this court to act as a legislature rather than an interpreter of law.

## ARGUMENT

### I.     The Government's Affordability Agenda and the Role the Board Plays

The Board's statutory mandate from Congress is a dual one: maximize employment and stabilize prices (with a secondary goal of moderating long-term interest rates). Done right, the Board's policies can help ensure a stable economy and promote a fair marketplace for consumers.

In fact, that is precisely what Section 1075 of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act sought to address. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1075, 124 Stat. 1376, 2068–74 (2010) (codified at 15 U.S.C. § 1693o-2) (the "Durbin Amendment"). Before the Durbin Amendment, U.S. debit interchange averaged 44 cents per transaction. Bd. of Governors of the Fed. Rsrv. Sys., Regulation II (Debit

2

Card Interchange Fees and Routing), Docket No. R-1404, Notice of Proposed

Rulemaking, 75 Fed. Reg. 81722, 81725 (Dec. 28, 2010). The Durbin Amendment

and the Federal Reserve's implementing Regulation II created a new framework

for how banks, merchants, and consumers could use debit cards. The statute

allowed the Federal Reserve to "consider the authorization, clearance, and

settlement costs of each transaction when it sets the interchange fee." Darryl

Getter, *Regulation of Debit Interchange Fees*, CRS Report (May 5, 2017),

https://www.congress.gov/crs-product/R41913. The statute also allowed for fees

"to be adjusted for costs incurred by debit card issuers to prevent fraud." *Id.*

Congress intended for a strong regulatory framework to exist while also ensuring

that regulators had the flexibility to impose a price cap that was commensurate

with changing market dynamics.

This underscores Congress's intent in enacting the Durbin Amendment's clear,

flexible authority in allowing the Federal Reserve to set and regulate debit card

interchange fees that are "reasonable and proportional to the cost incurred by the

issuer with respect to the transaction."

https://www.law.cornell.edu/uscode/text/15/1693o-2

The Durbin Amendment sought to achieve three things. *First*, the Act directed

the Federal Reserve to cap debit interchange at a level "reasonable and

proportional" to the actual cost of processing the transaction. 15 U.S.C. § 1693o-

2(a)(1). *Second*, it banned exclusivity arrangements, requiring every debit card to be enabled on at least two unaffiliated networks so merchants could choose where to route a transaction. *Id.*(b)(1)(A). *Third*, it gave merchants the explicit right to offer discounts for cash or lower-cost payment methods and to set minimum purchase amounts for cards. *Id.*(b)(2)(B).

Done right, this statute can assist the Trump Administration's affordability campaign. Indeed, the President has eyed the Board as one of the agencies that can assist in this regard. For instance, President Trump has called for the federal funds rate to be cut to 1% and has encouraged Chair Jerome Powell repeatedly by arguing that lower rates would relieve cost-of-living pressure on households. Justin Boggs, *Trump Demands Fed Lower Interest Rates Amid Steady Inflation, Rising Mortgage Costs*, New Channel 5 (Mar. 13, 2026), https://www.newschannel5.com/politics/the-president/trump-demands-fed-lower-interest-rates-amid-steady-inflation-rising-mortgage-costs?fbclid=IwY2xjawR5vnVleHRuA2FlbQIxMABicmlkETFsRDEycFJWMXp0Slh6Y2Zhc3J0YwZhcHBfaWQQMjIyMDM5MTc4ODIwMDg5MgABHlcf9kYPPDBshLtWfRG_15n_rhhI-s9lERCiuVS7DDIDtaDrLbOt0SVinZDG_aem_fHi99WgVNz_rCCUNkD3yyw. Given the rising costs everyday Americans are experiencing, now is not the time to dull a tool in its toolkit.

4

Appellant's only gripe here is that "the Board "*did not sufficiently* 'restructure' the debit card payment processing market" to avail themselves to more consumer monies. *Linney's Pizza, LLC v. Board of Governors of the Federal Reserve System*, 804 F.Supp.3d 717, 728 (E.D. Ken. 2025). That is hardly a justification to defy or even gut a democratically enacted statute, especially one that is intended to promote consumer welfare.

## II.    Appellant's Reading of Court Precedent Invites the Court to Make Policy Decisions

Appellant has an overly broad view of the major questions doctrine and the ruling of *Loper Bright*. Its interpretation would not only significantly hamper the agency's ability to respond to market pressure and dynamics, but also implies that a judge can supplant her own policy preferences to fill in the gaps statutorily delegated to the Board. Accepting its view would mean that the agency would have even more hurdles to regulate or even deregulate these fees that have a direct impact on consumers, while undermining the Constitutional balance the Supreme Court struck in the aforementioned case and doctrine. With rising inflation, now is not the time to limit the Fed's ability to advance policies that can help so many hardworking and bootstrapped Americans, especially on Appellant's tenuous and potentially dangerous statutory analysis.

