**Case No. 25-6038**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**LINNEY'S PIZZA, LLC,**
Plaintiff-Appellant,

v.

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,**
Defendant-Appellant,

- and -

**BANK POLICY INSTITUTE and CLEARING HOUSE ASSOCIATION,
LLC,**
Proposed Intervenors.

---

On appeal from the United States District Court for the
Eastern District of Kentucky
(Case No. 3:22-cv-00071)
(Judge Gregory F. Van Tatenhove)

---

**ELECTRONIC PAYMENTS COALITION'S *AMICUS CURIAE* BRIEF IN
SUPPORT OF AFFIRMANCE**

---

Kwaku A. Akowuah
Christopher A. Eiswerth
Olivia C. Campbell
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel. (202) 736-8000
kakowuah@sidley.com

*Counsel for Electronic Payments Coalition*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-6038                    Case Name: Linney's Pizza, LLC v. Board of Governo

Name of counsel:  Kwaku A. Akowuah

Pursuant to 6th Cir. R. 26.1, Electronic Payments Coalition
*Name of Party*

makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

| CERTIFICATE OF SERVICE |
|---|
| I certify that on _____ June 5, 2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record. |
| s/Kwaku A. Akowuah |

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                                    Page 1 of  2

# TABLE OF CONTENTS

CERTIFICATE OF DISCLOSURE ................................................................i

TABLE OF CONTENTS..........................................................................ii

TABLE OF AUTHORITIES ...................................................................iii

INTEREST OF *AMICUS CURIAE* ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT........................... 2

ARGUMENT........................................................................................ 6

    I.    Under The Durbin Amendment, Interchange Fees Must Be Reasonable And Proportional To Issuers' Actual Transaction-Related Costs....................................................................................... 6

    II.    Legislative History Cannot Upset The Balance That Congress Struck In The Durbin Amendment. ......................................................... 12

    III.    The Durbin Amendment Does Not Require The Board To Set A Separate Cap For Every Issuer And Every Transaction. .................. 17

CONCLUSION .................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ............................................................. 13

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ............................................................. 16

*Cent. Bank of Denv., N.A. v. First Interstate Bank of Den., N.A.*,
511 U.S. 164 (1994) ............................................................. 16

*Chevron U.S.A. Inc. v. Echazabal*,
536 U.S. 73 (2002) .............................................................. 10

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ............................................................. 13

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
794 F. Supp. 3d 610 (D.N.D. 2025) .......................................... 5

*INS v. Chadha*,
462 U.S. 919 (1983) .............................................................. 3

*Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.*,
804 F. Supp. 3d 717 (E.D. Ky. 2025) ........................ 5, 6, 7, 10, 17, 18, 20

*Lopez-Campos v. Raycraft*,
No. 25-1965, 2026 WL 1283891 (6th Cir. May 11, 2026) ............... 8

*Milman v. Fieger & Fieger, P.C.*,
58 F.4th 860 (6th Cir. 2023) ................................................. 20

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
746 F.3d 474 (D.C. Cir. 2014) ................................................ 5

*Pereira v. Sessions*,
585 U.S. 198 (2018) ............................................................. 20

iii

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ......................................................................... 12

*Schwegmann Bros. v. Calvert Distillers Corp.*,
   341 U.S. 384 (1951) ......................................................................... 16

**Constitution, Statutes, and Regulations**

U.S. Const. art. I, § 7, cls. 2–3........................................................... 2

Credut Card Reform Act, Pub. L. No. 111-24, 123 Stat. 1734....................... 13

Dodd-Frank Wall Street Reform and Consumer Protection Act of
   2010, Durbin Amendment, Pub. L. No. 11-203, 124 Stat. 1376
   (July 21, 2010) ............................................................................... 3, 6

