No. 25-6038

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

LINNEY'S PIZZA, LLC,

*Plaintiff-Appellant*

– v. –

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellee*

BANK POLICY INSTITUTE; CLEARING HOUSE ASSOCIATION, LLC,

*Proposed Intervenors*

On Appeal from the United States District
Court for the Eastern District of Kentucky at Frankfort
Case No. 3:22-cv-00071 (Hon. Van Tatenhove, J.)

## BRIEF OF AMICUS CURIAE INTERNATIONAL CENTER FOR LAW & ECONOMICS IN SUPPORT OF RESPONDENT

Philip D. Williamson
TAFT STETTINIUS & HOLLISTER LLP
301 E. 4th St., Ste. 2800
Cincinnati, OH 45202-4245
(513) 381-2838
pwilliamson@taftlaw.com

*Counsel for Amici Curiae*

Ben Sperry
Kristian Stout
Geoffrey Manne
INTERNATIONAL CENTER FOR LAW & ECONOMICS
1104 NW 15th Ave., Ste. 300
Portland, OR 97207
(609) 807-8688
bsperry@laweconcenter.org

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................ii

INTEREST OF AMICUS CURIAE.......................................................2

SUMMARY OF THE ARGUMENT ......................................................2

ARGUMENT ....................................................................................8

I.    The Board has the Discretion to Include All Costs Incurred by the Issuer in Respect to the Transaction....................................................9

II.   The Board has the Discretion to Consider Consumer Benefits When Determining Whether Interchange Transaction Fees are Reasonable and Proportional..............................................................14

CONCLUSION ...............................................................................18

CERTIFICATE OF COMPLIANCE.......................................................19

CERTIFICATE OF SERVICE.............................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Batterton v. Francis,*
    432 U.S. 416, 425 (1977) .................................................................... 11

*Linney's Pizza, LLC v. Board of Governors of Federal*
    *Reserve System,*
    804 F. Supp. 3d 717 (E.D. Ky. 2025) ...................................... 12, 13, 17

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ............................................................... 5, 10, 11

*Marx v. General Revenue Corp.,*
    568 U.S. 371 (2013) ............................................................................ 13

*NACS v. Board of Governors of Federal Reserve System,*
    746 F.3d 474. (D.C. Cir. 2014) ........................................................ 9, 10

*Ohio v. American Express Co.,*
    585 U.S. 529 (2018) ............................................................. 8, 9, 15, 16

## Statutes

15 U.S.C. § 1693o-2 ...................................................................... *passim*

## Regulations

Debit Card Interchange Fees and Routing, 76 Fed. Reg.
    43,394, 43,423 (July 20, 2011) ........................................................ 15

## Other Authorities

Federal Rule of Appellate Procedure 26.1 and 6 ...................................... 1

6th Cir. R. 26.1 .......................................................................................... 1

Black's Law Dictionary (12th ed. 2024) .................................................. 14

Comments of the International Center for Law & Economics,
Regulation II: Debit Card Interchange Fees and Routing,
RIN 7100-AG67 (Apr. 23, 2024) ........................................................16

Benjamin S. Kay, Mark D. Manuszak, & Cindy M. Vojtech,
*Bank Profitability and Debit Card Interchange
Regulation: Bank Responses to the Durbin Amendment*..................16

Kay, Benjamin S., Mark D. Manuszak & Cindy M. Vojtech,
*Bank Profitability and Debit Card Interchange
Regulation: Bank Responses to the Durbin Amendment,*
Finance and Economics Discussion Series 2014-77,
Federal Reserve Board (Sept. 2014)....................................................16

Manne, Geoffrey A., Julian Morris & Todd J. Zywicki,
*Unreasonable and Disproportionate: How the Durbin
Amendment Harms Poorer Americans and Small
Businesses,* International Center for Law & Economics
(Apr. 25, 2017)........................................................................................16

Manuszak, Mark D. & Krzysztof Wozniak, *The Impact of
Price Controls in Two-Sided Markets: Evidence from U.S.
Debit Card Interchange Fee Regulation,* Finance and
Economics Discussion Series 2017-074, Federal Reserve
Board (July 2017)....................................................................................16

Merriam-Webster Online Dictionary, "Proportional," (last
visited June 2, 2026) .............................................................................17

Wang, Zhu, Scarlett Schwartz & Neil Mitchell, *The Impact
of the Durbin Amendment on Merchants: A Survey Study,*
100(3) Econ. Q. 183 (Federal Reserve Bank of Richmond
2014)........................................................................................................17

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 6 Cir. R. 26.1, the International Center for Law & Economics makes the following disclosures:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

Dated: June 5, 2026

/s/ Philip D. Williamson

1

## INTEREST OF AMICUS CURIAE*

The **International Center for Law & Economics** ("ICLE") is a nonprofit, non-partisan global research and policy center that builds intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies and economic learning to inform policy debates and has longstanding expertise in evaluating law and policy.

