No. 25-6038

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

LINNEY'S PIZZA, LLC,

*Plaintiff-Appellant,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellee*

and

BANK POLICY INSTITUTE and CLEARING HOUSE ASSOCIATION, LLC,

*Proposed Intervenors.*

_____

On Appeal from the United States District Court for the
Eastern District of Kentucky at Frankfort, No. 3:22-cv-00071
(Van Tatenhove, J.)

_____

## BRIEF OF *AMICI CURIAE* PROFESSOR TODD ZYWICKI
## AND MANHATTAN INSTITUTE IN SUPPORT OF APPELLEE

_____

Ilya Shapiro
Manhattan Institute
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

Shawn T. Sheehy
   *Counsel of Record*
FisherBroyles, LLP
1200 G Street NW.
Suite 800
Washington, D.C. 20005
(202) 258-0741
shawn.sheehy@fisherbroyles.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Rules 26.1(a) and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, and Sixth Circuit Rule 26.1, *Amici Curiae* are Professor Todd Zywicki and the Manhattan Institute. Professor Zywicki submits this brief in his personal capacity.

The Manhattan Institute certifies that it is a non-partisan, nonprofit public policy think tank. The Manhattan Institute has no parent companies, subsidiaries, or affiliates, and does not issue shares.

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................... i

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF INTEREST ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ............................................................... 6

I. BANKS PROVIDE THE DEBIT CARD NETWORKS WHERE CONSUMERS AND MERCHANTS COME TOGETHER TO BUY AND SELL GOODS ............................................................... 6

II. DEBIT CARD USAGE SOARED BETWEEN 2000 AND 2009—AND WITH IT, FREE CHECKING ACCOUNTS THAT EXPANDED FINANCIAL INCLUSION ....................................... 9

III. THE DURBIN AMENDMENT TRIED TO LOWER BANKING COSTS BUT ONLY HURT CONSUMERS ....................................... 12

    A. Senator Durbin Wanted to Lower Interchange Fees ........................... 12

    B. The Durbin Amendment Forced Greater Banking Costs on Those Who Could Least Afford Them .................................... 14

IV. THE RULE THAT LINNEY'S PIZZA AND ITS AMICI ADVOCATE WILL ONLY EXACERBATE CONSUMER HARM ............................................................... 22

    A. Merchants Have Not Reduced Consumer Prices .............................. 22

    B. Linney's Pizza's Amici Rely on Dr. Shapiro, Who Has Recognized That the Durbin Amendment Harms Consumers and Small Merchants ................................... 23

V. REGULATION II CORRECTLY INTERPRETS THE STATUTE ............. 25

CONCLUSION ............................................................... 28

CERTIFICATE OF COMPLIANCE ............................................................... 29

CERTIFICATE OF SERVICE ............................................................... 30

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Biden v. Nebraska*, 600 U.S. 477 (2023) .......................................................5, 27, 28

*Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984) ...................................................25

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001).........................................25

*King v. Burwell*, 576 U.S. 473 (2015) ..........................................................5, 26, 27

*Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.*,
    804 F. Supp. 3d 717 (E.D. Ky. 2025)................................................. 11, 26-27

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..................................25, 27

*NACS v. Bd. of Governors of the Fed. Reserve Sys*., 746 F.3d 474
    (D.C. Cir. 2014) .................................................................................11, 25

*Ohio v. Am. Express Co.,* 585 U.S. 529 (2018) ......................................................3, 7

*U.S. Nat'l Bank v. Indep. Ins. Agents of Am.,* 508 U.S. 439 (1993) ........................26

*United States v. Hinckley*, 550 F.3d 926 (10th Cir. 2008).......................................26

**STATUTES AND REGULATIONS**

15 U.S.C. § 1693o-2(a)(4)(A)...........................................................................11

15 U.S.C. § 1693o-2(a)(4)(B)(i-ii)......................................................................27

Dodd-Frank Wall Street Reform and Consumer Protection Act, 124
    Stat. 1376 (2010) ...................................................................................5, 13, 25

**COURT FILINGS**

*Amicus* Br. of Sen. Richard Durbin, *NACS v. Board of Governors of
    the Federal Reserve System*, No. 14-200 (U.S. Sept. 18, 2014). ............12, 13

**TABLE OF AUTHORITIES—Continued**

OTHER AUTHORITIES                                              Page(s)

156 Cong. Rec. S4839 (daily ed. Jun. 10, 2010), *available at*
    https://www.gpo.gov/fdsys/pkg/CREC-2010-06-
    10/html/CREC-2010-06-10-pt1-PgS4839.htm..............................13

2010 Federal Reserve Payment Study (Dec. 2010), https://tinyurl.com/
    msrdpz5z......................................................................................9, 10

Bd. Of Governors of the Federal Reserve Board, *2023 Interchange
    Fee Revenue, Covered Issuer Costs, and Covered Issuer and
    Merchant Fraud Losses Related to Debit Card Transaction*
    (Dec. 2025) .....................................................................................16

Bd. of Governors of the Federal Reserve System, Average Debit Card
    Interchange Fee by Payment Card Network (Dec. 19, 2025) ........19

Benjamin S. Kay, Mark D. Manuszak, and Cindy M. Vojtech,
    *Competition and Complementarities in Retail Banking:
    Evidence from Debit Card Interchange Regulation*, 34 J. Fin.
    Intermediation 91 (2018) ...............................................................14

Bradley Hubbard, *The Durbin Amendment, Two-Sided Markets, and
    Wealth Transfers: An Examination of Unintended
    Consequences Three Years Later*
    (May 20, 2013) ....................................... 3, 9, 13, 16, 18, 19, 21, 26

Bureau of Consumer Financial Protection, Taskforce on Federal
    Consumer Financial Law Report (Jan. 2021).......4, 6-8, 10, 12, 14-18, 21, 22

