**No. 25-6038**

# In the United States Court of Appeals for the Sixth Circuit

———————

LINNEY'S PIZZA, LLC,

*Plaintiff-Appellant,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellee,*

———————

On Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort,
No. 3:22-cv-00071-GFVT

———————

BRIEF OF AMICUS CURIAE NATIONAL TAXPAYERS UNION
SUPPORTING DEFENDANT-APPELLEE

———————

Joseph D. Henchman
NATIONAL TAXPAYERS UNION
FOUNDATION
122 C Street N.W., Suite 700
Washington, DC 20001
jbh@ntu.org
(703) 683-5700
*Counsel for Amicus Curiae*

June 5, 2026

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, National Taxpayers Union ("NTU") certifies that it is a non-profit organization. NTU has no parent corporation and no publicly held company has 10% or greater ownership in NTU.

/s/ Joseph Henchman
Joseph Henchman
*Counsel of Record for Amicus Curiae*

i

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT...............................................i

TABLE OF CONTENTS ........................................................................ii

TABLE OF AUTHORITIES ..................................................................iii

INTEREST OF *AMICUS CURIAE* ......................................................1

SUMMARY OF THE ARGUMENT .....................................................2

ARGUMENT.........................................................................................4

I.  HOW INTERCHANGE WORKS, AND WHY APPELLANT'S
    PREFERRED INTERPRETATION HARMS TAXPAYERS,
    REALLOCATES REAL COSTS, AND STIFLES INNOVATION.....4

    A.  Interchange Is A Structural Price In A Two-Sided Market.............4

    B.  Taxpayers Will Be Harmed by Appellant's Proposed Price
        Control, In the Form of Higher Household Banking Costs,
        Reduced Financial Inclusion, and Atrophied Innovation. .............7

CONCLUSION....................................................................................16

CERTIFICATE OF COMPLIANCE ..................................................17

CERTIFICATE OF SERVICE...........................................................18

ii

# TABLE OF AUTHORITIES

**Cases**

*Ohio v. American Express Co.*, 585 U.S. 529 (2018)..........................................9, 11

**Other Authorities**

Iris Chan, Sophia Chong, & Stephen Mitchell, "The Personal Credit Card Market in Australia: Pricing Over the Past Decade," Res. Bank Of Austl. Bull. (2012),  https://tinyurl.com/2tyjwwzu ...............................................18

Jean-Charles Rochet & Jean Tirole, "Cooperation Among Competitors: Some Economics of Payment Card Associations," 33 RAND Journal of Economics 549 (2002), https://www.jstor.org/stable/3087474 ........... 12, 13

Julian Morris, "The Effects of Payment-Fee Price Controls on Competition and Consumers, International Center for Law and Economics, Jun. 7, 2024, https://tinyurl.com/5bd3xv3r ...........................................................17

Marc Rysman & Julian Wright, "The Economics of Payment Cards," at 10, Nov. 2012, https://tinyurl.com/24ehvn4k.....................................................14

Mark D. Manuszak & Krzysztof Wozniak, "The Impact of Price Controls in Two-Sided Markets: Evidence from U.S. Debit Card Interchange Fee Regulation," Federal Reserve System Finance & Economics Discussion Series, Jul. 2017, https://tinyurl.com/cuypnhpv .........................................13

Mattias Gugel & Jess Ward, "Don't Mess with My Miles: Why Government Shouldn't Ban Credit Card Interchange Fees," NTU, Sep. 19, 2024, https://tinyurl.com/33yy9n9y.........................................................................9

Russ Roberts & Patrick McKenzie, Econlib, "Inside the Mysterious World of Credit Cards," May 2025, https://tinyurl.com/49nm5tup ....................10

Sarah Maslin Nir, "Scammers Keep Stealing Food Stamps. New Cards Might Stop Them," *The New York Times*, Jan. 22, 2026, https://tinyurl.com/u9tppx49 ...................................................................16

U.S. Government Accountability Office, "Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges," at 1, Nov. 2009, https://www.gao.gov/assets/gao-10-45.pdf...................................................8

