No. 25-6038

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

LINNEY'S PIZZA, LLC, *Plaintiff/Appellant*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *Defendant/Appellee*,

On Appeal from the United States District Court for the Eastern District of Kentucky, Case No. 3:22-cv-00071, Honorable Gregory F. Van Tatenhove

## BRIEF OF *AMICI CURIAE* MISSOURI BANKERS ASSOCIATION AND TEN ADDITIONAL STATE BANKING ASSOCIATIONS IN SUPPORT OF DEFENDANT/APPELLEE AND URGING AFFIRMMAL

**[Additional amici listed on inside cover]**

George F. Verschelden
STINSON LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106
816-842-8600
816-691-3495 Facsimile
george.verschelden@stinson.com

*Counsel for Amici Curiae*

**Additional *Amici Curiae***

Eighth Federal Judicial Circuit: Arkansas Bankers Association, Iowa Bankers Association, Minnesota Bankers Association, Nebraska Bankers Association, North Dakota Bankers Association, and South Dakota Bankers Association.

Sixth Federal Judicial Circuit: Kentucky Bankers Association, Michigan Bankers Association, Ohio Bankers League, Tennessee Bankers Association.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(A), Fed. R. App. P. 26.1, and 8th Cir. R. 26.1A, the Arkansas Bankers Association ("ABA"), Iowa Bankers Association ("IBA"), Kentucky Bankers Association ("KBA"), Michigan Bankers Association ("MBA (Michigan)"), Minnesota Bankers Association ("MBA (Minnesota)"), Missouri Bankers Association ("MBA"), Nebraska Bankers Association ("NBA"), North Dakota Bankers Association ("NDBA"), Ohio Bankers Association ("OBA"), South Dakota Bankers Association ("SDBA"), and Tennessee Bankers Association ("TBA"), who are *amici curiae,* state as follows:

ABA, IBA, KBA, MBA (Michigan), MBA (Minnesota), MBA, NBA, NDBA, OBA, SDBA, and TBA are non-profit corporations, do not have parent corporations, and have not issued stock.

/s/ *George F. Verschelden*
George F. Verschelden

ii

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................................1

INTRODUCTION AND SUMMARY ....................................................................4

ARGUMENT .......................................................................................................6

    I.    Congress charged the Board with issuing regulations for an interchange transaction fee that is reasonable and proportional to the costs incurred by the issuer bank...........................................................6

        A.    The District Court's interpretation honors the process Congress established for determining an appropriate interchange transaction fee. ............................................................................9

        B.    The Durbin Amendment's statutory language supports the District Court's validation of Regulation II.............................14

                i.    The District Court faithfully applied the essential language in Section 1693o-2(a)(4)(B)(ii) .......................................14

                ii.    This Court should reject Linney's Pizza's request to ignore the statutory language of the Durbin Amendment. ........18

                iii.    Regulation II does not invoke the major question doctrine. .....................................................................................19

        C.    Invalidating Regulation II would be catastrophic for banks.....21

        D.    An interchange fee that is specific to both the issuer and the transaction would harm community banks and other low-volume issuers...................................................................28

CONCLUSION...................................................................................................30

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021)..................................................................21

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)....................................................................3

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
Case No. 25-3000 (8th Cir.) ........................................................1

*Linney's Pizza, LLC v. Board of Governors of the Federal Reserve System*,
804 F. Supp. 3d 717 (E.D. Ky. 2025).....................9, 12, 15, 16, 20, 29

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)....................................................................7

*Marx v. General Revenue Corp.*,
568 U.S. 371 (2013)..................................................................17

*NACS v. Board of Governors of Federal Reserve System*,
746 F.3d 474 (D.C. Cir. 2014), *cert. denied*, 574 U.S. 1121 (2015)..........2, 3, 15

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997)....................................................................9

*Seven County Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025)..................................................................12

*West Virginia v. EPA*,
597 U.S. 697 (2022)..................................................................20

**Statutes**

15 U.S.C. § 1693o-2.................................................................2, 9

15 U.S.C. § 1693o-2(a)(2) ...............................................................2, 4, 10, 11, 13

15 U.S.C. § 1693o-2(a)(2)-(3) ....................................................................8, 11

15 U.S.C. § 1693o-2(a)(2), (a)(3)(A)................................................................6, 7

15 U.S.C. § 1693o-2(a)(3)(B) ...............................................................6, 10, 19

15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii) .................................................................7, 10

15 U.S.C. § 1693o-2(a)(6) ...........................................................................5, 26

Dodd-Frank Wall Street Reform and Consumer Protection Act of
    2010.....................................................................................................2

## Other Authorities

12 C.F.R. § 235.3 ........................................................................................21

12 C.F.R. § 235.7(b) ...................................................................................25

Bank of America Schedule of Fees, available at
    www.bankofamerica.com/salesservices/smallbusiness/resources/bu
    siness-schedule-fees..............................................................................13

Board of Governors of the Federal Reserve System, 2023 Interchange
    Fee Revenue, Covered Issuer Costs, and Covered Issuer and
    Merchant Fraud Losses Related to Debit Card Transactions
    (December 2025), available at
    https://www.federalreserve.gov/paymentsystems/2023-
    interchange-fee-htm ........................................... 22, 23, 24, 25, 26, 27

Board of Governors of the Federal Reserve System, Average Debit
    Card Interchange Fee by Payment Card Network (December 19,
    2025), available at
    https://www.federalreserve.gov/paymentsystems/regii-average-
    interchange-fee.htm ..............................................................................24

Debit Card Interchange Fees and Routing (Proposed Rule), 75 Fed.
    Reg. 81,722 (Dec. 28, 2010)............................................................7, 13, 22, 23

