**No. 25-6038**

IN THE U.S. COURT OF APPEALS
FOR THE SIXTH CIRCUIT
————

LINNEY'S PIZZA, LLC,

*PLAINTIFF-APPELLANT*,

*V.*

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*DEFENDANT-APPELLEE.*
————

*Appeal from the U.S. District Court*
*for the Eastern District of Kentucky*

Case No. 3:22-cv-00071
Hon. Gregory F. Van Tatenhove
————

**AMICUS BRIEF OF THE CENTER FOR
AMERICAN RIGHTS, FRONTIERS OF FREEDOM,
& AMERICANS FOR LIBERTY AND SECURITY
SUPPORTING APPELLANT AND REVERSAL**
————

Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave.,
Suite 170
Chicago, IL 60614
414.588.1658
June 5, 2026          dsuhr@americanrights.org

I

# DISCLOSURE STATEMENT

The Center for American Rights, Americans for Liberty and Security, and Frontiers of Freedom are all nonstock nonprofit corporations. They do not issue stock and do not have any shareholders or owners. *See Fed. R. App. Proc. 26.1.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-6038                    Case Name: Linney's Pizza LLC v. Bd. of Governors

Name of counsel: Daniel R. Suhr

Pursuant to 6th Cir. R. 26.1, Center for American Rights (Amicus)
*Name of Party*

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____6/5/2026_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Daniel R. Suhr

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                                    Page 1 of  2

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-6038                    Case Name: Linney's Pizza LLC v. Bd. of Governors

Name of counsel:  Daniel R. Suhr

Pursuant to 6th Cir. R. 26.1, Frontiers of Freedom (Amicus)
                               *Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____6/5/2026_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Daniel R. Suhr

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                        Page 1 of  2

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-6038                    Case Name: Linney's Pizza LLC v. Bd. of Governors

Name of counsel: Daniel R. Suhr

Pursuant to 6th Cir. R. 26.1, Americans for Liberty and Security (Amicus)
                              *Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ 6/5/2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Daniel R. Suhr

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

II

# TABLE OF CONTENTS

**DISCLOSURE STATEMENT**......................I

**TABLE OF AUTHORITIES**......................III

**INTEREST OF THE AMICI CURIAE**....... 1

**SUMMARY OF ARGUMENT & INTRODUCTION** ........................................ 3

**ARGUMENT**................................................ 4

    I.   THIS CASE IS NOT SUITED TO THE MAJOR QUESTIONS DOCTRINE BECAUSE CONGRESS HAS SPOKEN WITH SPECIFICITY HERE, AND THE AGENCY HAS ACTED APPROPRIATELY WITHIN ITS SCOPE.......................................................4

    II.  TEXTUALIST TOOLS OF STATUTORY INTERPRETATION SUPPORT AN INDUSTRY-WIDE APPROACH TO REGULATION. ............................8

    III. THE TITLE OF THE SUBSECTION, "CONSIDERATIONS; CONSULTATION," IS A HELPFUL GUIDE TO ITS MEANING. .................12

**CONCLUSION** ........................................... 16

III

# TABLE OF AUTHORITIES

<u>CASES</u>

*Argus Leader Media v. United States Dep't of Agriculture*, 740 F.3d 1172, 1176 (8th Cir. 2014) ..........................................................10

*Couser v. Shelby Cnty.*, 139 F.4th 664, 671 (8th Cir. 2025).............................................8

*Couser v. Story Cnty.*, 704 F. Supp. 3d 917, 940 (S.D.Ia. 2023) .........................................8

*FCC v. Consumers' Rsch.,* 606 U.S. 656, 684 (2025)...........................................................6

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)...........................4, 5

*Hyuk Kee Yoo v. United States*, 43 F.4th 64, 74 (2d Cir. 2022) .........................................11

*Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.*, 2025 U.S. Dist. LEXIS 181314, \*22 (E.D.Ky. Sept. 12, 2025) ........12

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).............................................3

*Nat'l Fed'n of Indep. Bus. (NFIB) v. DOL, OSHA*, 595 U.S. 109, 126 (2022)..................6

*Nebraska v. Biden*, 600 U.S. 477 (2023) .3, 5, 6

*United States v. Locke*, 529 U.S. 89, 105 (2000) ..........................................................10

*United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1402 (2014 ..................................10

*Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014).........................................4, 5

IV

*Wayman v. Southard*, 23 U.S. 1, 10 Wheat. 1, 43 (1825) ..................................................... 6

*West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) ......................... 6

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ............................................. 4

*Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) ................................................. 7

