**No. 25-6038**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

LINNEY'S PIZZA, LLC,
*Plaintiff-Appellant*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
*Defendant-Appellee.*

---

On Appeal from the United States District Court  for the Eastern
District of Kentucky (No. 3:22-cv-00071-GFVT)

---

**Motion for Leave to File Brief of *Amici Curiae*, Consumer Action
for a Strong Economy, Institute for Policy Innovation, 60 Plus
Association, Center for Individual Freedom, Center for a Free
Economy and the Independent Women's Law Center In Support
of Appellant Board of Governors of the Federal Reserve System**

---

July 2, 2026

GERARD D. SCIMECA
  *Counsel of Record*
CONSUMER ACTION FOR A STRONG ECONOMY
MO Bar No. 76360, VA Bar No. 91693
1800 Diagonal Rd, Suite 600
Alexandria, VA 22314
(757) 375-9559
gds@caseforconsumers.org

*Counsel for Amici Curiae*

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

Pursuant to Federal Rule of Appellate Procedure 29(a), proposed amicus curiae Consumer Action for a Strong Economy) respectfully moves for leave to file the attached brief in support of The Board of Governors of the Federal Reserve System. In support of this motion, amicus states the following:

1.     Proposed Amici Curiae are 501(c)(4) and 501(c)(3) non-profit organizations engaged in public policy advocacy, education, and research for the purposes of promoting free market economic principles that generate greater individual freedom and prosperity. Amici Curiae often engage in advocacy on legal matters involving the legislative, judicial, and executive powers of federal and state government bodies.

2.     Counsel for Amici Curiae made several attempts to file the amicus brief in a timely manner prior to the June 5, 2026, filing deadline but was thwarted by technical barriers preventing access to the necessary features of the CM/ECF electronic filing system. counsel was repeatedly logged out of the system involuntarily and/or reached digital "dead ends" where no further progress was possible. counsel was informed there were no alternate means of filing a brief with the Court outside of the CM/ECF system.

3.     Counsel notified the case manager immediately of the technical issues preventing a timely filing of the proposed brief, and did so prior to the June 5 filing

deadline. The case manager informed counsel that a notation would be placed on the docket stating technical issues were preventing the brief from being filed.

4.  Over the next few days, counsel sought technical assistance from the staffs of both the  6th Circuit Court and Pacer.gov, two web-based platforms integrated in the electronic filing process. Calls were made daily and counsel spoke to at least  half a dozen customer service associates in order to diagnose and remedy the issue. Several "fixes" were tried, but none yielded success. As one example, counsel's Pacer.gov account was found to be properly functioning by technical staff, yet password resets and increased log-on verification protocols were directed to an email address unrelated to the account, even after technical staff had thoroughly reviewed the data in the account. Nevertheless, this "deleted" email address continued to prevent the e-filing process from being completed successfully.

5.  By Tuesday morning, June 16th, counsel's Pacer.gov account was finally able to access the Court's e-filing system. This is likely due to a call with technical support earlier that day that fixed an error preventing the system from recognizing counsel's  credentials to e-file to the Court docket.

6.  When two organizations who are now an amicus to this brief were informed that the brief would be filed past the deadline, counsel consented to granting them further legal review of the brief given the lack of progress in solving

the electronic filing issue. Each amicus confirmed approval of the brief on Thursday, June 18.

7.     On Friday, June 19th, counsel filed Form 6ca-68, Appearance of Counsel to the Court through the electronic filing system successfully. The full brief was filed by counsel, and based upon prompts received through the filing process counsel had reason to believe the full brief was also filed successfully with the Court.

8.     As counsel has been informed in the immediate moment that the amicus brief did not upload successfully, and he seeks to remedy this issue with urgency and dispatch, amending his filing and updating the relevant dates to reflect this later filing date. Though he believed the matter was handled June 19th, amici's appearance on the docket has been revealed as limited to the Appearance form, not the amicus brief in full.

9.     Counsel understands that the duty owed in ensuring that matters are properly filed with the Court are counsel's alone, and acknowledges misjudging the status of the brief that was unsuccessfully filed on June 19th. However, counsel respectfully asks the Court to consider that the earlier technical glitch prior to June 5th had some residual effect on counsel's ability to confidently use the CM/ECF system. The extensive time and steps taken both alone and with the help of various technical staff when problems were first encountered were not ideal conditions under which to understand and utilize the features of this platform.

10. Federal Rule of Appellate Procedure 29(e) provides that a court of appeals has the discretion to extend the time or grant leave for an amicus brief based on the totality of the facts and circumstances involved. *See Neonatology Associates, P.A. v. Commissioner, 293 F.3d 128 (3d Cir. 2002).* Such factors include timeliness and justification; relevance and value to the parties and the court; and prejudice to the parties.

11. In the present instance, amici were prevented from filing on time by unforeseen technical issues beyond their control. With the confirmed success of filing at least one document with the court, counsel concedes that given earlier frustrations, he was overly optimistic that all of the June 19 filings were successfully uploaded to the Court and in good faith treated the matter as resolved.

12. As e-filing provides the only path to filing an amicus with the Court, the technical issue just days before the filing deadline foreclosed any opportunity to file in a timely manner. Further, the technical issues were substantive to the extent it took several days and multiple employees of both Pacer.gov and the Sixth Circuit Court of Appeals to diagnose and eventually rectify the problem.

13. Prior to the delay, all parties consented to the filing of the amicus brief. The filing extension at issue is short, and no party will be prejudiced or gain an unfair advantage with an extended filing date.

14.    The accompanying amicus brief offers a unique perspective we hope the Court finds valuable, one that is not based on statutory interpretation or legislative history, but focused on how the law and regulation in question affect the well-being of its primary constituents, which are U.S. consumers.

15.    Courts routinely grant leave to file amicus briefs out of time where, as here, the delay is brief, the movant acted in good faith, the opposing parties are not prejudiced, and the brief offers a perspective that may be useful to the court. The defect at issue was a technical barrier beyond the control of amicus, who acted in good faith with regard to the Court and all parties in the attempt to so file.

16.    Proposed Amicus Curiae respectfully submit that no purpose would be served by excluding from the Court's consideration a brief that may provide valuable insights and arguments for the Court in rendering a ruling opinion, and which could do so without unfairly harming or helping either party.

17.    For the foregoing reasons, Proposed Amicus Curiae respectfully request this Court grant leave to file the accompanying amicus curiae brief out of time.

Dated: July 2, 2026

By: /s/ Gerard D. Scimeca
Gerard D. Scimeca
MO Bar No. 76360
VA Bar No. 91693
1800 Diagonal Rd, Suite 600
Alexandria, VA 22314

6

gds@caseforconsumers.org
Telephone: 757.375.9559
*counsel for Amici*

Pursuant to Circuit Rule 29A and Federal Rule of Appellate Procedure 29(a)(2), *Amici Curiae*, Consumer Action for a Strong Economy ("CASE"), the Institute for Policy Innovation ("IPI"), the 60 Plus Association ("60 Plus"), the Center for Individual Freedom ("CFIF"), the Independent Women's Law Center Forum ("IWLC"), and the Center for a Free Economy ("CFFE"), move this Court for an order permitting *amici curiae* to file the  attached brief in support of Appellant.

