No. 25-6038

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

LINNEY'S PIZZA, LLC,

Plaintiff-Appellant,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

Defendant-Appellee,

and

BANK POLICY INSTITUTE, and CLEARING HOUSE ASSOCIATION, LLC,

Proposed Intervenors.

On Appeal from the United States District Court for the
Eastern District of Kentucky, No. 3:22-cv-00071 (Van Tatenhove, J.)

## REPLY BRIEF OF APPELLANT LINNEY'S PIZZA, LLC

Jennifer Kincaid Adams
BLACKBURN DOMENE BURCHETT
PLLC
614 W. Main Street, Suite 3000
Louisville, KY 40202
(502) 584-1600
jadams@bdblawky.com

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main St., 5th Fl.
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Bryan Weir
Frank H. Chang
Cody Ray Milner
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
*Counsel for Appellant*

**TABLE OF CONTENTS**

Table of Contents......................................................................................... i

Table of Authorities..................................................................................... ii

Introduction.................................................................................................1

Argument.....................................................................................................3

   I.    The Board seeks to relabel "deference" as "delegation" ........................3

   II.   Regulation II exceeds the Board's statutory authority ........................12

       A.   Congress bifurcated issuer costs into two categories, and the Board's contrary arguments cannot defeat the plain text ...........12

            1.   "Reasonable and proportional" is not surplusage ..............14

            2.   Congress's "non-interlocking language" does not empower the Board to add text to the statute.....................19

            3.   An allegedly missing comma cannot bear the weight the Appellees place on it...........................................................26

       B.   The major-questions doctrine independently confirms the statute's two-category framework...............................................28

       C.   Proposed Intervenors' alternative "reasonable return" justification appears nowhere in the Durbin Amendment........31

       D.   Each of the four challenged cost categories independently conflicts with the Durbin Amendment.......................................34

            1.   Fixed ACS costs .................................................................34

            2.   Transaction-monitoring costs...............................................36

            3.   Issuer-fraud losses...............................................................36

            4.   Network-processing fees........................................................37

       E.   The uniform fee standard cannot be squared with the statute's definite articles ..................................................................38

   III.  Regulation II is independently arbitrary and capricious .....................41

   IV.  The appropriate remedy is vacatur of Regulation II............................43

Conclusion..................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*3M Co. v. Comm'r of Internal Revenue,*
  154 F.4th 574 (8th Cir. 2025) ...................................................................12

*Air Transport Ass'n of Am., Inc. v. USDA,*
  2021 WL 1166928 (D.D.C. Mar. 26, 2021) ....................................................10

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) ...............................................................................25

*Batterton v. Francis,*
  432 U.S. 416 (1977) ................................................................................9

*Biden v. Missouri,*
  595 U.S. 87 (2022) .................................................................................10

*Bridgeport Hospital v. Becerra,*
  108 F.4th 882 (D.C. Cir. 2024) ...................................................................6

*Brown v. Gardner,*
  513 U.S. 115 (1994) ...........................................................................10, 11

*Catawba Cnty., N.C. v. E.P.A.,*
  571 F.3d 20 (D.C. Cir. 2009) ....................................................................42

*Clayman v. Goodman Props., Inc.,*
  518 F.2d 1026 (D.C. Cir. 1973) .................................................................26

*Cleveland-Cliffs Iron Co. v. ICC,*
  664 F.2d 568 (6th Cir. 1981) ....................................................................39

*Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.,*
  794 F.Supp.3d 610 (D.N.D. 2025)...............................................................12

*Corner Post v. Bd. of Governors Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024) ...............................................................................11

*Dean v. United States,*
  556 U.S. 568 (2009) ...............................................................................32

*EPA v. Calumet Shreveport Refining, LLC*,
145 S.Ct. 1735 (2025) ................................................................39

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...................................................................30

*Flora v. United States*,
362 U.S. 145 (1960) ...................................................................26

*Georgia v. President of the U.S.*,
46 F.4th 1283 (11th Cir. 2022) .....................................................10

*In re Cardizem CD Antitrust Litig.*,
481 F.3d 355 (6th Cir. 2007) .......................................................17

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ...................................................................33

*Kentucky v. EPA*,
123 F.4th 447 (6th Cir. 2024) ..........................................4, 5, 8, 43

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013) ..............................................................20, 23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..............................................................3, 4, 5, 7

*Loughrin v. United States*,
573 U.S. 351 (2014) ..............................................................21, 22

*Louisiana v. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) .......................................................42

*MCI Telecommunications Corp. v. AT&T*,
512 U.S. 218 (1994) ...................................................................29

*Meister v. U.S. Dep't of Agric.*,
623 F.3d 363 (6th Cir. 2010) .......................................................41

*Moctezuma-Reyes v. Garland*,
124 F.4th 416 (6th Cir. 2024) ........................................................5

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................42, 43

*NACS v. Bd. of Governors Fed. Rsrv. Sys.* ("*NACS I*"),
    958 F.Supp.2d 85 (D.D.C. 2013) ............................................13, 45

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.* ("*NACS II*"),
    746 F.3d 474 (D.C. Cir. 2014) .......................................................35

*Nat'l Ass'n of Broadcasters v. FCC*,
    39 F.4th 817 (D.C. Cir. 2022)..........................................................6

*Ohio Telecom Ass'n v. FCC*,
    150 F.4th 694 (6th Cir. 2025) .......................................................18

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) .................................................................16, 19

*Russello v. United States*,
    464 U.S. 16 (1983) ........................................................................21

*Sierra Club v. EPA*,
    60 F.4th 1008 (6th Cir. 2023) .......................................................44

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993) .......................................................................26

*United States v. Davis*,
    45 F.4th 73 (D.C. Cir. 2022)..........................................................20

*Voss v. Comm'r of Internal Revenue*,
    796 F.3d 1051 (9th Cir. 2015) .......................................................10

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .................................................................29, 30

**Statutes**

1 U.S.C. §1 .......................................................................................39

15 U.S.C. §1693*o*-2 ..........................1, 4, 6, 8, 12, 13, 19, 21, 29, 32, 34, 37, 38, 39

## INTRODUCTION

Neither the Board nor proposed Intervenors defend Regulation II based on the full text Congress enacted. Instead, both focus only on Congress's command that the Board establish a regulatory standard for setting "reasonable and proportional" interchange fees. But Congress said more than that. It also prescribed *how* the Board must do so: Distinguish between incremental ACS costs and "other costs" not specific to a particular transaction. 15 U.S.C. §1693*o*-2(a)(4)(B).

