**DOCKET 25-6038**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**LINNEY'S PIZZA, LLC.,**
***Plaintiff-Appellant*,**

**v.**

**BOARD OF GOVERNORS OF THE**
**FEDERAL RESERVE SYSTEM,**
***Defendant- Appellee.***

***On Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort***

***Case No. 3:22-cv-00071***

# BRIEF OF AMICI CURIAE SOUTHWEST PUBLIC POLICY INSTITUTE, TAXPAYERS PROTECTION ALLIANCE FOUNDATION, AND PINPOINT POLICY INSTITUTE IN SUPPORT OF THE BRIEF OF BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO 80202
Telephone: 303.223.1100
Facsimile: 303.223.1111

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Civil Procedure, *Amici Curiae* ("*Amici*") Southwest Public Policy Institute, Taxpayers Protection Alliance Foundation, and Pinpoint Policy Institute state that neither *Amici* have a parent corporation and that no publicly held company owns 10% or more of the stock of any *Amicus*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........ i
TABLE OF CONTENTS ........ ii
TABLE OF AUTHORITIES ........ i
INTEREST OF AMICI CURIAE ........ 1
STATUTORY TEXT ........ 2
SUMMARY OF THE ARGUMENT ........ 5
ARGUMENT ........ 7

I. THE DURBIN AMENDMENT'S PLAIN TEXT AND PURPOSE PERMIT THE INCLUSION OF NON-INCREMENTAL ACS COSTS IN INTERCHANGE TRANSACTION FEES ........ 7

A. The District Court Was Right to Conclude That the Durbin Amendment Creates Three Broad Categories of Costs ........ 7

B. The District Court's Interpretation Recognizes the Durbin Amendment's Lawful Delegation of Authority ........ 10

C. Appellant's Interpretation of A Bifurcated Cost Structure Fails Textual Analysis ........ 11

D. The District Court's Three-Cost Construction Gives Meaning to the Board's Authority to Calculate *Reasonable* and *Proportional* Costs ........ 13

E. Even If Non-Incremental ACS Costs Were Prohibited, the Proper Definition of Incremental Costs Includes Product-Specific Variable and Fixed Costs of Production ........ 15

II. APPELLANT'S READING OF THE DURBIN AMENDMENT VIOLATES THE FIFTH AMENDMENT'S TAKINGS CLAUSE ........ 17

A. Courts Should Presume Congress Does Not Intend to Violate the Constitution When It Legislates ........ 18

B. Appellant's Interpretation of the Durbin Amendment Would Constitute a Regulatory Taking and Terminate Private Economic Property Rights ........ 20

C. Any Government Price Setting Action That Prohibits Private Entities From Recouping Invested Capital Is Likely a Violation of the Fifth Amendment's Takings Clause ............................... 24

CONCLUSION ............................................................................................. 26

CERTIFICATE OF SERVICE ......................................................................... 27

CERTIFICATE OF COMPLIANCE ................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

Statutes

15 U.S. Code § 1693o-2 ........................................ 1, 3

15 U.S. Code § 1693o-2(a)(4)(B)(i) ........................................ 6, 8, 11

15 U.S. Code § 1693o-2(a)(4)(B)(ii) ........................................ 6, 8, 9, 11

15 U.S.C. § 1693o–2(a)(3)(A) ........................................ 4, 11

U.S. Const. amend. V ........................................ 14

Regulations

88 Fed. Reg. 78100 (Nov. 14, 2023) ........................................ 13, 19

76 Fed. Reg. 43,394 (July 20, 2011) ........................................ 3, 5, 6, 7, 13, 19, 20

Other Authorities

The Accounting Review, Vol. 49, No. 1 (January 1974), p. 119 ........................................ 13

The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later ........................................ 20

Zhu Wang et al., The Impact of the Durbin Amendment on Merchants: A Survey Study, Fed. Reserve Bank of Richmond Economic Quarterly (2014) ........................................ 20

## INTEREST OF AMICI CURIAE

The Southwest Public Policy Institute (SPPI) is a 501(c)(3) non-profit research institute built to explore and build on sound, data-driven policies regarding education, crime, and economics that will encourage positive change in America, particularly in the Southwest. SPPI advances better living through better policy by defending human dignity and promoting financial inclusion, fair credit, affordable housing, and economic opportunity. SPPI's research has consistently found that free-market forces ensure access to economic opportunity at all ends of the wealth spectrum, whereas government-imposed price controls impede rational economic decisions.