To be sure, courts are still grappling with the interplay between the Supreme Court's decisions in *West Virginia v. EPA* and *Loper Bright v. Raimondo*. We offer

5

the court what we hope is a helpful framework to demonstrate why Appellant's arguments ultimately fail.

The Court appears to have, perhaps unintentionally, a new two-step process grounded in textualism as opposed to blanket agency deference. The first step would be for the court to engage in a major questions analysis.

Let's unpack this.

Although the Court formalized the doctrine for the first time in *West Virginia v. EPA*, the principle was nothing new. As the Court explained at length, it had previously applied the underlying principle against the Food and Drug Administration, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120 (2000), the Environmental Protection Agency, *Utility Air Regulatory Group v. EPA*, 573 U. S. 302 (2014), the Centers for Disease Control and Prevention, *Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 594 U. S. 758 (2021), and even the Federal Communications Commission. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U. S. 218, 229 (1994).

What the Court added was clarity on how and when the doctrine should apply. For example, many courts had attempted to incorporate the major questions doctrine into the traditional analysis of agency interpretation—that a court must defer to an agency's reasonable interpretation of an ambiguous statute within its

6

regulatory purview. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). In *West Virginia v. EPA*, the Court made clear that the major questions doctrine is a Step-Zero analysis that must apply before even getting into *Chevron*, which *Loper Bright* has now replaced.

Notably, this is not the first Step-Zero exception, *e.g.*, *United States v. Mead Corp.*, 533 U.S. 218 (2001), it stands to reason that major questions' status as a "step 0" will not change in a *Loper Bright* world. Read together, the likely result of *West Virginia* and *Loper Bright* is that they (albeit not explicitly) overturn other step-zero exceptions, such as *Mead*.

Under a *Mead* analysis, a court asks, "whether Congress gave the agency in question the authority to bind regulated parties with "the force of law" and, if so, whether the agency "exercise[d] . . . that authority."" Kristin E. Hickman, *In Search of the Modern Skidmore Standard*, 107 Col. L. Rev. 1235, 1247 (2007) (citing *Mead*, 533 U.S. at 226-27). In general, the Court in *Mead* set the terms as to when to apply *Chevron* deference or *Skidmore* respect. *Mead*, 533 U.S. at 219-20. To distill it down, *Mead* held that *Chevron* only applied to rules that the agency subjected to an informal rulemaking process (*i.e.*, a notice-and-comment rulemaking). *Id.* Whereas, all other interpretive documents, such as rulings letters or declaratory rulings, fell under *Skidmore*. *Id.* at 219. However, given that the Court in *Loper Bright* overturned *Chevron*, *Mead* is no longer relevant. Thus, it

7

may be fair to supplement with *Loper* because *Loper* clarifies that *Skidmore* is now the contemporary interpretative standard.

Turning to this case, we apply the framework above.

*First*, the lower court is correct that the Appellant's case does not rest on a major question. *Linney's Pizza, LLC*, 804 F.Supp.3d at 728. The major questions doctrine says a court should not sanction an agency's interpretation of a statute to expand its authority when the underlying claim of authority concerns an issue of "vast economic and political significance" unless Congress has clearly empowered the agency with authority over that issue.  *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014).

The reason? As the late Justice Antonin Scalia put it, Congress "does not . . . hide elephants in mouseholes. *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).

Here, the Board's promulgated rule is "[f]ar from being an "unheralded" power discovered in a "long-extant statute." *Linney's Pizza, LLC v. Board of Governors of the Federal Reserve System*, 804 F.Supp.3d 717, 728 (E.D. Ken. 2025). Indeed, Regulation II "came about as a direct implementation of the Durbin Amendment. It regulates in an area that the Board traditionally regulates and it specifically contemplates the Board making (at least some) decisions about the proper interchange fee cap." *Id.* It is not even clear that Appellant disputes the Board's

8

authority. As the lower court accurately summarized, Appellant's concern is that "the Board "*did not sufficiently*" 'restructure' the debit card payment processing market" and, worse, "seeks to *compel* the Board to take action with a greater economic impact." *Id.* Ironically, that logic requires the court to accept that the Board has even broader authority to ignore portions of the statute that directly invite the agency to fill in the statute's gaps or set the cap lower than what the statute permits.

Either way, it has clear authority from Congress to interpret ambiguous terms in the statute nonetheless. Thus, the Board's promulgation of Regulation II easily overcomes the major-question doctrine.

*Second*, Appellant overreads the ruling in *Loper Bright* as a call for a court to disregard the expert agency's findings or worse make policy judgments from the bench by filling the gaps Congress delegated to the agency. To begin, it is important to evaluate what the Supreme Court held ultimately in *Loper Bright*. The Court merely reestablishes the responsibility of the statutory interpretation to the courts as opposed to affording the relevant agency immediate deference. Practically, this means that courts will decide whether the agency has provided enough textual and contextual reasoning to ensure it has the "best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). In other

9

words, courts must rely on "traditional tools of statutory construction." *Id.* at 404. That's all.