15 U.S.C. § 1693*o*-2(a)(2).............................................. 2, 3, 4, 6, 19

15 U.S.C. § 1693*o*-2(a)(3)(A)................................................... 2, 3

15 U.S.C. § 1693*o*-2(a)(4)........................................................ 3

15 U.S.C. § 1693*o*-2(a)(4)(B) ..................................................... 7

15 U.S.C. § 1693*o*-2(a)(4)(B)(i)................................................... 7

15 U.S.C. § 1693*o*-2(a)(4)(B)(ii)................................................... 7

15 U.S.C. § 1693*o*-2(c)(8)....................................................... 10

15 U.S.C. § 1693*o*-2(c)(10) ...................................................... 10

Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394
   (July 20, 2011)............................................................................... 4

Debit Card Intercharge Fees and Routing, 88 Fed. Reg. 78,100
   (proposed Nov. 14, 2023)................................................................... 4

**Legislative History**

*Credit Card Interchange Fees: Antitrust Concerns? Before the S. Comm.
   on the Judiciary*, 109th Cong. (2006) ...................................... 13

156 Cong. Rec. S3663 (May 3, 2010) ......................................13, 14

iv

156 Cong. Rec. S3569 (May 12, 2010) ........................................................ 13

156 Cong. Rec. S4895 (June 15, 2010) ....................................................... 14

156 Cong. Rec. S5869 (July 15, 2010) ........................................................ 14

156 Cong. Rec. S5925 (July 15, 2010) ........................................................ 15

156 Cong. Rec. S5927 (July 15, 2010) ...................................................14, 15

157 Cong. Rec. S3559 (June 7, 2011) ......................................................... 15

156 Cong. Rec. H4679 (June 23, 2010) ...................................................... 14

## Scholarly Authorities

Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J. L. & Pub. Pol'y 59, 64 (1988)............................. 12

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2409 (2003)................................................................................................. 12

## Other Authorities

Bd. of Governors of the Fed. Rsrv. Sys., *Institutions Not Exempt from the Debit Card Interchange Standards* (May 21, 2025), https://www.federalreserve.gov/paymentsystems/files/ debitfees_nonexempt.pdf ........................................................................... 18

## INTEREST OF *AMICUS CURIAE*[1]

Electronic Payments Coalition (EPC) represents credit unions, community banks, payment card networks, and trade associations. Its members collectively operate, maintain, and secure the electronic payments systems on which millions of consumers and merchants rely each day.

The reliability and security of those systems depend on sustained investment by every participant in the electronic payments ecosystem. Interchange fees—the modest sums paid by merchants for credit and debit card transactions—help defray the costs of operating and protecting those systems. The Durbin Amendment and the regulations issued under it cap debit card interchange fees, liming issuers' ability to recover their costs and shifting the shortfall onto cardholders, often through higher deposit-account fees and reduced access to low-cost banking services with the heaviest burden falling on lower-income consumers. EPC's members therefore have a direct and substantial interest in the correct interpretation of the Durbin Amendment and the Federal Reserve Board's implementing regulations.

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(2), EPC states that counsel conferred with counsel for the parties, and all parties have consented to the filing of this brief. Further, EPC states that no party's counsel authored this brief in whole or in part, and no person—other than *amicus* EPC or its counsel—contributed money that was intended to fund preparing or submitting this brief.

The district court correctly held that, in setting a fee cap "reasonable and proportional to the cost incurred by the issuer with respect to the transaction," 15 U.S.C. § 1693o-2(a)(2), (a)(3)(A), the Board was permitted to consider transaction-related costs beyond the incremental authorization, clearance, and settlement costs. Were Linney's Pizza to prevail, the Board would be forced to rewrite its regulations in a way that departs further from the statutory text and reallocates still more cost within the electronic payments systems—deepening existing distortions, discouraging investment in payment security, and heightening risk to infrastructure on which modern commerce depends. The court also correctly held that the Durbin Amendment requires neither issuer-specific nor transaction-specific caps. Were this Court to decide otherwise, compliance costs would dramatically increase across the industry because, at present, an issuer's transaction costs are unknowable when the fee is charged and could never be calculated across more than 500 issuers and tens of billions of transactions. EPC submits this brief to explain why the statute does not compel these results, and why neither legislative history nor policy considerations can override the text Congress enacted.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Federal statutes are enacted through a constitutionally prescribed process that requires agreement from both Houses of Congress and the President. U.S.