ICLE scholars have written extensively on payment card markets, interchange fee regulation, and the consumer effects of the Durbin Amendment. This encompasses white papers, law journal articles, and regulatory comments analyzing the effects of interchange fee regulation from a law & economics perspective, including Regulation II and proposed amendments.

## SUMMARY OF THE ARGUMENT

Payment card networks operate as two-sided platforms, offering different services to two different groups (merchants and cardholders) that use the network as an intermediary. Payment card networks exhibit

---

* No party's counsel authored any part of this brief. No one, apart from amici and their counsel, contributed money intended to fund the brief's preparation or submission.

indirect network effects. In abstract terms, that means the value to one group of participants depends on how many members of a different group participate. Stated more concretely, merchants are incentivized to accept a particular card network if a lot of consumers use the card, and consumers are incentivized to use a particular card if a lot of merchants accept it.[1]

That indirect network effect means that payment card networks have to recruit both merchants and cardholders. Solving that chicken-and-egg problem sometimes requires a network to charge one side more than the other. For example, a payment card network may choose to lose money on the cardholder side by offering rewards and benefits, because increasing the number of cardholders means increasing the value of accepting the card for merchants. Networks then charge those merchants a fee for each transaction (like debit interchange fees). Two-sided platforms have to strike the optimal balance of the prices charged in each side in order to maximize value and compete with their rivals.

---

[1] This is the basic promise behind Visa's traditional tagline "It's everywhere you want to be," or American Express's "Don't leave home without it."

Debit interchange fees once enabled issuing banks to subsidize other benefits to consumers like debit card rewards and free checking accounts with low monthly minimum account balances. But the Durbin Amendment—and the Board's Regulation II implementing the Durbin Amendment—changed that. Regulation II imposed price caps on debit interchange fees.

Studies from Federal Reserve economists show that, following the imposition of the price caps under Regulation II, covered banks responded rationally by raising account fees, increasing monthly minimum balance requirements, reducing access to free checking, and eliminating debit-card rewards. These changes disproportionately affected lower-income households and increased the number of unbanked and underbanked consumers. What's more, there is little evidence that merchants passed through offsetting savings to consumers in the form of lower retail prices.

The Durbin Amendment requires the Federal Reserve Board ("Board") to "prescribe regulations… to establish standards for assessing whether the amount of any interchange fee… is reasonable and proportional to the cost incurred by the issuer with respect to the

transaction." 15 U.S.C. § 1693o-2(a)(3)(A). But it does *not* require the Board to set the interchange fee caps based solely on the incremental cost to the issuer in the "authorization, clearance, or settlement" (ACS) of a transaction. *Cf. id.* at (a)(4)(B). In other words, the Board is not required to set the cap on interchange fees even lower than it already has, which would further exacerbate the economic damage of Regulation II.

This case arises at a pivotal moment in administrative law. In *Loper Bright*, the Supreme Court reaffirmed that courts must exercise "independent judgment" in interpreting statutes and may not defer to agency interpretations simply because a statute is ambiguous. But *Loper Bright* did not eliminate all deference. Instead, the Court noted that sometimes the best reading of a statute is that it delegates authority and discretion to the agency.

The Durbin Amendment is just such a statute. The Durbin Amendment directs the Board to "establish standards" to determine whether an interchange transaction fee is "reasonable and proportional" to the cause incurred by the issuer. 15 U.S.C. § 1693o-2(a)(2), (a)(3)(A). That is the language of delegation recognized by *Loper Bright* itself. And the Board has wide latitude to determine the relevant "cost," subject to

two limitations. First, the Board "shall" consider "the incremental cost incurred by an issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* at (a)(4)(B)(i). And second, the Board "shall not" consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* at (a)(4)(B)(ii).