Comment of the Bank Policy Institute, *Docket No. R-1818, RIN 7100-
    AG67; Debit Card interchange Fees and Routing* (May 10,
    2024) ...............................................................................................19

David S. Evans, Howard Chang, Steven Joyce, *The Impact of the U.S.
    Debit Card Interchange Fee Regulation on Consumer Welfare:
    An Event Study Analysis*, Coase-Sandor Institute for Law &
    Economics Working Paper No. 658 (Oct. 23, 2013)...................23

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Debit Card Interchange Fees and Routing*, Final Rule, 76 Fed. Reg.
43,394 (July 20, 2011) ..................................................................... 10, 26-28

Eric Peters, *Repeal the Walgreens Assistance Act*, InsideSources.com
(Mar. 16, 2017), https://tinyurl.com/az68sxc4 ...............................13

Jean Tirole, *Market Failures and Public Policy* (Nobel Prize Lecture,
Dec. 8, 2014).....................................................................................7

Marshall Lux and Robert Green, *Out of Reach: Regressive Trends in
Credit Card Access*, Harvard Kennedy School, Mossavar-
Rahmani Center for Business and Government (April 2016) .......................16

Milton Friedman, *Capitalism and Freedom* (Puffin Books Ed. 2024)......................2

Robert J. Shapiro, *The Costs and Benefits of Half a Loaf: The
Economic Effects of Recent Regulation of Debit Card
Interchange Fees*, Sonecon Working Paper (Oct. 2013)..............................20

Robert J. Shapiro and Jerome Davis, *The Unanticipated Costs and
Consequences of Federal Reserve Regulation of Debit Card
Interchange Fees*, Progressive Policy Institute (December
2025) ................................................................... 5, 13, 17-21, 24

Scott D. Strockoz *Dodd-Frank and the Durbin Amendment—Is It
Working as Intended?*, Capstone Strategic Project for the
American Bankers Association Stonier Graduate School of
Banking (2012) .................................................................................22

Todd J. Zywicki, *The Economics of Payment Card Interchange Fees
and the Limits of Regulation*, International Center for Law and
Economics (June 14, 2010) ...............................................................17

Todd Zywicki, *Regulatory Tripwires: How Arbitrary Thresholds
Distort Financial Markets*, ICLE White Paper 2026-05-18
(May 18, 2026) ............................................................... 18-19

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris,
    *Unreasonable and Disproportionate: How the Durbin*
    *Amendment Harms Poorer Americans and Small Businesses*,
    International Center for Law & Economics
    (April 25, 2017) ....................................................... 4, 9, 13, 15, 19, 20, 23-25

Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the*
    *Durbin Amendment on Merchants: A Survey Study*, 100 Fed.
    Reserve Bank of Richmond Econ. Quarterly 183 (2014) ..................... 4-5, 22

**STATEMENT OF INTEREST**[1]

Professor Todd Zywicki is the George Mason University Foundation Professor of Law at George Mason University Antonin Scalia Law School and Co-Founder and Co-Director of the Institute for Consumer Financial Choice. He is the former executive director of the George Mason Law & Economics Center and Editor of the *Supreme Court Economic Review*. Professor Zywicki's expertise is in the economics of consumer finance and consumer protection law. For example, from 2020-2021, he chaired the Consumer Financial Protection Bureau's Taskforce on Federal Consumer Financial Law and was the Director of the Office of Policy Planning at the Federal Trade Commission. In 2025, Professor Zywicki was named a member of the U.S. delegation to the Expert Advisory Group of the OECD's Global Forum on Consumer Policy. He frequently testifies before Congress on consumer credit issues. He has also authored numerous articles analyzing the Durbin Amendment's impact on consumers.

The Manhattan Institute (MI) is a nonprofit public policy research foundation whose mission is to develop and disseminate new ideas that foster greater economic choice and individual responsibility. It has historically sponsored scholarship and

---

[1] Counsel for Appellee and Proposed-Intervenors both consent to the filing of this brief. Counsel for Appellant does not object to the filing of this brief. No party's counsel authored this brief in any part. No person, other than *amici*, its members, or its counsel, contributed money to fund the preparation and submission of this brief. Fed. R. App. P. 29(a)(4)(E).

1

filed briefs opposing government regulations that stifle economic freedom and promoting clear rules that advance the flourishing of America's great cities.

This case concerns *amici* because the Durbin Amendment's imposition of price controls on interchange fees has negatively impacted American consumers and small businesses.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Milton Friedman observed that price controls "lead to the destruction of the free-enterprise system and its replacement by a centrally controlled system." Milton Friedman, *Capitalism and Freedom*, 134 (Puffin Books Ed. 2024).

Congress passed the Durbin Amendment ostensibly to protect both consumers and small merchants. Instead, it did the opposite. The Durbin Amendment constituted government intervention into the free market by imposing price controls on interchange fees. In so doing, the government effected a wealth transfer: banks lost approximately $8 billion annually while large merchants—the groups that lobbied for the price cap—gained approximately $8 billion annually. Left in the large merchants' wake were small merchants (*e.g.*, convenience stores) and consumers. Largely, it was consumers who paid for the transfer of wealth, especially low-income, younger, and other consumers less likely to own credit cards or otherwise be able to avoid debit-card-related banking costs. Agreeing with Linney's Pizza's argument will only make the harm worse.

2

*Amici* advance the following points:

1.      Debit card transactions occur over a two-sided network. This means that banks provide the platform for consumers and merchants to transact business. What banks sell is the ability to transact business over the platform. If both consumers and merchants do not agree to transact business in this manner, there is no debit card transaction, and the banks cannot sell their platform to facilitate the transaction. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 545 (2018).