U.S. Government Accountability Office, "Payment Cards: Costs and Benefits for Federal Entities," GAO-25-107298, Apr. 30, 2025, https://www.gao.gov/products/gao-25-107298 ...............................17

U.S. Government Accountability Office, "Stolen SNAP Benefits Cost Beneficiaries Millions," Dec. 2025, https://tinyurl.com/z4t2p37b............16

Vladimir Mukharlyamov & Natasha Sarin, "The Impact of the Durbin Amendment on Banks, Merchants, and Consumers," at 4, Jan. 2019, https://tinyurl.com/2vw7x6ac ....................................................................14

Zhu Wang, Scarlett Schwartz, & Neil Mitchell, "The Impact of the Durbin Amendment on Merchants: A Survey Study," 100 Federal Reserve Bank of Richmond Economic Quarterly 3, at 184 (2014), https://tinyurl.com/22548rdj........................................................................15

## INTEREST OF *AMICUS CURIAE*[1]

National Taxpayers Union ("NTU"), founded in 1969, is a non-partisan organization that works for a simple and fair tax system that enables prosperity for all and respects taxpayers' civil rights, lean and efficient government services and regulations, sustainable fiscal policies to avoid national bankruptcy, and permanent limits on taxes, spending and debt. *Amicus* has written on the regulatory provision at issue in this case, communicating extensively with policymakers and regulators, producing research on the provision, and monitoring developments surrounding it. Because this Court's decision may be looked to as authority by the many courts considering this issue, and because any decision will significantly impact taxpayers, federal and state tax policy, and tax administration, *Amicus* has an institutional interest in this Court's ruling.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae*, their members, and their counsel made a monetary contribution to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF THE ARGUMENT

Who pays? This case involves savvy and large economic players that have together built a remarkably innovative and mostly seamless system for clearing financial transactions. Consumers tap into expanded liquidity, low or even negative fees (rebates or rewards programs), and a network where they can use a card essentially anywhere. Retailers shed the inefficiencies and costs of extending credit from scarce capital and keeping credit ledgers, trying to collect from defaulted customers, and avoiding geographic concentration. The government, and the taxpayers who fund it, benefit from the expanded economic mobility and the technological innovations that can be incorporated into government payment systems. And yes, card issuers and payment networks get to collect fees, so long as they make it all happen instantaneously, with as little error, fraud, and friction as their investments in the latest technology and practices enable.

Economists call this a "two-sided platform," with the intermediary facilitating benefits and costs in multiple directions. Interchange is a structural price within that two-sided market, notwithstanding the attempts

2

of Appellant and its *Amici* to focus just on one portion of it. In a two-sided market, lowering prices on one side results in price or quality adjustments on the other side, and these reallocations are real costs that should not be ignored. A court-imposed "reasonable" cap that constrains revenue on one side of a two-sided platform will push the costs to show up somewhere else: in the form of higher prices, less choice, and depressed innovation.

Consumers have options, businesses have negotiating power, and competition between banks ensures that the market for cards works. The combination of all these actors has made payment cards not just a private convenience but a core consumer product. The Board, utilizing the research available and its own expertise, crafted an approach that considered all factors to fulfill the goal everyone shares of a safe and trustworthy transaction system that benefits everyone. This Court should not disturb that, and should consider all costs involved in making this system function for every transaction. For the foregoing reasons, *Amicus* respectfully requests that the decision of the court below be affirmed.

## ARGUMENT

I.  **HOW INTERCHANGE WORKS, AND WHY APPELLANT'S PREFERRED INTERPRETATION HARMS TAXPAYERS, REALLOCATES REAL COSTS, AND STIFLES INNOVATION.**

### A. Interchange Is A Structural Price In A Two-Sided Market.

When a consumer swipes a card at a merchant checkout, the amount paid compensates not just the merchant but also "the merchant's financial institution, the financial institution that issued the card, and the card network that processes the transaction." U.S. Government Accountability Office, "Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges," at 1, Nov. 2009, https://www.gao.gov/assets/gao-10-45.pdf. Generally, the merchant receives between 97% and 98% of the transaction amount, with the remaining negotiated 2% to 3% paid as an access, or interchange, fee by the merchant (or the merchant's bank) to the card company. This fee covers everything from transaction processing to fraud protection to rewards programs. It is not a fee charged by the government, and not a tax, but the cost to the business of processing the card transaction. *See, e.g.*, Mattias Gugel & Jess

4

Ward, "Don't Mess with My Miles: Why Government Shouldn't Ban Credit Card Interchange Fees," NTU, Sep. 19, 2024, https://tinyurl.com/33yy9n9y.