Debit Card Interchange Fees and Routing (Final Rule), 76 Fed. Reg. 43,394 (July 20, 2011) (codified at 12 C.F.R. §§ 235.1-235.10) ...................... 2, 3, 4, 5, 8, 9, 11, 12, 13, 14, 19, 20, 21, 22, 23, 24, 25, 28, 29, 30

Debit Card Interchange Fees and Routing (Clarification), 80 Fed. Reg. 48,684 (August 14, 2015) ..............................................................................3

Debit Card Interchange Fees and Routing, 87 Fed. Reg. 61,217, 61,226 (Oct. 11, 2022)................................................................................26, 27

Mark D. Manuszak and Krzysztof Wozniak, The Impact of Price Controls in Two-sided Markets: Evidence from US Debit Card Interchange Fee Regulation, Finance and Economics Discussion Series 2017-074, Washington: Board of Governors of the Federal Reserve System (2017), available at https://doi.org/10.17016/FEDS.2017.074............................................................25

"Statement on Proposed Revisions to Regulation II's Interchange Fee Cap by Governor Michelle W. Bowman," October 25, 2023, available at https://www.federalreserve.gov/newsevents/pressreleases/bowman -statement-20231025.htm ......................................................................28

Target Corporation website, available at https://help.target.com/help/subcategoryarticle?childcat=Accepted +payment+options&parentcat=Payment+Options .............................................13

The Federal Reserve, 2026 Paper Check Collection and FedImage Ser Services Fee Schedule, available at https://www.frbservices.org/resources/fees/check-paper-fedimage-2026.....................................................................................................13

Webster's Third New International Dictionary (2002) ...........................................17

Zhu Wang, Price Cap Regulation in a Two-Sided Market: Intended and Unintended Consequences (The Federal Reserve Bank of Richmond, Working Paper No. 13-06R, 2013), available at https://www.richmondfed.org/publications/research/working_paper s/2013/wp_13-06r ...............................................................................25

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Missouri Bankers Association ("MBA") is a Missouri non-profit corporation and trade association, founded in 1891, that represents more than 220 banks and savings and loan institutions that collectively have more than 2,000 locations in Missouri and employ over 30,000 Missouri residents. Its members serve hundreds of communities, thousands of businesses, and hundreds of thousands of individuals. The MBA filed an amicus brief in support of the Board of Governors of the Federal Reserve System with the Eighth Circuit Court of Appeals in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System,* Case No. 25-3000.

Also appearing as *amici* are *all* the state bankers' associations represented in the related MBA brief in the Eighth Circuit for the states of Arkansas, Iowa, Minnesota, Nebraska, North Dakota, and South Dakota. The MBA is further joined in this brief by each of the bankers' associations from the Sixth Federal Circuit Court of Appeals representing the states of Kentucky, Ohio, Michigan and Tennessee.

Collectively, the MBA and these ten associations represent all four states in the Sixth Circuit and all seven states in the Eighth Circuit.  Collectively these associations represent and are advocates for the interests of their members which

---

[1] As required by Fed. R. App. P. 29(a)(2), *amici* have obtained all parties' consent to the filing of this brief. Also, as required by Fed. R. App. P. 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici,* their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

include more than 1,650 state and state and federally chartered banks as well as savings and loan associations and collectively serve thousands of communities, tens of thousands of businesses, and millions of individuals. The banking associations for these eleven states collectively represent 37% of the banks in the United States.

This case is important to the interests of the MBA and other bankers' associations and their members. In 2010, Congress passed the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, which is codified at 15 U.S.C. § 1693o-2, directing the Board of Governors of the Federal Reserve System (the "Board") to prescribe regulations regarding any interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction.   Congress directed that this interchange transaction fee "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."   15 U.S.C. § 1693o-2(a)(2).   The Board issued its final rule, titled Regulation II, on July 20, 2011.  *See* Debit Card Interchange Fees and Routing (Final Rule), 76 Fed. Reg. 43,394 (July 20, 2011).  Regulation II capped the interchange transaction fee at 21 cents per transaction plus an 0.05% *ad valorem* adjustment.

Regulation II was challenged in court, and in 2014 the United States Court of Appeals for the District of Columbia largely upheld Regulation II.  *See NACS v. Board of Governors of Federal Reserve System,* 746 F.3d 474 (D.C. Cir. 2014), *cert.*

2

*denied*, 574 U.S. 1121 (2015).[2] Members of each of the *amici* have abided by Regulation II for over a decade.

Because *NACS* was decided using the standard expressed in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), Plaintiff/Appellant Linney's Pizza, LLC reasserted the same challenges that were rejected over a decade ago, and asks this Court to reverse the District Court's ruling that the Durbin Amendment allows the Board to consider a specific category of costs in setting an interchange transaction fee. If reversed, the Board would be precluded from considering relevant facts in an inherently policy-implicating decision and could never set an interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." This would be highly detrimental to banks. As the Board acknowledged, the fee cap in Regulation II already "result[ed] in some issuers not fully recovering their average per-transaction cost through interchange fees."[3] The Board previously found that Regulation II would allow only 80 percent of covered issuers to recover the costs for transactions processing, chargebacks and other non-routine transactions, network processing

---

[2] The DC Circuit remanded a "minor issue" and directed the Board to clarify why it chose to include transaction-monitoring costs under Regulation II. *NACS*, 746 F.3d at 492-93. On August 14, 2015, the Board issued this clarification. Debit Card Interchange Fees and Routing (Clarification), 80 Fed. Reg. 48,684 (August 14, 2015). This clarification was not challenged in court, nor has Congress taken any action to limit the Board's authority under the Durbin Amendment.