## STATUTES

15 U.S.C. § 1693o-2 ............................... passim

49 U.S.C. § 60102(a)(2) .................................. 7

## OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. 2019) .......... 8

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. of Chi. L. Rev. 1175 (1989) ...... 8

1

## INTEREST OF THE AMICI CURIAE[1]

The **Center for American Rights** is a nonprofit public-interest law firm dedicated to accountability for powerful interests, such as the media, unions, and government. The Center frequently files amicus briefs in cases related to its core issues. The Center is engaged in this particular case because of its interest in the major questions doctrine and statutory interpretation on questions of agency power. *See, e.g., Nat. Horsemen's Benevolent & Protective Assoc. v. Black,* 53 F.4th 869 (5th Cir. 2022) and 107 F.4th 415 (5th Cir. 2024) (Suhr represents challengers to broad interpretations of agency power).

**Frontiers of Freedom** (FF) is an educational foundation whose mission is to promote freedom and opportunity whenever and wherever it can. FF

---

[1] No counsel for a party authored any part of the brief, and no party or counsel contributed money to prepare or submit the brief. The Center funded the brief through its general revenue. *See* Fed. R. App. Proc. 29.

This brief is filed by the written consent of all parties. Fed. R. App. Proc. 29(2).

2

is dedicated to the principles of individual liberty, peace through strength, limited government, free enterprise, and the values embodied in the Declaration of Independence, Constitution, and Bill of Rights. FF believes freedom is worth preserving, defending and renewing. FF's goal is to build a robust culture of freedom, opportunity, and prosperity through effective education, analysis and advocacy.

**Americans for Liberty and Security** is a conservative 501(c)(4) non-profit organization which focuses on promoting constitutional, small government policies.  ALS supports free markets, federalism, a robust national security and related policies that will sustain America for generations to come. Americans for Liberty and Security is interested in this particular case because of its interest in the major questions doctrine and statutory interpretation on questions of agency power as well as promoting the separation of powers.

3

## SUMMARY OF ARGUMENT
## & INTRODUCTION

The Federal Reserve's debit card rule is important. It affects major industries, including retailers and financial institutions. It affects millions of customers nationwide who use debit cards. But just because a rule is important, an industry is large, or the affected population is significant does not make the case appropriate for the Major Questions Doctrine. Here Congress wrote with sufficient specificity what it wanted. The Fed did not discover newfound powers *ex nihilo*, *deus ex machina*, or *mirabile dictu*—it promptly and thoughtfully exercised the powers that Congress gave it.

As an amicus, this brief's particular contribution is to thoroughly analyze the opinion of the district court in the companion case *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610, 615 (D.N.D. 2025), appeal pending, 8th Circuit No. 25-3000. The U.S. District Court for the District of North Dakota's decision on specific vs. representative issuer standards failed to appreciate the ordinary meaning of the statutory term "standards." Standards are generally applicable rules

4

or baselines against which individual actions or instances are judged. They are not themselves individualized and particularized—that notion is opposite the idea of "standards," which inherently govern multiple individuals and situations.

Separately, the North Dakota District Court erred in its exclusivist interpretation of Subsection (a)(4), wherein the Court found the so-called "third category" of factors incompatible with the statute. The section's title and neighboring statute are useful tools to illuminate its meaning, which can include other considerations.

The North Dakota District Court got it wrong, and the Eastern District of Kentucky Court got it right, such that the decision below should be affirmed.

## ARGUMENT

**I. This case is not suited to the major questions doctrine because Congress has spoken with specificity here, and the agency has acted appropriately within its scope.**

Over the course of the past two years, opponents of the Trump Administration have rushed to declare every administration initiative a major question in an effort to stop, frustrate, and stay each rulemaking and

5

agency action through the courts. Though it's encouraging to see the late and enthusiastic embrace of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and *Nebraska v. Biden*, 600 U.S. 477 (2023), by some recent adopters, courts should not fall into the trap of declaring everything a major question or soon the doctrine will lose its power. For the doctrine to remain meaningful, courts must insist that Congress legislate on actually major questions, and that it give agencies sufficient clarity that their only job is to "fill in the details."

This rule is not an instance of the Fed shoving an elephant into a mousehole. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouseholes."). This is, rather, the Fed putting a dormouse in a mousehole when certain special interests desired a church mouse. They may not like the Fed's policy choice, but that doesn't make it a major question.

6

This is not an instance of the Fed using "vague terms or ancillary provisions" to "alter the fundamental details" of the regulatory scheme. *Whitman v. American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001). Nor is it the case the Fed has suddenly "claim[ed] to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Courts appropriately "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regulatory Group*, 573 U.S. at 324 (quoting *Brown & Williamson Tobacco*, 529 U.S. at 160).