## CERTIFICATE OF COMPLIANCE

1. Pursuant to Fed. R. App. P. 32(g), this document complies with the type-volume and word-count limits of Federal Rules of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 1,128 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5-6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Gerard D. Scimeca*

GERARD D. SCIMECA
*Counsel to Amici Curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 1ST day of July, 2026, a true copy of the foregoing Motion for Leave to File Brief of *Amici Curiae* was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to all counsel of record.

/s/ *Gerard D. Scimeca*

GERARD D. SCIMECA
*Counsel to Amici Curiae*

**25-6038**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

LINNEY'S PIZZA, LLC,
*Plaintiff-Appellant*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
*Defendant-Appellee.*

---

On Appeal from the United States District Court  for the Eastern
District of Kentucky (No. 3:22-cv-00071-GFVT)

---

**BRIEF OF AMICI CURIAE, CONSUMER ACTION FOR A STRONG ECONOMY, INSTITUTE FOR POLICY INNOVATION, 60 PLUS ASSOCIATION, CENTER FOR INDIVIDUAL FREEDOM, CENTER FOR A FREE ECONOMY AND INDEPENDENT WOMEN'S LAW CENTER IN SUPPORT OF APPELLANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM**

---

July 2, 2026

GERARD D. SCIMECA
  *Counsel of Record*
Consumer Action for a  Strong Economy
MO Bar No. 76360; VA Bar No. 91693
1800 Diagonal Rd, Suite 600
Alexandria, VA 22314
757-375-9559
gds@caseforconsumers.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ………………………………….……….……..ii

CORPORATE DISCLOSURE STATEMENT …………………….………1

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE …….………2

INTRODUCTION ……………………………………………….……..3

SUMMARY OF ARGUMENT …………………………………….……9

ARGUMENT …………………………………………………………..12

I.     THE BOARD PROPERLY EXERCISED ITS VESTED
AUTHORITY IN PROMULGATING REGULATION II ……………….....12

A.     CONGRESS GRANTED THE BOARD THE AUTHORITY TO INCLUDE
DISCRETIONARY COST CONSIDERATIONS IN FORMULATING REGULATION II …...13

B.     THE BOARD WAS THOROUGH AND DELIBERATIVE AS CONGRESS REQUIRED
IN PROMULGATING REGULATION II ……………………………………..…15

II.     VACATING REGULATION II WOULD AGAIN FORCE CONSUMERS
TO SUBSIDIZE WINDFALL PROFITS FOR MERCHANTS ……………18

A.     DURBIN AMENDMENT WAS SOLD AS PRO-CONSUMER BUT THE
HARM TO CONSUMERS FAR OUTWEIGHS BENEFITS …………….………...19

B.     OVERTURNING REG II WILL HAND MERCHANTS MORE WINDFALL
PROFITS ON THE BACKS OF CONSUMERS ………………………….……22

C.     A RULING THAT FURTHER INJURES CONSUMERS IS INCOMPATIBLE
WITH THE STATUTORY INTENT OF DURBIN AMENDMENT …………….…..24

III.     OVERTURNING REG II OPENS THE DOOR TO CONSTITUTIONAL
CHALLENGES BASED UPON CONFISCATORY DOCTRINE …………...26

CONCLUSION ..............................................................……30

CERTIFICATE OF COMPLIANCE ………………………………………...31

CERTIFICATE OF SERVICE …………………………..………………...…32

i

# TABLE OF AUTHORITIES

**CASE**                                                                 **Page(s)**

*Linney's Pizza, LLC v. Bd. of Governors of the Federal Reserve System,*
No. 22-cv-00071, 2025 LEXIS 181314
(E.D. Ky. Sept. 15, 2025)………………………………………………….5, 9, 14, 16, 17

*NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474
(D.C. Cir. 2014)......................................................................................4, 15, 16-17

*TCF National Bank v. Bernanke,* No. CIV. 10-4149, , 746 F.3d 474
(D.C. Cir. 2014).......................................................................................... 27

*Michigan Bell Telephone Company v. Engler,* 257 F.3d 587, .
(6th Cir. 2001)…………………………………………………………………..27

*The Aetna Casualty & Surety Co., v. Commissioner of Insurance,*
263 N.E.2d (Mass.1970)…....................................................................28

*Keystone Ins. Co. v. Foster,.*732 F. Supp. 36 (E.D. Pa. 1990)…........................................…28

## STATUTES AND REGULATIONS

15 U.S.C. § 1693o-2……………………………………………………..……….………13

15 U.S.C. § 1693b(a)(2-3)……………………………………………...…….……..….8, 17

15 U.S.C. § 1693o-2(a)(2-3)…………………………………………...…….….……17

15 U.S.C. § 1693o2(a)(4)(B)……………………………………......…….….……14

15 U.S.C. § 1693o-2(a)(4)(B)(i)…………….…..........................……………..........14

15  U.S.C.  §  1693o-2(a)(4)(B)(ii).........................................................................…14

26 U.S.C.§501(c)(3)………………………………………………...…..………1

26 U.S.C. § 501(c)(4)……………………………………………...…..……….…….…1

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L.
111-203 (2010), 124 Stat. 1376………………………………………..……….4, 13

ii

# TABLE OF AUTHORITIES – Continued

**Page(s)**

Fed.Reg. 12 CFR Part 235 [Regulation II; Docket No. R-1404]
*Debit Card Interchange Fees and Routing,* July 20, 2011, *available at*
*https://www.federalregister.gov/d/2011-16861/p-*720..................................................26

12 C.F.R. § 235.5…………………………………………………………...…......5

## RULES

Fed. R. App. P. 29(a)(2) …………………………………………...……..……...1

Fed. R. App. P. 29(a)(4)(E)(i-iii) ……………………………………….…….…...1

## OTHER AUTHORITIES

The Constitution of the United States…………………………………….…….…....11

156 Congressional Record S4839 (daily ed. June 10, 2010)……………..……..……...18

*2023 NPRM, Debit Card Interchange Fees and Routing*, 88 Fed. Reg. 78,10
(Nov. 14, 2023)………………………………………………….……...….10

Lynn Neary (host), *Banks To Raise Debit Card Fees, NPR Morning Edition,*
*October 17 (2011) available at https://www.npr.org/2011/10/07/*
*141144766/banks-to-raise-debit-card-fees*.......................................................3

Ronny A. Nader, *If It Ain't Broke, Don't Fix It: Senator Durbin's*
*Disastrous Solution to an Illusory Problem,* 80 Brook. L. Rev.
(2014) *available at*
*https://brooklynworks.brooklaw.edu/blr/vol80/iss1/8*......................................... 4, 23, 27

Brad G. Hubbard, *The Durbin Amendment, Two-Sided Markets, and Wealth*
*Transfers: An Examination of Unintended Consequences Three*
*Years Later* (May 20, 2013)*, available at* SSRN: https://dx.doi.org/10.2139/
ssrn.2285105 (last visited Jun. 1, 2026) ……………………………………7-8, 18, 20-21