Regulation II disregards the Durbin Amendment's specific commands and thus fails to implement Congress's framework. It creates an unwritten third category of recoverable costs. It includes costs Congress specifically excluded. And it replaces the statute's issuer- and transaction-specific approach to cost recovery with a one-size-fits-all scheme that allows the nation's largest banks to amass extraordinary profits through card-swipe fees that are neither reasonable nor proportional to those banks' costs.

The Board's response confirms that this appeal ultimately concerns a broader question: Whether, after *Loper Bright*, agencies may continue doing

1

what they once did under *Chevron*—using broad statutory language to ignore specific statutory limits. The Board no longer seeks deference by name. Now it invokes "delegated discretion" instead. But *Loper Bright* did not overrule *Chevron* only to permit agencies to achieve the same result under different terminology. Whatever discretion Congress delegated to establish a reasonable fee is cabined by the specific terms of the cost-consideration regime Congress enacted. This Court determines the statute's best reading and enforces the limits Congress imposed.

Appellees' remaining arguments reflect the same mistake. Their surplusage theory conflates Congress's overarching standard for setting appropriate fees—where the words "reasonable and proportional" do real work—with the subsidiary question of what baseline costs Congress allowed the Board to consider when analyzing the costs of debit-card transactions. And their "non-interlocking language" and punctuation arguments seek to manufacture an agency power that the statute never grants. For their part, the proposed Intervenors all but abandon the Board's attempts at textual analysis, instead defending Regulation II as a vehicle for

guaranteeing the nation's banks a "reasonable return"—a purported guarantee absent from the Durbin Amendment. Whenever the statutory text becomes inconvenient, Appellees and proposed Intervenors appeal to administrative or banking convenience instead.

None of those arguments can overcome the statute Congress wrote. The Durbin Amendment establishes a two-category cost framework, imposes multiple independent limits on the Board's authority, and repeatedly instructs the Board to establish fee caps that track an issuer's actual costs of processing its customers' debit transactions. Regulation II disregards each of those commands. Because it exceeds the Board's statutory authority and is independently arbitrary and capricious, the Court should reverse the judgment and vacate Regulation II's fee standard.

## ARGUMENT

### I. The Board seeks to relabel "deference" as "delegation."

The Board begins by asking for deference to its legal rewrite of the Durbin Amendment—just under a new name. But "*Chevron* is overruled." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Courts "no longer

3

defer to an agency's answers to legal questions" or "pure question[s] of law." *Kentucky v. EPA*, 123 F.4th 447, 467 (6th Cir. 2024). Now courts "exercise their independent judgment in deciding whether an agency has acted *within* its statutory authority." *Loper Bright*, 603 U.S. at 412 (emphasis added).

Deprived of formal judicial deference to its rewriting of Congress's commands, the Board seeks the same deference under a new label: delegation. The Board now says the Durbin Amendment "delegated substantial discretion" by instructing the Board to establish a transaction fee standard that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." Board-Br.16, 18 (quoting 15 U.S.C. §1693*o*-2(a)(3)(A)). And the Board believes that based on this sweeping delegated discretion, the Board may consider any formula of costs it deems necessary to reach a fee it deems "reasonable and proportional," even if that includes a three-category cost formula that conflicts with the text's bifurcation of costs.

To be sure, Congress sometimes confers discretion by empowering an agency to fill a defined gap, or to regulate on terms the statute itself makes

4

open-ended, such as what is "appropriate" or "reasonable." *Loper Bright*, 603 U.S. at 395. But the Board's request for deference to rewrite the statutory scheme under this supposed "delegated discretion" is wrong for two reasons.

*First*, a general delegation of discretion in a statute does not convey the authority to rewrite "pure question[s] of law," *Kentucky*, 123 F.4th at 467, or substantially alter Congress's specific commands elsewhere in the same statute. Otherwise—if a statute's "broad language alone triggered deference"—courts would "unwittingly return to construing less than precise words as implicit delegations to the agency that warrant deference." *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024). "That can't be right," because "[t]he case that declared 'Chevron is overruled' didn't quietly reinstitute it." *Id.* (quoting *Loper Bright*, 603 U.S. at 412).

*Second*, the Board can't rely on a general grant of discretion as authority to "fill up the details" when Congress itself has *already* filled up the details. "A generic grant of rulemaking authority to fill gaps … does not allow" an agency "to alter the specific choices Congress made." *Nat'l Ass'n of*

5

*Broadcasters v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022); *see also Bridgeport Hospital v. Becerra*, 108 F.4th 882, 888-90 (D.C. Cir. 2024) (agency cannot use general gap-filling authority to displace specific congressional commands).

The Durbin Amendment instructs the Board to "establish standards" so that an "interchange transaction fee" is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693*o*-2(a)(2), -2(a)(3)(A). But the Durbin Amendment doesn't stop there. After its general instruction to "establish standards," the statute includes more specific commands on *how* the agency must carry out that duty: "In prescribing regulations ... the Board *shall* ... distinguish between ... the incremental cost incurred by an issuer for ... a particular electronic debit transaction, which cost *shall be* considered," and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs *shall not be* considered." *Id.* §1693*o*-2(a)(4)(B) (emphasis added). The Board cannot "fill up the details" about how to achieve "reasonable and proportional" fee standards in a way that ignores Congress's express instructions about how to consider issuers' costs. Congress circumscribed

6

what the Board could consider—two categories of costs, one required and one prohibited.

The Board's effort to ground its de facto deference argument in *Loper Bright* overlooks *Loper Bright*'s reasoning. Even where a statute conveys some discretion to "fill up the details," this Court retains the duty to "interpret the statute" and "fix[] the boundaries of the delegated authority." *Loper Bright*, 603 U.S. at 395 (cleaned up). And this Court must ensure that the agency remains "*within* those boundaries." *Id.* (emphasis added). Here, Congress's specific instruction that the Board "shall" consider certain costs and "shall not" consider others when fixing a reasonable and proportional fee standard channels the agency's general authority to establish fees that are reasonable and proportional. The Board's authority to set fee standards that are "reasonable and proportional" to the costs incurred by issuers does *not* convey authority to disregard Congress's instruction to "distinguish between" Congress's defined sets of costs that "shall be considered" and "shall not be considered." The Board's attempt to conjure an unwritten third category of costs that *may* be considered presents a classic question about

7

"the boundaries of [the Board's] delegated authority." *Id.* Under *Loper Bright*, review of those boundaries belongs to this Court.