The Taxpayers Protection Alliance (TPA) is a non-partisan, 501(c)(3) non-profit dedicated to educating the public through the research, analysis and dissemination of information on the government's effects on the economy. TPA, through its network of taxpayers, holds politicians accountable for the effects of their policies on the size, scope, efficiency and activity of government and offer real solutions to runaway deficits and debt.

Pinpoint Policy Institute ("Pinpoint")is a nonpartisan, 501(c)(3) nonprofit educational organization dedicated to promoting and defending the essential pillars of American prosperity. Pinpoint has found that the heavy hand of government through ill-conceived legislation, burdensome regulation, and/or misguided

oversight threatens to stifle market dynamism, while parochial interests seek to reimagine the American market economy as a zero-sum game. PPI advances the cause of prosperity, offering an optimistic vision for the American economy, and vigorously defends the pillars of American excellence. To fulfill this mission, Pinpoint wages a ceaseless campaign to promote economic growth with fact-based research, policymaker education, agile communications, and public engagement.

These organizations seek to advance their missions by working with governments, business leaders, and citizens to be the conscious of wise policymaking – through solid research, engaged outreach, and compelling thought leadership.

SPPI, TPA, and Pinpoint submit this brief in support of the Appellee, the Federal Reserve Board of Governors, because the outcome of this litigation is germane to both non-profits' missions: ensuring that the government does not manipulate markets in a manner that reduces incentive for private capital investment. When price controls strip companies of the incentive to invest, everyone loses.

## STATUTORY TEXT

**15 U.S. Code § 1693o-2 - Reasonable fees and rules for payment card transactions**

(a) Reasonable interchange transaction fees for electronic debit transactions

(1) Regulatory authority over interchange transaction fees

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any interchange transaction fee that an issuer may receive or

charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection.

(2) Reasonable interchange transaction fees

The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

(3) Rulemaking required

> (A) In general
>
> The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.
>
> …

(4) Considerations; consultation

In prescribing regulations under paragraph (3)(A), the Board shall—

> (A) consider the functional similarity between—
>
> > (i) electronic debit transactions; and
> >
> > (ii) checking transactions that are required within the Federal Reserve bank system to clear at par;
>
> (B) distinguish between—
>
> > (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and
> >
> > (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

(C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

## SUMMARY OF THE ARGUMENT

This case concerns the Board of Governors of the Federal Reserve System's ("Board") Regulation II, which was promulgated in 2011 pursuant to the Durbin Amendment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1693o-2 (the "Durbin Amendment" or "Amendment").[1] Regulation II regulates, among other things, the interchange fees that debit card issuers may receive for debit card transactions to compensate them for the costs of processing such transactions. *See* Regulation II, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011). These card issuer costs are incurred during the Authorization, Clearance, and Settlement ("ACS") stages of a debit card transaction.

The District Court in *Linney's Pizza, LLC v. Board of Governors of the Federal Reserve System*, No. 3:22-cv-00071-GFVT (E.D. Ky. May 1, 2025) (mem. op. & order), correctly concluded that the Durbin Amendment permits the inclusion of certain fixed, transaction-specific costs in the setting of interchange transaction fees. This reading of the Durbin Amendment is faithful to the Amendment's plain text and broader structure. The Amendment plainly establishes three costs relevant to interchange fees: (1) incremental ACS costs tied to a specific transaction, which

[1] All parties have consented to the filing of this *amici curiae* brief. No party's counsel authored this brief in whole or in part, and no person or entity other than *amici*, their counsel, or their members made a monetary contribution intended to fund the brief's preparation or submission.

***must*** be considered; (2) non-specific costs, which ***must not*** be considered; and (3) non-incremental but transaction-specific ACS costs, which the statute mandates must be "**reasonable** and **proportional**" under 15 U.S.C. § 1693o–2(a)(3)(A).

Appellant's bifurcated reading of the Durbin Amendment, where there are two, not three categories of costs, would read several operative provisions out of the statute, including the Amendment's delegation of authority to the Board to calculate "reasonable and proportional" fees under 15 U.S.C. § 1693o–2(a)(3)(A). The District Court rightly rejected this interpretation. But even if this Court concluded that only two categories of costs exist, the costs at issue in this case should be considered incremental ACS costs and eligible for inclusion in the interchange fee.