*Loper Bright* should not be read as requiring courts to give no credence to the agency to resolve ambiguities in the statute. To start, the Court's decision intentionally reinstituted *Skidmore* when saying that courts could rely on "'the interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon … specialized experience….'" *Id.* at 389 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944)). And that an agency "'constitute[d] a body of experience and informed judgment to which courts and litigations [could] properly resort for guidance,' even on legal questions." *Id*.

To obtain such *Skidmore* respect, "[a] court…determines the best available construction of the statute." *Skidmore deference to statutory and regulatory interpretations*, 4 Admin. L. & Prac. § 11:37 (3d ed.). Before *Loper Bright*, *Skidmore* respect was thought of as an intermediary between *Chevron* deference and no deference. *U.S. v. Mead Corp.*, 533 U.S. 218, 236-38 (2001). In a *Skidmore* scenario, a court considers the agency's analysis as "persuasive" authority where the judge is the sole arbiter as to how much the analysis receives. *Skidmore*, 323 U.S. at 140.

One key factor with respect to "the power to persuade" is the agency's expertise "to the extent [the statutory interpretation] rests on factual premises within [the

10

agency's] expertise." *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U. S. 89, 98, n. 8 (1983).

Without a doubt, an agency's technical expertise is paramount for a court to consider when Congress has explicitly sanctioned the agency to resolve "gray areas" within a hyper-technical statute. Such is the case here. As the Court held in *Skidmore*, courts should respect the decision of an agency if the agency's interpretations "depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. The agency's power to persuade is key to the agency's success. *Skidmore*, at 140.

Here, the Board has been regulating these markets, conservatively, since 2011. It has also relied on "thousands of [public] comments" before promulgating its Regulation II. *Linney's Pizza*, 804 F.Supp.3d at 723. Point being, this was far from a fly-by-night proceeding and the agency leveraged its long history and understanding of this market when promulgating Regulation II.

What is more, the structure of the statute invites the Board, not the court, to fill in the gaps. *Loper Bright* does not require the court to create new text or ignore the will of Congress, even if it disagrees with the Board's policy decision; it merely asks a court to apply traditional canons of construction, such as the "surplusage

11

canon" which we believe is most applicable to this case. As the late Antonin Scalia and Bryan Garner write, "the surplusage canon holds that it is no more the court's function to revise by subtraction than by addition." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, p. 174 (2012). They further explain that "[a] provision that seems to the court unjust or unfortunate…must nonetheless be given effect." *Id*. In other words, even though we understand that a court may disagree with the Board's decision, it has no right to add or subtract words, ideas, or concepts into a statute.

We can see how this principle applies in the instant case as the structure of the statute clearly gives the agency the flexibility to determine what is "reasonable and proportionate" to "the cost incurred by the issuer with respect to the transaction." § 1693o-2(a). As the district court explains how the syntax of the statute supports the Board's view:

> § 1693o-2 plainly allows the Board to consider other costs it is not mandated to consider, as long as they are not costs it is prohibited from considering. Section (a)(4)(B)(ii) contains a restrictive clause, thus "other costs" must be read narrowly in the restricted fashion Congress set forth rather than in the broad and bifurcating manner Linney's Pizza envisions. This leaves a gray area for the Board to operate within, pursuant to its mandate to develop a fee standard that is "reasonable and proportional" to "the cost incurred by the issuer with respect to the transaction." This reading of the statute gives full effect to all of its terms and further reflects that the Board's role in implementing it involves something more than mere calculation and cost-sorting drudgery. *Linney's Pizza*, at 732.

This is the correct view as it follows a straightforward textualist surplusage canon. As the Supreme Court has long held, "every word and every provision is to be given effect. None should be ignored. *U.S. v. Butler*, 297 U.S. 1, 65 (1936) (per Roberts, J.).

To hold otherwise would mean that *Loper Bright* invites a judge to impose her own policy perspectives to fill in the gaps. This is antithetical to any canon of construction and the will of Congress in the instant case.

## CONCLUSION

For the following reasons, the court should uphold the district court's opinion in this case.

Dated: June 3, 2026                    Respectfully submitted,

                                       */s/ Joel Thayer*

                                       _____

                                       JOEL THAYER
                                       THAYER, P.L.L.C.
                                       *Attorneys for Amicus Curiae*
                                         *Bull Moose Project*
                                       1255 Union Street NE, 7th Floor
                                       Washington, DC 20002
                                       (760) 668-0934

13

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), contains 2,799 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:    June 3, 2026

*/s/ Joel Thayer*

JOEL THAYER
*Attorney for Amicus Curiae
   Bull Moose Project*

14

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 3, 2026, an electronic copy of the Brief of *Amicus Curiae* Bull Moose Project in Support of Appellee was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.

Dated:    June 3, 2026

/s/ Joel Thayer

JOEL THAYER
*Attorney for Amicus Curiae*
  *Bull Moose Project*

15