2

Const. art. I, § 7, cls. 2–3. Because "[c]onvenience and efficiency" are not this process's "primary objectives," *INS v. Chadha*, 462 U.S. 919, 944 (1983), the legislation that it produces necessarily reflects compromise among competing interests. The statutory text that emerges embodies those compromises and defines the law that Congress enacted.

The Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 is no exception. *See* Pub. L. No. 111-203, § 1075, 124 Stat. 1376, 2068 (July 21, 2010) (codified at 15 U.S.C. § 1693*o*-2). Debit card interchange fees had long gone unregulated, reflecting the competing interests of consumers, merchants, financial institutions, and payment networks. In the wake of the financial crisis, Congress agreed to impose a constraint: interchange transaction fees must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2).

Congress did not enumerate every cost that must enter the calculation or prescribe the precise level at which fees must be set. Instead, it identified factors for consideration and delegated implementation to the Board. *See id.* § 1693*o*-2(a)(3)(A), (4). In 2011, the Board exercised that authority by promulgating Regulation II, which capped debit card interchange fees and recognized that four categories of transaction-related costs may be recovered through the fee: certain authorization, clearance, and settlement (ACS) costs, transaction-monitoring

3

costs, fraud losses, and network-processing fees. *See* Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394, 43,430–31, 43,434–35 (July 20, 2011) [hereinafter Regulation II] (codified at 12 C.F.R. pt. 235).

Contrary to Linney's Pizza's contention here, Congress did not require the Board to build an exceedingly complex, unworkable fee standard that varies issuer by issuer and transaction by transaction. Rather, the Durbin Amendment allowed the Board to set fees based on the costs of a representative issuer and a representative transaction. *See* 15 U.S.C. § 1693*o*-2(a)(2). Regulation II did just that: it capped the interchange fee at the sum of a base component, set at "the per-transaction allowable costs of the issuer at the 80th percentile as reported on the Board's survey," and an *ad valorem* component, set at the per-transaction fraud loss of the median surveyed issuer. Regulation II, 76 Fed. Reg. at 43,422.

Regulation II is not perfect. If anything, it errs against issuers, not merchants: *by the Board's design*, nearly a quarter of covered issuers cannot fully recover even their allowable costs under the cap. *See* Debit Card Interchange Fees and Routing, 88 Fed. Reg. 78,100, 78,105 (proposed Nov. 14, 2023). That burdens many covered issuers by preventing them from achieving cost recovery for the debit card services they provide. And, central to this case, that economic reality undercuts the premise of the present challenge—that the cap (supposedly) is set too high. A decade ago, the D.C. Circuit rejected a similar challenge that

merchants brought to the rule. *See NACS v. Bd. of Governors of the Fed. Rsrv. Sys.*, 746 F.3d 474, 483–93 (D.C. Cir. 2014). Regulation II has supplied a transparent, predictable interchange standard ever since. Merchants now challenge the rule again, and the district courts have divided—unsettling the very stability a uniform standard is meant to provide. *See Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.*, 804 F. Supp. 3d 717 (E.D. Ky. 2025) (rejecting challenge to Regulation II); *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610 (D.N.D. 2025) (vacating Regulation II but staying decision pending appeal).

The decision below is correct and should be affirmed. First, the Durbin Amendment's text and structure permit, and indeed require, the Board to consider the transaction-specific costs at issue here when determining a "reasonable and proportional" fee cap. The Board's treatment of those costs in Regulation II faithfully implements the statutory framework that Congress adopted. Second, legislative history, particularly the floor statements of a single Senator, cannot be used to override the statutory text or unsettle the congressional compromise it reflects. Nor can the Amendment's general purpose of lowering fees justify reading the statute to drive interchange fees still lower than its text permits. Third, contrary to Linney's Pizza's position, the statute's text does not compel issuer- and transaction-specific fee caps, and the

5

Board's approach of pegging the fee cap to a representative issuer and transaction creates a workable standard where the alternative would not. This Court should affirm.