Thus, the Board exercised its delegated authority and rightly concluded that the cost of a particular transaction includes "fixed" authorization, clearance, and settlement ("ACS") costs, transaction-monitoring costs, issuer fraud losses, and network processing fees. This is the best reading of the statute because it "gives full effect to all of its terms." That alone is enough to affirm the district court.

The Board could have gone even further and remained within the statute, because the statute only requires the Board to "establish standards for assessing whether the amount of any interchange transaction fee… is *reasonable and proportional* to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A) (emphasis added). Accordingly, this Court could also affirm the district court because the interchange transaction fee the Board chose is

6

"reasonable and proportional" in light of the underlying economics of two-sided platforms.

As described above, in the payment card market, an interchange fee exists to balance the participation between merchants and consumers. The Board *could* prescribe a regulation establishing a standard that considers the consumer benefits the debit card interchange fee enabled issuers to subsidize, like debit card rewards, free checking accounts, and low monthly minimum account balances. The statute does not say an interchange transaction fee is limited to a mathematical calculation of the "cost incurred by the issuer with respect to the transaction," but that the fee an issuer may receive or charge "shall be reasonable and proportional" to those costs. 15 U.S.C. § 1693o-2(a)(2). An interchange transaction fee could be "reasonable and proportional" if it allows issuing banks to offer greater or commensurate benefits to consumers on the other side of the market. Indeed, rather than set a single fee, the Board could even issue a rule that interchange fees are subject to Board review for to whether the fees are "reasonable and proportional," according to the Board's published standard criteria.

7

In sum, both the law and the underlying economics favor the Board. The Board can (and should) take costs beyond just the incremental ACS costs into consideration when establishing standards for a "reasonable and proportional" interchange transaction fee. The district court should be affirmed.

## ARGUMENT

The Supreme Court explained the foundational principles for this case. Card payment networks (like debit and credit cards) are two-sided platforms. *Ohio v. American Express Co.*, 585 U.S. 529, 534 (2018). Two-sided platforms offer different products or services to two different groups that rely on the platform as an intermediary. *Id.* An indirect network effect exists "where the value… to one group of participants depends on how many members of a different group participate." *Id.* at 535. "Sometimes indirect network effects require two-sided platforms to charge one side more than the other," which in the payment card network context means they may choose to "lose money on the cardholder side by offering rewards" and other benefits "because increasing the number of cardholders increases the value of accepting the card to merchants and, thus, increases the number of merchants who accept it." *Id.* at 536-37.

"Networks can then charge those merchants a fee for every transaction (typically a percentage of the purchasing price). Striking the optimal balance of the prices charged on each side of the platform is essential for two-sided platforms to maximize the value of their services and to compete with rivals." *Id.* at 537. In other words, interchange fees are a market-driven price that are fundamental to the operation of the payment card system.

## I. The Board has the Discretion to Include All Costs Incurred by the Issuer in Respect to the Transaction.

Banks previously used debit interchange fees—a fee charged to the merchant side of the ledger—to subsidize benefits to cardholders. But with the implementation of price caps under the Durbin Amendment and Regulation II, many of those benefits disappeared.

While Regulation II caps debit interchange fees, the final rule's caps are higher than those the Board's initial (but not final) proposed rule. *NACS v. Board of Governors of Federal Reserve System*, 746 F.3d 474, 481-82. (D.C. Cir. 2014). That prompted the first challenge to Regulation II, which the D.C. Circuit turned away relying in part on *Chevron* deference to the Board. The DC Circuit found the statute was ambiguous, and that the Board's interpretation was reasonable (*i.e.* that there were

three categories of costs). *See NACS*, 746 F.3d at 488 ("Given the Durbin Amendment's ambiguity as to the existence of a third category of costs, we must defer to the Board's reasonable determination that the statute splits costs into three categories..."). The challengers here question whether, after *Loper Bright*, a court exercising independent judgment would agree that Regulation II is the best reading of the Durbin Amendment. But that challenge misses the mark.

It is true that *Loper Bright* overturned *Chevron*, holding that courts must exercise independent judgment and not merely defer to reasonable agency interpretations of ambiguous statutes. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgement in deciding whether an agency has acted within its statutory authority…"). But the Court also made clear that there are times when "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 394. For example, a statute might empower an agency "to regulate subject to limits imposed by a term or phrase that leaves agencies with flexibility. *Id.* at 395 (internal quotations omitted). And how might a statute signal that

10

flexibility? By tasking the agency with promulgating standards, or by using a term like "appropriate" or "reasonable." *Id.*

This is precisely such a statute. The Durbin Amendment gives the Board broad discretion "to establish standards for assessing whether the amount of any interchange fee… is *reasonable* and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2) (emphasis added).