2.      Debit cards pervaded the market beginning in the early 2000s. The money generated from the facilitation of transactions—*i.e.*, the interchange fee—allowed banks to expand access to free checking accounts and lower other fees. *See, e.g.,* Bradley Hubbard, *The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later* at 10-11 (May 20, 2013).

3.      Senator Durbin focused only on the increase in the interchange fees and considered this a market defect. He therefore proposed and passed his eponymous amendment imposing price controls on interchange fees. He did this with the purported hope that his amendment would help merchants keep more of their money and that the merchants would pass on their savings to consumers.

4.      This had disastrous consequences for small merchants and consumers alike. For example, in 2006, 76% of bank accounts were free checking accounts.  By

2014, that had fallen to only 34%. Additionally, banks increased their checking account fees, overdraft fees, ATM fees, and minimum balance requirements. Banks also drastically reduced debit-based rewards programs. All of this caused the number of unbanked and underbanked households to increase by one million and three million, respectively. Additionally, for their part, merchants rarely passed on savings to consumers. *See, e.g.,* Bureau of Consumer Financial Protection, Taskforce on Federal Consumer Financial Law Report, Vol. 1 at 589 (Jan. 2021) ("Federal Consumer Financial Law Report").

5.　　Small merchants were also harmed. Interchange fees on small transactions, for example, $7.50, exceeded the profit margins of many industries that depend on small transactions, such as convenience stores. Prior to the Durbin Amendment, banks and debit card issuers applied lower interchange fees to small transactions. *See, e.g.,* Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris, *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses*, International Center for Law & Economics at 22 (April 25, 2017).

6.　　Adopting the Appellant's preferred reading of the Durbin Amendment will only exacerbate the harms imposed on consumers. Banks will continue shifting substantial costs on the two-sided network to consumers. Meanwhile, as the studies demonstrate, merchants will, at most, pass negligible savings onto consumers. *See,*

*e.g.,* Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Fed. Reserve Bank of Richmond Econ. Quarterly 183, 184, 194 (2014).

7.    Appellant's *amici* rely on studies produced by economist Robert Shapiro. These studies are flawed in that they are based on fanciful assumptions. Additionally, and more importantly, Dr. Shapiro has recanted the findings of these studies. Robert J. Shapiro and Jerome Davis, *The Unanticipated Costs and Consequences of Federal Reserve Regulation of Debit Card Interchange Fees*, at 14 Progressive Policy Institute (December 2025) ("Shapiro").

8.    Lastly, *amici* agree with both the district court's and the Board's statutory interpretation analysis. The Durbin Amendment is ambiguous and poorly drafted. The Appellant's preferred reading of the statute would lower the interchange fee even further and therefore impose additional harms on consumers. Given Congress's stated purpose in passing the Durbin Amendment and Dodd-Frank, Congress could not have intended such a compelled massive transfer of wealth from consumers to large merchants on the two-sided network through which trillions of dollars pass every year. This is especially true when Congress placed the statutory delegation in a sub-sub section of a massive consumer protection piece of legislation like Dodd-Frank while using ambiguous language. *See King v. Burwell*, 576 U.S. 473, 497 (2015); *Biden v. Nebraska*, 600 U.S. 477, 507 (2023).

## ARGUMENT

### I. BANKS PROVIDE THE DEBIT CARD NETWORKS WHERE CONSUMERS AND MERCHANTS COME TOGETHER TO BUY AND SELL GOODS

Debit card networks operate under one of two structures: a three-party system or a four-party system. *See Federal Consumer Financial Law Report* at 586.[2] American Express and Discover cards operate under a three-party system. Here, the card issuer*, e.g.*, American Express, directly acts with both the consumer and the merchant on each transaction. In this three-party system, American Express issues the card, processes the payment transfer, and handles the credit underwriting and processing for each consumer.

In a four-party system, *e.g.*, Visa and Mastercard, there is an added intermediary. Here, the relationship between merchants and consumers is mediated by the consumer's financial institution (the issuer) and the merchant's bank (known as the acquirer). The network acts as a bridge between the consumer's issuing bank and the merchant's acquiring bank. Thus, the debit card payment transaction is not done directly between consumer and merchant, instead, the transaction is completed through an intermediary, *i.e.*, a platform.

---

[2] Unless otherwise noted, this report provides the factual support for the assertions made in this section. Prof. Zywicki chaired the taskforce that produced the report.

Payment card networks are a paradigm example of a "two-sided network" in which a buyer and seller interact across a platform the primary function of which is to coordinate those interactions. *See Am. Express Co.*, 585 U.S. at 545. Two-sided markets are ubiquitous in modern economies—including search engines, newspapers, app stores, and online dating sites—where the platform's function is to coordinate actors on both sides of the market.[3] This is similar to conducting business through an internet search engine. Merchants and consumers do not conduct business directly but are connected by an intermediary.

Accordingly, the costs of operating the intermediary platform necessarily include the joint interaction of the cardholder and the merchant. Costs only occur if both the consumer and the merchant agree to operate through the platform. Therefore, "because these costs arise from the joint interaction, there is no 'natural' way to allocate the costs associated with the platform supplying the transaction." *Federal Consumer Financial Law Report* at 586. Costs for operating the platform must be borne by either the consumer, the merchant, or both. If platform operators calibrate the price too high for merchants or consumers, they will stop using the platform to finalize transactions. Moreover, the value to users of two-sided networks often is maximized when one party bears more of the cost of maintaining the network

---

[3] Jean Tirole was awarded the Nobel Prize in Economics in 2014 for, among other things, explaining the characteristics of two-sided markets. *See* Jean Tirole, *Market Failures and Public Policy* (Nobel Prize Lecture, Dec. 8, 2014).

than the other—for example, advertisers bear the entire financial cost associated with Google and other online search engines whereas consumers receive an unlimited number of free searches (and other services) at zero cost. The bottom line, however, is that for merchants to be willing to accept debit cards and consumers to use them, both sides of the transaction must enjoy benefits that exceed the costs, otherwise they would cease using it.