By providing services to both cardholders and merchants, "credit-card companies bring these parties together, and therefore operate what economists call a 'two-sided platform'." *Ohio v. American Express Co.*, 585 U.S. 529, 534 (2018). In such two-sided markets, price structure matters as much as the sticker price on one side of the transaction. *See id.* at 4. "In fact, the network might well *lose* money on the cardholder side by offering rewards such as low or no fees, cash back, airline miles, or gift cards. The network can do this because increasing the number of cardholders increases the value of accepting the card to merchants and, thus, increases the number of merchants who accept it." *Id.* at 4-5.

The interchange service provided to the merchant – the opportunity to process transactions via a card of a particular card issuer – is an innovation that is much more efficient for merchants than past practices:

> "In the old days…, stores offered credit and they kept a ledger. Sometimes it was a piece of paper…. And they offered credit to their customers because sometimes customers didn't have sufficient cash to make a payment….

"This is the deal that the credit card issuer offers to the merchant. If you had a specialist doing that for you, it would be much more efficient. They'd have computers doing the math, not bookkeepers. They'd have departments doing collections, not clothing salespeople worried about offending customers who they'd need again at Christmas. They'd have access to cheap deposits to fund loans, rather than expensive working capital. They'd be adequately capitalized against losses, rather than having tiny margins backed by almost no equity, like most retailers. They'd diversify against regional and sectoral risk, rather than being all-in on the plant down the road still being open.

"In that hypothetical world where you don't pay your credit card bill, the bank doesn't call up every company that you've bought a coffee from or bought a TV from and say, 'Well, they welshed on the bill, so I want my money back.' The bank takes the loss….

"But in the world -- and again, we used to live in this world where retailers took the loss if you were less than credit-worthy -- that had multiple negative consequences…. And, not underwriting based on, say, risk-scoring models that were adequately informed by actual data about behavior. And, that resulted in very sharply different experiences from people who are relatively advantaged in the socioeconomic system they find themselves in versus other people."

Russ Roberts & Patrick McKenzie, Econlib, "Inside the Mysterious World of Credit Cards," May 2025, https://tinyurl.com/49nm5tup.

Appellant and its *Amici* attempt to keep the focus away from the two-sided nature of interchange transactions, and the benefits and costs that

6

accrue on both sides. This is problematic because courts should evaluate the statute, the regulations, and the costs involved with full awareness of who ultimately pays. In a two-sided market, lowering prices on one side results in price or quality adjustments on the other side, and these are real costs. Appellant's stilted framing is also contrary to Supreme Court direction. *See Ohio v. American Express Co.*, 585 U.S. at 546 ("[T]he plaintiffs' argument about merchant fees wrongly focuses on only one side of the two-sided credit-card market."). Contrary to the suggestion that consumer savings are guaranteed, the reality is that some regulatory changes will reallocate costs, not eliminate them, and all of these should be properly considered by the Board and by this Court.

**B. Taxpayers Will Be Harmed by Appellant's Proposed Price Control, In the Form of Higher Household Banking Costs, Reduced Financial Inclusion, and Atrophied Innovation.**

Payment cards are not just a private retail convenience but are a core consumer product. If a court-imposed "reasonable" cap constrains revenue on one side of a two-sided platform, the system will be transformed. The

costs will show up somewhere, and they will show up in the form of higher prices, less choice, and depressed innovation.