[3] Regulation II, 76 Fed. Reg. at 43,434.

fees, transactions monitoring, and fraud losses.[4] In setting the fee cap in Regulation II, the Board declined to consider all eligible costs and "did not include a level of profit or a rate of return."[5]  Linney's Pizza's position—which would further limit the relevant factors the Board can consider in setting the interchange transaction fee—would force the Board to set an interchange transaction fee that will cause more banks to lose even more money from debit card transactions or force banks to raise consumer checking and debit account fees to recover costs for processing electronic debit transactions.  This is why *amici* request that the Court affirm the District Court's decision and allow Regulation II to stand.

## INTRODUCTION AND SUMMARY

Congress passed the Durbin Amendment to regulate interchange transaction fees.  Congress did not directly regulate these fees; instead, it directed the Board to issue regulations that would set a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(2). Congress made it clear that the costs considered should be costs particular to an electronic debit transaction.

To fulfill this directive, the Board had to (1) determine what costs are incurred by an issuer with respect to an electronic debit transaction and (2) set a fee that was

---

[4] Regulation II, 76 Fed. Reg. at 43,434.
[5] Regulation II, 76 Fed. Reg. at 43,420, 43,427, 43,427 n.119.

4

reasonable and proportional to those costs.  To do so, Congress authorized the Board to gather whatever information it needed from issuers and networks.  Armed with this information, the Board in Regulation II capped the fee at 21 cents per transaction plus an 0.05% *ad valorem* adjustment.

To be clear, *amici* contend that the fee cap in Regulation II is too low as the Board failed to include all costs which are incurred by issuers.[6]  Indeed, the Board acknowledged that the fee established in Regulation II would cover costs for only eighty percent of covered issuers.  While issuers with under $10 billion in assets were excluded from Regulation II, *see* 15 U.S.C. § 1693o-2(a)(6), these banks are impacted by Regulation II due to market competition and because the same payment card networks serve both covered and exempt issuers.  To remain competitive, community banks must give their customers the ability to use a debit card that is widely accepted, forcing them to absorb the losses for debit card accounts.  While not ideal, community banks have dealt with the impact of Regulation II since 2011.

The invalidation of Regulation II would be devastating to community banks. Under Linney's Pizza's interpretation of the Durbin Amendment, the Board could not determine "the cost incurred by the issuer with respect to the transaction," and instead the Board would be restricted to considering only the incremental cost incurred by an issuer for the authorization, clearance, or settlement of a particular

---

[6] Regulation II, 76 Fed. Reg. at 43,427.

5

electronic debit transaction ("incremental ACS costs") in setting the interchange transaction fee. This interpretation would require the Board to materially decrease the interchange transaction fee, which would lead to devastating results for community banks and be detrimental and costly to their customers. Many community banks would either have to stop offering debit cards to their customers or would have to increase revenues from other sources such as account fees or establishing minimum account balance requirements – both of which would be detrimental to their customers. Additionally, if debit card payment volumes fall, then unit costs for all debit card payment network participants would increase.

This Court should affirm the District Court's decision.

## **ARGUMENT**

I. **CONGRESS CHARGED THE BOARD WITH ISSUING REGULATIONS FOR AN INTERCHANGE TRANSACTION FEE THAT IS REASONABLE AND PROPORTIONAL TO THE COSTS INCURRED BY THE ISSUER BANK.**

In the Durbin Amendment, Congress directed the Board to issue regulations setting a debit card interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2), (a)(3)(A). To do so, the Board was granted authority to "obtain such information as may be necessary to carry out the provisions of this subsection" from any issuer or payment card network. 15 U.S.C. § 1693o-2(a)(3)(B).

6

The Durbin Amendment made it clear that the Board's analysis must focus on the costs incurred by an issuer for an electronic debit transaction.  Thus, Congress stated that the Board shall consider "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," but the Board shall not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction."  15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii).

While establishing a fee that is "reasonable and proportional" to costs incurred is inherently discretionary, *see Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394-395 (2024), the Board was directed to consider all costs incurred by the issuer with respect to an electronic debit transaction. As part of its decision-making process, the Board was expressly directed to gather information from networks and issuers.  In 2010, the Board issued a proposed rule that contemplated a 12 cent cap. *See* Debit Card Interchange Fees and Routing (Proposed Rule), 75 Fed. Reg. 81,722 (Dec. 28, 2010).  The Board then received and considered public comments on its Proposed Rule.  It was clear that issuers incurred costs with respect to and directly associated with debit transactions that did not fit neatly within the cost categories of 15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii) but nevertheless were costs directly incurred by the issuer with respect to the transaction.  *See* 15 U.S.C. § 1693o-2(a)(2), (a)(3)(A). Based on the public comments and mandated information gathering, the Board

7

determined that certain additional costs (in addition to the incremental ACS costs) must be considered so that the interchange transaction fee would be reasonable and proportional to the "*cost incurred by the issuer* with respect to the transaction." (emphasis added).  The Board considered the facts and data it received and made policy decisions based on its expert knowledge of interchange and networks to consider the following four additional costs: 1) non-incremental ACS costs; 2) transaction-monitoring costs; 3) fraud losses; and 4) networking processing fees. *See* Debit Card Interchange Fees and Routing (Final Rule), 76 Fed. Reg. 43,394 (July 20, 2011) (codified at 12 C.F.R. §§ 235.1-235.10) ("Regulation II"). The Board set a fee cap that it acknowledged "will result in some issuers not fully recovering their average per-transaction cost through interchange fees."[7]  While this may reflect a reallocation of costs between banks, consumers and merchants, *amici* believe that the Board's fee cap failed the Durbin Amendment's directive, repeated twice by Congress, that the fee shall be "reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*."  15 U.S.C. § 1693o-2(a)(2)-(3) (emphasis added).  Linney's Pizza's argument would compound the harm to banks and consumers and completely discount the mandate stated by Congress.  The Board issued its final rule and established the interchange transaction fee with a cap of 21

---

[7] Regulation II, 76 Fed. Reg. at 43,434.

cents per transaction plus an 0.05% *ad valorem* adjustment.   Regulation II, 76 Fed. Reg. at 43,404.