Here, debit card swipe fees are no doubt big business. *Corner Post*, 794 F. Supp. 3d at 616. They at minimum facilitate a significant portion of the American economy, even if they do not directly constitute it. And they affect millions of businesses and customers who use debit cards. *See* Appellant Br. 31.

7

The important difference is that the Fed is not discovering an unheralded new power in a long-extant statute. Congress asked the Fed to do this, gave it clear guidance on how to go about its job, and then the Fed acted promptly to implement the congressional directive. This is not, in other words, anything like the U.S. Department of Education waiting two-plus decades to suddenly (conveniently) discover in a post-9/11 emergency responder statute the power to cancel hundreds of billions of dollars in student loan debt. *Nebraska v. Biden*, 600 U.S. 477 (2023).

"There are some 'important subjects, which must be entirely regulated by the legislature itself,' and others 'of less interest, in which a general provision may be made, and power given to [others] to fill up the details.'" *Nat'l Fed'n of Indep. Bus. (NFIB) v. DOL, OSHA*, 595 U.S. 109, 126 (2022) (Gorsuch, J., concurring (quoting *Wayman v. Southard*, 23 U.S. 1, 10 Wheat. 1, 43 (1825)).

This case falls somewhere in between in Justice Gorsuch's scheme. The major questions doctrine is less of an on-off switch than a spectrum, or really a two-axis chart. This is an important question, for sure, but it

8

is probably not as vital to the nation's economic and political superstructures as student loan cancellation (as in *Nebraska*) or our energy grid (as in *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022)).

On the other axis, Congress made more than general provision. It did not simply empower the Fed to go forth and act in "the public interest" by setting "just and reasonable rates." *See FCC v. Consumers' Rsch.,* 606 U.S. 656, 684 (2025). Rather, Congress in the Durbin Amendment gave the Fed specific considerations and consultations to undertake, ordered it to develop an extensive informational record, and set forth particulars as to fraud prevention and networks. Congress left the Fed to "fill up the details" only after establishing specifically how the agency should go about doing its job. This is not a case where "the Government [as] claimed broad, expansive power on an uncertain statutory basis." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 639 (2026).

## II. Textualist tools of statutory interpretation support an industry-wide approach to regulation.

Congress mandated that the Fed should "establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S. Code § 1693o-2(3)(a).

"Standards" are, in their ordinary meaning, generally applicable. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) ("our job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." Cleaned up). In a similar case, the Eighth Circuit was recently called upon to determine the meaning of the term "standards" in the Pipeline Safety Act, which requires that the Secretary of Transportation "shall prescribe minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(2). The Eighth Circuit found a particular local ordinance set a "safety standard" because it had "blanket application" that "appl[ies] alike" to different persons in different circumstances. *Couser v. Shelby Cnty.*, 139 F.4th 664,

10

671 (8th Cir. 2025), *rehearing denied*, 2025 U.S. App. LEXIS 18818 (July 28, 2025).

The district court in that case turned to *Black's Law Dictionary*, which defined "Standard" in this context as "[a] model accepted as correct by custom, consent, or authority" or "[a] criterion for measuring acceptability, quality, or accuracy." *Couser v. Story Cnty.*, 704 F. Supp. 3d 917, 940 (S.D.Ia. 2023) (quoting "Standard," *Black's Law Dictionary* (11th ed. 2019)).

Standards, in other words, set a generally applicable model or criteria by which individual actions are judged. They are, by their nature, intended to be a universal baseline against which individual applications are held up. Contrary to Appellant and the North Dakota District Court's opinion, Appellant Br. 13 and 794 F. Supp. 3d at 638-39, in some sense the whole *point* of establishing standards in a rule is to set a "one-size-fits-all approach." That's a feature, not a bug, of what it means to be "standards." For a standard to make sense, it has to serve as the rule by

11

which to judge all transactions. *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. of Chi. L. Rev. 1175 (1989).

That reading is reinforced by the rest of the statutory phrasing: the Fed must "establish standards *for assessing* whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S. Code § 1693o-2(3)(a) (italics added).

The Fed must set standards that allows the Fed and issuers to assess whether the amount of the fee is reasonable. Again, an assessment in this context is the comparison of an individual situation against the universal norm, *i.e.*, the standards.

Thus, the North Dakota District Court erred in adopting the "issuer-specific'" and "transaction-specific" model for interpreting this language. 794 F. Supp. 3d at 637-39. *See* Appellant Br. 60.