Tom Rosenkoetter, *How the Durbin Amendment Hurt Consumers –*
*and Why Expanding It Would Hurt More*, ABA Banking Journal (Feb. 26, 2006),
*available at https://bankingjournal.aba.com/2026/02/how-the-durbin-mendment -hurt-*
*consumers-and- why-expanding-it-would-hurt-more/*
(last visited Jun. 3, 2026)……………….......................................................…7

# TABLE OF AUTHORITIES – Continued

**Page(s)**

Kevin Foster, *The 2010 Survey of Consumer Payment Choice*, Federal
Reserve Bank of Boston, No. 13-2 (2013)
(last Visited June 3, 2026)……………………………………………….......12

David S. Evans, Howard Chang, Steven Joyce, *The Impact of the U.S. Debit
Card Interchange Fee Regulation on Consumer Welfare: An Event
Study Analysis* (Coase-Sandor Institute for Law & Economics Working
Paper No. 658 (Oct. 23, 2013), *available at* https://chicagounbounduchicago.
edu/cgi/viewcontent.cgi? article=1651&context=lawandeconomics
(last visited Jun. 3,  2026)……………………………………….......…..…….19, 21

Debit Card Interchange Fees and Routing, Final Rule, 76 Fed. Reg. 43, 394
(July 20, 2011)
("Regulation II")……………………….…..…… 3-9, 11, 12, 14, 16-22, 24, 25, 27-29

Debit Card Interchange Fees and Routing, NPRM, 75 Fed. Reg. 81,722
(Dec. 28, 2010)……………………………..……………………………...…17

Scott D. Strockoz, *Dodd-Frank and the Durbin Amendment—Is It Working as Intended?,*
Capstone Strategic Project for the American Bankers
Association Stonier Graduate School of Banking (2012)………………………...….20

Todd J. Zywicki, Geoffrey Manne, and Julian Morris, *The Effects of Price
Controls on Payment-Card Interchange Fees: A Review and Update*,
International Center for Law and Economics, (March 4, 2022), *avail-able
at* https://laweconcenter.org/wp-content/uploads/2022/03/Payments-
2021-Lit-Review.pdf (last visited May 28, 2026)…………...…………….....…..…….28

Todd J. Zywicki, Geoffrey Manne, and Julian Morris, *Price Controls on
Payment Card Interchange Fees: The U.S. Experience* (June 4, 2014),
George Mason Law & Economics Research Paper No. 14-18, *available
at* SSRN: https://ssrn.com/abstract=2446080.......................................................25, 26

Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris, *Unreasonable and
Disproportionate: How the Durbin Amendment Harms Poorer Americans and
Small Businesses*, International Center for Law & Economics (April 25, 2017),
*available at* https://laweconcenter.org/ images/articles/icle-
durbin_update_2017_final.pdf  (last visited May 29, 2026) ……………..……18, 20

# TABLE OF AUTHORITIES – Continued

**Page(s)**

Thomas Aiello, *The Durbin Amendment's Fourteen Years of Harm,* National
Taxpayer's Union (October31 2025) *available at
https://www.ntu.org/publications/detail/the-
durbin-amendments-fourteen-years-of-harm* ……………………………………6

Patrick C. McGinnis, *Misguided Regulation of Interchange Fees: The Consumer
Impact of the Durbin Amendment*, 25 LOY. CONSUMER L. REV. 285, 289
(2013) ……………………………………………………………...……23

Richard A. Epstein, *Durbin's Folly: The Erratic Course of Debit Card Markets,*
7 COMPETITION POL'Y INT'L 58,60 (2011) quoted by Nader at 343…………..…27

*The Durbin Effect: Two Years Later Consumers Not Benefitting from Durbin
Price Control Regulation, Electronic Payments Coalition, available at
http://wheresmydebitdiscount.com/the-durbin-effect*................................................6

Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin
Amendment on Merchants: A Survey Study*, 100 Fed. Reserve Bank of
Richmond Econ. Quarterly 183 (2014), *available at
https://www.rich mondfed.org/-/media/RichmondFed.Org/publications/
research/economic_quarterly/2014/q3/pdf/wang.pdf*
(last visited Jun. 2, 2026) ……………………………………………….…...19

# CORPORATE DISCLOSURE STATEMENT

Under Rules 26.1(a) and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, Amici Curiae, Consumer Action for a Strong Economy ("CASE"), the Institute for Policy Innovation ("IPI"), the 60 Plus Association ("60 Plus"), the Center for Individual Freedom ("CFIF"), and the Center for a Free Economy ("CFFE") state that they are tax-exempt and not-for-profit corporations. CASE, 60 Plus, CFIF, and CFFE are organized under 26 U.S.C. § 501(c)(4) while IPI and IWLC are organized under 26 U.S.C § 501(c)(3). None of these Amici have a corporate parent, none of these Amici issue stock, and no publicly held corporation owns 10 percent or more of any of these Amici.

/s/ *Gerard D. Scimeca*

GERARD D. SCIMECA
*Counsel to Amici Curiae*
*Consumer Action for a Strong Economy*

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are the following organizations: Consumer Action for a Strong Economy ("CASE"), Institute for Policy Innovation ("IPI"), 60 Plus Association ("60 Plus"), Center for Individual Freedom ("CFIF"), the Center for a Free Economy ("CFFE"), and the Independent Women's Law Center ("IWLC"). *Amici* state that they are tax-exempt not-for-profit corporations. CASE, 60 Plus, CFIF, CFFE, are organized under 26 U.S.C. § 501(c)(4) while IPI and IWLC are organized under 26 U.S.C. § 501(c)(3). CASE advocates on behalf of American consumers by promoting free-market policies, fiscal responsibility, and reasonable consumer protections. IPI is a free market think tank focusing on economic growth, limited government, and individual liberty. 60 Plus advocates on behalf of seniors who believe in free market solutions and limited but effective government. CFIF's mission is to, among other things, promote fidelity to the Constitution and advocate for policies that promote consumer well-being and the rule of law. CFFE advocates for free-market policy reforms.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for Amici Curiae contacted counsel for the Parties seeking their consent to submit this brief for this Court's consideration. Counsel for Appellant, Appellee, and Proposed-Intervenors consent to the filing of this brief. No Party's counsel authored this brief in whole or in part. No Party or Party's counsel contributed money that was intended to fund the preparation or submission of this brief. In fact, no one, besides Amici Curiae, contributed money to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E)(i-iii).

*Amici*'s interest in this appeal is that Regulation II represents the best compromise between competing interests. Regulation II compensates issuers and banks for their efforts in processing debit card transactions. Regulation II imposes a safe harbor thus limiting the costs to merchants and therefore also limiting any pass-through costs to consumers. Regulation II also minimizes harm to consumers—e.g., increased banking fees and the decrease of free-checking accounts—while also availing consumers of the benefits of paying for purchases with debit cards. Thus, Regulation II represents the best compromise between competing interests. Vacating Regulation II and advocating for a lower interchange fee cap, therefore, will cause significant harm to consumers.