The Board protests that this understanding of the Board's delegated authority would reduce its role in the interchange-fee-standard process to something "purely ministerial." Board-Br.18. That's wrong. The Board's role in the fee-standard calculus is not purely ministerial—the Board retains discretion to determine what fee standards are "reasonable and proportional" once it has weighed all the correct factors. 15 U.S.C. §1693*o*-2(a)(2), (4). But whether 15 U.S.C. §1693*o*-2 divides the universe of relevant costs into two categories (mandatory and prohibited), as Linney's Pizza argues—or into three categories (mandatory, prohibited, and permitted), as the Board argues—is a "pure question of law" that this Court must review "without giving [the agency] deference." *Kentucky*, 123 F.4th at 467. This Court's resolution of that legal question in light of the statute's plain text does not strip the Board of its discretion to determine a "reasonable and proportional" fee. Conversely, the Board's argument for deference asks this

8

Court to ignore Congress's specific categorical command about which costs "shall" or "shall not" be considered.

The Board also invokes the pre-*Chevron* decision in *Batterton v. Francis*, 432 U.S. 416 (1977), to support its claim that grants of general discretion afford agencies flexibility and authority over a statute's legal terms. *See* Board-Br.18. But *Batterton* involved a statute that conveyed a general grant of authority without specific or limiting commands on how to carry it out. In that statute, Congress had directed the agency to prescribe "standards" for determining whether a parent was unemployed, while offering no accompanying statutory guidance on how to formulate those standards. *See Batterton*, 432 U.S. at 419, 425-26. The Durbin Amendment differs. After directing the Board to set a "reasonable and proportional" interchange fee, Congress enumerated a series of specific instructions cabining the Board's discretion. Defining and enforcing those limits on the Board's discretion are questions of law for this Court.

Finally, the Board seeks deference for its "longstanding and consistent" interpretation of the Durbin Amendment. Board-Br.19-20. That

argument misfires. The Board's interpretation in Regulation II is not a longstanding one meriting any deference. Regulation II is the "only pronouncement" of the Board's interpretation of the Durbin Amendment— hardly proof of the Board's "consistent position" over the years. *Voss v. Comm'r of Internal Revenue*, 796 F.3d 1051, 1066 (9th Cir. 2015). "[T]hat single [regulation] falls far short of establishing the kind of 'longstanding practice' that might" warrant respect. *Georgia v. President of the U.S.*, 46 F.4th 1283, 1301 (11th Cir. 2022) (quoting *Biden v. Missouri*, 595 U.S. 87, 94 (2022)). Nor does the fact that 14 years have elapsed since Regulation II's issuance render the Board's interpretation longstanding. "Courts have considered agency interpretations to be longstanding when they have been in place for decades." *Air Transport Ass'n of Am., Inc. v. USDA*, 2021 WL 1166928, at *13 (D.D.C. Mar. 26, 2021) (emphasis added), *rev'd in part on other grounds*, 37 F.4th 667, 673 (D.C. Cir. 2022).

Nor has the Board's erroneous interpretation of the Durbin Amendment "'aged nicely,'" *Brown v. Gardner*, 513 U.S. 115, 122 (1994), since Regulation II escaped challenge for years only because of two erroneous

assumptions. First, that the Board's construction of the Durbin Amendment was entitled to judicial deference, *see NACS v. Bd. of Governors Fed. Rsrv. Sys.*, 746 F.3d 474, 488-89 (D.C. Cir. 2014) ("*NACS II*") (upholding Regulation II under *Chevron*); *but see Loper Bright*, 603 U.S. at 412 (overruling *Chevron*). And second, that any challenges to Regulation II after 2017 would have been time-barred, *but see Corner Post v. Bd. of Governors Fed. Rsrv. Sys.*, 603 U.S. 799, 806 (2024). "'The length of such regulation['s] unscrutinized and unscrutinizable existence' could not alone, therefore, enhance any claim to deference" or respect. *Brown*, 513 U.S. at 122. In any event, "[a] regulation's age is no antidote to clear inconsistency with a statute." *Id.*

In the end, strip away the new label and the Board asks for only one thing—judicial deference to its legal interpretation of the Durbin Amendment. But this Court must independently determine the statute's best reading, identify the boundaries of any authority Congress delegated, and enforce the specific limits Congress imposed. The Board's interpretation asks the Court to disregard those limits and approve the Board's disregard for Congress's specific two-category cost consideration formula. This use of

11

"delegate[d] discretionary authority" to "fish for deference," *3M Co. v. Comm'r of Internal Revenue*, 154 F.4th 574, 581-82 (8th Cir. 2025), simply "repackage[s] the defunct-*Chevron* deference under a different name," *Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F.Supp.3d 610, 623 (D.N.D. 2025).

## II.    Regulation II exceeds the Board's statutory authority.

### A.    Congress bifurcated issuer costs into two categories, and the Board's contrary arguments cannot defeat the plain text.

The Durbin Amendment bifurcates the entire universe of interchange-fee costs into two, and only two, categories: (i) the incremental ACS costs incurred in authorizing, clearing, and settling a particular transaction, which the Board "shall" consider, and (ii) "other costs" not specific to a particular transaction, which the Board "shall not" consider. 15 U.S.C. §1693*o*-2(a)(4)(B); *see* Aplt.-Br.17-47.

The plain text compels that conclusion. The command to "distinguish between" two enumerated categories, the word "between" (denoting two options, not the "among" Congress would have used for more), Congress's decision to name only "incremental cost[s]" as costs that "shall be

12

considered," and the sweeping reach of "other costs"—which "subsumes all costs" not in the first category—together confirm that the statute leaves no room for a third category conjured from silence. *See NACS v. Bd. of Governors Fed. Rsrv. Sys.*, 958 F.Supp.2d 85, 100-02 (D.D.C. 2013) ("*NACS I*").