Beyond these statutory arguments, Appellant's reading of the Durbin Amendment violates the Fifth Amendment's Takings Clause. By prohibiting recovery of transaction-specific investments, the interpretation effectively terminates economic property rights in invested capital and forces card issuers to operate at a loss. This loss is substantial, interferes with reasonable investment-backed expectations, and operates as a government-sponsored transfer of wealth from one class (debit card issuers) to another (merchants). As a result, the interpretation creates a regulatory taking while denying issuers compensation without a Fifth Amendment permissible purpose.

Because the Appellant's proposed interpretation presents these fatal constitutional flaws, and the District Court's interpretation is more faithful to the plain text of the Durbin Amendment, this Court should uphold District Court's decision. In doing so, this Court should clarify that the Durbin Amendment creates three, not two, categories of costs, and that the third, unenumerated category of reasonable and proportional costs can lawfully be included in the Board's determination of the interchange transaction fee lest a 5th Amendment taking occur.

## ARGUMENT

### I. THE DURBIN AMENDMENT'S PLAIN TEXT AND PURPOSE PERMIT THE INCLUSION OF NON-INCREMENTAL ACS COSTS IN INTERCHANGE TRANSACTION FEES

#### A. The District Court Was Right to Conclude That the Durbin Amendment Creates Three Broad Categories of Costs

As the District Court rightly concluded, the Durbin Amendment creates three categories of costs: (1) incremental ACS costs related to a particular debit card transaction, which must be considered when the Board sets the fee cap; (2) other costs incurred by issuers but are not specific to a particular debit card transaction, which must not be considered; and (3) non-incremental but still transaction-specific ACS costs. Regulation II, 76 Fed. Reg. at 43,426-27. Broadly speaking, the Durbin Amendment requires that the Board's calculated costs be reasonable and proportional, but does not say whether this third category of costs must be included.

The **first category** of costs — incremental ACS costs related to a particular debit card transaction — are the marginal costs incurred by the card issuer during ACS. A debit card transaction has three steps: authorization, clearance, and settlement. Authorization "begins when the cardholder swipes her debit card, which sends an electronic 'authorization request' to the acquirer conveying the cardholder's account information and the transaction's value," and is followed by checks concerning the sufficiency of funds and whether the transaction appears fraudulent. *NACS v. Bd. of Governors of Fed. Rsrv. Sys*., 746 F.3d 474, 478 (D.C. Cir. 2014) ("NACS II"). Clearance is "a formal request for payment sent from the merchant on the network to the issuer" and settlement "involves the actual transfer of funds from the issuer to the acquirer," (i.e. the merchant's bank) after which "the transaction has concluded." *Id*. Typically, PIN debit transactions are authorized and cleared simultaneously, while signature debit transactions require separate clearance. *Id*. The delay for signature transactions is effectively what allows some businesses — such as restaurants or hotels — to account for additional expenses like room service or a tip. *Id*. Put together, incremental ACS costs are simply the direct costs associated with the three stages described above, and the Durbin Amendment names them specifically for inclusion. The Durbin Amendment is clear–these ACS costs must be considered. 15 U.S. Code § 1693o-2(a)(4)(B)(i) ("which cost ***shall*** be considered"). Regulation II satisfies that command. 76 Fed. Reg. at 43,426.

The **second category** of costs explicitly created by the Durbin Amendment is those costs "incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S. Code § 1693o-2(a)(4)(B)(ii). These non-specific costs may not be considered. *Id*. ("which costs ***shall not*** be considered"). These costs would be those perhaps loosely associated with transactions that are not tied to a specific transaction itself. Regulation II lawfully excluded these costs from consideration in the interchange fee. 76 Fed. Reg. at 43,426.

The **third category** of costs — though not specifically named by the Durbin Amendment — is as real and operative as the first two. Given that the text specifically *includes* incremental-ACS costs, and specifically *excludes* non-specific costs, the text creates a third category: non-incremental, but still transaction-specific, ACS costs. The Durbin Amendment is silent on how the Board should approach this third category. In other words, the Board can either choose to consider, or not consider, those costs in the calculation of the interchange fee. The only limitation on the Board's authority is that the ultimate cost is reasonable and proportional. 15 U.S.C. § 1693o–2(a)(3)(A).