## ARGUMENT

### I.　Under The Durbin Amendment, Interchange Fees Must Be Reasonable And Proportional To Issuers' Actual Transaction-Related Costs.

Section 1075 of Dodd-Frank—the Durbin Amendment—sets a single operative command: a debit card interchange fee must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693$o$-2(a)(2). That command refers to "cost[s] incurred" with respect to the transaction, not to some preselected subset of them. And subsection (a)(3)(A) builds the Board's implementing standards on the same phrase. Regulation II's inclusion of certain transaction-related issuer costs follows directly from that text, as the district court correctly held. *See Linney's Pizza*, 804 F. Supp. 3d at 731. Linney's Pizza reads the "considerations" listed in subsection (a)(4)(B) to silently narrow the "cost incurred" to incremental ACS costs alone. The text does no such thing. This Court should reject Linney's Pizza's efforts to convince it otherwise.

*First*, a command to "distinguish between" two kinds of costs settles how the Board treats those two—and says nothing about any others. Congress told the Board to distinguish between incremental ACS costs, which "shall be

6

considered," and non-transaction-specific costs, which "shall not." 15 U.S.C. § 1693o-2(a)(4)(B). Linney's Pizza reads that direction to "bifurcate[] all costs into only *two* categories." Appellant Br. 20. But "distinguish between" tells the Board to keep two named categories apart. 15 U.S.C. § 1693o-2(a)(4)(B). It does not declare those two to be the whole universe. The district court saw as much. It explained that "no definition of 'distinguish' inherently limits the distinguishing being done to only two entities" and that Congress "merely staked out what [it] considered essential to include and essential to exclude" and "did not speak" in subsection (a)(4)(B) "to the array of other possible costs" an issuer incurs. *Linney's Pizza*, 804 F. Supp. 3d at 729. Those other costs can be weighed under the operative standard in subsections (a)(2) and (a)(3)(A), which direct a fee "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.*

*Second*, the two categories that Congress did name in subsection (a)(4)(B) do not exhaust the field because they are not, as Linney's Pizza insists, "inverse sides of the same dichotomy." Appellant Br. 38. Subparagraph (i) reaches a specific subset of transaction-related costs—the "incremental cost" that an issuer incurs for its role in "the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(i). Subparagraph (ii) reaches costs "not specific to a particular electronic debit transaction." *Id.*

7

§ 1693*o*-2(a)(4)(B)(ii). Between the incremental ACS costs that subparagraph (i) covers and the non-transaction-specific costs that subparagraph (ii) covers lies a remainder: costs tied to a particular transaction that are not incremental ACS costs. That remainder does not fall within either subparagraph.

Linney's Pizza tries to close the gap by arguing that "other costs" in subparagraph (ii) sweeps in everything that is not an incremental ACS cost. Appellant Br. 20–21, 38. But "other costs" does not stand alone. The restrictive clause that follows—"which are not specific to a particular electronic debit transaction"—defines which "other costs" drop out. If "other costs" did the work that Linney's Pizza says, the restrictive clause would be unnecessary and mere surplusage. *Cf. Lopez-Campos v. Raycraft*, No. 25-1965, 2026 WL 1283891, at *4 (6th Cir. May 11, 2026) ("If 'seeking admission' did not have independent meaning, then Congress could have simply written § 1225(b)(2)(A) without the phrase and instead employed 'applicant for admission.'").

Linney's Pizza's related argument—that subparagraphs (i) and (ii) are "two overlapping definitions" of a single line, so that "incremental ACS" and "specific to a particular transaction" mean "roughly the same thing"—likewise fails. Appellant Br. 26, 38–39 (quoting *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013)). An incremental ACS cost is one kind of transaction-specific cost, not all of them. A fixed ACS cost or a monitoring cost can be

8

specific to a particular transaction without being incremental ACS. Congress used the narrower phrase in subparagraph (i) and the broader one in subparagraph (ii) for that reason. *Kirtsaeng* may permit reading different words to mean the same thing, but it does not require reading a subset to mean the whole.