The examples cited by the *Loper Bright* Court as valid broad delegations of authority to an agency are instructive. For instance, in *Batterton v. Francis*, the Court held the statute "expressly delegated to the Secretary the power to prescribe standards for determining what constitutes 'unemployment'…" 432 U.S. 416, 425 (1977). Specifically, the statute required a participating State to provide assistance where a needy child had been deprived of parental support or care by reason of the unemployment of his father, with unemployment being "determined in accordance with standards prescribed by the Secretary." *Id.* at 419. In such a case, a "reviewing court is not free to set aside those regulations because it would have interpreted the statute in a different manner." *Id.* at 425.

11

Here, the Durbin Amendment similarly gives the Board authority to establish standards for determining what is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2); (a)(3)(A). This gives the Board wide latitude to determine the relevant "cost" incurred by the issuers, subject to two limitations. First, that it "shall" consider the incremental ACS costs incurred by an issuer. *Id.* at (a)(4)(B)(i). And second, that it "shall not" consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* at (a)(4)(B)(ii). *Cf. Linney's Pizza, LLC v. Board of Governors of Federal Reserve System*, 804 F. Supp. 3d 717, 731 (E.D. Ky. 2025) ("Put together, § 1693o-2 plainly allows the Board to consider costs it is not mandated to consider, as long as they are not costs it is prohibited from considering.").

This leaves to the Board's discretion whether it may consider other costs incurred by an issuer, as long as they are specific to a particular electronic debit transaction. This would include "fixed" ACS costs, transaction-monitoring costs, network processing fees, and fraud-loss adjustments.

The traditional canons of statutory interpretation also show that the best reading of the statute allows the Board to recognize these other transaction-specific costs. The canon of surplusage assumes that all words are meant to have some effect. "The canon of surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013).

Here, the reading of statute forwarded by the appellants would render subparagraphs (a)(2) and (a)(3) unnecessary. The statute could simply say that "the Board shall prescribe regulations setting an interchange transaction fee equal to the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" – but it doesn't. The District Court correctly reasoned that "[i]f the statute were as restrictive and mechanical as Linney's Pizza suggests, then there would be no need to require the fee standard to be 'reasonable and proportional'" as it "would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i)." *Linney's Pizza*, 804 F. Supp. 3d at 731. In sum, the Durbin Amendment gives the Board the discretion to take costs

13

beyond just the incremental ACS costs into consideration when establishing standards for a "reasonable and proportional" interchange transaction fee. The District Court should be affirmed.

## II. The Board has the Discretion to Consider Consumer Benefits When Determining Whether Interchange Transaction Fees are Reasonable and Proportional.

The District Court should be affirmed for a second independent reason: The text of the Durbin Amendment explicitly delegates to the Board even broader authority than the Board chose to exercise in determining whether an interchange transaction fee is "reasonable and proportional." The very nature of those broad words suggest that the Board should consider not only the costs themselves but whether an interchange fee could be "reasonable" and "proportional" in relation to those costs.

In the legal context, "reasonable" normally means "[r]eflecting good judgment; fair and proper under the circumstances; rational, sound, and sensible." Black's Law Dictionary (12th ed. 2024). Similarly, proportional requires a "correspond[ence] in size, degree, or intensity." The Mirriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/proportional (last accessed Jun. 2, 2026). Neither

14

term suggests the Board must set an interchange fee at exactly incremental ACS costs. *Cf.* Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43394, 43423 (Jul. 20, 2011) (Final Rule) ("Congress indicated that interchange fees must have a relationship to related costs, but need not be equal to those costs. If Congress intended a fixed proportion between an issuer's transaction cost and the amount of an interchange fee, it would have said so by requiring an interchange fee to have a 'given proportion to,' 'be equal to,' or have a 'fixed proportion to' cost.").

To effectively make this judgment, the Board could consider that debit card networks are two-sided platforms and that interchange fees allow for the merchants on one side of the platform to subsidize benefits to consumers on the other.