Accordingly, interchange fees are the "fundamental price mechanism used within the four-party network system to allocate the costs among merchants and consumers." *Federal Consumer Financial Law Report* at 588.   And just as advertisers pay a premium for space in part of a newspaper, while the consumer pays a fraction to obtain the whole paper, merchants tend to subsidize the debit card platform more than consumers. *Id*. at 587-88.  The total price paid by the merchant for a debit card transaction is known as the "merchant discount" and includes the cost to the merchant to its bank partner (the acquirer) to maintain an account (including the costs to process transactions, dispute resolution, fraud protection, etc.), the cost of the network fee, and the interchange fee, which is paid to the consumer's issuing bank. Thus, the interchange fee is only one of the costs embedded in the merchant discount.

In turn, the issuing bank uses that revenue to cover some of the costs of maintaining and servicing the consumer's account as well as other related costs such

8

as fraud protection, unauthorized-user charges, dispute resolution, maintenance of branches and customer service, processing payments, card replacement, and the like. Merchants derive significant indirect benefit from the issuing bank's services. For example, because the issuing bank handles billing and collections, it guarantees immediate payment and relieves the merchant of the cost, delay, and unpleasantness of having to collect from delinquent consumers, dealing with bounced checks, or handling cash (such as safes, security cameras, and armored trucks). Any costs not covered by interchange fees or other revenue sources must be borne directly by consumers through higher bank fees or reduced quality and services.

Distilled to its essence, when a customer pays for merchandise with a debit card, the purchase price is deducted from the customer's account. The issuing bank then sends the total amount to the acquiring bank, less the interchange and network fees. The merchant's bank then deducts the fee for its services and remits the final amount to the merchant. Zywicki, et al., *Unreasonable and Disproportionate:* at 22.

II. **DEBIT CARD USAGE SOARED BETWEEN 2000 AND 2009—AND WITH IT, FREE CHECKING ACCOUNTS THAT EXPANDED FINANCIAL INCLUSION**

In 2000, consumers used debit cards in 8 billion transactions. Bradley Hubbard, *Two-Sided Markets, and Wealth Transfers:* at 10-11. Between 2006 and 2009, debit card payments grew by double digits, accounting for 34.8% of noncash payments in 2009. This represented an average annual increase of 14.8%. *See* 2010

9

Federal Reserve Payment Study at 16 (Dec. 2010), https://tinyurl.com/msrdpz5z. During the same period, check usage saw an average annual decrease of 7.1%. *See id*. at 5. By 2009, consumer use of debit cards accounted for 37.6 billion transactions totaling $1.4 trillion. *Debit Card Interchange Fees and Routing*, Final Rule ("Regulation II") 76 Fed. Reg. 43,394, 43,397 (July 20, 2011). Networks reported that interchange fees totaled $16.2 billion. *See id.*

This growth in debit card usage, with the accompanying interchange fees, "enabled a growth in access to bank accounts for many consumers." *See Federal Consumer Financial Law Report* at 589. Prior to the rise in debit cards, consumers bore most of the cost of checking accounts through monthly fees which defrayed the bank's cost of operating the account as well as the cost of ordering checks. That consumers paid these costs for checks was a benefit to merchants who enjoyed the security and convenience of checks as opposed to cash. *See id*.

Consumers could escape those fees only by maintaining high monthly balances or purchasing other bank products like car loans or mortgages. In fact, those direct bank fees did not even include printing and mailing checks, unlike modern payment cards which are issued at no cost to customers. *See id*. Historically, checks, like payment cards today, cleared at a discount to the merchant, a practice that was reversed by Section 16 of the Federal Reserve Act of 1913, which mandated that checks should clear at "par." Like the impact of the Durbin Amendment, the net

10

effect of politically reallocating those costs from merchants to banks was to transfer the costs of maintaining bank accounts from merchants to consumers, who bore the bulk of the costs of bank accounts through high fees and limited services—such as the dispute resolution, fraud protection, and other benefits that consumers take for granted with modern payment cards. *But see* Appellant's Br. at 34 (stating that the Durbin Amendment commands the Board to move debit card transactions closer to clearing at par, like checks); *see also* Br. of *Amici Curiae* American Economic Liberties Project, et al., at 27 (same).[4]

Meanwhile, as the laws of economics dictate, as demand for debit cards increased, along with their use, so too did the price to use the debit cards. By 2009, the average cost per transaction was between 8 and 13 cents. *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.*, 804 F. Supp. 3d 717, 722 (E.D. Ky. 2025). Interchange transaction fees charged to merchants, however, averaged between 44 and 55.5 cents per transaction. *See id*; *see also NACS v. Bd. of Governors of the Fed. Reserve Sys.*, 746 F.3d 474, 479 (D.C. Cir. 2014). These banks were able to use these

---

[4] Appellant mischaracterizes the actual language of the Durbin Amendment, which requires the Fed to *consider* the *functional* similarity between check transactions and debit cards. *See* 15 U.S.C. § 1693o-2(a)(4)(A) (emphasis added). This suggests the Fed should consider the actual total costs of checks, not the government-mandated zero cost to merchants. Checks have high costs, but the government transferred all the costs to consumers, not the merchants. This cost allocation simply redistributes the costs of checks to consumers; it does not eliminate them. Notably, even though they bear none of the costs, many merchants today refuse to accept checks.

interchange fees to defray the costs of bank account services, such as by providing free checking accounts. *But see* Br. of *Amici Curiae* Retail Litigation Center, Inc, et al. at 2-3, 14-15 (complaining that banks received unreasonable profits from interchange fees); Br. of *Amici Curiae* American Economic Liberties Project, et al., at 21, 26 (same). This further permitted many lower-income consumers to participate in the financial system. *See Federal Consumer Financial Law Report* at 589.