Merchants would, naturally, prefer to receive closer to 100% of the revenue from every transaction and have interchange and payment network services provided for free or paid by someone else. *See, e.g.*, Jean-Charles Rochet & Jean Tirole, "Cooperation Among Competitors: Some Economics of Payment Card Associations," 33 RAND Journal of Economics 549 (2002), https://www.jstor.org/stable/3087474 (listing four "determinants of merchant resistance": (1) variable payments for different cards rather than a fixed yearly fee for the entire network; (2) overprovision of accepted forms of payment because customers expect all stores will accept their card, punishing stores that only accept certain cards; (3) the perceived benefits from the level competition between associations competing for offering payment card services (essentially 2 to 4 payment networks) as opposed to bank issuers (of which there are many); and (4) consumer and card issuer resistance to cash discounts or surcharges for paying by card).

8

But a world without interchange fees may leave everyone worse off, including merchants. Lowering interchange fees will not make costs disappear, but will instead reallocate them, and such cross-subsidies (and how they change who participates and how much they use the system) are a very real and important part of any regulatory action in this area. A reduced interchange fee may well accrue to the merchant, not to the customer, or even to no one at all. *See id.* at 561 ("[I]ntuitions based on competition between for-profit corporations are misleading when applied to associations…. We show, first, that competition between two associations need not result in a lower interchange fee, and second, that even if it does lower the interchange fee, this reduction may lower welfare."); Mark D. Manuszak & Krzysztof Wozniak, "The Impact of Price Controls in Two-Sided Markets: Evidence from U.S. Debit Card Interchange Fee Regulation," Federal Reserve System Finance & Economics Discussion Series, Jul. 2017, https://tinyurl.com/cuypnhpv ("Our results show that banks subject to the cap raised checking account prices by decreasing the availability of free accounts, raising monthly fees, and increasing minimum balance

9

requirements, with different adjustment across account types."); Marc Rysman & Julian Wright, "The Economics of Payment Cards," at 10, Nov. 2012, https://tinyurl.com/24ehvn4k ("It is similar to asking whether more competition between rival newspapers will result in publishers charging less to readers or less to advertisers.").

Unable to recover costs to support the transactions at the time of transaction, fees show up in other places. *See* Vladimir Mukharlyamov & Natasha Sarin, "The Impact of the Durbin Amendment on Banks, Merchants, and Consumers," at 4, Jan. 2019, https://tinyurl.com/2vw7x6ac ("The share of free basic checking accounts (accounts with a $0 monthly minimum for all customers, regardless of account balance) decreases from 60 percent to 20 percent as a result of Durbin. Equivalently, average checking account fees increase from $4.34/month to $7.44/month. Monthly minimums to avoid these fees increase by around 25 percent, and monthly fees on interest checking accounts also increase by nearly 13 percent."). Because bank fees are a leading cause of unbanking and underbanking, many of those harmed are low-income households, and the result is greater reliance on products

10

such as check cashing and payday loans. A court definition that artificially tightens caps will shift more burdens onto those households, and push those households out of the primary financial system with all the attendant long-term costs to society at large.

Few merchants reduce their prices in practice when interchange fees are "saved." *See, e.g.*, Zhu Wang, Scarlett Schwartz, & Neil Mitchell, "The Impact of the Durbin Amendment on Merchants: A Survey Study," 100 Federal Reserve Bank of Richmond Economic Quarterly 3, at 184 (2014), https://tinyurl.com/22548rdj ("A sizable fraction of merchants are found to raise prices or debit restrictions as their costs of accepting debit cards increase. However, few merchants are found to reduce prices or debit restrictions as debit costs decrease."). In short, the costs for these incremental transactions are real, and if the balloon is squeezed in one place they can show up somewhere else. The Board properly included that reality as an important consideration, and this Court should too.

Had the price caps sought by Appellant existed in the past, innovative operational and security protocols would not have developed as quickly or

11

pervasively, or perhaps not at all. Most government payment networks depend heavily on this private sector innovation. Future developments that could save taxpayers money, such as chip technology and advanced anti-fraud efforts, cannot be developed by the private sector in a more restrictive price-control environment. *See, e.g.*, U.S. Government Accountability Office, "Stolen SNAP Benefits Cost Beneficiaries Millions," Dec. 2025, https://tinyurl.com/z4t2p37b ("California has modernized its SNAP EBT cards to better align with credit and debit card security standards. And six other states have ongoing SNAP EBT card modernization projects."); Sarah Maslin Nir, "Scammers Keep Stealing Food Stamps. New Cards Might Stop Them," *The New York Times*, Jan. 22, 2026, https://tinyurl.com/u9tppx49 ("New York is making moves to fight the fraud. This month, Gov. Kathy Hochul, a Democrat, said that the state would upgrade from magnetic strips to more secure, encrypted chip-and-pin technology on the cards, known as Electronic Benefits Transfer or E.B.T. cards.").