Linney's Pizza asks this Court to reverse the District Court and invalidate Regulation II due to the consideration of the four costs the Board found issuers incurred through its data collection.  The District Court ruled that the Board did not exceed its authority because "§ 1693o-2 plainly allows the Board to consider other costs it is not mandated to consider, as long as they are not costs it is prohibited from considering."  *Linney's Pizza*, *LLC v. Board of Governors of the Federal Reserve System*, 804 F. Supp. 3d 717, 731 (E.D. Ky. 2025).  As explained by the District Court, this interpretation gives full effect to all of the statutory terms and gives the Board the ability to achieve Congress's mandate to develop a fee standard that is "reasonable and proportional" to "the cost incurred by the issuer with respect to the transaction."  *Id.*  The District Court's ruling should be affirmed.

A.    **The District Court's interpretation honors the process Congress established for determining an appropriate interchange transaction fee.**

In upholding Regulation II, the District Court gave full effect to the statutory language and the expressed purpose of the Durbin Amendment.  It is axiomatic that in interpreting a statute one must consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

9

In the Durbin Amendment, Congress gave the Board authority to issue regulations setting an interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). Thus, the Board must determine "the cost incurred by the issuer with respect to the transaction" to set the fee. This clear directive must drive the reading and implementation of the Durbin Amendment.

To allow the Board to make a fully informed decision, Congress expressly tasked the Board with fact finding and required that the Board gather "such information as may be necessary to carry out the provisions of this subsection." 15 U.S.C. § 1693o-2(a)(3)(B). Congress identified two categories of costs. Congress stated that the Board must consider incremental ACS costs, and the Board may not consider costs which are not specific to a debit transaction. 15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii). Congress also vested the Board with discretion to assure a fee that is "reasonable and proportional" to costs incurred by the card issuer.

Based on the information gathered from issuers, networks, and public comments, the Board determined that there was a third relevant category of costs - "costs incurred by the issuer with respect to the transaction" other than incremental ACS costs, and that these costs must be considered to set a fee "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). In doing so, the Board followed the Congressional mandate

10

and statutory framework created in the Durbin Amendment to determine a cap of the fee at an amount "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(2).

Linney's Pizza's interpretation of the Durbin Amendment nullifies the Congressional mandate and effectively eliminates the statutory framework. Congress used the same language in two separate places in the Durbin Amendment – the fee shall be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(2)-(3).  Any interpretation of Regulation II must honor this mandate.

By interpreting the Durbin Amendment to limit consideration to incremental ACS costs, Linney's Pizza improperly seeks to narrow the Board's Congressional mandate to find facts and gather "such information as may be necessary to carry out the provisions of this subsection," preclude the Board from using its expertise to make policy decisions as to an appropriate interchange transaction fee, and prevent the Board from establishing a reasonable and proportional fee.  Linney's Pizza's interpretation would require the Board to set a fee that would result in increased losses for card issuers from debit card transactions and higher costs for customers.

Under Linney's Pizza's interpretation, the only costs that can be considered are incremental ACS costs.  If that was Congress's intent, then Congress could have simply said that the Board will set an interchange transaction fee based only on the

11

incremental ACS costs incurred by the issuer.  Indeed, as explained by the District Court, "[i]f the statute were as restrictive and mechanical as Linney's Pizza suggests, then there would be no need to require the fee standard to be 'reasonable and proportional.'  Instead, the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i)." *Linney's Pizza*, 804 F. Supp. 3d at 731.  But Congress did not, and instead delegated such a "fact-dependent, context-specific, and policy-laden choice" to the Board.  *Seven County Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 182-83 (2025).

Linney's Pizza argues that the Board's consideration of non-incremental ACS costs "vitiates the Durbin Amendment's purpose of reducing the interchange fee and making debit transactions more like checking transaction."  Appellant's Brief, ECF No. 28, Page ID #47.  This argument is non-sensical.  First, Linney's Pizza acknowledges that Regulation II reduced the interchange fee from an average per transaction cost of 44 cents to 21 cents.  Thus, there is no basis to conclude that Regulation II did not reduce the interchange fee.  Second, the Durbin Amendment was motivated by Congress's desire to stop issuers from using the interchange fee as a profit center by tying the fee to the costs incurred by the issuer.  But Linney's Pizza takes it a step further by arguing that Congress wanted the Board to set the fee as close as possible to zero.  Congress directed the Board to consider the similarities between debit card transactions and checking transactions, but Congress never said

12

that that the interchange fee should approach zero.[8]  Instead, Congress directed the Board to issue regulations setting an interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2).  In making this determination, the Board noted that capping the fee at 12 cents meant that 20 percent of covered issuers would not be able to recover their per-transaction costs (i.e., they would lose money on each transaction).[9]  By increasing the fee to 21 cents (plus five basis points of the transaction's value),[10] 80 percent of covered issuers would recover, in addition to per-transaction costs, the additional costs for transactions processing, chargebacks and other non-routine transactions, network processing fees, transactions

---

[8] Linney's Pizza's argument that Congress sought to make debit card transactions more like checking transactions is misguided.  While checks are not subject to debit card interchange fees, processing check transactions present far higher costs for both banks and merchants than a debit card transaction.