Rather, the language makes clear that the Fed was to set "standards" by which the issuers themselves could "assess" whether their fees were reasonable and proportional. If the issuers assessed incorrectly—if they

12

charged fees that were not reasonable and proportional in light of the universal criteria set by the Fed in the rule—then they would be liable to enforcement for their noncompliance. 15 U.S.C. § 1693o-2(d)(1). But it's not the Fed's job to set a number for every issuer and every transaction. It's the Fed's job to set generally applicable standards by which issuers can then judge whether their own behavior and their own transactions are compliant with the law. Appellant is wrong to urge the alternative approach.

## III. The title of the subsection, "Considerations; Consultation," is a helpful guide to its meaning.

The correct resolution of the debate over the so-called "third category" of considerations is more easily resolved by reference to the title of the relevant statutory section. *See Corner Post*, 794 F. Supp. 3d at 629-30. *See also* Appellant Br. 23 (looking to surrounding "statutory structure" on this categories question). A statutory section's title or heading "can be a useful aid in resolving a statutory text's ambiguity." *United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1402 (2014). They provide "useful clues." *United States v. Deakins*, 152 F.4th 693, 714 (6th Cir. 2025)

13

(cleaned up). Similarly, "words of a statute should be interpreted consistent with their neighbors." *United States v. Locke*, 529 U.S. 89, 105 (2000).

To the extent this Court has doubt about the statute's meaning here, Amici find the section heading and neighboring subsection both helpful.

The prior subsection is entitled, "Rulemaking required." 15 U.S.C. § 1693o-2(a)(3). The next subsection, the one at the heart of this debate, is entitled, "Considerations; consultation." *Id.* at (a)(4). In other words, Congress in that subsection tells the Fed what things to ensure it considers and whom it must consult while developing the required rule.

"Considerations" as a word has an open-ended texture to it—it is Congress telling the agency, "When you develop the rule, make sure you consider these things and consult these other impacted agencies."

Put differently, "considerations" is a word that confers discretion. *See Hyuk Kee Yoo v. United States*, 43 F.4th 64, 74 (2d Cir. 2022) (treaty "drafters knew the difference between a mandatory determination and a

14

discretionary consideration"). It empowers the Fed to use its best judgment as it weighs the required considerations, weighs any other considerations, reviews the evidence gathered in the administrative record (*see* 15 U.S.C. § 1693o-2(a)(3)(b)), and hears the feedback of those suggested for consultation (*see id*. at (a)(4)(c)).

Of course, developing a rule has all sorts of considerations from any agency perspective. Administrability is one, as we see from the discussion of the issuer v. representative question above. *See* Appellant Br. 61. Cost may be another—can regulated parties afford compliance? The ideological preferences of the political policymakers may be another—do these particular Fed governors lean in a more free-market direction, or are they more comfortable with a heavy hand for the government because they are skeptical of big financial institutions? These are all "considerations" — inputs for the agency as it develops the rule, even if they are not specified in the statute.

15

Which is to say, the statutory "considerations" are not a complete, exhaustive, and exclusive list of considerations that limits the Fed's discretion. Rather, they indicate particular points that Congress wanted to make sure the Fed addressed while developing the rule, even as Congress left the Fed broad discretion to weigh these and other considerations and consultations. *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.,* 804 F. Supp. 3d 717, 729 (E.D. Ky. 2025).

Indeed, that principle can be seen from the "consultation" section that immediately follows. Congress specifies a list of officers for "consultation." In developing the rule, the Fed "shall" "consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection." 15 U.S.C. § 1693o-2(a)(4)(c).

No one would say this is an exclusive and exhaustive list of whom the Fed may consult while developing this rule. If the Fed decided to ask the

16

Secretary of the Treasury for his views, or the White House's National Economic Council, no one would say the Fed was breaking the law by doing so. That's because consultations, like considerations, are not ordinarily read as exclusive and exhaustive.

The Durbin Amendment may not be the picture of perspicacity, but that's why we have courts. In instances of ambiguity, headings and neighboring texts provide useful illumination of textual problems. That's the case here.

## CONCLUSION

For the above-stated reasons, Amici urges the Court to rule in favor of the Board.

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave. Suite 170
Chicago, Illinois 60614
414.588.1658
dsuhr@americanrights.org

*June 5, 2026*

17

## CERTIFICATE OF SERVICE

This brief was served on all parties by CM/ECF. */s/ Daniel R. Suhr*

## CERTIFICATE OF COMPLIANCE

This brief was prepared in Microsoft Word, Century Schoolbook font, size 14, and has 2,632 words in the body. */s/ Daniel R. Suhr*