## INTRODUCTION

In spring 2011, a nationwide consumer backlash forced some of America's largest financial institutions to do something rarely witnessed – reverse course. Banks had just enacted new fees on the use of debit cards,[2] a product that previously did not charge customers any direct user fees. Online petitions gained hundreds of thousands of signatures in just hours while a local news reporter cut up her debit

---

[2] Lynn Neary (host), *Banks To Raise Debit Card Fees,* NPR Morning Edition, October 17 (2011) *available at https://www.npr.org/2011/10/07/141144766/banks-to-raise-debit-card-fees*

3

card during a live broadcast.[3] Meanwhile, hackers targeted the Bank of America website to send a message to corporate executives.

The fee itself was the banks' response to make up for lost revenue caused by the Durbin Amendment[4] ("Durbin"), which mandated a cap on debit card interchange fees charged by the larger (at least $10 billion in assets)[5] issuing banks. Durbin was a last-minute addition to the comprehensive 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. 111-203 (2010), 124 Stat. 1376. Dodd-Frank aimed to reform the nation's financial services industry and create increased consumer protections. The legislation was heavily debated and vetted, yet Durbin was never subject to a thorough, comprehensive bi-partisan review or congressional committee hearings.[6] Durbin's unprecedented mission of enacting sweeping new rules and price caps for the entire banking industry, coupled with the lack of prior review and bi-partisan debate, has led commentators and courts to call out the bill as poorly drafted, convoluted, and difficult to interpret.[7] This is most

---

[3] Ronny A. Nader, *If It Ain't Broke, Don't Fix It: Senator Durbin's Disastrous Solution to an Illusory Problem,* 80 Brook. L. Rev. (2014) *available at https://brooklynworks.brooklaw.edu/blr/vol80/iss1/8*

[4] 15 U.S.C. § 1693o-2

[5] C.F.R. § 235.5

[6] Senator Durbin disputes this claim, noting that the issue, though not his specific bill, had been debated for years on Capitol Hill, See Office of Senator Richard Durbin, *Myths and Realities About Swipe Fee Reform, at www.durbin.senate.gov.*

[7] *NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474 (D.C. Cir. 2014) at 483

noteworthy, as Appellant's argument hinges on an alternate statutory interpretation from that of the district court[8] and not whether the regulation promulgated by the Board has faithfully and effectively met its congressional mandate.

Durbin authorized the Governors Board of the Federal Reserve ("the Board") to issue a regulation effectuating the Durbin debit card interchange price cap, currently known as Regulation II[9] ("Reg II"), the validity of which is at issue in this appeal. The debit card fees the banks created post-Durbin, along with the subsequent public backlash, are instructive in the current matter before this Court, as they point to certain unavoidable realities that must be considered. These include: how the unintended negative consequences for consumers arising from legislative and regulatory price-setting for debit card interchange swipe fees will invariably be repeated; that a re-interpretation of a purportedly pro-consumer law will only further harm consumers; the understanding that additional price caps on the interchange will require banks to adjust accordingly by raising fees on their customers and cutting back on banking services and investment in innovation, and that any further restrictions on interchange swipe fees will only serve to benefit merchants with billions more dollars in windfall revenue, just as they received upon the enactment

---

[8] *Linney's Pizza, LLC v. Bd. of Governors of the Federal Reserve System*, No. 22-cv-00071, 2025 LEXIS 181314 (E.W.D. Ky. Sept. 15, 2025)
[9] 12 C.F.R. § 235.5

of Senator Durbin's legislation in 2011 and continue to realize every year it remains in effect.[10]

Unintended cost burdens on consumers were not the only negative consequences the legislation failed to consider. Durbin suffers from the effects of its rushed and ill-conceived enactment to such an extent that Reg II actually *raises* interchange fees on smaller-sized merchants, a sizable group within the retail industry least equipped to mitigate these additional costs.[11] When Durbin took effect, discounts for transactions below $11.00 were eliminated by the interchange, creating yet another haphazard consequence of this disconcerting piece of legislation.

Similarly, we must consider the failure of *intended consequences* to be achieved by Durbin, such as the intention to save consumers money upon the theory that retailers would pass on the savings from lower interchange fees to their customers in the form of lower prices. The overwhelming data compiled by numerous studies after Durbin took effect concludes that consumers experienced more actual price increases than decreases for retail items, and the vast majority of merchants failed to

---

[10] Thomas Aiello, *The Durbin Amendment's Fourteen Years of Harm,* National Taxpayer's Union (October31 2025) *available at https://www.ntu.org/publications/detail/the- durbin-amendments-fourteen-years-of-harm*

[11] *The Durbin Effect: Two Years Later Consumers Not Benefitting from Durbin Price Control Regulation, Electronic Payments Coalition, available at http://wheresmydebitdiscount.com/the-durbin-effect*

pass the savings from lower interchange fees to their customers. (study from previous Durbin supporter who came to oppose it after assessing the actual results).[12]

The debit card fee that caused the public backlash was swiftly repealed by the banks that adopted it, but the fee's demise was hardly a victory for banking customers. Because the public outcry prevented issuing banks from adding fees to existing debit card services in order to reclaim revenue lost from the cap on swipe fees, they had to look elsewhere. The limited options available to issuing banks led to higher fees on checking and savings accounts, higher monthly minimum balances to avoid maintenance fees, increased ATM fees, a massive reduction and elimination of rewards programs, and a major reduction in the availability of free checking account services for millions of customers.[13] Lower-income people without an adequate credit history or sufficient deposits lost checking and savings accounts altogether.[14]

The Durbin Amendment was enacted with the stated purpose to provide financial relief to regular consumers, an intent stated in the very title of the

---

[12] Tom Rosenkoetter, *How the Durbin Amendment Hurt Consumers – and Why Expanding It Would Hurt More*, ABA Banking Journal, (Feb. 26, 2006), *available at https://bankingjournal.aba.com/2026/02/how-the-durbin-amendment-hurt-consumers-and-why-expanding-it-would-hurt-more/.*
[13] Brad G. Hubbard, *The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later* at 17, 29,37, 39 (May 20, 2013), *available at http://ssrn.com/abstract=2285105*
[14] *id*. at 39.

legislation. But with the benefit of hindsight, it is quite clear that retailers have been the overwhelming beneficiaries of this legislation, reaping an annual windfall of over $7,000,000,000[15] while consumers are not seeing lower prices at the cash register to help offset the higher prices and reduction in services they are experiencing with their banking. Appellant Linney's attempt to repeal Reg II and lower interchange swipe fees even further through an alternative regulatory scheme must be seen as an effort to subsidize merchants even more at the expense of consumers. This will occur as bank losses from lower interchange fees will result in higher costs for checking and savings accounts, ATM charges, service fees, and maintenance fees, and trigger higher minimum balance requirements and a steep reduction or elimination of free checking services. Meanwhile, just as when Durbin initially took effect, merchants will overwhelmingly pocket the difference instead of sharing the savings with consumers.