Statutory structure reinforces the point: inserting a third category of costs that *may be considered* would require tacking new language onto §1693*o*-2(a)(4)(B)'s deliberate two-subparagraph design, which courts cannot do. And the *expressio unius* canon of construction seals the point. Just one subsection further in the statute, when outlining factors to consider for a fraud-prevention adjustment, Congress explicitly gave the Board authority to weigh "such other factors as the Board considers appropriate," *see* 15 U.S.C. §1693*o*-2(a)(5)(B)(ii)(VII). This shows that Congress knew exactly how to craft a catchall when it wanted to give the Board that type of authority— and it chose not to in §1693*o*-2(a)(4)(B). The major-questions doctrine, the Amendment's par-clearing purpose, and Senator Durbin's own floor statement also all point the same direction. The Durbin Amendment sorts costs into two mutually exclusive sets. It requires consideration of one set of

13

costs and forbids consideration of all others. And it leaves no residue. The Board's contrary reading is not a better construction of the words Congress used—it is a different statute altogether.

Faced with this clear conclusion derived from plain text and the traditional tools of statutory interpretation, the Board and the proposed Intervenors offer just three responses—arguments about surplusage, "non-interlocking" language, and a purported missing comma in the "which" clause. None of those arguments overcomes the statute's plain text, and none casts doubt on the interpretation established by the ordinary tools of statutory construction.

### 1.    "Reasonable and proportional" is not surplusage.

The Board and proposed Intervenors contend that a strict bifurcation of the Durbin Amendment's cost categories leads to "surplusage." Board-Br.23-27; Banks-Br.42-43. On their telling, Linney's Pizza's two-category reading drains "reasonable and proportional" of meaning, because a fee limited to incremental ACS costs would "merely equal" those costs and leave the standard nothing to do. That argument confuses two different things.

The Durbin Amendment gives the Board a degree of policy discretion to construct appropriate fee standards that are "reasonable and proportional" to issuers' interchange costs. But it also gives the Board narrow technical instructions for measuring those issuer costs. Adhering to those narrow technical instructions does not turn Congress's policy delegation into surplusage.

Under the Durbin Amendment, before the Board can exercise its policy discretion to craft interchange-fee standards that are "reasonable and proportional" to issuer costs, it must first understand and identify what specific issuer costs constitute the baseline ("reasonable and proportional—*to what?*"). The Durbin Amendment answers by telling the Board which costs "shall be considered" and which costs "shall not be considered." 15 U.S.C. §1693*o*-2(a)(4)(B). Enforcing that bifurcated instruction does not make surplusage of Congress's broader command that the Board shall ensure that interchange fees are "reasonable and proportional to the cost incurred by the issuer." Nor does it strip the Board of its policy judgment over what is

15

"reasonable" or "proportional" to issuer costs. It simply forbids the Board from smuggling in a third bucket of costs to inflate the baseline.

At bottom, the Board and the proposed Intervenors' surplusage argument assumes that any fee limited to incremental ACS costs—the one category the Durbin Amendment authorizes—would collapse to the *bare* incremental cost, leaving "reasonable and proportional" nothing to modify. That assumption is unwarranted. Congress gave the Board a degree of policy discretion to determine what fees are "reasonable and proportional" to issuer costs. For example, the Board might find that a particular issuer's incremental ACS costs range between 6 and 8 cents per transaction, and it could conclude that a fee cap of 8 cents for that issuer is "reasonable and proportional to the cost incurred by the issuer" with respect to all such transactions, even though that would leave the issuer with an above-cost fee recovery on some transactions.

The Board's contrary construction also violates the longstanding canon of construction that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Congress's

16

general instruction to set fee standards that are "proportional" to issuer costs does not swallow or override its specific instructions about *which* issuer costs to measure against. And, ironically, the construction advanced by the Board and proposed Intervenors also violates the canon against surplusage because it nullifies the statutory command to "distinguish between"; it drains "other costs" of its residual force; and it empties "shall" and "shall not" of their mandatory content. A construction that leaves four operative phrases without work is not a rescue from surplusage; it is the cause of it. *See In re Cardizem CD Antitrust Litig.*, 481 F.3d 355, 364 (6th Cir. 2007) (statutes should be read to give effect to every clause and word).

The Board argues that this is "not a case of a general provision swallowing up" a specific provision. Board-Br.25 (cleaned up). The Board's rebuttal fails. In the Durbin Amendment's text, Congress directed the agency to bifurcate the applicable universe of costs into two buckets, and to consider one of those and ignore the other. Instead of following that specific text, the Board relies on the Durbin Amendment's general "reasonable and proportional" language to invent a third category of costs that Congress

17

never mentioned. That is a classic instance of the general swallowing the specific: using a statute's broad statement of purpose to nullify Congress's specific instructions for carrying it out.

Nor does the Board's reference to *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694 (6th Cir. 2025), save its argument. There, this Court determined that the conduct at issue was regulated *only* by a general command, and not by a specific command. *See id.* at 716. That's not the case here, where the Board invokes the statute's general statement of purpose to *disregard* the specific cost-consideration regime that Congress established to control the calculation of the reasonable-fee standard.

Likewise, the Board is wrong to argue that under its reading "there is no 'conflict'" between the general statement of purpose and Congress's specific cost-consideration scheme. Board-Br.26. The statute's plain text orders the Board to define the universe of costs into two buckets; the Board's reading of the general statement of purpose nullifies Congress's demarcation of the two categories. The Board also errs by suggesting that the general/specific canon applies only where there is "irreconcilable

18

conflict." Board-Br.27 (cleaned up). "[T]he canon has full application as well to statutes" where "a general authorization and a more limited, specific authorization exist side-by-side," and serves to "avoid[] not contradiction but the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel*, 566 U.S. at 645. In this sort of application, courts should seek to harmonize two provisions, but "[t]he terms of the specific authorization *must* be complied with." *Id.* (emphasis added). The Board's failure to comply with Congress's specific instructions regarding cost considerations dooms its position here.

### 2. Congress's "non-interlocking language" does not empower the Board to add text to the statute.

Next, the Board and the proposed Intervenors contend that this Court must recognize a third (unwritten) category of issuer costs because subsection (i) and subsection (ii) use slightly different words: "incremental cost ... of a particular electronic debit transaction" versus "costs ... not specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B). Since those two descriptors do not perfectly mirror each other, the Board and the proposed Intervenors argue, Congress must have "intended

19

a difference in meaning," and thus the two categories are not mutually exclusive and an unwritten third category must exist. Board-Br.28-32; Banks-Br.36-41. This premise proves far too much.