In Regulation II, the Board uses its delegated authority to choose to consider the third category of costs in the calculation. The Board does so by considering a number of costs in setting the fee, including: (1) fixed costs related to processing a particular transaction, such as network connectivity and software, hardware,

equipment, and labor; (2) transaction monitoring costs; (3) an allowance for fraud costs; and (4) network processing fees. 76 Fed. Reg. at 43,404, 43,429-31.

### B. The District Court's Interpretation Recognizes the Durbin Amendment's Lawful Delegation of Authority

The Durbin Amendment's clear delegation to the Board, coupled with the Amendment's silence on the third category, directly implies that Congress intended to "empower [the Board] to prescribe rules to fill up the details" of the Amendment's statutory scheme. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 395 (2024), *quoting Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed.253 (1825) (internal quotations omitted). If a statute is clearly intended to empower an agency, a court properly fulfills its role by "recognizing constitutional delegations" and "ensuring the agency has engaged in reasoned decision making." *Loper Bright*, 603 U.S. at 395 (internal citations omitted). Here, the Board is clearly empowered to implement the statutory text, *see* 15 U.S. Code § 1693o-2(a)(3)(A) ("The Board shall prescribe regulations. . ."), meaning that any gaps in the statute — such as a gap in how to treat non-incremental, but transaction-specific, ACS costs — are left for the Board to "fill up the details." *Loper*, 603 U.S. at 395.

Further, this Court, like the District Court, would be reasonable to conclude that the Durbin Amendment's silence on category three is intentional because the Amendment chose to exclude other costs. Clearly, the Amendment's drafters knew how to both require and prohibit the Board from considering different categories of

costs. *See* 15 U.S. Code § 1693o-2(a)(4)(B)(i) ("which cost ***shall*** be considered"); but see (a)(4)(B)(ii) ("costs which costs ***shall not*** be considered"). The fact that the Amendment's drafters chose silence with regards to the third category of costs is notable and must be given effect in judicial interpretation. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168-69 (2003) (recognizing that statutory silence in the face of specificity elsewhere is significant, especially when Congress has shown that it knows how to speak clearly through an associated list).

### C. Appellant's Interpretation of A Bifurcated Cost Structure Fails Textual Analysis

Textual arguments that the Durbin Amendment creates only a bifurcated cost structure — where the third category of costs either does not exist or must be excluded — are unconvincing. Appellants argue that the Durbin Amendment's command that the Board "distinguish between" the two enumerated categories bifurcates the entire world of costs into only two categories: the must-considers and the must-not-considers. *See Linney's Pizza, LLC v. Board of Governors of the Federal Reserve System*, No. 3:22-cv-00071-GFVT, at *14 (E.D. Ky. May 1, 2025) (mem. op. & order). Further, Appellants claim that the use of the word "other" before "costs" in section (a)(4)(B)(ii) further implies that the Durbin Amendment creates only two categories of costs. *Id*.

These textual arguments are faulty. The term "to distinguish" does not inherently limit the distinguishing being done to only two categories. Surely, as the

District Court concludes, one can distinguish between two, three, or even ten different categories. *See id.*; *see also NACS v. Bd. Of Governors of Fed. Rsrv. Sys.*, 958 F. Supp. 2d 85, 100 (D.D.C. 2013) (stating that to "distinguish" means to "separate into different categories or to make a distinction"). There is simply no evidence for a reading of "distinguish" that would limit the universe to only two categories; the word is far broader.

On the other hand, the word "other" — as in "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" — is bounded in its application. The word "other" is tied to the phrase that immediately follows: "costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S. Code § 1693o-2(a)(4)(B)(ii). In other words, the prohibition on "other" costs refers only to other ***non-specific*** costs, not all costs separate from incremental ACS costs. Appellant's argument effectively reads the phrase "which are not specific to a particular electronic debit transaction" entirely out of the statute by prohibiting every "other" cost (regardless of whether or not that "other" cost is specific or not). The canon against surplusage counsels against such a reading. *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013) (stating that courts prefer an "interpretation [that] gives effect to every clause and word of a statute").

The text provides no support to a reading that creates only two categories of costs. While the Amendment specifically names both incremental ACS costs (for

inclusion) and non-specific costs (for exclusion), the text functionally creates a third category: non-incremental, but still transaction-specific, ACS costs. The Amendment's silence with regards to how to treat those costs creates the legal authority for the Board to decide.