*Third*, the Board's general authority to consider non-ACS transaction-specific costs under subsection (a)(2) is not limited by the existence of a catchall provision in another subsection of the statute. Linney's Pizza points to subsection (a)(5)(B)(ii), which lists six factors for the Board to consider in issuing fraud-prevention standards and then adds a residual clause allowing the Board to weigh "such other factors as the Board considers appropriate" in that context. Appellant Br. 26–27 (quoting 15 U.S.C. § 1693*o*-2(a)(5)(B)(ii)(VII)). And it reasons that, by including this catchall in subsection (a)(5)(B), the absence of one in (a)(4)(B) must be deliberate. *See id.*

But the two provisions are not alike. Subsection (a)(5)(B)(ii) lists factors the Board weighs inside a discrete, optional adjustment, and its catchall shows only that Congress knew how to authorize open-ended factor-weighing within that mechanism. Subsection (a)(4)(B) is not a list of allowable costs at all. It is a constraint—pulling two specified cost types into and out of the standard that subsections (a)(2) and (a)(3)(A) already set. The Board needs no residual clause

9

because subsection (a)(2) supplies the rule: a fee reasonable and proportional to "the cost incurred by the issuer with respect to the transaction."

*Expressio unius* bites only where the listed items form a group that the reader would expect to be exhaustive. *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002). A provision telling the Board how to handle two cost types is no such list. And when Congress did want a clean binary, it drew one in plain terms. *Compare* 15 U.S.C. § 1693*o*-2(c)(8) (defining "interchange transaction fee" as a charge for "compensating an issuer for its involvement in an electronic debit transaction") *with id.* § 1693*o*-2(c)(10) (defining "network fee" as a charge "other than an interchange transaction fee"). In other words, had Congress meant to exclude every cost other than incremental ACS costs, it had a ready means of saying so, as it did elsewhere in the statute. Instead, it limited the excluded category to non-transaction-specific costs—language that carries meaning only under the Board's and Proposed Intervenors' interpretation.

*Fourth*, step back, and it is Linney's Pizza's reading—not the Board's or Proposed Intervenors'—that produces the stranger statute. Linney's Pizza accuses the Board of overreading congressional silence, making decisions with vast economic significance over a new category of costs, worth billions, without a clear statement of authorization. Appellant Br. 28–32; *see Linney's Pizza*, 804 F. Supp. 3d at 726–27 (rejecting that charge). But on Linney's Pizza's reading,

10

Congress announced a broad standard in subsection (a)(2)—a fee must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction"—directed the Board in subsection (a)(3)(A) to build its assessment standards around that same phrase, and then, without clear signal, used a later "considerations" provision to contract that standard down to incremental ACS costs alone. Yet nothing in subsections (a)(2) or (a)(3)(A) hints at so sharp a contraction of the rule.

Had Congress meant to cap allowable costs at incremental ACS, it could have said so in the provisions that set and implement the fee standard. It did not. Subsection (a)(4) does humbler work: it tells the Board to weigh functional similarity to checks, to distinguish incremental ACS costs from a defined subset of non-transaction-specific costs, and to consult other agencies. Reading that provision to silently rewrite the standard announced elsewhere is far less plausible than the reading that the Board and Proposed Intervenors advance and that the district court adopted—one that gives each subsection a distinct and coherent role.

In short, Regulation II's treatment of the transaction-related costs is consistent with the statute as written. The district court rightly rejected Linney's Pizza's effort to rewrite what Congress actually enacted. This Court should too.