As the Supreme Court discussed in *American Express*, payment card networks are "two-sided platforms… where the value… to one group of participants depends on how many members of a different group participate." *American Express*, 585 U.S. at 535. These "indirect network effects" sometimes "require two-sided platforms to charge on side more than the other," which in the payment card network context means they

15

may choose to "lose money on the cardholder side by offering rewards" and other benefits. *Id.* at 536-37.

Before the adoption of the Durbin Amendment, debit interchange fees allowed issuing banks to subsidize other benefits to consumers like debit card rewards and free checking accounts with low monthly minimum account balances. Unfortunately, many of these benefits disappeared after promulgation of Regulation II.[2] Federal Reserve economists themselves have found a loss of benefits to consumers from Regulation II, but no compensating reduction in prices from retailers.[3]

---

[2] *See generally* Comments of the International Center for Law & Economics, Regulation II: Debit Card Interchange Fees and Routing, Docket No.R-1818, RIN 7100-AG67 (Apr. 23, 2024), *available at* https://laweconcenter.org/wp-content/uploads/2024/04/Reg-II-comment-FINAL.pdf; Geoffrey A. Manne, Julian Morris, & Todd J. Zywicki, *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses*, INT'L. CTR. LAW & ECON. (Apr. 25, 2017), *available at* https://laweconcenter.org/wp-content/uploads/2017/08/icledurbin_update_2017_final-1.pdf.

[3] *See, e.g.*, Mark D. Manuszak & Krzysztof Wozniak, *The Impact of Price Controls in Two-sided Markets: Evidence from US Debit Card Interchange Fee Regulation*, Finance and Economics Discussion Series 2017-074, FED. RSRV. (Jul. 2017), https://www.federalreserve.gov/econres/feds/the-impact-of-price-controls-in-two-sided-markets-evidence-from-us-debit-cardinterchange-fee-regulation.htm; Benjamin S. Kay, Mark D. Manuszak, & Cindy M. Vojtech, *Bank Profitability and Debit Card Interchange Regulation: Bank Responses to the Durbin Amendment*, Finance and Economics Discussion Series 2014-77, FED. RSRV. (Sep. 2014),

16

In recognition of the benefits to consumers enabled by interchange fees, the Board could have determined that a higher interchange fee is justified because it is "reasonable and proportional" to the cost incurred by the issuer in a specific transaction. The Board could have even published standards, enforceable *ex post*, for what a reasonable percentage for an interchange fee *could be*, considering consumer benefits that they enable, rather than setting any percentage themselves. *Cf. Linney's Pizza*, 804 F. Supp. 3d at 731 ("[T]he Boad's role in implementing [the statute] involves more than mere calculation and cost-sorting drudgery.").

In other words, the broad grant of discretion given to the Board would allow them to not only make this reasonable interpretation allowing them to consider other costs in setting what they believe to be a reasonable and proportional interchange fee cap, but for a far broader exercise of authority that would benefit consumers.

---

https://www.federalreserve.gov/econres/feds/bank-profitability-and-debit-card-interchange-regulation-bank-responses-to-thedurbin-amendment.htm; Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 (3) ECON. QUAR. (FED. RSRV. BANK OF RICHMOND) 183 (2014).

17

## CONCLUSION

There is no such thing as a free lunch, not even pizza. Artificially limiting interchange fees far below the market rate—as well as what the underlying statute requires—ultimately harms consumers. The Board did not violate its enabling statute by declining to limit rates further still. For the foregoing reasons, District Court should be affirmed.

Dated: June 5, 2026

Respectfully submitted,

*/s/* Philip D. Williamson

Philip D. Williamson
TAFT STETTINIUS & HOLLISTER LLP
301 E. 4th St., Ste. 2800
Cincinnati, OH 45202-4245
(513) 381-2838
pwilliamson@taftlaw.com

Ben Sperry
Kristian Stout
Geoffrey Manne
INTERNATIONAL CENTER FOR LAW & ECONOMICS
1104 NW 15th Ave., Ste. 300
Portland, OR 97207
(609) 807-8688
bsperry@laweconcenter.org

*Counsel for Amicus Curiae*

18

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and 6 Cir. R. 32 because it contains 3094 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century font.

Dated: June 5, 2026                    */s/* Philip D. Williamson

19

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically on June 5, 2026 using the Court's CM/ECF system, which will serve notice of this filing on all counsel of record:

<u>*/s/*</u> <u>Philip D. Williamson</u>