Data proves the point. In 2001, just as debit card usage began to increase, only 7.5% of bank accounts offered free checking. *See id*. In a mere eight years, 76% of bank accounts offered free checking. "By dramatically expanding access to free checking and eliminating monthly maintenance fees, the introduction and rapid adoption of debit cards dramatically expanded financial inclusion for many consumers who traditionally could not afford a bank account." *See id*.

## III.  THE DURBIN AMENDMENT TRIED TO LOWER BANKING COSTS BUT ONLY HURT CONSUMERS

### A. Senator Durbin Wanted to Lower Interchange Fees

Senator Durbin, however, saw things differently. He saw the interchange fees as "excessive," causing harm to merchants and forcing consumers to pay $16.2 billion in interchange fees in 2009. *Amicus* Br. of Sen. Richard Durbin at 4, *NACS v. Board of Governors of the Federal Reserve System*, No. 14-200 (U.S. Sept. 18, 2014).   Senator Durbin believed that, without government intervention, the interchange fees would continually rise and these fees would "subsidize bank

12

inefficiencies." *Id.* Accordingly, Senator Durbin wanted to reduce the interchange fees by imposing price controls. *Id*.

In the wake of the Great Recession, and to protect consumers, on July 21, 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. 124 Stat. 1376. In addressing interchange fees, Senator Durbin offered his eponymous amendment to the Dodd-Frank Act of 2010. He asserted that the purpose of his proposal was, in part, to help consumers and small merchants. Senator Durbin stated that his amendment was intended to "help every Main Street business that accepts debit cards keep more of their money, which is a savings they can pass on to their consumers."[5] Senator Durbin sought to accomplish this by shifting costs from merchants to banks. *Shapiro* at 17.

The primary supporters of Durbin's proposal, however, and those who conducted a conspicuous lobbying effort, were not small businesses. Instead, they were large merchants, such as Target, Home Depot, and Walgreens. Zywicki, et al., *Unreasonable and Disproportionate:* at 19, 23-24; Hubbard, *Two-Sided Markets, and Wealth Transfers:* at 31.[6] So it was not surprising that the Durbin Amendment

---

[5] 156 Cong. Rec. S4839 (daily ed. Jun. 10, 2010) (statement of Sen. Richard Durbin), *available at* https://www.gpo.gov/fdsys/pkg/CREC-2010-06-10/html/CREC-2010-06-10-pt1-PgS4839.htm (last visited June 2, 2026).

[6] Senator Durbin himself stated that the amendment was prompted by a conversation with Walgreens' CEO. *See*, *e.g.*, Eric Peters, *Repeal the Walgreens Assistance Act*, InsideSources.com (Mar. 16, 2017), https://tinyurl.com/az68sxc4.

13

has benefited big-box chains and harmed consumers and small merchants, especially lower-income consumers.

## B. The Durbin Amendment Forced Greater Banking Costs on Those Who Could Least Afford Them

The Durbin Amendment imposed a ceiling on what banks could charge to merchants for interchange fees—*i.e.*, the fees banks charged for using their platforms. Banks reacted as expected: by passing on more of the costs of operating the platform to consumers. The initial estimates demonstrated that the annual revenues to banks decreased between $4.1-$6.5 billion. *Federal Consumer Financial Law Report* at 590. These annual losses have only increased every year since, peaking at $14 billion in lost annual revenue in 2019. *Id*. Since implementation, it is estimated that the total lost revenue from decreased interchange fees is $90.9 billion. *Id*.

1. Banks recovered much of their lost interchange-fee revenue through increased bank fees, thereby shifting the cost of using the two-sided network from merchants to consumers. *Id*. at 591. According to one estimate, banks recouped more than 90% of their lost interchange fee revenues through higher fees on consumers. *See* Benjamin S. Kay, Mark D. Manuszak, and Cindy M. Vojtech, *Competition and Complementarities in Retail Banking: Evidence from Debit Card Interchange Regulation*, 34 J. Fin. Intermediation 91, 92 (2018). This means that, in the two-sided network of interchange fees, banks shifted costs from merchants to consumers.

14

These fees included significantly restricting access to free checking accounts and increasing minimum account balances, which had a significant negative impact on consumers. *Federal Consumer Financial Law Report* at 591-92.

"One of the great pro-consumer developments of the 2000s was the rapid growth of consumer access to free checking accounts and a general reduction in bank fees, which in turn enabled millions of consumers to gain access to bank accounts." Zywicki, et al., *Unreasonable and Disproportionate:* at 10. In 2009, the percentage of bank accounts that offered free checking was 76%. Within two years of Regulation II's promulgation, that percentage fell to 38%. This holds true to this day. *Federal Consumer Financial Law Report* at 591.

Additionally, as the percentage of free checking accounts decreased, monthly account-maintenance fees increased. In 1999, to be eligible for free checking accounts, banks required on average a minimum balance of $562. *Id*. at 593. As debit cards pervaded the economy, increasing revenue through interchange fees, the minimum balance requirement for free checking account eligibility dropped to $109. *Id*. Within one year of Regulation II's promulgation, however, in 2012, to be eligible for free checking accounts, banks required a minimum balance of $723 and that minimum balance requirement remains true today. *Id*. When broken down further to noninterest-bearing free checking accounts and interest-bearing checking accounts,

15

the average minimum balance necessary to qualify for the former rose by $400 while the minimum balance necessary to qualify for the latter rose by $1,700. *Id*.