Taxpayers also have a stake in the revenue that payment cards can yield for the federal government. In Fiscal Year 2023, federal entities whose

12

employees utilize cards for official purchases paid a total of $299 million in network and interchange fees, along with $13 million in processing and other charges. Yet, thanks to the GSA SmartPay program, the government received some $488 million in spending-based refunds. While not the exact same concept as "rewards" on cards in the private sector, these refunds serve a similar purpose. *See* U.S. Government Accountability Office, "Payment Cards: Costs and Benefits for Federal Entities," GAO-25-107298, Apr. 30, 2025, https://www.gao.gov/products/gao-25-107298. Yet, experience with harsh interchange price controls here and abroad demonstrates that these policy tools have a deleterious impact on card-related benefit programs. "U.S. banks subject to the Durbin amendment generally eliminated debit-card rewards. In Australia, meanwhile, the average value of rewards fell by about 30%." Julian Morris, "The Effects of Payment-Fee Price Controls on Competition and Consumers, International Center for Law and Economics, Jun. 7, 2024, https://tinyurl.com/5bd3xv3r, *citing* Iris Chan, Sophia Chong, & Stephen Mitchell, "The Personal Credit Card Market in Australia: Pricing Over the Past Decade," Res. Bank Of Austl. Bull.

(2012), https://tinyurl.com/2tyjwwzu. Imposition of harsher price controls on interchange could backfire for government purchase cards, leaving taxpayers with smaller spending-based refunds than they would otherwise enjoy. *See id.* ("The reductions in rewards and other benefits on cards subject to interchange-fee caps amount to a direct pecuniary loss for millions of consumers. Often, these losses far exceed the reduction in interchange fees that cause them.").

Taxpayers know to be wary of government interventions that promise short-term savings at the expense of long-term value. The first round of price controls pushes banks toward a new normal (fewer free checking accounts, higher maintenance fees). Further tightening will impact participation and product quality, with the associated systemic fragility and downstream fiscal exposure. Making the caps tighter, step-by-step, increases the same harms to consumers and taxpayers that we have already seen, and makes them harder to undo. The direct costs (higher fees, reduced benefits) and the indirect costs (financial exclusion) are real.

14

Consumers have options, businesses have negotiating power, and competition between banks ensures that the market for cards works. The Board, utilizing the research availability and its own expertise, crafted an approach that considered all factors to fulfill the goal everyone shares of a safe and trustworthy transaction system that benefits everyone. This Court should not disturb that, and should consider all costs involved in making this system function for every transaction.

## CONCLUSION

For the foregoing reasons, *Amicus* respectfully requests that this Court

affirm the decision below.


Dated: June 5, 2026                    Respectfully submitted,

                                       /s/ Joseph Henchman
                                       Joseph D. Henchman
                                       NATIONAL TAXPAYERS UNION
                                       FOUNDATION
                                       122 C Street N.W., Suite 700
                                       Washington, DC 20001
                                       jbh@ntu.org
                                       (703) 683-5700
                                       *Counsel for Amicus Curiae*

16

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit specified in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed R. App. P. 32(f), it contains 2,621 words. The document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Palatino Linotype font.

/s/ Joseph Henchman
Joseph D. Henchman

17

## CERTIFICATE OF SERVICE

I certify that on June 5, 2026, the foregoing was served via CM/ECF

on all registered counsel and transmitted to the Clerk of the Court.

Dated: June 5, 2026                    Respectfully submitted,

/s/ Joseph Henchman
Joseph D. Henchman
NATIONAL TAXPAYERS UNION
FOUNDATION
122 C Street N.W., Suite 700
Washington, DC 20001
jbh@ntu.org
(703) 683-5700
*Counsel for Amicus Curiae*

18