Some banks charge business accounts a fee for depositing paper checks.  For example, Bank of America can charge business accounts $.45 per check. www.bankofamerica.com/salesservices/smallbusiness/resources/business-schedule-fees (pages 2 and 3). In addition, the Federal Reserve System charges banks significant check processing fees. https://www.frbservices.org/resources/fees/check-paper-fedimage-2026.  As a result, some merchants, such as Target, expressly decline to accept checks. https://help.target.com/help/subcategoryarticle?childcat=Accepted+payment+options&parentcat=Payment+Options.  It would not serve the interests of banks, merchants, businesses, or consumers to make debit card transaction costs and costs allocations mirror check transactions.

[9] Proposed Rule, 75 Fed. Reg. at 81,737.

[10] Regulation II, 76 Fed. Reg. at 43,434.

monitoring, and fraud losses without generating a profit.[11]  There is no basis for Linney's Pizza's apparent position that a fee can be "reasonable and proportional" even if it causes the issuer to lose money processing the transaction.  The Board fulfilled its mandate by making the fee "reasonable and proportional" to the cost incurred by the issuer.

The District Court correctly interpreted the Durbin Amendment in a manner that honored the Congressional mandate and recognized the Board's express authority and discretion.  The District Court's decision should be affirmed.

**B.     The Durbin Amendment's statutory language supports the District Court's validation of Regulation II.**

The District Court correctly interpreted the Durbin Amendment based on its actual statutory language.

**i.     The District Court faithfully applied the essential language in Section 1693o-2(a)(4)(B)(ii)**

Section 1693o-2(a)(4)(B)(ii) provides that the Board shall not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction."  The Board argued that the phrase "which are not specific to a particular electronic debit transaction" is "restrictive" defining a certain category of costs that cannot be considered by the Board.  Linney's Pizza argued that this phrase is "descriptive," and describes a non-exhaustive example of excluded costs.

---

[11] Regulation II, 76 Fed. Reg. at 43,434.

14

The District Court appropriately concluded that subparagraph (a)(4)(B)(ii)'s grammar does not justify bifurcating costs in the Durbin Amendment as either incremental ACS costs (relevant) or other costs (irrelevant). The District Court agreed with the D.C. Circuit's explanation that "[w]idely-respected style guides expressly require that commas set off descriptive clauses, but refer to descriptive 'which' and restrictive 'that' as a style preference rather than an ironclad grammatical rule." *Linney's Pizza,* 804 F. Supp. 3d at 730 (quoting *NACS*, 746 F.3d at 487). Further, the District Court agreed with the D.C. Circuit that "elsewhere in the Durbin Amendment Congress demonstrated that it is among those writers who ignore the distinction between descriptive 'which' and restrictive 'that.'" *Id.* (quoting *NACS*, 746 F.3d at 487)).

Linney's Pizza argues to this Court that the District Court should be reversed because reliance on punctuation runs the risk of distorting a statute's true meaning. Appellant's Brief, ECF 28, Page ID #56. The District Court's reliance on the Durbin Amendment's punctation results in an interpretation that is consistent with the Durbin Amendment's directive to the Board to see a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."

Further, if Linney's Pizza was correct about Congress's intent, Congress could have simply stated that the Board shall not consider any costs other than "the incremental cost incurred by an issuer for the role of the issuer in the authorization,

15

clearance, or settlement of a particular electronic debit transaction" as identified in (B)(i).  Congress would have no need to "describe" one category of excluded costs in (B)(ii) if it was excluding *all* costs other than incremental ACS costs in (B)(i).

Linney's Pizza emphasizes that the Durbin Amendment directs the Board to "distinguish between" incremental ACS costs (which shall be considered) and other costs which are not specific to a particular debit card transaction (which shall not be considered).  Appellant's Brief, ECF No. 28, Page ID #31-32.  But Linney's Pizza presents no legal support for its conclusion that a direction to "distinguish" between two different cost categories means that they are the only possible cost categories to consider.  As explained by the District Court when rejecting this same argument:

> True, Congress enumerated only two categories, but the very nature of those categories creates a gray area for the existence of a third.  The inclusion of those categories does not imply the exclusion of the third in context because the statute also requires that the fee standard promulgated by the Board be 'reasonable and proportionate' to the costs incurred by issuers, a command that Linney's Pizza simply glosses over.  The distinguishing Congress required the Board to engage in merely staked out what Congress considered essential to include and essential to exclude – it did not speak to the array of other possible costs relevant to determining a reasonable and proportional fee.

*Linney's Pizza,* 804 F. Supp. 3d at 729.

Linney's Pizza also takes the Durbin Amendment's language out of context.  Congress did not identify the two cost categories as "incremental costs" and "other costs" as Linney's Pizza argues.  Appellant's Brief, ECF No. 28, Page ID #32.

16

Instead, Congress instructed the Board to not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." The Court should ignore Linney's Pizza's attempt to simplify the statutory text in a manner that removes its meaning and context.

Similarly, the District Court's interpretation follows the canon against surplusage, which prefers an "interpretation [that] gives effect to every clause and word of a statute." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). Linney's Pizza's interpretation would render superfluous the phrase "which are not specific to a particular electronic debit transaction" in (B)(ii), and would essentially render subparagraphs (a)(2), (a)(3), and (a)(4) unnecessary. If the Board can only consider incremental ACS costs, then there is no reason for (a)(2) and (a)(3) to refer to a broader category of "cost[s] incurred by the issuer with respect to the transaction," and (a)(4) is completely unnecessary as there is no reason to have a subparagraph addressing what can be considered and who can be consulted if the only consideration is incremental ACS costs.