It is entirely appropriate to conclude, then, that not only did Durbin fail to achieve its aim of providing consumers financial relief as it corrupted and distorted the free market of the debit card interchange, it actually injured the very constituent consumers it purportedly intended to help. While we hold that consumers and the free market would benefit most from a complete repeal of Durbin, we acknowledge

---

[15] *id.* at 37.

that the retention of Reg II is vastly more preferable than its repeal, which would be injurious to U.S. consumers as noted above. As our argument makes clear, the Board issued a proper regulation within its statutory authority, and Appellant offers no sound legal basis by which Reg II should be overruled by this Court. Therefore, we respectfully ask the Court to uphold the original mandate of Durbin and prohibit the further expansion of interchange price caps that cannot be reconciled with activating legislation that claims widespread consumer benefits as its primary intent.

## SUMMARY OF THE ARGUMENT

Appellee, the Board, was delegated by Congress via Durbin to promulgate a rule to ensure that merchant debit card interchange fees charged by issuing banks were "reasonable" and "proportional," as well as to "protect consumers from abusive financial services practices."[16] In vesting the Board with the authority to create this rule, Congress stipulated costs that the Board *must* consider, costs they *must not* consider, leaving a third category of costs upon which they were silent. Appellee has established through the rulemaking process as well as through the district court decision that they possessed the discretion to include this third category of costs in the creation of Reg II. *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Res. Sys., 804 F. Supp. 3d 717* (E.D. Ky. 2025). Contrarily, a  substantial part of Appellant's

---

[16] Pub. L. 111-203 (2010), 124 Stat. 1376.

case rests on the argument that the language of Durbin prohibited the Board from including this third cost category, thus rendering Reg II invalid. Appellant also claims the Board's Final Rule to be arbitrary and capricious, and the process flawed, thus failing to meet its statutory requirements. This is inaccurate as the Board left an extensive record of its deliberations and came to promulgate the Final Rule absent bias.

*Second*, while Durbin was intended as a pro-consumer regulation, in reality it has harmed consumers a great deal while creating windfall profits for merchants. Of the three parties beholden to Durbin in a debit card transaction – the merchant, the issuing bank, and the consumer – it is consumers who were harmed and burdened the most. This is because price caps on debit swipes greatly reduced bank revenue,[17] part of which went directly to subsidizing other bank services, such as free checking accounts and debit rewards programs. And given that retailers and merchants did not pass on the savings from lower swipe fees to their customers, consumers ended up subsidizing greater profits for retailers and other merchants. Durbin was not enacted to siphon money from the wallets of consumers to pad the profits of retailers, yet this was the net result. Overturning Reg II and requiring the Board to issue more restrictive price caps will require banks to chase this lost revenue through an increase

---

[17] See 2023 NPRM, Debit Card Interchange Fees and Routing, 88 Fed. Reg. 78, 100, 78, 105 (Nov. 14, 2023).

in banking fees and further reductions in banking services and free checking accounts, not only costing Americans billions of dollars but possibly causing millions more people to become unbanked.  Further, given that Appellant's position would result in additional harm to consumers, it is wholly at odds with the mandate of Durbin to provide financial benefits for average American consumers

*Third*, a repeal of the current Reg II rule that results in even lower interchange price caps will open the door to constitutional challenges to Reg II for violating the confiscatory rate doctrine of the 5th Amendment Takings Clause of the U.S. Constitution.[18] Under this doctrine, a business or enterprise cannot be prevented from satisfying its costs plus a fair profit due to a government regulatory scheme. The doctrine further prohibits any regulation that prevents a provider from recovering all the costs associated with providing a product or service. Durbin has been challenged on at least one occasion based on the confiscatory doctrine and prevailed. But the court in that particular instance erred in claiming that the doctrine applied only to public utilities and their equivalents, which is objectively false. Given that Durbin cut interchange fees in half, resulting in some covered and uncovered issuing banks frequently failing to cover costs, let alone achieve a fair profit for their efforts, it is clear that Durbin remains vulnerable to a constitutional

---

[18] U.S. Const. amend. V, cl. 4

challenge. Overturning Reg II to render it even more "confiscatory" will only exacerbate this issue and increase the possibility of regulatory revisions that could result in costly confusion, financial inefficiencies, and regulatory delays as the Board and the courts labor to agree on new cost standards for swipe fees. We respectfully ask the Court to give serious consideration to the application and effect of the confiscatory doctrine in their review of Reg II.

## ARGUMENT

### I. THE BOARD PROPERLY EXERCISED ITS VESTED AUTHORITY IN PROMULGATING REG II

After years of rapid growth, in 2010 debit cards finally surpassed cash as the top consumer payment method, processing just over 31 percent of consumer point-of-purchase sales.[19] Annual data from around this same time indicates that consumers swiped their debit cards 37.6 billion times to pay for over $1.4 trillion in goods and services. *See NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474, 477 (D.C. Cir. 2014). Swipe fees delivered 55.5 cents per transaction on average from merchants to financial institutions, netting over $20 billion in fees for banks and networks. *NACS*, 746 F.3d at 479. Banks and networks attempted to limit processing to a single network, setting fees on debit and credit card transactions, and

---

[19] Kevin Foster, *The 2010 Survey of Consumer Payment Choice*, Federal Reserve Bank of Boston, No. 13-2 (2013).

imposing Honor All Card rules that required merchants to pay whatever fees card issuers set. *NACS*, 746 F.3d at 479. Concerned about what they considered to be excessive debit interchange fees and a lack of negotiating power for merchants, Congress passed Durbin as part of the sweeping Dodd-Frank reform bill.

A. CONGRESS GRANTED THE BOARD THE AUTHORITY TO INCLUDE DISCRETIONARY COST CONSIDERATIONS IN FORMULATING REG II

The Dodd-Frank[20] banking reform legislation was enacted by Congress in 2011 in the wake of the 2008 financial crisis and included the Durbin Amendment[21] which set caps on debit card interchange fees that banks charge merchants. Durbin required Congress to direct the Board to promulgate a regulation setting an interchange transaction fee to be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2-3). To this end, Congress provided guidance on "reasonable" and "proportional" through the determination of the costs the Board must consider, and those costs disallowed for consideration. 15 U.S.C. § 1693o-2(a)(4)(B). The "must" category included an issuer's "incremental costs" for services provided in "the authorization, clearance, or settlement ("ACS") of a particular electronic debit transaction…". Id. § 1693o-2(a)(4)(B)(i). By contrast, prohibited costs were  "other costs incurred by an issuer which are not specific to a

---

[20] Pub. L. No. 111-203, 1075, 124 Stat. 1376, 2068 (2010)

[21] 15 U.S.C. § 1693o-2

particular electronic debit transaction." Id. § 1693o-2(a)(4)(B)(ii). Congress, and the district court, never characterized these two subsections as the complete menu of possible cost considerations, only as specific mandates on costs to include and exclude. *See* Add. 017-018; R. Doc. No. 79 at 17-18. The boundaries, as set by legislative language are: the incremental authorization, clearing, and settlement ("ACS") costs specific to a transaction and those other costs not specific to a transaction. *See* Add. 018; R. Doc. Note, Congress is silent on cost considerations that the Board *may* consider, leaving a very visible open door for the Board to make discretionary cost decisions in formulating the Rule.