The two subsections of §1693*o*-2(a)(4)(B) describe the inverse faces of the same coin: Costs incremental to a particular transaction (considered) and costs not specific to a particular transaction (not considered). While the words Congress used do not perfectly mirror each other, they do accurately describe the content that falls on both sides of the line Congress drew. Describing a line from both sides does not create a third region—it fixes and better describes the line's contours. After all, there is no "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing," *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013), since different "words sometimes express overlapping meaning, as indicated by context," *United States v. Davis*, 45 F.4th 73, 79 (D.C. Cir. 2022). Context here supplies exactly that overlap: the two slightly different clauses are complementary, not "non-interlocking," and help better explain the line between mandatory cost and

20

prohibited costs. The Durbin Amendment broadly excludes from consideration all costs that are "not specific to a particular transaction," while the inverse side of the coin provides greater detail on what *is* specific to a particular transaction—the measurable "incremental cost[s] ... of a particular electronic debit transaction." §1693*o*-2(a)(4)(B).

The Board invokes *Loughrin v. United States*, 573 U.S. 351 (2014), and *Russello v. United States*, 464 U.S. 16 (1983), to support its argument that the difference between "incremental ... particular transaction" and "specific to ... particular transaction" must imply a secret third category. But neither case resembles the statute or context that exists here. *Russello* inferred a difference in meaning where Congress used different words in parallel provisions serving parallel functions—there, two forfeiture provisions doing the same work. 464 U.S. at 23. Here, the two subsections are not parallel. They mark opposite sides of a single line. Subsection (i) tells the Board what it must consider when crafting the fee standard, while subsection (ii) tells it what it must not consider. Both sides of the line focus on whether the cost can be traced back to particular transactions, and the words differ slightly because

21

the sides of the line differ in size. Subsection (i) is a narrow inclusion; subsection (ii) a broad exclusion.

Nor does *Loughrin* help. There, different language in adjacent clauses helped clarify which conduct each subsection of the statute reached. The different language did not create a third category of conduct the statute never mentioned. *Loughrin*, 573 U.S. at 358. The Board asks this Court to treat lexical variety as an affirmative grant of authority, but *Loughrin* does not support that result.

The Board seeks to turn a modest canon of construction into a sweeping grant of authority. From the idea that "the two clauses use different language," the Board concludes that Congress silently created and affirmatively permitted a third category of costs and a third authorized form of treatment (include it if the Board finds it useful) that appears nowhere in the statute. But *Russello* at most licenses an inference about meaning, not the creation of a substantive category the text never names. Neither *Russello* nor *Loughrin* has ever been used to convert the space between an inclusion and an exclusion into a zone of agency discretion. The Board needs a clear

22

affirmative grant of authority to justify departing from the text's bifurcation. These cases do not supply it.

Finally, even if the differing words created textual tension, the canon the Board invokes yields to context. Where two clauses describe the same boundary from opposite directions—here, the line between transaction-specific costs and everything else—the surplusage and consistent-usage canons give way to the ordinary meaning the structure supplies. *See Kirtsaeng*, 568 U.S. at 540. Canons are tools of construction, not "trump[s]" over statutory design. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 462 (1993). Congress's design here is binary—costs that can be measured as incremental to a particular transaction (and are therefore specific to a particular transaction), and costs that are not specific to a particular transaction.

The proposed Intervenors' own analogies discussing non-interlocking language give the game away. They discuss a hypothetical statute supporting domestic coal and disfavoring foreign-purchased energy to ask whether the agency could still support domestic natural gas. Banks-Br.40.

23

And they also repeat an analogy from *NACS II* about a baseball card deal—handing over rookie cards, keeping cards under five years old—and note that a 1960 Killebrew, being neither, may be handed over anyway. Banks-Br.39. But both hypotheticals manufacture their "third category" by defining the two enumerated categories along *non-exhaustive* axes—rookie-versus-age, domestic-coal-versus-any-foreign-energy—so that a residual necessarily exists. Meanwhile, Congress defined §1693*o*-2(a)(4)(B)'s categories along a *single exhaustive* axis: Costs that are incremental to (therefore, measurably specific to) a particular transaction, and costs that are not specific to a particular transaction. A proposition and its negation leave no remainder—no Killebrew card, no unsupported natural gas, and no silent third category of costs for the Board to fill by discretion.

Furthermore, both of proposed Intervenors' analogies fail because they ignore the central question in an administrative-law case: whether Congress authorized the agency to act. Even if the "non-interlocking" premise were correct and the statute left some narrow category of costs unaddressed, that would establish only that Congress was silent as to those

24

costs. But statutory silence within a detailed regulatory scheme is not an affirmative delegation of authority to regulate. Silence does not empower an agency to supply whatever rule it thinks best. Rather, "silence is just that—silence." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

In this way, any gap left in the Durbin Amendment is better analogized to a situation where a homeowner hires a contractor and gives him general authority to "renovate the house," then hands over a detailed set of blueprints for renovating the kitchen and the primary suite—but with no blueprints for a new basement. If the contractor decides that the basement also needs renovation, he cannot point back to the request to "renovate the house" as permission to start knocking down basement walls. The moment the homeowner supplied specific commands for how to renovate, those commands became the measure of the authority—not the general phrase that preceded them.

So while the best reading of the Durbin Amendment is that Congress used slightly different language to better describe the two sides of the single bifurcating line, even if the language does imply some residual gap, the

25

Board lacks affirmative authority to step into that gap and supply its own rule of action.

### 3. An allegedly missing comma cannot bear the weight the Appellees place on it.

Finally, both the Board and proposed Intervenors insist that the absence of a comma before "which" in subsection (ii) makes the clause restrictive rather than descriptive. This move would make a supposed type of costs—transaction-specific-but-non-incremental costs—available for the third category. Board-Br.35-37; Banks-Br.43-44.

This restrictive "which" argument asks a comma to do the work the rest of the sentence forbids. Even on its own terms this argument fails. "[P]unctuation is [the] most fallible guide" to statutory meaning, *Clayman v. Goodman Props., Inc.*, 518 F.2d 1026, 1031 n.24 (D.C. Cir. 1973) (cleaned up), and "purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning," *U.S. Nat'l Bank of Or.*, 508 U.S. at 454-55 (cleaned up). Courts do not review statutes "as a panel of grammarians." *Flora v. United States*, 362 U.S. 145, 150 (1960). And even if they did, a grammarian's style preference

on whether to include a comma before the word "which" is a slender reed upon which to read a whole new cost-category provision into a statute.