### D. The District Court's Three-Cost Construction Gives Meaning to the Board's Authority to Calculate *Reasonable* and *Proportional* Costs

The three-cost construction of the Durbin Amendment is bolstered by the broader structure of the Amendment. If the Durbin Amendment were as restrictive and mechanical as a bifurcated structure suggests (where there are only two categories of costs), there would be no need to require that the fee standard be "reasonable and proportional." 15 U.S.C. § 1693o–2(a)(3)(A). Indeed, the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)B)(i). No further analysis or calculation would be necessary.

But the Durbin Amendment's clear, plain text contemplates — and requires — a reasonability analysis. The Amendment directs the Board to promulgate regulations ensuring that "the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o–2(a)(3)(A). This delegation implies that the Board must possess some amount of leeway to determine what is reasonable and proportional. If the determination is handled by the Durbin Amendment, and only

includes incremental ACS costs, why include a Board-determined reasonability requirement? Worse yet, why delegate any authority to the Board at all?

Arguments to the contrary suffer death by surplusage. *See Marx*, 568 U.S. at 385. Proponents of the two-category-only approach would read out of the statute at least three operative phrases or sections: (1) section (a)(4)(B)(ii)'s phrase "which are not specific to a particular electronic debit transaction"; (2) the requirement that the fee standard be "reasonable and proportional"; and (3) the Board's delegated authority to promulgate regulations implementing the reasonability and proportionality requirement. That approach would leave meaningless far too much of the Durbin Amendment's clear text.

Further, since this approach was first launched over a decade ago, Congress has chosen not to step in and overrule the Board's decision finding three — rather than two — categories of costs. Taken as a whole, the District Court was right to conclude that the Durbin Amendment clearly allows the Board to consider costs it is not mandated to consider, so long as those costs are not those that the Board is prohibited from considering. The Amendment specifically names both incremental ACS costs (for inclusion) and non-specific costs (for exclusion). This creates the third category: non-incremental, but still transaction-specific, ACS costs. The Amendment's silence on how to treat those costs creates the legal authority for the Board to decide. As the District Court concluded, this reading of the Durbin

Amendment gives full effect to all of its operative terms, and further reflects the Board's clearly established role in developing the regulatory regime. *See Linney's Pizza*, No. 3:22-cv-00071-GFVT, at *18.

### E. Even If Non-Incremental ACS Costs Were Prohibited, the Proper Definition of Incremental Costs Includes Product-Specific Variable and Fixed Costs of Production

Even if the Durbin Amendment did bifurcate the world of costs into two categories, the costs challenged in this case should be read as "incremental" for the purposes of this case. To review, these challenged costs include (1) fixed costs related to processing a particular transaction, such as network connectivity and software, hardware, equipment, and labor; (2) transaction monitoring costs; (3) an allowance for fraud costs; and (4) network processing fees. 76 Fed. Reg. at 43,404, 43,429-31. As the Board itself has rightfully acknowledged, these costs fit into the common economic definition of "incremental cost." 88 Fed. Reg. 78100, 78104 (Nov. 14, 2023).

This conclusion is supported by several prominent economists and management professors. For example, distinguished economist William Baumol, a professor at Princeton and New York Universities, wrote in the Yale Journal of Regulation that "incremental cost" means "***total costs***" per additional unit produced, and noted that "marginal cost and incremental cost can differ substantially." William J Baumol and J. Gregory Sidak, "The Pricing of Inputs Sold to Competitors," Yale

Journal of Regulation, Vol. 11, No. 1 (Winter 1994), p. 176, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=289386 (emphasis added). Similarly, management professors E. Earl Burch and William R. Henry wrote in *The Accounting Review* that "incremental cost is the change in ***total cost***." E Earl Burch and William R. Henry, "Opportunity and Incremental Cost: Attempt to Define in Systems Terms: A Comment," The Accounting Review, Vol. 49, No. 1 (January 1974), p. 119, https://www.jstor.org/stable/244804 (emphasis added).