11

## II. Legislative History Cannot Upset The Balance That Congress Struck In The Durbin Amendment.

Even if some legislators hoped to limit interchange fees to incremental ACS costs, unenacted statutory purpose and post-hoc statements from legislators—even the bill's sponsor—cannot narrow the statute's text. The Supreme Court has long recognized that "no legislation pursues its purposes at all costs" and that "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). The Durbin Amendment's history confirms that Congress made just such a choice, and the terms of that compromise live in the text that survived bicameralism and presentment—not in any legislator's later gloss.

Statutes reflect legislative compromise. A bill must "run the gamut of the [legislative] process"—"committees, fighting for time on the floor, compromise because other members want some unrelated objective, passage, exposure to veto, and so on." Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J.L. & Pub. Pol'y 59, 64 (1988). For that reason, "legislators may sometimes craft statutory language very broadly or very narrowly to elide or avoid disagreements over specific applications," and "one cannot take for granted that the legislature would be able to enact a more precise statement of the majority's aims, even if those aims could be known." John F.

12

Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2409 (2003). Because "a change in any individual provision could have unraveled the whole," *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461 (2002), statements by individual legislators—however prominent—do not necessarily capture the terms of the deal. Courts therefore "presume that a legislature says in a statute what it means and means in a statute what it says there" to respect the legislative process. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

The Durbin Amendment is a textbook example. Senator Durbin had sought for years, without success, to regulate interchange fees. *See, e.g.*, *Credit Card Interchange Fee: Antitrust Concerns?: Before the S. Comm. on the Judiciary*, 109th Cong. 4 (2006) (statement of Sen. Durbin, S. Comm of the Judiciary). During the 111th Congress, he offered an amendment to the Credit Card Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734, but that effort was rebuffed, *see* 156 Cong. Rec. S3569, S3589 (May 12, 2010) (statement of Sen. Durbin). The proposal was "controversial," *id.*; *see* 156 Cong. Rec. S3663, S3696 (May 13, 2010) (statement of Sen. Durbin) (describing interchange fee-related issues as "controversial and complex"), and some legislators did not "want to touch it" given its disparate effects on major constituencies. 156 Cong. Rec. at S3588–89 (statement of Sen. Durbin).

Shortly before the Senate passed its version of Dodd-Frank, Senator Durbin introduced Amendment 3989—what would become the Durbin Amendment. *See id.* at S3588. It borrowed the "reasonable and proportional" formulation from prior credit card reform legislation and made key concessions, including an exemption for smaller issuers. *Id.* at S3589. Senator Durbin explained that the amendment did "not pick a number" or "set a fee," but charged the Board with ensuring that fees were "proportional and reasonable *to the cost incurred* in processing the transaction." 156 Cong. Rec. at S3696 (emphasis added); *accord id.* at S3704–05. The Senate passed the amendment 64 votes to 33. *See id.* at S3703–04. And in the ensuing weeks, as Dodd-Frank proceeded to conference, the amendment's supporters consistently returned to the same themes: interchange fees should be reasonable and proportional to costs; the Board would be responsible for implementation; and the statute sought to balance the interests of consumers, merchants, and banks.[2]

---

[2] *See, e.g.*, 156 Cong. Rec. S4895, S4929 (June 15, 2010) (statement of Sen. Durbin) ("the regular proportional cost of a transaction of using the card is certainly fair"); 156 Cong. Rec. H4679, H4680 (June 23, 2010) (statement of Rep. Shuster) ("The compromise reached in the conference committee does not eliminate the interchange fee or allow the Federal Government to set the interchange fee. The amendment simply creates a level playing field for banks and small businesses to negotiate interchange fees like any other business contract."); 156 Cong. Rec. S5869, S5927 (July 15, 2010) (statement of Sen. Dodd) (describing interchange fees as "a very complicated subject involving many different stakeholders, including payment networks, issuing banks, acquiring banks, merchants, and, of course, consumers").