Additionally, and almost immediately after the passage of the Durbin Amendment, in the second half of 2010, banks substantially increased the monthly maintenance fees on non-free checking accounts. *Id*. at 591. Banks also significantly increased: (1) the minimum balances necessary to avoid maintenance fees; (2) overdraft fees; and (3) ATM fees. Hubbard, *Two-Sided Markets, and Wealth Transfers:* at 39; *see also* Marshall Lux and Robert Green, *Out of Reach: Regressive Trends in Credit Card Access*, Harvard Kennedy School, Mossavar-Rahmani Center for Business and Government, 20 and Figure 11 (April 2016). Additionally, in 2011, banks drastically reduced or eliminated debit cards rewards programs. *See Federal Consumer Financial Law Report* at 593.  By 2020, banks had all but eliminated their debit card rewards programs. *See* Bd. Of Governors of the Federal Reserve Board, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transaction,* Figure 22 at 27 (Dec. 2025).

2. Studies have concluded that low-income consumers disproportionately bore the brunt of higher banking fees. *See Federal Consumer Financial Law Report* at 592-93. Importantly, Dr. Shapiro, a prominent progressive economist and member of Democratic presidential administrations, no longer supports the Durbin

16

Amendment. He has concluded that the provision "disproportionately burdened lower-income and minority Americans." *Shapiro* at 5. The higher bank fees imposed on those who failed to meet the minimum monthly threshold impacted 70% of account holders in the lowest 25% income bracket, while impacting only 3% in the top 25% bracket. *Id*. Of those who closed their bank accounts, 81% said it was due to high banking fees. *Id*. These developments harmed low-income households in hindering their ability to establish sound credit—a necessary requirement for bank loans and credit cards. *Id*.

*Amici* agree with this assessment. These harms to lower-income and minority consumers were foreseeable as early as 2010. *See* Todd J. Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, International Center for Law and Economics, 51-52 (June 14, 2010).

As Mukyarlamov and Sarin conclude "over 70% of consumers in the lowest income quintile (annual household income of $22,500 or less) bore higher account fees, since they fall below the average post-Durbin account minimum required to avoid a monthly maintenance fee." *Federal Consumer Financial Law Report* at 592. The percentage of consumers in the highest income quintile whose checking account balances fell below the minimum required to avoid fees was only 5%. *See id*. at 593.

This dynamic had the effect of pushing many low-income consumers out of the banking system entirely. For example, prior to promulgation of Regulation II,

17

8% of the population lacked a checking account. After promulgation, that number increased to 12%. Hubbard, *Two-Sided Markets, and Wealth Transfers:* at 40. From 2009-2011, the number of unbanked households increased by one million and the number of underbanked households increased by three million. *Federal Consumer Financial Law Report* at 593. This had the effect of forcing low-income consumers to "rely on alternatives that ultimately are more expensive, including money orders, prepaid cards, and check cashers." *Id*.

High-income consumers also avoided the debit card fees and reduction of rewards programs by increasing their transactional use of credit cards. *Id*. at 592-93. Lower-income, younger, and minority consumers are less likely to own credit cards and so were less able to make that switch. *Shapiro* at 11-14.  As Shapiro notes, the increased use of credit cards (which generally have higher costs than debit cards), also eroded much of the savings merchants anticipated from the Durbin Amendment. *See id*. at 17-21.

But the Durbin Amendment's predicted savings turned out to be a phantasm for another reason--the hard cliff of its $10 billion threshold amount incentivized the rise of the "banking-as-a-service" fintech model. Here, fintech companies partner with banks *below* the $10 billion threshold amount and are therefore exempt from the Durbin Amendment. *See* Todd Zywicki, *Regulatory Tripwires: How Arbitrary Thresholds Distort Financial Markets*, ICLE White Paper 2026-05-18 (May 18,

18

2026). These companies and exempt banks have targeted lower-income consumers who have been pushed out of the larger banks by the Durbin Amendment and then given these lower-income consumers free banking services. These services, however, are paid for by interchange fees that are more than double that of covered banks. Bd. of Governors of the Federal Reserve System, Average Debit Card Interchange Fee by Payment Card Network (Dec. 19, 2025).

3. Although Senator Durbin sought to ensure small merchants could keep more of their money from sales, the opposite happened. For debit card transactions, small retailers faced increased costs. Zywicki, et al., *Unreasonable and Disproportionate:* at 19, 23-24; Hubbard, *Two-Sided Markets, and Wealth Transfers:* at 2. Looking at the full weight of evidence, Shapiro concluded that while consumers and small businesses have generally lost from the Durbin Amendment, the biggest winners have been large "big box" national retailers and their shareholders. *Shapiro* at 22-23. In one famous example, Home Depot's CFO estimated that the chain would benefit by approximately $35 million per year from the Durbin Amendment. *See* Comment of the Bank Policy Institute, *Docket No. R-1818, RIN 7100-AG67; Debit Card interchange Fees and Routing* at 26 (May 10, 2024).

It is hard to square these distributional effects with the language or purported intent of the Durbin Amendment. Further ratcheting down debit card interchange

fees, as appellants desire, would simply transfer even more wealth from lower-income consumers to the shareholders of national retailers. *See Shapiro* at 20.

4.    By contrast, small retailers saw increased costs because of Regulation II. *See id.* at 19. The merchants who suffered the most under Regulation II include: grocery stores and fast-food restaurants, among similar establishments. In fact, approximately 31.3% of merchants reported increased debit costs after the Durbin Amendment was passed. The consequences of these price increases impacted low-income households the most. *See* Zywicki, et al., *Unreasonable and Disproportionate:* at 20 and 40.