The District Court's interpretation of subparagraph (a)(4)(B) is consistent with Congress's directive that the Board "consider" certain costs but not "consider" other costs. "Consider" is defined as "to reflect on" or to "think about with a degree of care or caution." Webster's Third New International Dictionary (2002). Congress's use of the term "consider" indicates that incremental ACS costs must be

17

reflected on under (b)(i), not that incremental ACS costs are the only basis on which to set the fee. Congress's express directive to the Board to "consider" incremental ACS costs requires the consideration of other costs. If Congress wanted the fee to be based solely on incremental ACS costs, it would have been simple to say so. Congress did not.

### ii. This Court should reject Linney's Pizza's request to ignore the statutory language of the Durbin Amendment.

Linney's Pizza effectively asks this Court to adopt its interpretation of the Durbin Amendment, and ignore its actual language, because it is always possible for Congress to express its intent more clearly. Appellant's Brief, ECF No. 28, Page ID #38-40. There is no legal basis to do so, as the District Court's interpretation of the Durbin Amendment is consistent with Congress's directive that the Board set a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."

Linney's Pizza also argues that the "silence" in the Durbin Amendment regarding the third category of costs did not grant the Board the authority to consider such costs and "upend" the rest of the statute. Appellant's Brief, ECF No. 28, Page ID #40. The District Court's interpretation did not "upend" the Durbin Amendment but merely recognized the discretion expressly vested by Congress for the Board to establish a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." In doing so, the Board set the fee at an amount that

allowed 80% of issuers to recover costs (without generating a profit) while reducing the fee more than 23 cents from the prevailing market rate.

*Amici* note that the District Court's decision is consistent with Congress granting the Board the right to collect "such information as may be necessary to carry out the provisions of this subsection." Section 1693o-2 (a)(3)(B). There would be no reason to grant the Board such a broad-ranging authority to collect information if the Board could only consider incremental ACS costs.

Linney's Pizza argues that the District Court improperly elevated a general provision (to set a reasonable and proportional fee) over a specific provision (to distinguish between two categories of costs). Appellant's Brief, ECF No. 28, Page ID #39-42. This argument assumes too much. Linney's Pizza does not argue that the Durbin Amendment specifically precludes the consideration of non-incremental ACS costs. Linney's Pizza is advocating that this Court interpret the meaning of § 1693o-2(a)(4)(B) in a vacuum without consideration of the rest of the Durbin Amendment. This request violates numerous statutory construction rules and should be disregarded.

### iii.    Regulation II does not invoke the major question doctrine.

Linney's Pizza contends that the District Court's decision should be reversed under the major question doctrine. Appellant's Brief, ECF No. 28, Page ID #40-45. As explained by the District Court, the major question doctrine recognizes that there

19

are "extraordinary cases" in which the "history and breadth of the authority" asserted by an agency, and the "economic and political significance" of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority. *Linney's Pizza*, 804 F. Supp. 3d at 727 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quotations omitted)).

The District Court correctly concluded that the major question doctrine does not apply. Congress directed the Board to set a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." The Board exercised its authority and expertise to gather and analyze mass data from many sources to arrive at a decision in a diligent process that Congress would be ill-equipped to perform. The average interchange fee in 2009 reached a competitive market rate of 44 cents per transaction, and Regulation II reduced the interchange fee to 21 cents plus a 0.05% ad valorem charge. While Linney's Pizza believes that the interchange fee should be lower than 21 cents per transaction, Regulation II did decrease the interchange fee by 23 cents. Congress never expressed an intent that banks process debit card transactions at a loss. Linney's Pizza's belief that the Board considered inappropriate costs in setting the fee does not refute that Congress did in fact vest the Board with broad discretion in a statute which nullifies Linney's Pizza's assertion of the major question doctrine. *Cf. West Virginia*, 597 U.S. at 724 (rejecting an attempt by the EPA to "substantially restructure the American energy

20

market" by invoking a new power in a long-extant statute that result in a "transformative expansion in [its] regulatory authority"); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764-65 (2021) (rejecting CDC's attempt to institute a nationwide eviction moratorium under its authority to adopt measures to prevent the spread of disease).

## C.    Invalidating Regulation II would be catastrophic for banks.

The Durbin Amendment made two main changes to the law governing debit card processing.  In addition to giving the Board authority to establish standards for the amount of interchange transaction fees, the Durbin Amendment requires that issuers give merchants the choice of at least two payment card networks for processing debit card transactions.  Both changes have reduced the amount of debit card interchange fees earned by debit card issuers – the Board used its rulemaking authority to set a cap on interchange transaction fee amounts for large issuers,[12] and merchants have chosen to use cheaper networks for processing electronic debit transactions.[13]

The MBA and the associations joined with this brief represent more than 1,650 banks and savings and loan institutions, nearly all of which have less than $10 billion in assets and are exempt from Regulation II.  This exemption has not fully

---

[12] 12 C.F.R. § 235.3.
[13] *See* notes 28–30 *infra*.

21

protected small issuers from the interchange transaction fee cap. The spillover effect from the interchange transaction fee cap and the requirement for the two-network routing rule has harmed community banks by reducing their single-message-network interchange fee revenue.[14]   Any prohibition of the consideration of the additional reasonable and proportional costs incurred by issuers would further harm community banks. Such additional costs include transactions processing, chargebacks and other non-routine transactions, network processing fees, transactions monitoring, and fraud losses. If the Board cannot consider such costs, it will be forced to reduce debit card interchange fee amounts in consideration of only per-transaction incremental ACS costs.