Therefore, the Board's actions and decisions in promulgating Reg II were entirely proper and accordingly authorized by Congress. With a mandate to create a regulation that would result in "reasonable" and "proportional" interchange fees, the Board followed the guardrails of Durbin by including cost considerations mandated by Congress, ignoring cost considerations prohibited by Congress, and using the discretion clearly available by the absence of any mandatory language on the third category of items. In creating Reg II, the Board chose to use four non-incremental costs that were still influenced by and related to a particular debit card transaction: "(1) fixed ACS costs; (2) transaction-monitoring costs; (3) network processing fees; and (4) a fraud-loss. Appellate Case: 25-3000 *Linney's Pizza, LLC*, 2025 LEXIS 181314 *19 (citing Reg II, 76 Fed. Reg. at 43,429-31). Appellant argues the Board

14

exceeded its authority in using these four cost considerations, yet none of the four would, by definition, be included on the list of prohibited cost considerations of which Congress was explicit.

Appellant's argument makes little sense given that Congress could have simply stated what costs the Board was permitted to use (e.g., incremental ACS costs particular to a specific transaction) or likewise just enumerated prohibited costs (e.g., fixed costs unrelated to a particular transaction). The Board chose four costs that were neither explicitly required nor proscribed, correctly accepting them as discretionary. The statute cannot be read any other way.

B. THE BOARD WAS THOROUGH AND DELIBERATE AS CONGRESS REQUIRED IN PROMULGATING REG II

As noted, Durbin was introduced at the 11th hour as an addition to the Dodd-Frank financial reform package, received no committee hearings or thorough vetting, and was considered "confusing" and "difficult to interpret…"[22] The Board then took a hastily introduced piece of legislation consisting of a mere 3 to 4 pages in length,[23] which set new price limits affecting America's entire banking and consumer retail and service industries, and successfully produced a regulation that satisfied the

---

[22] *See NACS*, 746 F.3d *supra n*. 6

[23] https://www.congress.gov/amendment/111th-congress/senate-amendment/3989

15

congressional mandate of a more reasonable and proportional swipe fee framework as Durbin required.

Worth noting is that the Board initially proposed a ceiling of 12 cents per transaction, a staggering cut of 80 percent of the former average fee of 55.5 cents. *See Debit Card Interchange Fees and Routing*, NPRM, 75 Fed. Reg. 81,737 (Dec. 28, 2010). However, after receiving more than 11,500 public comments, including over 1,300 comments from individual consumers, the Board came to see that the 12-cent ceiling was neither reasonable nor proportional. Reg II, 76 Fed. Reg. at 43395, 43402. (July 20, 2011). In response to these comments, the Board promulgated its Final Rule that caps interchange fees at a base of 21 cents per transaction plus an *ad valorem* component of 0.05% of the transaction and a fraud-prevention adjustment cap of 1 cent. *See* Reg II, 76 Fed. Reg. at 43,404; 12 C.F.R. § 235.5.

Linney's argues that the rulemaking process in the creation of Reg II was flawed, and that the Board failed to adopt a valid uniform fee cap from industrywide data, thus rendering the Rule invalid for being "arbitrary" and "capricious." See *NACS v. Bd. Of Governors of the Fed. Res. Sys*., 574 U.S. 1121 (2015); Complaint, R.1, PageID##14. In 2025 the district court ruled the Board acted within the scope of authority granted and Reg II was properly promulgated within that authority. *See* R.61; *Linney's Pizza, LLC v. Bd. of Governors of the*

16

*Fed. Res. Sys., 804 F. Supp. 3d 717* (E.D. Ky. 2025). Regarding the four cost considerations that Linney's argues were improperly included by the Board in formulating the Rule, the court concluded the Board had the proper reading of the statute and rejected Linney's argument that the rulemaking process was arbitrary and capricious. *Id.* at 736-38.

In formulating the final Rule, the Board was required to ensure that the consumer protections of Reg II outweigh the compliance costs imposed on consumers and financial institutions. *See* 15 U.S.C. § 1693b(a)(2-3); *see also* 76 Fed. Reg. at 43,464. Likewise, the Board was required to analyze the costs and benefits of Reg II for both financial institutions and consumers.[24] Only after weighing the costs and benefits to both consumers and financial institutions did the Board promulgate the Final Rule.

The Board regulation issued was deliberative, thorough, proper, and achieved its legislative mandate. The Board's careful deliberation after extensive public response and input demonstrate that it faithfully carried out Durbin's directive to craft a reasonable and proportional swipe-fee regulation. The robust comment period was possible only because the Board considered costs beyond Appellant's artificially restrictive cost considerations. If the limits Linney's seeks to impose on the Board had been imposed, the rulemaking process would have been far less extensive, less

---

[24]  *See id*.; *see also* 76 Fed. Reg. at 43,462-63.

17

attended, drawn fewer comments, received less valuable input, and more likely to have created a less equitable Rule.

## II.     VACATING REGULATION II WOULD AGAIN FORCE CONSUMERS TO SUBSIDIZE WINDFALL PROFITS FOR MERCHANTS

The primary constituent beneficiary of Durbin has always been, as proclaimed by Senator Durbin himself, U.S. consumers.[25] The Senator, while lobbying for the passage of his eponymous legislation also maintained that it would benefit "every single Main Street business."[26] The reality is that consumers have paid a heavy price from government mandated caps on swipe-fees in the form of higher fees on banking and ATM services, loss of other financial services, and a nearly complete evisceration of debit card rewards programs.[27] Meanwhile merchants – who pass on the cost of interchange fees to consumers – have realized over $100 billion in added revenue since 2011 from paying lower interchange fees that were never passed on to customers as predicted by the Senator and his allies.[28]

---

[25]  Congressional Record Volume 156, Number 87, June 10, 2010, Pages 54839-54841

[26] *id.*

[27] Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris, *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses*, International Center for Law & Economics (April 25, 2017), at 9. *See also* Hubbard *supra n.* 12.

[28] *See* Hubbard *supra n.* 12 at 29.

A.    DURBIN AMENDMENT WAS SOLD AS PRO-CONSUMER BUT THE HARM TO CONSUMERS FAR OUTWEIGHS BENEFITS

In 2011, various consumer advocates enthusiastically pushed for the 12-cent cap per transaction, believing merchants would pass at least some of these savings to their customers. 76 Fed. Reg. at 43,460. What we have learned since Durbin's passage is that merchants will not pass along the savings but use the lower fees to pad their bottom lines. Some prices have even increased despite lower costs for merchants. Merchant savings in debit card payment costs is projected to increase as the volume of debit card transactions increases.[29] A 2014 study published by the Federal Reserve Bank of Richmond Economic Quarterly that surveyed 420 merchants across 26 sectors, uncovered that the majority of merchants—77.2%—"did not change prices post-regulation."[30] A meager 1.2% reduced their prices while 21.6% of merchants *increased* their prices.

---

[29] David S. Evans, Howard Chang, Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis* at 2 (Coase-Sandor Institute for Law & Economics Working Paper No. 658) (Oct. 23, 2013), *available at* https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1651&context=1.