The deeper problem is whose burden the comma argument reflects. The Board and proposed Intervenors demand grammatical perfection from Congress—in their eyes, one missing comma renders obsolete statutory text that bifurcates costs into two categories. Not only that, to the Board and proposed Intervenors, one missing comma operates as a permissive grant of authority for the agency to construct from silence a third cost category that swallows both listed categories. But Congress does not draft to the standard of a style manual, and courts do not hold it to one. Read as written, the clause excludes "other costs … not specific to a particular electronic debit transaction." The Board may not reintroduce those costs—and indeed, introduce a whole third cost category that overrides Congress's specified framework—through a stylistic comma that Congress chose to omit. *See U.S. Nat'l Bank of Or.*, 508 U.S. at 455, 462 ("[T]he evidence from the Act's punctuation" was "too weak to trump" the "overwhelming evidence from the structure, language, and subject matter.").

The Appellees' reliance on grammar manuals sharpens the point. They invoke Fowler, Strunk & White, and the Chicago Manual of Style for the convention that a "which" unpreceded by a comma introduces a restrictive clause. Board-Br.36. But a stylistic preference is not a canon of construction. If anything, their appeal to grammarians' stylistic preferences concedes Linney's Pizza's point—the Board and proposed Intervenors must depart from the statute's plain text and borrow a copyeditor's stylistic presumption because the crucial unwritten third category of costs cannot be found in that text. Here, the plain text, statutory structure, and canons of construction all point decisively in one direction. Those "traditional tools of statutory interpretation"—not Strunk & White's stylistic preferences—must carry the day in resolving this dispute. *Loper Bright*, 603 U.S. at 401.

## B. The major-questions doctrine independently confirms the statute's two-category framework.

The Durbin Amendment's plain text leaves no doubt, but if it did, the major-questions doctrine would resolve that doubt against the Board. The doctrine applies here for two independent reasons.

*First*, the Board's interpretation rewrites the statutory scheme Congress enacted. Congress did not stop after instructing the Board to establish a "reasonable and proportional" interchange fee. It then prescribed *how* the Board must do so—by distinguishing between two categories of costs, one that "shall" be considered and one that "shall not." 15 U.S.C. §1693*o*-2(a)(4)(B). Regulation II replaces that framework with one of the Board's own making—allowing recovery of a broad third category of costs Congress never identified. Agencies may not invoke broad statutory language to "make a 'radical or fundamental change' to a statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 229 (1994)).

*Second*, the doctrine applies because here the Board claims authority to regulate a question of enormous economic consequence without a clear statement from Congress. Regulation II sets interchange fees across the national debit-card system, and the *difference* between the Durbin Amendment's two-category bifurcation and the Board's atextual three-category scheme affects hundreds of billions of transactions and tens of

29

billions of dollars annually. Yet the Board grounds that major difference in economic regulation in the general phrase "reasonable and proportional," and in supposed silence between Congress's two enumerated cost categories. Congress does not delegate authority of that magnitude through implication or statutory silence. *West Virginia*, 597 U.S. at 716, 723; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

The Board responds that the major-questions doctrine is inapplicable because Linney's Pizza seeks *less* regulation, not more. Board-Br.20-21. That misunderstands the doctrine. The question is not whether Regulation II is more or less burdensome than Linney's Pizza's preferred rule—it is whether Congress clearly authorized *this* assertion of agency power. Nor does it matter that Congress authorized the Board to regulate interchange fees generally. The relevant question is whether Congress authorized the Board to discard the statute's own cost-allocation framework and substitute one of its own. That is the major policy decision the Board claims authority to make, and nothing in the Durbin Amendment clearly delegates it.

30

### C. Proposed Intervenors' alternative "reasonable return" justification appears nowhere in the Durbin Amendment.

For their part, proposed Intervenors do not defend the rule the Board actually wrote. Instead, they defend a different, theoretical rule. The Board argues that the Durbin Amendment gives it discretion to include costs the statute does not expressly prohibit. The proposed Intervenors, by contrast, argue that the statute affirmatively guarantees issuers a "reasonable return" and therefore requires interchange fees high enough to avoid a constitutional taking. *See* Banks-Br.28-31, 46-49. The Court should disregard this argument. Neither Linney's Pizza nor the Board makes that argument, meaning it's relevant to Regulation II only if the proposed Intervenors wish to file their own lawsuit to compel the Board to *raise* the transaction fee standard. In any event, their theory of a congressionally guaranteed "reasonable return" appears nowhere in the Board's rulemaking because it appears nowhere in the statute.

The Durbin Amendment repeatedly speaks in terms of "cost"—not "return," "profit," or "rate of return." It directs the Board to establish an interchange fee that is "reasonable and proportional to the *cost* incurred by

31

the issuer," 15 U.S.C. §1693*o*-2(a)(2), (a)(3)(A) (emphasis added), and then specifies which costs "shall" and "shall not" be considered, *id.* §1693*o*-2(a)(4)(B). Courts must "resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009). A statute that repeatedly speaks of matching the transaction fee standard to the measure of permissible "cost" cannot be rewritten to guarantee a "reasonable return."

That divergence between the Board and proposed Intervenors is more than an academic disagreement. It underscores the absence of any textual foundation for Regulation II. Two sophisticated parties who both purport to defend the same regulation under the same statute cannot even agree on the true source of the Board's authority. The Board locates its authority in purported discretion drawn from statutory silence. The proposed Intervenors locate the Board's authority in an unwritten guarantee of a reasonable return. If either theory were rooted in the statute's text, both the Board and the proposed Intervenors would defend the statute on the same text-based ground. Instead, each party advances different nontextual

32

defenses because neither can find support for Regulation II in the words Congress enacted.

Nor can the proposed Intervenors rescue their argument by invoking the canon of constitutional avoidance. That canon applies only where a statute is "susceptible of more than one construction" and one of those constructions would avoid a serious constitutional question. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). Neither prerequisite is satisfied here. The Durbin Amendment is not plausibly read to require a "reasonable return," and the proposed Intervenors identify no authority suggesting that Congress effects a taking merely by requiring interchange fees to be tied to an issuer's recoverable costs. Constitutional avoidance is a tool for choosing among permissible interpretations; it is not a license to add substantive terms Congress omitted. *See id.* Because the statute's two-category framework raises no serious constitutional questions, the avoidance canon is inapt.