The academic work on the "incremental cost" definition matches common sense. A business — whether it is a small retailer or a bank — would not engage in any transactions if such transactions did not help defray operational costs. For example, a retailer would go under if she could not rely on her sales to pay for costs like rent, insurance, or software to manage sales. These types of costs are rightfully included in the definition of "total costs," which is rightfully included in the definition of "incremental costs." *See* Comment Letter, Debit Card Interchange Fees and Routing, Docket No. R—1818, RIN 7100-AG67, Competitive Enterprise Institute (May 12, 2024).

Rational actors are unlikely to invest capital in a regime where their pricing and profit structure do not allow it to charge fees to cover the basic operational expenses that must be recouped in increments through its sales transactions. *Amicus* in this matter are especially concerned when government price controls operate to

limit the incentive to invest in new products and services or for investments to improve existing systems.

## II. APPELLANT'S READING OF THE DURBIN AMENDMENT VIOLATES THE FIFTH AMENDMENT'S TAKINGS CLAUSE

The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. AMEND. V. The Takings Clause ensures that when the government takes property for public use — through direct seizure, condemnation actions, or permanent physical occupation — it must pay fair market value to the owner. *See United States v. Carmack*, 329 U.S. 230, 241–42 (1946). In *Armstrong v. United States*, the Supreme Court explained that the Takings Clause protects individuals from bearing public burdens alone by requiring compensation when the government appropriates private property for public benefit, regardless of the form the taking takes. 364 U.S. 40, 49 (1960).

Beyond physical appropriation, the Clause also prohibits regulatory takings. These are governmental restrictions so severe that they effectively deprive owners of their property's economic use. The leading case is *Penn Cent. Transp. Co. v. City of New York*, where the Court established a multi-factor test considering (1) economic impact, (2) investment-backed expectations, and (3) the nature of the regulation when landmark protections prevented a high-rise addition over Grand Central Terminal. 438 U.S. 104, 124, 136–37 (1978). Further, a court must also assess whether the governmental restriction is a "permissible purpose." This purpose

consideration was once limited to roads and parks, but was broadened by the Supreme Court in *Kelo v. City of New London*, which upheld takings for economic development, holding that "public use" need only mean "public purpose." 545 U.S. 469, 480–81 (2005). The Takings Clause thus prohibits the government from (1) taking private property without compensation and (2) abusing its condemnation power by appropriating property under the guise of public use when the real purpose is private benefit. Appellant's interpretation of the Durbin Amendment fails on both principles. Given that fact, this Court should not read the Amendment in a way that so clearly violates the Constitution.

### A. Courts Should Presume Congress Does Not Intend to Violate the Constitution When It Legislates

The constitutional avoidance canon instructs federal courts to resolve cases on non-constitutional grounds whenever reasonably possible, ensuring they only address constitutional issues as a strict necessity. As the Court has said, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988)

The constitutional avoidance canon is particularly enduring because it instructs courts to apply a strong presumption that Congress does not intend to legislate in a manner that violates the Constitution. This principle is rooted in the

idea that "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 500 (1979). Similarly, the Court in *Rust v. Sullivan* reaffirmed that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." 500 U.S. 173, 190 (1991), *quoting Hooper v. California*, 155 U.S. 648, 657 (1895).

This presumption reflects judicial respect for the coordinate branches and the principle that Congress is presumed to legislate within constitutional bounds unless its intent to do otherwise is unmistakably clear. *See Edward J. DeBartolo Corp.*, 485 U.S. at 575 ("[t]his approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution). Because the Appellant's reading of the Durbin Amendment would unlawfully terminate the economic property rights of private entities without compensation, it violates the Takings Clause of the Constitution. The District Court's reading better fits the plain text of the Amendment, presumes Congress intended to adhere to the Constitution, and thus avoids constitutional concerns. This Court should maintain that reading out of fidelity to the Amendment's text and the Constitution.

### B. Appellant's Interpretation of the Durbin Amendment Would Constitute a Regulatory Taking and Terminate Private Economic Property Rights

When a government regulation does not amount to a *per se* taking, such as a total deprivation of economic use, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992), or a permanent physical occupation, *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982), the *Penn Central* test described *supra* governs. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 136–37 (1978). This inquiry balances three factors: (1) the regulation's economic impact on the property owner, particularly whether it deprives the owner of a reasonable return; (2) the extent to which the regulation interferes with distinct investment-backed expectations; and (3) the character of the governmental action. *Id*.