14

What none of those statements did was express that "the cost incurred by the issuer with respect to the transaction," if enacted, would confine the Board to considering solely incremental ACS costs. Senator Durbin's amicus brief gathers a series of his pre-passage floor remarks for the proposition that fees should track "the cost incurred in processing the transaction." Br. of Sen. Richard J. Durbin as Amicus Curiae at 13 & n.14, No. 25-6038 (6th Cir. May 6, 2026) [hereinafter Durbin Br.] (emphasis omitted) (citing 156 Cong. Rec. S3696 (May 13, 2010); 156 Cong. Rec. S4930 (June 15, 2010)). But each repeats the general, enacted standard; none narrows it to incremental ACS costs. Limiting the fee to only those costs was discussed exactly once: on July 15, 2010, the day the Senate gave Dodd-Frank final passage, after the conference process had closed. 156 Cong. Rec. S5925 (July 15, 2010) (statement of Sen. Durbin); *see* Appellant Br. 35. A single, post-conference characterization is a thin foundation for narrowing what both Houses enacted.

The remaining materials postdate enactment altogether. Senator Durbin has filed amicus briefs—in *NACS*, in the Eighth Circuit's *Corner Post* appeal, and now here—each describing the statute as limited to ACS costs. *See, e.g.*, Durbin Br. 13–16. And his brief in this case points to the Senate's 2011 rejection of the Tester-Corker amendment as a "reaffirm[ation]" that the statute permits ACS costs only. *Id.* at 12 & n.13 (citing 157 Cong. Rec. S3574 (June 8, 2011)). But

15

that amendment would have directed the Board to consider a broader range of costs than addressed in Regulation II, including "all *fixed* and incremental costs *associated with* debit card transactions *and program operations*." 157 Cong. Rec. S3559 (June 7, 2011) (emphases added). In any event, the debates on the Tester-Corker amendment post-date Dodd-Frank. And for good reason, courts emphatically reject calls to rely on such materials in interpreting statutes. "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). And "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation." *Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*, 511 U.S. 164, 187 (1994). At most, the Senate's 2011 refusal to broaden the Board's authority shows what a later Senate declined to do; it cannot tell this Court what the 2010 text means.

The principle that resolves all of this is old and plain: courts apply the statute Congress enacted, not the explanations later offered for it. "We do not inquire what the legislature meant; we ask only what the statute means." *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 397 (1951) (Jackson, J., concurring) (quoting Oliver Wendell Holmes, Collected Legal Papers 207 (1920)). Senator Durbin's account of his amendment, however informed, did not pass both Houses or earn the President's signature; the text did. To let one

16

legislator's later explanation contract that text would trade lawmaking by Congress for lawmaking by quotation. Because the Durbin Amendment requires interchange fees to be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction"—not to a subset of those costs selected after the fact—the district court correctly held that Regulation II's inclusion of additional transaction-related costs falls within the statute's limits. *See Linney's*, 804 F. Supp. 3d at 731.

### III. The Durbin Amendment Does Not Require The Board To Set A Separate Cap For Every Issuer And Every Transaction.

Linney's Pizza's contention (at 59–63) that the Durbin Amendment compels the Board to set issuer- and transaction-specific fees lacks merit. It misreads the statute, and it would produce a rule no one could administer.

On Linney's Pizza's telling, Congress's decision to use the definite article "the" in subsection (a)(2)—"*the* cost incurred by *the* issuer with respect to *the* transaction"— requires a fee that tracks each issuer's own cost on each particular transaction. Appellant Br. 59–60 (quoting 15 U.S.C. § 1693*o*-2(a)(2)). But subsection (a)(2) speaks first of "*an* issuer" and "*an* electronic debit transaction," then of "the issuer" and "the transaction"—language naturally read as a reference back to that representative issuer and transaction, not a command to single out each one. *See Linney's Pizza*, 804 F. Supp. 3d at 737. At a minimum, the grammar does not cleanly cut Linney's Pizza's way. *See id.* Between the two

17

readings that the text leaves open, only the Board's is workable—and a statute that does not clearly compel Linney's Pizza's reading cannot be construed to require the unworkable regime that reading would create.