The Durbin Amendment harmed small merchants in part because small merchants sell lower-ticket items. Prior to the Durbin Amendment, for transactions of $15 or less, the interchange fee was 1.55% of the transaction plus 4 cents. *Id.* at 22. Thus, on a $10 purchase, the interchange fee was $0.195, yielding the merchant $9.805. As Shapiro recognized, the interchange fee on a small transaction of, for example, $7.50 "exceeds the profit margin on such transactions for six industries that depend on small purchases, including supermarkets, groceries, convenience stores, gas stations and pharmacies." *Id.* (citing Robert J. Shapiro, *The Costs and Benefits of Half a Loaf: The Economic Effects of Recent Regulation of Debit Card Interchange Fees*, Sonecon Working Paper at 2 (Oct. 2013)).    Accordingly, the Richmond Federal Reserve Bank found that 31.8% of merchants stated that for small

20

ticket items, debit costs actually increased. *Id.* (citing Richmond Fed Durbin Impact Study). Thus, the Durbin Amendment's promise of helping "every single Main Street business that accepts debit cards *keep more of their money*" has proven false. *Id*. at 23.

Worse, by replacing market forces with a politically motivated central-planning mandate, Durbin Amendment's price ceiling effectively became a floor as well. Debit card interchange processors eliminated the small-ticket discount, a discount where the processors would lower the fee charged for purchases $15 or less. Hubbard, *Two-Sided Markets, and Wealth Transfers:* at 34. Prior to the Durbin Amendment, the interchange fee on a $2 charge was 7 cents and on a $5 charge it was 11 cents. *Id*. Post Durbin Amendment, however, every debit card transaction pays the same interchange fee: 21 cents plus 0.05% of the value of the transaction. Thus, small merchants like convenience stores, on transactions of $18.78 or less, pay higher interchange fees. *Id*.

In summary, the Durbin Amendment's benefits for merchants "are both far less than expected and highly concentrated among the nation's large retail chains and their shareholders, not among local merchants and their customers." *Shapiro* at 23. Accordingly, the net result of the Durbin Amendment is a $4 billion transfer to merchants funded by $3.2 billion directly from the banks and $0.8 billion from consumers. *Federal Consumer Financial Law Report* at 595. For this government

21

mandated wealth transfer, consumers, meanwhile, were required to pay $2.3 billion in higher checking fees while receiving only $1.5 billion in lower retail prices. *Id*.

## IV.   THE RULE THAT LINNEY'S PIZZA AND ITS *AMICI* ADVOCATE WILL ONLY EXACERBATE CONSUMER HARM

Supporters of the Durbin Amendment argued that any increase in bank fees would be offset by cost reductions to merchants that would result in lower prices. A decade-plus of experience, however, has shown that any merchant pass-through has been trivial at best and far smaller and slower than increases in consumer bank fees.

### A. Merchants Have Not Reduced Consumer Prices

*First*, some merchants have increased prices while most have kept prices the same. According to one study published in the Federal Reserve Bank of Richmond Economic Quarterly, 77.2% of merchants kept their prices the same after Regulation II was promulgated. Wang, et al., *The Impact of the Durbin Amendment on Merchants: A Survey Study* at 194. 21.6% of merchants increased prices while only 1.2% reduced prices. *Id*. Accordingly, within a year of Regulation II's implementation, "in many cases, consumers [saw] higher prices for low cost items or no savings at all." Scott D. Strockoz *Dodd-Frank and the Durbin Amendment— Is It Working as Intended?*, Capstone Strategic Project for the American Bankers Association Stonier Graduate School of Banking at ii (2012).

*Second*, even if prices went down, the reduction was *de minimis*. The Durbin Amendment has decreased costs for consumers an average of less than 5 cents per

transaction—assuming merchants pass through 100% of the savings. *See* David S. Evans, Howard Chang, Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis*, Coase-Sandor Institute for Law & Economics Working Paper No. 658 at 23 (Oct. 23, 2013).

Accordingly, as is demonstrated by a "wealth of economic studies," consumers "have no reason to believe that merchants would give this [$7 billion annual] windfall back to consumers." *See id*. at 49; *see also* Zywicki, et al., *Unreasonable and Disproportionate:* at 30 (stating that "even if merchants did pass on their entire cost to consumers, the savings would be small . . . a maximum retail price reduction of only $0.07 on a $40 purchase."). Decreasing the interchange fee to 12 cents or less will only harm consumers more: consumers will bear the brunt of increased bank fees while not receiving the benefit of reduced prices.

### B. Linney's Pizza's *Amici* Rely on Dr. Shapiro, Who Has Recognized That the Durbin Amendment Harms Consumers and Small Merchants

The overwhelming body of evidence concerning the impact of the Durbin Amendment on consumers confirms the above summary. In fact, even the study that Linney's Pizza's *amici* rely on—the aforementioned study by Dr. Robert Shapiro— was methodologically unsound. And even more devastating, Shapiro himself has repudiated those predictions based on a subsequent decade-plus of actual experience. For example, the American Economic Liberties Project brief cites Shapiro's 2013 study that asserts that Regulation II produced billions in savings for merchants and

that merchants would pass most of these savings onto consumers. Br. of Am. Econ. Liberties Project at 24-25. Additionally, that brief argues that Regulation II creates more than 37,000 jobs annually and, if the fee is reduced further, the job creation number could increase to more than 55,000 jobs annually. *Id*. at 28.

While that argument accurately represents Shapiro's predictions from 2013, he has now expressly repudiated those claims. The brief of the American Economic Liberties project fails to acknowledge this change. Originally, Dr. Shapiro thought that the Durbin Amendment would benefit both merchants and consumers. *Shapiro* at 13. Now, with "more than a decade" of additional data and analysis, Shapiro admits that those "consumer benefits never materialized." *Id*. at 14. At the time, Prof. Zywicki published a study (with co-authors) in which he characterized Shapiro's original conclusions as resting on "fanciful" assumptions, which has been confirmed by experience. Zywicki, et al., *Unreasonable and Disproportionate:* at 25.