That more limited scope of costs necessarily will reduce the Board's cap on the amount of per-transaction debit card interchange fees. When Regulation II was initially proposed, the Board did not consider these additional costs.[15]   With such costs excluded, the Board considered setting the interchange transaction fee cap at 12 cents.[16]   Capping the fee at 12 cents meant that 20 percent of covered issuers

---

[14] Board of Governors of the Federal Reserve System, 2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions (hereafter, "2025 Federal Reserve Report") at 2, 15 (December 2025), available at https://www.federalreserve.gov/paymentsystems/2023-interchange-fee-htm.

[15] *Cf.* Proposed Rule, 75 Fed. Reg. at 81,737, *with* Regulation II, 76 Fed. Reg. at 43,429–43,431.

[16] Proposed Rule, 75 Fed. Reg. at 81,737.

would not be able to recover their per-transaction costs.[17]  In response to industry feedback that issuers would be unable to recover their costs, the Board increased the cap to 21 cents (plus five basis points of the transaction's value) in the final rule.[18] The Board concluded that this increase would allow 80 percent of covered issuers to recover, in addition to per-transaction costs, the additional necessary costs for transactions processing, chargebacks and other non-routine transactions, network processing fees, transactions monitoring, and fraud losses.[19]  In reaching this decision, the Board acknowledged that it did not consider all recoverable costs, that some issuers would not fully recover their average per-transaction cost, and that there would be no profit for issuers.  Any prohibition on considering such additional costs actually incurred by issuers necessarily will decrease the cap on interchange transaction fees and risk failure of alternative payment networks that serve small debit card issuers or a further erosion of bank competition and choice of banks and bank services for both merchants and consumers.

Given the current impact of the cap on small issuers' single-message-network interchange fee revenue,[20] any reduction of the cap would further impact community banks' ability to offer minimum-viable deposit account products with debit cards.

---

[17] Proposed Rule, 75 Fed. Reg. at 81,737.
[18] Regulation II, 76 Fed. Reg. at 43,434.
[19] Regulation II, 76 Fed. Reg. at 43,434.
[20] 2025 Federal Reserve Report at 2, 15.

23

In its most recent report on the impacts of Regulation II, the Board found that "for exempt transactions processed over single-message networks, the average interchange fee gradually fell after Regulation II took effect, from $0.31 in the fourth quarter of 2011 to $0.25 in 2017, and has since gradually increased to $0.27 in 2023."[21]    Since 2023, data published by the Board shows that the average interchange fee for exempt transactions processed over single-message networks has continued to slightly decline.[22]  While community banks are exempt from Regulation II's cap on debit card interchange fees, their single-message-network fees nevertheless have fallen with the implementation of Regulation II.  If the Board is forced to reduce the cap on interchange transaction fees from 21 cents (plus five basis points) because it cannot consider anything other than incremental ACS costs, community bank checking and debit card programs will suffer, and bank debit card account holders will face increased account fees and higher minimum balance requirements.

The foregoing is borne out by the results of Regulation II. In response to decreased interchange fee revenues, community banks have passed at least some of the unrecouped costs of their debit card programs to consumers in the form of higher-

---

[21] 2025 Federal Reserve Report at 2, 15.

[22] Board of Governors of the Federal Reserve System, Average Debit Card Interchange Fee by Payment Card Network (December 19, 2025), available at https://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm.

24

priced financial products. The availability of free, non-interest-bearing deposit accounts offered by exempt financial institutions declined by 15.5 percent following initial imposition of the interchange fee cap under Regulation II.[23] Similarly, a Federal Reserve Bank of Richmond study found that both large and small debit card issuers substantially reduced free deposit account products and services in the aftermath of Regulation II's interchange fee cap.[24]

While the average interchange fee for exempt transactions processed over *dual-message* networks has increased since Regulation II took effect,[25] card issuers do not control whether a transaction runs on a single-message network (where fees have decreased for small exempt issuers) or dual-message network (where fees have increased).  Regulation II gives merchants the right "to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions."[26]  Small issuers, while exempt from the cap on

---

[23] Mark D. Manuszak and Krzysztof Wozniak, The Impact of Price Controls in Two-sided Markets: Evidence from US Debit Card Interchange Fee Regulation, Finance and Economics Discussion Series 2017-074, Washington: Board of Governors of the Federal Reserve System (2017), at 5-6, https://doi.org/10.17016/FEDS.2017.074.
[24] Zhu Wang, Price Cap Regulation in a Two-sided Market: Intended and Unintended Consequences (The Federal Reserve Bank of Richmond, Working Paper No. 13-06R, 2013), https://www.richmondfed.org/publications/research/working_papers/2013/wp_13-06r.
[25] 2025 Federal Reserve Report at 2, 15.
[26] 12 C.F.R. § 235.7(b).

interchange transaction fees, are subject to the right of merchants to choose the payment card network.[27]

The Board has acknowledged that "increased routing choice" for merchants allows them to route transactions over networks "with lower interchange fees," which "suggest[s] that community bank issuers exempt from Regulation II's interchange fee standards that are not already compliant with the rule in particular may experience lower interchange fee revenues."[28]  On July 1, 2023, the Board finalized a revision to Regulation II specifying that the regulation's routing provisions apply to Card Not Present transactions ("CNP").[29]  This will further decrease debit card interchange fee revenue for community banks to the extent merchants choose to process card-not-present transactions on single-message networks because small issuers' average per-transaction fees on single-message networks have declined since implementation of Regulation II.[30]

Stagnating or declining community bank revenue from debit card interchange transaction fees by means of a regulatory price cap is particularly harmful because small community banks' per-transaction debit card processing costs are significantly higher than for high-volume issuers.  In a report released in December 2025, the

---

[27] 15 U.S.C.A. § 1693o-2(a)(6).

[28] Debit Card Interchange Fees and Routing, 87 Fed. Reg. 61,217, 61,226 (Oct. 11, 2022).