[30] Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Fed. Reserve Bank of Richmond Econ. Quarterly 183, 184, 194 (2014), *available at https://www.richmondfed.org/-/media/RichmondFedOrg/publications/research/economic_quarterly/2014/q3/pdf/ wang.pdf* (last visited Dec. 16, 2025).

Even in competitive markets, where the Board believed merchants were more likely to pass-through savings to consumers, Reg II, 76 Fed. Reg. at 43,460, "cost induced price reductions are unlikely to materialize if they aren't actually discernable by consumers."[31] Accordingly, within a year of Reg II's implementation, "in many cases, consumers [saw] higher prices for low cost items or no savings at all."[32] This data is consistent across other studies. Within one year of Reg II's promulgation, "research show[ed] that retailers continue to hold on to the $8 billion windfall they received from Congress, without passing those savings along to consumers."[33] In 2012, only 3% of retailers intended to pass any savings on to consumers, 41% of retailers said they would not pass on any savings to consumers, and 56% of retailers said they were unsure.[34] Accordingly, the effect of the Durbin Amendment was to "merely transfer[] the cost of items from retailers to consumers[]" making merchants the "main beneficiaries of the interchange cap."[35]

This is hardly surprising. Despite the decrease in cost to merchants amounting

---

[31] See *supra* Zywicki *n*. 12.

[32] Scott D. Strockoz, *Dodd-Frank and the Durbin Amendment—Is It Working as Int?,* at ii Capstone Strategic Project for the American Bankers Association Stonier Graduate School of Banking (2012).

[33] *See* Hubbard at 37.
[34] *See id.*
[35] *See id.* at 33, 37.

to more than $7 billion annually, the net effect on consumers has been minimal, as fewer than 5 cents on an average transaction. And this assumes merchants pass through 100% of the savings.[36] Accordingly, even if the Board were to reduce the interchange fee to 12 cents per transaction, and even assuming merchants pass through 100% of the savings, this will have only a minimal impact on how much consumers pay for goods. Ultimately, however, as is demonstrated by a "wealth of economic studies," consumers "have no reason to believe that merchants would give this [$7 billion annual] windfall back to consumers…"[37]. And while consumers would not benefit from a decrease in the interchange fee in the form of lower prices, consumers would be greatly harmed by the increase in banking fees, the increase in checking account minimum balances, and the elimination of free checking accounts.

The swipe fee caps passed that year led to two things we can identify with certainty: 1) higher banking costs and reduced services for consumers; 2) windfall profits for merchants and retailers. The Court, in its deliberations, must ask who will benefit and who will be harmed through further cost restrictions on the interchange,

---

[36] *See* Evans *et al*., *supra n*. 24 at 23.

[37]  *See id*. at 49; *see also* Zywicki, et al., *supra n*. 15 at 30 (stating that "even if merchants did pass on their entire cost to consumers, the savings would be small…a maximum retail price reduction of only $0.07 on a $40 purchase.").

21

of the three parties to consider (merchants, consumers, financial institutions). Financial institutions have the means to mitigate the harm of reduced revenue resulting from lower debit fee caps by adjusting customer fees and costs elsewhere; consumers do not have this option regardless of whether they continue to use debit cards for purchases. Given that retailers failed to pass the savings from lower interchange rates to consumers as Durbin had anticipated, there is no reason to believe consumers will benefit from the lower caps that Appellant seeks to impose. And though the merchant will argue they are harmed by what they claim are exaggerated swipe fees, studies of Durbin in the sixteen years since its passage point to transaction costs of debit cards being entirely passed on to consumers. Therefore, regardless of the fee rate or structure, merchants remain a pass-through, largely unencumbered by swipe fees, even as they seek a "remedy" that results in consumers subsidizing billions of dollars in additional merchant revenue.

B.    OVERTURNING REG II WILL HAND MERCHANTS GREATER PROFITS ON THE BACKS OF CONSUMERS

It is clear that, by far, merchants benefited the most by Reg II, receiving an annual windfall of between $7-$8 billion dollars annually. It is also clear that merchants are not burdened with debit interchange fees, as these expenses are passed directly to the consumer at sale. As shown above, a very thorough litany of economic studies and analyses make it quite clear that consumers saw almost no benefit from

22

reduced swipe fees, a predictable outcome given the tendency of merchants to pocket the lower transaction costs.

A key reason why consumers ultimately pay the price for the losses banks experience from heavy-handed price regulation on debit card fees is because banks use these very fees to pay for other customer programs that are by themselves unprofitable. Debit card interchange fees are "exogenous," meaning the fees directly fund other bank services, primarily free and low-cost checking accounts.[38] Debit card fees subsidize a range of consumer banking products that "facilitate[s] broader penetration of mainstream checking account services to low- and middle-income populations." Additionally, "these fees are used to fund reward programs and debit cards – there are no usage fees for having a debit card."[39]

For banks, reductions in interchange fees don't just represent lost revenue from their debit card programs, but an actual cut in a primary funding source for other customer services, such as the aforementioned free checking and free ATM services that by themselves do not generate any revenue. The connection should be clear to all parties that cutting interchange fees for debit cards is a direct cut  of funding for services that primarily help the middle and lower class.

---

[38] Patrick C. McGinnis, *Misguided Regulation of Interchange Fees: The Consumer Impact of the Durbin Amendment*, 25 LOY. CONSUMER L. REV. 285, 289 (2013)
[39] Nader at 330 and quoting Ronald J. Mann, *Anticompetitive Regulation in the Payment Card Industry*, 7 COMPETITION POL'Y INT'L 44, 51 (2011).

The result if this Court were to overturn Reg II is entirely predictable and absolutely dire for average consumers. Cuts in interchange fees will be kept by merchants with no "trickle down" effect for consumers or the economy, and the loss of revenue for issuing banks – which is definitionally the same as revenue to fund banking services for the less affluent – will be further reduced or eliminated, resulting in consumers losing banking services or paying more for them. This, in short, is the scenario of consumers subsidizing greater merchant profits, which is not only a thoroughly unwelcome development, but one that also runs completely afoul of the entire justification and mandate of the Durbin Amendment.

C.  A RULING THAT FURTHER INJURES CONSUMERS IS INCOMPATIBLE WITH THE STATUTORY INTENT OF DURBIN AMENDMENT|

Appellants and their affiliated parties focus the majority of their attention on "large banks," (over $10 billion in assets) as an adversary due to what they claim are "huge profit margins" earned off their backs.  This same interest group never seems to offer insight into how consumers, their own customers, will benefit from their pursuit of even lower exchange fees. The advocacy in support of Durbin when it was introduced to Congress in 2010 was highly focused on consumer benefits and protections, along with "going to battler for

Main Street, not Wall Street."[40] Yet none of the consumer benefits predicted by the Senator and his legislative supporters came even close to becoming a reality for cash-strapped Americans.