**D.** **Each of the four challenged cost categories independently conflicts with the Durbin Amendment.**

The Board treats the four unlawful cost categories identified by Linney's Pizza as though they rise or fall on a single question: whether each category is specific to a particular electronic debit transaction. *See* Board-Br.38-50. But the Durbin Amendment imposes multiple independent limitations. Contrary to the Board's framing, Congress did not authorize the Board to recover *any* cost that bears some relationship to a transaction. Within the default fee standard, Congress authorized recovery only for the issuer's incremental costs incurred for its role in the authorization, clearance, or settlement of a particular electronic debit transaction. Meanwhile, Congress separately addressed fraud-prevention costs and network fees elsewhere in the statute. 15 U.S.C. §1693*o*-2(a)(4)(B), (a)(5), (a)(8). Each of the four challenged categories independently violates one or more of those statutory commands.

**1.** **Fixed ACS costs.**

Fixed ACS costs are not incremental ACS costs. By definition, a fixed cost does not vary with a particular transaction. *See* Fixed Cost, Black's Law

34

Dictionary (12th ed. 2024). The Board responds by arguing that the Durbin Amendment does not use the terms "fixed" or "variable." Board-Br.39. But §1693*o*-2(a)(4)(B) prohibits the consideration of all costs that are "not *specific* to a particular transaction"—language that the Board alters when it addresses whether fixed costs are "*related* to a particular transaction." Board-Br.39 (emphasis added). As even the *Chevron*-bound D.C. Circuit observed, it would be "a stretch if a shoe store claimed that the rent it pays its landlord is somehow 'specific' to a 'particular' shoe sale." *NACS II*, 746 F.3d at 489. The Board makes precisely that stretch here. The prohibition on costs that are "not specific to a particular transaction" bars the Board's decision to include fixed costs in the fee standard.

The Board also responds that fixed and variable costs are difficult to separate. *See* Board-Br.40-41. But administrative difficulty does not expand statutory authority. *See* Aplt.-Br.50. If a cost is not incremental, the Board cannot include it simply because excluding it is inconvenient. The statute requires the Board to exclude costs that are not "specific to a particular" transaction—not to redefine them.

35

### 2.   Transaction-monitoring costs.

At their core, transaction-monitoring costs are fraud-prevention costs. The Board itself has repeatedly described transaction monitoring as a fraud-prevention activity. *See* Regulation II, R.39-2, PageID#368. But Congress separately addressed fraud-prevention costs in §1693*o*-2(a)(5), creating a distinct adjustment with its own conditions and limitations. The Board cannot evade those limits by relabeling fraud-prevention costs as ordinary authorization costs and recovering them through the base interchange fee. That interpretation effectively reads §1693*o*-2(a)(5) out of the statute.

### 3.   Issuer-fraud losses.

The Board's inclusion of issuer-fraud losses fails even under the Board's own description of those costs. The Board defines these costs as losses on transactions that appeared legitimate during authorization but were "later identified as fraudulent." Board-Br.45. Even setting aside that a "loss" is not the same as a "cost," a loss that is not realized or does not exist until *after* the authorization, clearance, and settlement process has already concluded is not a cost incurred as part of authorization, clearance, or

36

settlement. It is a downstream loss, not an incremental ACS cost, and therefore falls within §1693*o*-2(a)(4)(B)(ii)'s prohibited "other costs."

### 4.    Network-processing fees.

Network-processing fees fail for two independent reasons. *First*, they are fees paid to the card network, not incremental costs of the issuer's own role in authorization, clearance, and settlement. They therefore also fall within §1693*o*-2(a)(4)(B)(ii)'s prohibited "other costs." *Second*, Congress separately prohibited network fees from being used to "circumvent or evade" the interchange-fee limitations. 15 U.S.C. §1693*o*-2(a)(8)(B)(ii). The Board cannot accomplish indirectly through the base fee what Congress expressly prohibited elsewhere.

The Board argues that network-processing fees ultimately relate to authorization, clearance, and settlement. *See* Board-Br.48-50. But that reasoning has no limiting principle. Nearly every cost associated with debit-card processing can be seen as somehow *relating* to a particular transaction. But Congress foreclosed that exact wordplay by requiring the Board to focus on costs incurred for the issuer's own role in authorization, clearance, and

37

settlement, and prohibiting costs that are "not *specific* to a particular" transaction. 15 U.S.C. §1693*o*-2(a)(4)(B)(ii). A fee paid to a third-party network is the cost of someone else's role, not the issuer's. Reading those fees back into the interchange standard would nullify the very prohibition Congress enacted.

### E. The uniform fee standard cannot be squared with the statute's definite articles.

Congress wrote the fee standard in the singular and the specific. The Board must set a fee reasonable and proportional to the cost incurred by "*the issuer*" for its role in "*a particular* … transaction," and must exclude costs "not *specific* to *a particular* … transaction." 15 U.S.C. §1693*o*-2(a)(3)(A), (a)(4)(B) (emphasis added). Congress used "particular" and "specific" three times in the operative provisions. A single, industrywide standard that applies the same fee cap to every issuer and every transaction erases those words from the statute. Regulation II's one-size-fits-all standard is not a measurement of "the" issuer's cost of "a particular" transaction. By design, it is an average that corresponds to no specific issuer and no specific transaction.

38

The Board responds by invoking *Cleveland-Cliffs Iron Co. v. ICC*, 664 F.2d 568 (6th Cir. 1981). But *Cleveland-Cliffs* involved a different statute that authorized the agency to establish ratemaking "standards" based on broad concepts like "profit" and "return." *Id.* at 586. The Durbin Amendment does the opposite. It repeatedly speaks of identifiable "costs," ties those costs to "the issuer" and "a particular" transaction, and forbids consideration of costs not "specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(2), (a)(4)(B). *Cleveland-Cliffs* undermines the Board's argument by confirming that when Congress wants an industrywide proxy, it knows how to say so clearly—but Congress here described its commands at a much more granular level of abstraction.