Courts applying this standard have found takings where regulations impose severe economic burdens and frustrate reasonable expectations. For example, in *Palazzolo v. Rhode Island*, the Court found that a wetlands regulation that reduced development potential to six percent per parcel may violate the *Penn Central* test. 533 U.S. 606, 631–32 (2001) (remanding the case for further proceedings applying the Penn Central test); *see also Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 540 (2005) ("[a]nd the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests").

Appellant's reading of the Durbin Amendment violates each of *Penn Central's* three factors. To begin, the economic impact of Appellant's reading would be substantial. Under Appellant's interpretation, the Durbin Amendment does not permit entities to recover a host of costs that are specific to each and every transaction that occurs, including (1) fixed ACS costs, (2) transaction monitoring costs, (3) network processing fees, and (4) a fraud-loss adjustment based on the value of the transaction. The funds required to pay for these costs come from invested capital or retained earnings. Appellant's interpretation extinguishes private entities' right to recover and obtain a reasonable profit from this investment.

Indeed, Appellant's interpretation would effectively require debit card issuers to provide electronic transactions at a loss. As it stands now, only 77 percent of debit card issuers recover the full subset of costs that the Board deemed allowable to be considered in Regulation II. *Debit Card Interchange Fees & Routing*, Notice of Proposed Rulemaking, 88 Fed. Reg. 78,100, 78, 113 (Nov. 14, 2023). Appellant's reading would cause that number to drop further. As the number drops, more and more entities are forced to surrender their investments in electronic transfers. Any reasonable observer would call this termination of property rights "substantial." *See Penn Central*, 634 F.3d at 1178. Because of this "substantial" loss of property, this factor favors avoiding Appellant's interpretation. *See Edward J. DeBartolo Corp.*, 485 U.S. at 575.

The next *Penn Central* factor considers the investor's expectations when the capital was invested. The interchange system was designed and implemented long before government price controls were contemplated. When the Board released its interpretation of the Durbin Amendment over a decade ago (Regulation II, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011) it limited the recovery of costs such that only 77 percent of debit card issuers actually recover the full subset of costs that the Board deemed allowable to be considered in Regulation II. *Debit Card Interchange Fees & Routing*, Notice of Proposed Rulemaking, 88 Fed. Reg. 78,100, 78, 113 (Nov. 14, 2023). Thus, the cap set currently significantly lowered the fees previously charged. But Appellant's interpretation would prohibit recovery of even more costs. Entities' reasonable, investment-backed expectations are thus reduced even further. This factor also heavily favors avoiding Appellant's reading.

Finally, the character of regulatory taking here is particularly offensive. This is, simply put, a transfer of wealth from one party (card issuers) to another (merchants) with little justification in law or policy. There is no evidence to suggest that this taking will result in lower costs for consumers. A recent study found that most merchants — 77 percent of them — did not adjust their prices after the Durbin Amendment capped interchange fees. Zhu Wang et al., *The Impact of the Durbin Amendment on Merchants: A Survey Study*, Fed. Reserve Bank of Richmond

Economic Quarterly (2014). Indeed, the same study found that 22 percent of merchants actually raised their prices in the wake of the Durbin Amendment's passage. *Id*. Moreover, a 2013 study by Mastercard found that only 3 percent of merchants intended to pass on savings to consumers. MasterCard Worldwide, "Interchange and Durbin Amendment" at 2, as cited in Bradley Hubbard, "The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later" at 37, Univ. of Chi. L. Sch. (2013), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2285105.

Even if Appellant's interpretation survived the three *Penn Central* factors (it does not), the interpretation has one final flaw: the government action at issue is not a permissible purpose under the Fifth Amendment. *Penn Central*, 438 U.S. at 125. Because the Appellant's interpretation would create a regime that merely enriches one class at the expense of another, there is no generally applicable purpose advanced, and the action cannot be considered a permissible purpose under the Fifth Amendment. *Id*. at 125 (explaining that land-use regulations are generally upheld when they reflect a legitimate governmental objective, such as promoting the general welfare, preserving historic resources, or preventing harmful uses, because these actions constitute "adjustments of the benefits and burdens of economic life" rather than appropriations of private property for private gain).