That is where Linney's Pizza's interpretation most clearly fails, for reasons that both the Board and the district court well captured. An interchange fee is computed when the transaction occurs. *See* Regulation II, 76 Fed. Reg. at 43,422. But an issuer's actual cost for that particular transaction is not knowable then—those costs are tallied afterward and shift with a range of factors. *See id.* Linney's Pizza's reading would thus require the Board to fix, at the instant of the swipe, a fee pegged to a number that does not yet exist. *Linney's Pizza*, 804 F. Supp. 3d at 737. A standard that no one can apply when the fee is charged is not one Congress can be presumed to have demanded.

The scale only deepens the problem. Even if per-transaction costs could somehow be computed in real time, the Board would have to do it across tens of billions of debit transactions a year, for every one of the more than 500 covered issuers, that is, those with reported assets of $10 billion or more. *See* Bd. of Governors of the Fed. Rsrv. Sys., *Institutions Not Exempt from the Debit Card Interchange Standards* (May 21, 2025) (listing 528 non-exempt institutions).[3] The

---

[3] Available at https://www.federalreserve.gov/paymentsystems/files/debitfees_nonexempt.pdf.

result, as the Board explained, would be "an exceedingly complex matrix of interchange fees"—a different number for every issuer and every transaction, recalculated continuously. Regulation II, 76 Fed. Reg. at 43,422. It would impose steep administrative costs on issuers, networks, acquirers, and merchants, and it would make monitoring and enforcement exceedingly difficult. *Id.* A statute that directs the Board to set fees "reasonable and proportional to the cost incurred," 15 U.S.C. § 1693*o*-2(a)(2), should not be read to compel that kind of "absurd result," Regulation II, 76 Fed. Reg. at 43,422.

It is also telling that no one who actually grappled with the rule as it was being crafted proposed to read the statute as Linney's Pizza now does. In the rulemaking, "nearly all commenters" understood the statute not to require calculating each transaction's actual cost, and "none argued for such a calculation." Regulation II, 76 Fed. Reg. at 43,422. Senator Durbin's amicus brief is no exception. He insists that only incremental ACS costs may be recovered, but he accepts that the Board may treat the incremental ACS costs of a representative issuer "as an allowable proxy for the exact costs ... in every case." Durbin Br. 14. A proxy applied in every case is a generalized standard, not a bespoke one. So even the author of the Amendment assumes the single, representative measure that Linney's Pizza now says the statute forbids.

19

In the end, Linney's Pizza asks this Court to read the Durbin Amendment to require the one thing it cannot deliver and no one sought: an individualized fee for every issuer and every transaction, drawn from costs that are unknowable when the fee is charged and multiplied across billions of transactions. Practical concerns do not override genuinely clear text, *see Pereira v. Sessions*, 585 U.S. 198, 217 (2018)—but the text here does not compel the absurd result that Linney's Pizza's favors. A court need not "impose nonsensical readings of a statute 'if alternative interpretations consistent with the legislative purpose are available.'" *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 869 (6th Cir. 2023). The Board's single, generally applicable standard is exactly such a reading. It sets debit interchange fees by rule, as Congress directed, and it serves the Amendment's goal of ensuring that fees are reasonable, proportional, and lower—without demanding the impossible. The district court resolved this challenge correctly. *See Linney's Pizza*, 804 F. Supp. 3d at 738. This Court should affirm.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

20

Dated: June 5, 2026

Respectfully submitted,

/s/ *Kwaku A. Akowuah*
Kwaku A. Akowuah
Christopher A. Eiswerth
Olivia C. Campbell
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel. (202) 736-8000
kakowuah@sidley.com

*Counsel for Electronic Payments Coalition*

21

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and 29(a)(5) because it contains 4,643 words.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Calisto MT font.

Dated: June 5, 2026                    Respectfully submitted,

                                        */s/ Kwaku A. Akowuah*
                                        Kwaku A. Akowuah

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Kwaku A. Akowuah*
Kwaku A. Akowuah