As Shapiro now acknowledges, his original predictions were based on the unrealistic premise that bank pricing would remain static while merchant pricing adjusted dynamically to lower costs. At its most basic level, Shapiro's calculation made simplistic assumptions that the interchange fees remain static, and that 69% of the interchange fee reduction is passed onto consumers--an estimate derived from a completely unrelated study of the pass-through of temporary promotional discounts

24

for merchants. Zywicki, et al., *Unreasonable and Disproportionate:* at 25.[7] Shapiro further assumed that each penny saved from the reduced interchange fee would go to support job growth. *Id*. Such assumptions are fanciful.

## V.    REGULATION II CORRECTLY INTERPRETS THE STATUTE

Congress crafted the Durbin Amendment in conference committee at the last minute. *See NACS*, 746 F.3d at 483. Because of this rush to insert this important piece of legislation into Dodd-Frank, the provision's language is "confusing" and its structure is "convoluted." *Id*.

It is no surprise, therefore, that the D.C. Circuit, under the *Chevron* regime, declared that the Durbin Amendment was ambiguous. *See id*. at 488. Although this Court is now tasked with discerning the statute's best interpretation, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), statutory interpretation can also seek to effectuate Congress's purpose. *See, e.g., Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001).  Where interpretive canons of ambiguous statutes lead to results that contradict Congress's intent, courts should reject the interpretation. *See id*; *see*

---

[7] Linney's Pizza's *amici* claim that a study by the consulting firm CMSPI "find[s]" that U.S. merchants passed 69% of interchange fee savings onto consumers. Br. of Am. Econ. Liberties Project at 24. That statement is wrong. The CMSPI study does not "find" it, but simply repeats Shapiro's unfounded assumption from his 2013 analysis. More to the point, it was not an independent "finding" by CMSPI but simply repeats Shapiro's assertion about pass-throughs is derived from a completely different context. *See* Zywicki, *Unreasonable and Disproportionate:* at 26. As noted, it is also inconsistent with every other study of U.S. interchange-fee pass-throughs, including Shapiro's updated analysis.

*also U.S. Nat'l Bank v. Indep. Ins. Agents of Am.,* 508 U.S. 439, 462 (1993) ("Courts, we have said, should disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute.") (cleaned up); *King*, 576 U.S. at 497 (holding that the plain reading of the Affordable Care Act contradicted Congress's purpose because Congress would not have placed the viability of the ACA framework on vague language contained in a sub-sub-sub provision of the Tax Code); *United States v. Hinckley*, 550 F.3d 926, 942 (10th Cir. 2008) (Gorsuch, J., concurring) ("[J]udges are not charged with grading Congress's grammar but with applying laws in conformance with Congress's manifest purpose.").

Here, debit card transactions account for more than $1.4 trillion annually. Regulation II, 76 Fed. Reg. at 43,397. After the Durbin Amendment was enacted, banks lost anywhere between $6.6 billion and $8 billion per year as a direct result of the interchange fee cap, while merchants saved $8.3 billion annually. Hubbard*, Two-Sided Markets, and Wealth Transfers:* at 29, 33. On the two-sided network, the Durbin Amendment caused banks to shift more of the costs from merchants to consumers in the form of increased checking account minimums and decreased access to free checking.

*Amici* agree with both the district court's interpretation of the statute and the Board's interpretation as effectuating Congress's purpose. *See Linney's Pizza,* 804 F.

26

Supp. 3d at 728-36; Appellee's Br. at 16-51. Additionally, *amici* provide three additional arguments regarding statutory interpretation.

*First*, courts give great respect to the contemporaneous interpretation that the Board gives to the Durbin Amendment. *Loper Bright Enters.*, 603 U.S. at 386, 394. The Board here, contemporaneous to the passage of the Durbin Amendment, construed the statute to permit the recovery of two sets of costs: those incremental costs specific to each transaction and those costs that, while not incremental, are specific to each transaction. *See* Regulation II, 76 Fed. Reg. at 43,404, 43,422. Accordingly, this Court should afford the Board's interpretation great respect. *Loper Bright*, 603 U.S. at 386, 403.

*Second*, Appellant wants to compel banks to shift even more costs to consumers through a lower interchange fee. As the data proves, this would only increase the harm to consumers and small merchants. Accordingly, Congress, consistent with its purpose to protect consumers, could not have intended to cause such a significant shift of economic cost through an amendment that was drafted and passed at the last minute, and placed in a sub-sub-section while using ambiguous terms. 15 U.S.C. § 1693o-2(a)(4)(B)(i-ii); *see King*, 576 U.S. at 497.

*Third*, the Supreme Court has held that where Congress empowers an administrative agency to alter large swaths of the American economy, Congress, in its delegation of power to the agency, must speak clearly. *See*, *e.g.*, *Biden*, 600 U.S.

27

at 507. Congress did not delegate to the Board the authority to compel such a massive shift on the two-sided network in the manner that the Appellant urges. Trillions of dollars annually pass through these networks.  Regulation II, 76 Fed. Reg. at 43,397. If Congress wanted to impose such a significant price control and transfer of wealth, Congress would have used explicit language, not ambiguous words hidden in a sub-sub section. *Biden*, 600 U.S. at 507.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the decision below.

Respectfully submitted,

Ilya Shapiro
Manhattan Institute
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

/s/ Shawn T. Sheehy
Shawn T. Sheehy
   *Counsel of Record*
FisherBroyles, LLP
D.C. Bar Number 90002670
1200 G Street NW.
Suite 800
Washington, D.C. 20005
202-258-0741
shawn.sheehy@fisherbroyles.com

June 5, 2026

28

## **CERTIFICATE OF COMPLIANCE**

1. Pursuant to Fed. R. App. P. 32(g), this document complies with the type-volume and word-count limits of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,456 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5-6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 5th day of June, 2026, a true copy of the foregoing Brief of Amici Curiae was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to all counsel of record.

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*