[29] 2025 Federal Reserve Report at 20.

[30] 2025 Federal Reserve Report at 2, 15.

Board found that average per-transaction ACS cost precipitously increases for issuers to the extent they have lower transaction volume.[31] Specifically, "the average per-transaction ACS cost for mid-volume issuers [] was over three times higher than the cost for high-volume issuers [], whereas the cost for low-volume issuers [] was 30 times higher than the cost for high-volume issuers."[32] For low-volume issuers, the cost nearly doubled from 2021 to 2023.[33] Clearly, the *current* average per-transaction fee will result in most small community bank issuers suffering losses from debit card programs because their costs are far higher than the costs incurred by larger issuers.

The concerns of *amici* about the impact of reduced debit card interchange fees were raised by Federal Reserve Board Governor Michelle Bowman in her statement on the Board's recent proposed rule to further reduce interchange fees:

> . . . [S]maller issuers subject to the cap—those with smaller transaction volumes, less negotiating power, and fewer efficiencies in scale—may be at a significant competitive disadvantage. Because retail banking is such a core function for many smaller issuers, this pricing dynamic may not ultimately force smaller issuers to abandon their debit card programs. But it is possible that banks will be forced to either pass costs through to customers or operate their debit card programs as a loss leader, which many banks do today. Under the proposed rule [further

---

[31] 2025 Federal Reserve Report at 24–25. High-volume issuers are defined as those that process more than 100 million debit card transactions annually, mid-volume issuers as those that process between 1 million and 100 million debit card transactions, and low-volume issuers as those that process fewer than 1 million debit card transactions. *See id.*

[32] 2025 Federal Reserve Report at 24–25.

[33] *Id.*

reducing interchange fees], nearly one-third of bank issuers would not be able to recover even the subset of costs that factor into the interchange fee cap, let alone those debit card program costs that are disregarded in the cap.

. . .

. . . [S]maller debit card issuers do not exist in a vacuum. Issuers of all sizes use the same payment rails, and smaller issuers inevitably face some degree of pricing pressure, at least indirectly, from the interchange fee cap. And while the interchange fees many smaller issuers have collected since the introduction of the interchange fee cap may have remained largely stable, it is difficult to determine how this compares to the aggregate costs of processing, fraud and fraud prevention, and the many other inputs for running a debit card program. It is not clear that interchange fees have kept up for many smaller issuers, and I am concerned that even if the interchange fee cap does not directly apply, smaller issuers will continue to face ongoing fee pressure in operating debit card programs.[34]

While most of the community banks represented by the *amici* are exempt from the interchange fee cap, the indirect impact is clear. If the Board is prohibited from considering the additional costs for setting debit card interchange fees, community banks and their customers will suffer.

### D.    An interchange fee that is specific to both the issuer and the transaction would harm community banks and other low-volume issuers.

Linney's Pizza argues that the District Court should be reversed because Regulation II improperly sets a universal interchange fee cap for large issuers.

---

[34] "Statement on Proposed Revisions to Regulation II's Interchange Fee Cap by Governor Michelle W. Bowman," October 25, 2023, accessed December 17, 2025, available at https://www.federalreserve.gov/newsevents/pressreleases/bowman-statement-20231025.htm.

Instead, Linney's Pizza contends that "each issuer's recoverable fee must reflect its own *specific* costs for its own *specific* transactions.  The interchange fee thus must be issuer-specific and transaction-specific."  Appellant's Brief, ECF No. 28, Page ID #72 (emphasis in original).

*Amici* believe that the District Court properly rejected this interpretation based on statutory construction grounds.  *Amici* agrees with the Board that requiring an issuer-specific and transaction-specific fee would be practically impossible. *Linney's Pizza*, 804 F. Supp. 3d at 732 (citing Regulation II, 76 Fed. Reg. at 43,422). Further, even if possible, the use of an issuer-specific and transaction-specific fee would be disastrous for smaller low-volume issuers and small merchants.  The Board properly acted with the discretion granted by Congress to protect small issuers and small merchants to maintain competition and choice.

Low-volume issuers – whether subject to Regulation II or not – incur higher per-transaction costs to process a debit card transaction than high-volume issuers.  If the interchange fee was issuer-specific and transaction-specific, then low-volume issuers could be eligible to charge a materially higher interchange fee than high-volume issuers.  But market forces would preclude the low-volume issuers from charging a fee that would be necessary to cover even its incremental ACS costs because the fee charged by high-volume users would be so much lower.  In other words, making the interchange fee be issuer-specific and transaction-specific would

29

force all banks to use debit cards transactions as a loss leader, which would be greatly advantageous to high-volume issuers with their lower per-transaction costs.

Regulation II reflects a careful evaluation and balancing of the interests of large and small issuers and large and small merchants.  As stated, even if possible, the use of an issuer-specific and transaction-specific fee would be catastrophic for smaller low-volume issuers and small merchants.

## **CONCLUSION**

This Court should affirm the District Court's judgment.

Respectfully submitted,

STINSON LLP

*/s/ George F. Verschelden*

George F. Verschelden
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150
Tel. (816) 842-8600
Fax (816) 691-3495
george.verschelden@stinson.com

COUNSEL FOR AMICI CURIAE

31

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point font Times New Roman type style. This brief contains 6,494 words, excluding parts of the document exempted by Fed. R. App. P. 32(f).

The electronic version of this filing was scanned for viruses and is virus-free.

Dated:        June 5, 2026                    /s/ *George F. Verschelden*
                                                 George F. Verschelden

32

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system on June 5, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:        June 5, 2026                    /s/ *George F. Verschelden*

                                                            George F. Verschelden

33