Regardless of interchange fee levels, merchants still benefit immensely from debit cards, which: present cost savings relative to accepting cash, checks, or credit cards, offer faster check-out at the point of sale, promote higher consumer spending, ensure guaranteed payment, avoid liability for most fraudulent transactions, provide faster settlement, support secure online transactions, and involve less time and money spent on collections, billing, and other administrative matters. Debit cards have driven sales and thus profits of merchants steadily for the past decade, the unspoken benefits of debit to merchants should be included in any analysis that seeks to balance the interests of issuers and vendors.

Senator Durbin is surely aware of the available data pointing to his eponymous amendment hurting the very people he claims need the most help. But his advocacy for Appellant's position cannot be reconciled with his own legislative mandate. His legislation is putting another $7-$8 billion a year into the retail industry's wallets and practically zero into the wallets of consumers. And his advocacy for the repeal of Reg II would only pad retail profits further.

25

At the heart of this litigation is a mandate to create a "reasonable" and "proportional" interchange regulation for the primary purpose of helping average American consumers make ends meet and to help them achieve their financial and budgetary goals. Yet the very mechanism by which Mr. Durbin aims to achieve this predictably and invariably results in greater financial harm to average consumers. There is a fundamental conflict in the Durbin Amendment given that among the three primary constituencies, consumers, merchants, and financial institutions, consumers are the big losers from its initial passage and retailers have gained the most.

III.   OVERTURNING REGULATION II OPENS THE DOOR TO CONSTITUTIONAL CHALLENGES BASED UPON THE CONFISCATORY DOCTRINE

Despite Appellant Linney's contention that banks continue to reap "excessive profits" from debit card interchange fees, Reg II does not permit banks to recover fixed or "sunk" costs necessary to maintain this service; fees such as customer service, employee training, advertising, production and distribution, facilities and software, and other costs relating to operations and infrastructure.[41] Transaction costs and redemptions can vary a great deal depending on the issuing bank, the size of the transaction, the  network on which it occurs, and other considerations.

---

[41] Fed.Reg. 12 CFR Part 235 [Regulation II; Docket No. R-1404] *Debit Card Interchange Fees and Routing,* July 20, 2011 *available at https://www.federalregister.gov/d/2011-16861/p-720*.

Though the Board set the interchange cap at $0.21, an analysis by one highly regarded economist determined that "costs associated with each swipe have been projected to be $0.27."[42] If Reg II is overturned and swipe-fee caps are further reduced, the ruling could reinvigorate challenges based upon the confiscatory rate doctrine of the 5th Amendment Takings Clause, which disallows a confiscatory regulatory scheme, that is, a financial burden that does not allow the supplier of a good or service to recoup costs as well as a fair profit.[43]

Reg II was challenged in 2011 on grounds of confiscatory takings by TCF National Bank,[44] and though the district court denied plaintiff's petition, its holding is ripe for review given several intervening rulings from the U.S. Supreme Court that have expanded the application of Takings. *See Horne v. U.S. Department of Agriculture, 576 U.S. 351 (2015),* ruling the Takings Clause is not limited to real property, and *Koontz v. St. Johns River Water Mgmt. Dist., 57*0 U.S. 595 (2013) relating to proportionality of development permits on real property.

This Court upheld a constitutional challenge based on confiscatory takings in 2001, in *Michigan Bell Telephone Co. v. Engler.*[45] Here the 6th Circuit ruled the

---

[42] Richard A. Epstein, *Durbin's Folly: The Erratic Course of Debit Card Markets,* 7 COMPETITION POL'Y INT'L 58,60 (2011) quoted by Nader at 343.

[43] John N. Drobak, *Constitutional Limits on Price and Rent Control" The Lessons of Utility Regulation,* 64 Wash. U. L. REV. 107,109 (1986)

[44] *TCF National Bank v. Bernanke*, No. CIV. 10-4149, 2011 WL 1578535.

[45] *Michigan Bell Tel. Co. V. Engler*, 257 F.3d 587 (6th Cir. 2001).

Michigan Telecommunications Act was unconstitutional for canceling a fee the company charged customers while also limiting other rates. The Court agreed with plaintiffs that the Act was confiscatory, "because it merely permits telephone service providers to cover costs, and does not ensure a fair and reasonable rate of return on investment."[46] Reg II devised a fee that was "reasonable and proportional to the cost" of a debit transaction, [47] yet excluded "other costs incurred by an issuer which are not specific to a particular electronic debit transaction. . . ."[48] In effect and by design, Reg II prohibits issuers from charging fees to compensate for the bulk of costs related to their debit card business.

Though the court in *TCF* dismissed the case as applicable only to a utility or company functioning as a utility within a monopolistic market, the doctrine has been applied by courts in cases unrelated to such specific circumstances. *See Giles Lowery Stockyards, Inc. v. Dept. of v. Agriculture, 565 F.2d 321 (5ᵗʰ Cir. 1977)* and *Central Ark. Auction Sales, Inc. v. Bergland, 570 F2d 724* (8ᵗʰ Cir. 1978) where the confiscatory doctrine was considered for private stockyards unrelated to public utilities or monopolistic markets.[49]

---

[46] *Id*. At 594.

[47] 15 U.S.C. § 1693*o*-2(a)(2).

[48] *Id*. Nader at 343.

[49] *See also Aetna Cas. & Sur. Co., v. Comm'r of Ins., 263 N.E.2d (Mass. 1970) and Keystone Ins. Co. v. Foster,. 732 F. Supp. 36 (E.D. Pa. 1990)* where the doctrine was considered in the insurance industry*, cited by Nader at 345.
15 U.S.C. § 1693b(a)(2-3)

Given that a case can be made that Reg II fails to fully compensate issuing banks for the total costs of operating a debit card program, that its repeal would set an even lower limit on debit transaction fees, and the precedent of courts applying the doctrine in a wider range of Takings cases beyond the public utility context or real property cases, financial institutions will have a valid constitutional basis to claim harm and challenge a regulation that replaces Reg II with lower debit card interchange fees that further reduce their capacity to recover costs and a fair profit for providing this service.

## CONCLUSION

In promulgating Reg II, the Board interpreted the statute correctly in formulating a regulation that is both reasonable and proportional. Appellant Linney's seeks a remedy that is inconsistent with the statute's intent, that will harm consumers as merchants profit, and which revives constitutional questions on Takings. This Court should affirm the decision of the district court and uphold Reg II.

Respectfully submitted,

DATED: July 2, 2026

/s/ *Gerard D. Scimeca*
GERARD D. SCIMECA, General Counsel
Consumer Action for a Strong Economy
Missouri Bar No. 76360
Virginia Bar No. 91693
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Direct: 757-375-9559
gds@caseforconsumers.org

*Counsel to Amici Curiae*

30

**CERTIFICATE OF COMPLIANCE**

1. Pursuant to Fed. R. App. P. 32(g), this document complies with the type-volume and word-count limits of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,432 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5-6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Gerard D. Scimeca*
GERARD D. SCIMECA
*Counsel to Amici Curiae*

31

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 2ND day of July 2026, a true copy of the foregoing Brief of Amici Curiae was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to all counsel of record.

/s/ *Gerard D. Scimeca*
GERARD D. SCIMECA
*Counsel to Amici Curiae*