Nor does the singular/plural provision of 1 U.S.C. §1 or *EPA v. Calumet Shreveport Refining, LLC*, 145 S.Ct. 1735 (2025), help the Board. *Calumet* held only that the definite article is "too thin a reed" to require a singular reading "in the absence of other evidence." *Id.* at 1749. But here, the surrounding text supplies exactly that evidence. Congress referred not merely to "the issuer," but to "a particular" transaction, costs "specific to a particular" transaction,

39

and required the Board to "distinguish between" permissible and prohibited costs. Read together, those provisions rebut any default presumption under §1.

Finally, the Board says an issuer-specific standard would be administratively difficult. But administrative convenience cannot rewrite the statute. The Board itself originally proposed an issuer-specific methodology, so the problem is not impossibility but effort. Coupling Congress's command that the fee be "reasonable and proportional" with a standard tied to the costs of "the issuer" for "a particular" transaction leaves the Board discretion to manage purported transaction-specific difficulties short of abandoning that standard for an industrywide average.

Ultimately, the Board's defense reflects the same mistake that runs throughout its brief. Faced with statutory language that is repeatedly issuer- and transaction-specific, the Board chooses to ignore context and read the statute at the highest possible level of generality—even when doing so does violence to the congressional scheme. But courts must apply the statute Congress enacted, not the one that is easiest to administer.

Regulation II shuns the issuer- and transaction-specific standard Congress enacted in favor of a one-size-fits-all scheme that relies on industrywide averages. Regulation II thus exceeds the Board's statutory authority and is contrary to law.

## III.   Regulation II is independently arbitrary and capricious.

Regulation II's rewrite of the bifurcated cost regime and repeated violations of statutory authority are the primary reasons to vacate the rule. But Regulation II also independently fails arbitrary-and-capricious review, and that failure supplies a second ground for vacatur. An agency acts arbitrarily when it "rel[ies] on factors which Congress has not intended it to consider." *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (cleaned up). The Board did exactly that here. By building the fee standard on four cost categories the statute places off-limits, the Board rested its decision on considerations Congress foreclosed. A rule that runs on forbidden inputs is not merely unlawful in result; it is arbitrary in method.

The Board's own line-drawing compounds the problem. Reasoned decision making requires the agency to "articulate a satisfactory

41

explanation" and to treat like cases alike. *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Board did neither. It counted fixed equipment costs while excluding other overhead; it counted issuer fraud losses discovered after settlement while excluding conceptually parallel losses; and it never coherently explained why the costs it swept in are "specific" to a "particular" transaction when, by its own admission, several are not. *See* Aplt.-Br.59-70. "[B]are acknowledgment" of a statutory line is insufficient. *Louisiana v. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024). And internally inconsistent classifications—some non-incremental costs in, others out, with no principle to sort them—are the "hallmark of arbitrary agency action." *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 51 (D.C. Cir. 2009). That the Board could not keep its own three categories straight is itself a symptom of the deeper defect: The statute gave it two categories, and the Board created an abstract third category that swallows the first two rather than trying to determine the boundaries of any of its three categories.

Ultimately, the Board's arbitrary reasoning follows directly from its statutory error. Because the Board believed the Durbin Amendment

42

authorized it to recover any costs sufficiently related to debit transactions, it never seriously engaged with the statutory limitations Congress imposed. Rather than explaining why each challenged cost satisfies the Act's requirements, the Board justified its choices by invoking administrative convenience, practical line-drawing, and its own policy preferences. That is not reasoned decision making. *See State Farm*, 463 U.S. at 43. An agency acts arbitrarily when it fails to apply the governing statutory standard to the facts before it. Here, Regulation II's fee standard is arbitrary and capricious because the Board never meaningfully applied Congress's directives at all.

## IV. The appropriate remedy is vacatur of Regulation II.

This Court should vacate Regulation II. Vacatur is the "default" remedy for a successful APA challenge. *Kentucky*, 123 F.4th at 473. The Board's request for remand without vacatur turns on the Board recharacterizing its error as a mere failure to appropriately explain its decisions, which could be theoretically correctable on remand. *See* Board-Br.60-65. But a regulation that builds its calculations on costs Congress

43

commanded it not to consider does not reflect a fixable failure to explain. It is *ultra vires*—substantively beyond the Board's authority.

The remand-without-vacatur cases the Board cites prove Linney's Pizza's point. Each involved a rule the agency had authority to issue but had explained inadequately—a defect curable on remand by a better explanation. *See Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023). No explanation can cure the defect here, since the problem is not that the Board insufficiently explained its reasons but that the Board acted in ways the statute never authorizes. The Board cannot, on remand, explain its way into authority Congress withheld. Vacatur is the only remedy that responds to this type of violation. *Corner Post*, 603 U.S. at 832 (Kavanaugh, J., concurring). Leaving Regulation II in place while the Board reconsiders would preserve an unlawful fee standard indefinitely and convert any merits victory into a nullity.

Linney's Pizza's request for a six-month stay of vacatur is not a concession that vacatur may be withheld in this case. Rather, it is a request that will prevent short-term disruption to the payments system while the

44

Board writes a lawful rule. This is an ordinary equitable accommodation courts make when vacating a regulation. *See, e.g.*, *NACS I*, 958 F.Supp.2d at 115. The Court should therefore vacate the fee standard and order that vacatur be stayed for six months.

## CONCLUSION

Regulation II's fee standard exceeds the Board's statutory authority, is contrary to law, and is arbitrary and capricious. The Court should reverse the judgment below and vacate Regulation II's fee standard, subject to a six-month stay of vacatur.

Dated: July 13, 2026

Respectfully submitted,

Jennifer Kincaid Adams
BLACKBURN DOMENE BURCHETT
PLLC
614 W. Main Street, Suite 3000
Louisville, KY 40202
(502) 584-1600
jadams@bdblawky.com

/s/ *Tyler R. Green*
Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main St., 5th Fl.
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Bryan Weir
Frank H. Chang
Cody Ray Milner
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
bryan@consovoymccarthy.com
frank@consovoymccarthy.com
cody@consovoymccarthy.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B)—as modified by this Court's scheduling and type-limit order—because it contains 7,938 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it was prepared using Microsoft Word in 14-point Palatino Linotype font.

Dated: July 13, 2026                                              */s/ Tyler R. Green*
                                                                  Counsel for Appellant

## CERTIFICATE OF SERVICE

I filed this brief via ECF, which will email everyone requiring notice.

Dated: July 13, 2026                                              */s/ Tyler R. Green*
                                                                  Counsel for Appellant

47