Appellant's interpretation would not create a curated, targeted regulatory regime that would balance costs between private entities and consumers. Instead, the interpretation operates as a class-based taking from debit card issuers to merchants. The cost is substantial and directly conflicts with the investment-backed expectations of private parties. If the Fifth Amendment's Taking Clause is to have any meaning at all, Appellant's reading of the Durbin Amendment must be disregarded, either because the constitutional violation is avoided as an interpretive matter, or because the Amendment itself violates the Constitution if Appellant's interpretation is adopted. *See Edward J. DeBartolo Corp*., 485 U.S. at 575.

### C. Any Government Price Setting Action That Prohibits Private Entities From Recouping Invested Capital Is Likely a Violation of the Fifth Amendment's Takings Clause

In *Duquesne Light v. Barasch*, the Supreme Court affirmed the principle that a government-set "rate is too low if it is so unjust as to destroy the value of [the] property for all the purposes for which it was acquired, and in so doing practically . . . deprive[s] the owner of property without due process of law." 488 U.S. 299, 307 (1989), *quoting Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 597 (1896) (quotations omitted). Here, Appellant's reading would set the price-cap so low that the property is deprived of any meaningful value.

The Federal Circuit confronted a similar set of facts in *Cienega Gardens v. United States*. There, the Federal Circuit held that rent-control restrictions imposed

on owners of federally subsidized housing constituted a compensable taking under the *Penn Central* framework because the regulation inflicted severe economic harm and frustrated reasonable investment-backed expectations. 331 F.3d 1319, 1330–31 (Fed. Cir. 2003). The court emphasized that the economic impact was "extraordinary," reducing the properties' value by over 90 percent and eliminating any possibility of earning a reasonable return. *Id*. at 1332–33, 1343. It further found that the owners had distinct investment-backed expectations based on statutory provisions allowing prepayment of mortgages and exit from the program, which the regulation effectively nullified. *Id*. at 1344–45. Finally, the character of the government action weighed toward a taking because the regulation imposed a disproportionate burden on a small group of property owners to achieve broad social goals, rather than reflecting a general adjustment of economic benefits and burdens. *Id.* at 1350. Taken together, these factors led the court to conclude that the rent-control scheme violated the Takings Clause by appropriating economic value without just compensation.

The rent-control scheme at issue in *Cienega Gardens* is functionally equivalent to the scheme at issue here. Both are government-mandated price caps, one for rent and the other for interchange fees. Both impose "extraordinary" economic impacts by reducing the value of already-invested capital. *Id*. at 1332–33. Both violate reasonable investment-backed expectations by extinguishing value that

is statutorily protected. *See supra* Section I.B. And both impose unreasonable, unnecessary burdens on private parties in a way that is divorced from any curated economic balancing.

When the government sets prices, as it does in *Cienega Gardens* or as the Durbin Amendment does here, it must be careful to ensure that it does not deprive investors of their protected property rights. Appellant's interpretation fails to do that. Fixed ACS costs, transaction monitoring costs, network processing fees, and fraud-loss adjustments are all reasonable, necessary costs that private entities are entitled to recover. Through its interpretation of the government's price-setting action, Appellant's reading would impermissibly prohibit that recovery and violate the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this court to uphold the District Court's decision.

Dated: June 9, 2026

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: /s
Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO 80202
Telephone: 303.223.1100
Facsimile: 303.223.1111

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2026, a true and accurate copy of the foregoing was served via the Courts ECFS system via electronic filing.

Dated: June 9, 2026

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: */s/Sarah J. Auchterlonie*

Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO 80202
Telephone: 303.223.1100
Facsimile: 303.223.1111

# CERTIFICATE OF COMPLIANCE

I, Sarah Auchterlonie, attorney for *Amici Curai*, Southwest Public Policy Institute, Taxpayers Protection Alliance and Pinpoint Policy Institute , certify that:

1. This brief complies with the word limit for a principal brief under Fed. R. App. P. 32(a)(7)(B) and Eighth Circuit Local Rule 32(a).

2. This brief contains fewer than 6,368 words, excluding the items exempted by Fed. R. App. P. 32(f) (e.g., corporate disclosure statement, table of contents, table of authorities, caption, etc.).

3. The typeface and type size used in this brief comply with Fed. R. App. P. 32(a)(5) and (6).

4. This version of the amicus brief has been scanned for viruses and is virus-free.

Dated: June 9, 2026

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: */s/Sarah J. Auchterlonie*

Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO 80202
Telephone: 303.223.1100
Facsimile: 303.223.1111